# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

| | |
|---|---|
| MICHAEL AMOS, PITRELL BRISTER, ANTONIO DAVIS, WILLIE FRIEND, CHARLES GAYLES, DANIEL GUTHRIE, JONATHAN J. HAM, DESMOND HARDY, BILLY JAMES, JR., JUSTIN JAMES, QUENTEN JOHNSON, CHALLIS LEWIS, DEAUNTE LEWIS, LARRY MAXWELL, TERRANCE MCKINNEY, DERRICK PAN, BRANDON ROBERTSON, KURIAKI RILEY, DERRICK ROGERS, TYREE ROSS, H.D. ALEXANDER SCOTT, DEANGELO TAYLOR, LEMARTINE TAYLOR, CONTI TILLIS, DEMARCUS TIMMONS, CARLOS VARNADO, PHILLIP DECARLOS WEBSTER, ADRIAN WILLARD, and CURTIS WILSON, | Case No. 4:20-CV-007-DMB-JMV |

Plaintiffs,

v.

PELICIA E. HALL, in her official capacity as the Commissioner of the Mississippi Department of Corrections, and MARSHAL TURNER, in his official capacity as the Superintendent of the Mississippi State Penitentiary,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## PRELIMINARY STATEMENT

Plaintiffs are inmates at the Mississippi State Penitentiary at Parchman, Mississippi ("Parchman"), a century-old maximum security prison built on the site of a former plantation. Over the last twenty-six (26) days, eight (8) of their fellow inmates have died as a result of the inhumane and torturous conditions in which they are being held. There is no room for mistake or ambiguity: the situation at Parchman is an ongoing and lethal humanitarian crisis. Without this Court's immediate intervention, more people will die, injuries will worsen, and conditions will further deteriorate.

Plaintiffs recognize that there are people incarcerated at Parchman for due cause and that some may be considered a danger to society. We are simply asking that Plaintiffs and their fellow inmates be allowed to serve their sentences as human beings and not animals. The relief Plaintiffs seek will not lessen any prisoner's sentence by so much as a day. Nor does this Motion ask this Honorable Court to second-guess the discretionary authority of Parchman officials; commandeer the legislature's determinations as to Parchman's funding; or otherwise insert the judicial power of the United States where it does not belong. Plaintiffs ask the Court only to apply and enforce a well-established constitutional rule: that prisoners are human beings at the mercy of the State who are entitled to safe, healthy, and humane living conditions. The remedial action sought by this Motion is well within the Court's power to grant, and urgently needed if Plaintiffs' constitutional rights—and, indeed, their lives—are to be afforded basic respect.

Parchman is operating in a perpetual state of crisis, where prisoners live in barbaric and horrific conditions and their basic human rights are violated daily. Grossly inhumane conditions have cost many prisoners their health, and their sanity, and even their lives. Knowledge of these heinous conditions is and has been widespread for many years by officials at the Mississippi

Department of Corrections (MDOC). Even so, prison officials have consistently failed to take reasonable and necessary steps to protect the prisoners in their charge. In less than a month's time, since January 1, 2020, eight (8) prisoners incarcerated at Parchman have died.[1] These deaths are a direct result of Mississippi's utter disregard for the people it has incarcerated and their constitutional rights. As this State has incarcerated increasing numbers of people, it has dramatically reduced its funding of prisons. Nearly half of the prison guard slots for Mississippi's prison remain unfilled. Parchman—Mississippi's oldest prison and only maximum-security facility for males—has only *one-quarter* of the corrections officers needed.

Understaffing and lack of adequate shelter, food, and health care services exacerbates tension, stress, and competition for resources among inmates. MDOC has been incapable of protecting inmates at Parchman's chronically understaffed correctional facilities from harm in this environment, resulting in inmate assaults, deaths, and prison breaks. The unthinkable spate of recent deaths is without doubt a gross culmination of systemic neglect, continual understaffing, and utterly inhumane conditions—the impact of which is readily apparent.

For three days this week, undersigned counsel was denied access to their clients. During those three days, three more inmates died, including one by suicide while counsel was on the facility grounds. The actual conditions at Parchman, especially in Unit 29, are far more appalling and egregious than what has been reported in the media. Because MDOC has failed to provide safe and sanitary living conditions for the inmates, requisite medical care, and adequately staff

---

[1] Thomas Lee, age 49, died January 22, 2020 at MSP (Unit 29) due to suspected suicide; Timothy Hudspeth, age 35, died January 21, 2020 at MSP (presumably Unit 30) as a result of blunt force trauma; James Talley, age 36, died January 21, 2020 at MSP (presumably Unit 30) as a result of blunt force trauma; Gabriel Carmen, age 31, died January 19, 2020 at MSP (Unit 29) due to suspected suicide; A.D. Mills, age 42, died January 8, 2020 at MSP (Unit 29); Denorris Howell, age 36, died January 3, 2020 at MSP (Unit 29) as the result of multiple stab wounds; Roosevelt Holliman, age 32, died January 2, 2020 at MSP (Unit 29) as the result of multiple stab wounds; Walter Gates, age 29, died January 1, 2020 at MSP (Unit 29) as the result of multiple stab wounds.

- 3 -

and compensate correctional officers, the humanitarian crisis at Parchman is at a boiling point and will only lead to more loss of life if not addressed immediately.

## STATEMENT OF FACTS

As the Affirmations attached to the Motion at Exhibit A make clear, the most shocking issues include, but are not limited to:[2]

- Inmates in Unit 29 have not been allowed to shower since Christmas Day, December 25, 2019. *See e.g.* Exhibit A at 3, 24, 29.

- Certain inmates and Plaintiffs are being denied visits to the medical unit for daily or critical care (*Id.* at 26, 40, 46, 51); and, for some, weeks have gone-by without medication. *Id.* at 6, 26, 30, 40, 43, 45.

- There is only one guard (usually female) for each building (160 inmates) at Unit 29. *Id.* at 1, 8, 28, 33, 48.

- Rats and cockroaches crawl over inmates while they sleep and attack their food. *Id.* at 3, 4, 11, 15, 19, 25, 39, 42, 50.

- Toilets overflow with sewage which spills out and remains on the floors. *Id.* at 3, 4, 18, 24, 31, 44.

- Potable water from available sources is contaminated with human waste and brown in color. *Id.* at 3, 4, 10, 24, 49.

- Rain leaks from the roof streaming through multiple cells and causing black mold to grow on walls and surfaces where inmates sleep. *Id.* at 4, 11, 19, 25, 50.

- There are no meals at times, and sometimes only one per day. *Id.* at 3, 21, 29, 34, 49.

---

[2] *See* Exhibit A, Redacted Affirmations of Inmates at Parchman, attached to the Motion (ECF No. 13) ("Exhibit A"). Affirmations are redacted due to the extraordinary circumstances of the case and out of fear for their safety. Unredacted versions can and will be provided to this Honorable Court *en camera*.

- When served, the "food" is cold, rotten, and often containing rocks, insects, bird droppings, and rat feces. *Id.*

- Lone guards can't, and won't, enter Unit 29 buildings to prevent violence or even render much needed emergency medical assistance. *Id.* at 2, 9, 13, 17, 20, 48.

- Finally, inmates are resorting to setting fires to compel officials to enter their building and, hopefully, render life-saving care to fellow inmates who are sick and dying. *Id.* at 28, 30, 41, 45.

## ARGUMENT

### I.      Standard for Relief

It is well-established that courts should grant preliminary injunctive relief where the movant can show the following:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)). The same standard applies to both a temporary restraining order and a preliminary injunction. *Clark v. Pritchard*, 812 F.2d 991, 993 (5th Cir. 1987).

### II.     Plaintiffs Exceed the Threshold for Temporary and Preliminary Injunctive Relief

Under the circumstances of this case, Plaintiffs have more than met the threshold to justify temporary and preliminary injunctive relief from this Court.

#### A.      Plaintiffs are Substantially Likely to Prevail on the Merits and will Suffer Irreparable Harm if Relief is Not Granted

##### 1.      The Inhumane Conditions of Plaintiffs' Detention Violate the Eighth and Fourteenth Amendments

The Eighth Amendment's categorical ban on cruel and unusual punishment "prohibits the imposition of inherently barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 58 (2010) (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). This requirement has long been held to apply to the conditions of prisons and the treatment of prison inmates, and to require prison officials to respect inmates' basic rights. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Supreme Court has stated in simple terms that "[a] prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 511 (2011). At absolute minimum, the Eighth Amendment requires prison officials to provide "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care . . . [as well as] 'reasonable measures to guarantee the safety of the inmates.'" *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).[3] Conditions at Parchman have deteriorated far past this point. Indeed, the inmates—including Plaintiffs—have been systematically denied the most basic humane considerations. The Fifth Circuit and other appellate courts have repeatedly found the Eighth Amendment violations in far less egregious cases.

A claim that prison officials' conduct violates the Eighth Amendment must meet two conditions. First, the deprivation or violation at issue must be "'sufficiently serious'; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. at 834). Second, the official must have the requisite culpable state of mind: in this case, "one of deliberate indifference to inmate health or safety." *Palmer*, 193 F.3d at 352 (citing *Farmer*, 511 U.S. at 834). To establish this state of mind, a plaintiff must show that the

---

[3] The Eighth Amendment's ban on cruel and unusual punishment applies to the states via the Fourteenth Amendment. *State of Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947).

officials "(1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed." *Palmer*, 193 F.3d at 352 (quoting *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998)).

Crucially, although the test involves officials' *subjective* knowledge of the risks at issue (such that merely failing to notice a significant risk may not establish liability), the required knowledge can be *shown* by inference from circumstantial evidence, as well as the straightforward fact that the risk was obvious. *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (citing *Farmer*, 511 U.S. at 842-43). Such a finding is particularly appropriate where, as with Parchman, the risk at issue was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official had been exposed to information concerning the risk and thus 'must have known' about it . . . ." *Id.* Consequently, a plaintiff need not delve into an official's internal thoughts to establish a culpable state of mind: he or she need only present the Court with sufficient evidence that the official must have known of the excessive risk.

Both of the foregoing prongs are easily met under the circumstances. Evidence establishes beyond doubt that the privations taking place at Parchman are severe beyond any acceptable minimum standards, and certainly rise to the level of denial of the minimal civilized measure of life's necessities,' as Fifth Circuit precedent requires. *See* P. 4-5, *supra.*

### *Lack of Basic Safety and Protection from Violence*

It is well-established that prison officials' Eighth Amendment duties toward prisoners include the duty to protect them from violence, including at one another's hands. *Farmer*, 511 U.S. at 833 ("[A]s the lower courts have uniformly held, and as we have assumed, 'prison

officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'") (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Defendants and the officials at Parchman have utterly failed to do so, and their failures of protection are self-evidently severe enough to constitute an Eighth Amendment violation. There have been **eight deaths** at Parchman since January 1, 2020; and, Plaintiffs ask the Court to take judicial notice of the extraordinarily troubling and haunting accounts of violence and risk to human life contained in official reports, information releases, and statements released by State officials and agencies over the past few weeks. *See also* Exhibit A at P. 47. The State of Mississippi's failure to protect the safety and well-being of Parchman inmates under the Eighth Amendment would unquestionably withstand summary judgment under the present circumstances. *See Earrey v. Chickasaw Cty., Miss.*, 965 F.Supp. 870 (N.D. Miss. 1997) (denying summary judgment for defendants on plaintiff prisoner's claim for failure to protect under the Eighth Amendment, based on his being severely beaten without interference despite a deputy being able to "hear[] the racket" of the beating).

### Denial of Urgent Medical Care

It is beyond dispute that prisoners are entitled to provision of adequate medical care to address their needs. *Brown v. Plata*, 563 U.S. 493, 510-11 (2011). *See also* Order and Judgment of Civil Contempt, *Parsons v. Ryan*, Case No. 2:12-CV-00601-DKD (D. Ariz. June 22, 2018), ECF No. 2898 (finding Arizona state prison officials in civil contempt for repeatedly failing to meet court-imposed requirements to improve critical flaws in system providing healthcare services to inmates). Due to understaffing, lack of funding, or simple disregard for prisoners' well-being, Plaintiffs have been consistently denied necessary medical care, including needed

medications. *See Id.*; Exhibit A at 5, 12, 16, 30, 43. Each day, they grow sicker and inch closer to death.

No better evidence of this crisis exists than the fires set by some prisoners in Unit 29. They are not, as has been reported, the result of "gang-violence", but rather a last and desperate attempt to force their lone guard to enter the Unit building so that sick and dying inmates might receive emergent medical care. *See* P. 4-5, *supra.* To be clear, people are *setting fires in the locked room from which they cannot escape* in order to save their fellow inmates. A clearer indication of how serious the situation has become is difficult to imagine.

### *Critical Lack of Sanitation and Hygiene*

Prison officials also have a legal duty to provide adequate means of sanitation and hygiene. Failure to do so constitutes cruel and unusual punishment under the Eighth Amendment, particularly where it actively exposes inmates to sewage, feces, and other contaminants. *See Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) (affirming district court's finding of Eighth Amendment violation where testimony showed cells were filthy due to fecal matter, urine, other fluids, peeling and chipping paint, and food particles, and that such conditions were common and obvious); *see also Webb v. Deboo*, 423 F. App'x 299, 301 (4th Cir. Apr. 15, 2011) (prisoner stated a claim for unconstitutional prison conditions based on, inter alia, lack of sanitation); *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) (being detained for three days in feces-covered cell established a valid Eighth Amendment claim).

Prisoners described poor plumbing conditions, stating that toilets are often broken, overrun, backup and overflow. *See* P. 4-5, *supra.* They do not flush properly preventing waste disposal and causing the units to flood with sewage and smell like urine and feces. *Id.* Potable water from available sources is contaminated with human waste and brown in color. *Id.* Sewage

contamination and exposure to raw sewage is not merely unpleasant or uncomfortable: it is actively unhealthy and dangerous. The expert testimony of Debra Graham, whose sworn Declaration is attached to the Motion as Exhibit C, sets forth the many health risks associated with exposure to sewage. *See* Exhibit C at 3-6 (detailing health risks arising from exposure to sewage and human waste). These conditions are a stark violation of prison officials' duty under the Eighth Amendment to maintain basic levels of sanitation and hygiene for prisoners and the facilities in which they are held. *See*, *e.g.*, *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999) (affirming that "housing in filthy, unsanitary cells" could constitute a violation of the Eighth Amendment as a matter of law). Such conditions are a flagrant violation of Defendants' obligation to provide humane, basic sanitation for inmates. *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004).

### *Exposure to Extreme Temperatures*

The Fifth Circuit has repeatedly and unambiguously held that prison conditions that expose inmates to extreme temperatures—whether heat or cold—are severe enough to violate the Eighth Amendment. *See Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (" We have held that exposing an inmate to extreme cell temperatures can constitute cruel and unusual punishment.") (collecting cases); *Beck v. Lynaugh*, 842 F.2d 759, 761 (5th Cir. 1988) (finding that prisoners stated valid Eighth Amendment claim for detention over the winter in cells missing window panes, without blankets or coats).

Parchman is utterly without sufficient means to protect the inmates from extreme cold. The heat in Unit 29 is not functioning; blankets have not been made available since November 2019; and the building itself cannot retain heat or keep out conditions that worsen the cold, because the windows do not close, there are holes in the walls (allowing in wind and rain), and

the ceilings leak when it rains. *See e.g.* Exhibit A at 4, 22, 25. As the Court is well aware, it is late January as of the time of filing, and near-freezing temperatures at night are common.

Such facts are more than sufficient to establish an Eighth Amendment violation. In *Palmer v. Johnson*, 193 F.3d 246 (5th Cir. 1999), the Fifth Circuit found such a violation where officials forced several dozen inmates to sleep outdoors in the open for a night without blankets or jackets, while "the temperature fell below fifty-nine degrees Fahrenheit." *Id.* at 349. Here, Plaintiffs have been exposed to much lower temperatures, and that repeatedly for weeks or months rather than a single night. *See e.g.* Exhibit A at 4, 22, and 25. Plaintiffs do not have blankets or other means of keeping warm, any more than the prisoners in *Palmer* did. Plaintiffs' being held in their cells rather than sleeping outside as in *Palmer* is irrelevant: because the cells lack artificial heating and cannot keep out the cold or the elements, Plaintiffs might as well be outside for all the protection they have. In short, since the facts of *Palmer* sufficed to violate the Eighth Amendment, the much longer exposure to cold in this case *a fortiori* is unconstitutional as well. It bears noting, furthermore, that the Fifth Circuit's established position that exposure to extreme temperatures is cruel and unusual is consistent with that of its sister circuits. *See Dixon v. Godinez*, 114 F.3d 640 (7th Cir. 1997) (finding Eighth Amendment violation on the basis of excessive cold where inmates had inadequate heating and had to rely on standard clothing in conditions where the average temperature was forty degrees for prolonged periods); *Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (reversing district court's finding that plaintiff had not stated an Eighth Amendment claim based on exposure to extreme cold).

### Food Unfit for Human Consumption

The Supreme Court has unambiguously confirmed that prisons are responsible for providing food, among other basic necessities, to their inmates. *Brown v. Plata*, 563 U.S. 493,

510-11 (2011) ("Prisoners are dependent on the State for food, clothing, and necessary medical care. . . . A prison that deprives prisoners of basic sustenance . . . is incompatible with the concept of human dignity and has no place in civilized society."). *See* P. 4-5, *supra*. At Parchman, there are no meals at times, and sometimes only one per day. When finally delivered, the "food" is cold, rotten, and often containing rocks, insects, bird droppings, and rat feces. *Id.*

Any one of the above categories suffices to establish that conditions at Parchman are severe enough to violate the Eighth Amendment. Together, they are mutually reinforcing: courts must consider inadequate prison conditions in their entirety, not piecemeal. *See Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (stating that untenable conditions may establish an Eighth Amendment violation even if each would not do so in isolation if they have a mutually-reinforcing effect, *e.g.* low cell temperatures coupled with lack of blankets).

Moreover, the facts establish that prison officials are fully and subjectively aware of the facts regarding conditions at Parchman. First, the evidence makes clear that inmates have alerted guards and other officials to their specific grievances many times, to no avail, or that guards have personally been present when violations have occurred. *See e.g.* Exhibit A at 7, 27. Indeed, prisoners have worked in good faith—it bears repeating, under incredibly difficult conditions—to submit grievances through the Administrative Remedy Program and thus alert the appropriate officials to the grave problems taking place. *Id.* Yet, the complete breakdown in the systems at Parchman has rendered that process completely unavailable and inaccessible. *Id.* Second, the facts are clear that the unconstitutional conditions at issue are obvious, unmistakable, and plain. Pervasive black mold, rat and roach infestations, and a lack of heating systems are conditions that prison officials—including Defendants—could not possibly fail to notice. *See* P. 4-5, *supra*. Similarly, Defendants certainly know that inmates are at extreme risk of assault or murder from

other inmates, given the numerous recent killings at Parchman. Consequently, Defendants, as prison officials, have the requisite culpable state of mind to satisfy the second prong of Plaintiffs' Eighth Amendment claim.

In short, Plaintiffs have shown that the conditions at Parchman are not only cruel and unusual under the Eighth Amendment, but actively and acutely dangerous in multiple ways— from freezing cold to contaminated water to lack of medical care. *See* P. 4-5, *supra.* For the purposes of this Motion, it is plain that the totality of the circumstances and conditions at Parchman are causing, and will cause, Plaintiffs to suffer irreparable harm absent immediate relief.

**B. The Harm Plaintiffs Face if Injunctive Relief is Not Granted Significantly Outweighs Any Prejudice to Defendants**

As noted above, Plaintiffs are being held in unconscionable conditions in violation of the Eighth Amendment. *See* P. 4-5, *supra.* Deaths, including murder, suicide, and upon information and belief, deaths by sickness alone, have been a regular occurrence for weeks as a direct result. Even those whose lives are not in acute danger face ongoing threats to health and safety, and unconstitutionally harsh living conditions in general, as a result of factors such as the extreme cold, the long-standing exposure to raw sewage, the inedible food, and the lack of medical care, to name a few. *Id.* At an absolute minimum, it is a truism that Plaintiffs have a constitutional right not to be held in conditions that violate the Constitution, and that right will continue to be violated if this Court does not grant relief. Every additional minute Plaintiffs spend in these unconstitutional and unbearable conditions is prejudicial.

No countervailing prejudice to Defendants would occur as a result of granting the Motion, and even if it did, it could not conceivably outweigh the immense prejudice that Plaintiffs will suffer if this Court denies relief. *See*, *e.g.*, *Rufo v. Inmates of Suffolk Cty. Jail*, 502

U.S. 367, 396 (1992) ("the lack of resources can never excuse a failure to obey constitutional requirements"); *Henderson v. Stadler*, 112 F.Supp.2d 589, 602 (E.D. La. 2000), *overruled on other grounds*, 287 F.3d 374 (5th Cir. 2002) (injury to constitutional rights outweighs monetary costs).

It is true that restoring Parchman to humane conditions could entail significant expense and time. But that is not what is before the Court. The most immediate priority for Plaintiffs is that an impartial and reliable figure, unaffiliated with the state government or prison administration, be able to see conditions at Parchman firsthand and unvarnished and decide on appropriate next steps, and that Plaintiffs be able to meet with their attorneys.

## C.    Injunctive Relief Will Serve the Public Interest

Finally, it is readily apparent that the relief Plaintiffs seek will promote the public interest. By definition, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012), and upholding injunction). Furthermore, the public has a straightforward interest in ensuring that taxpayer-funded prisons are run humanely and in a manner consistent with the Constitution. As such, granting the requested relief will vindicate the public interest.

## III.    Plaintiffs Are Indigent Prisoners and Should Not Be Required to Post a Bond

Rule 65(c) of the Federal Rules of Civil Procedure, pursuant to which this Motion is brought, ordinarily requires that movants seeking a preliminary injunction post security "in an amount the Court considers proper" before the injunction may be issued. However, the amount of such a bond is fully within the discretion of the Court, which is free to require no such bond at all if the situation warrants. *See*, *e.g.*, *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d

- 14 -

300, 302-303 (5th Cir. 1978) (cited approvingly in *Gordon v. City of Houston, Texas*, 2015 WL
138115, at *16 (S.D. Tex. January 9, 2015)). Plaintiffs in this matter are indigent and do not
have the resources to post a bond. Accordingly, Plaintiffs respectfully request that the Court
exercise its broad discretion to waive posting security as to this Motion, or alternatively, impose
a purely nominal bond.

## IV.  Relief Requested

Because the unconstitutional conditions at the prison are pervasive, diverse, and
longstanding, Plaintiffs must ask this Court to craft a multi-faceted injunction to fully and fairly
address the needs of this case.

### A.  Evidentiary Hearing at Parchman

First and most immediately, Plaintiffs ask that, upon such notice to Defendants as it may
deem appropriate, the Court hold an evidentiary hearing on the record at Parchman itself so that
the Court may speak with inmates in person and inspect the facilities. Despite the best efforts of
Plaintiffs' counsel to convey the situation at Parchman, it is impossible to accurately represent
the state of the prison in writing. An accurate picture requires in-person inspection.

Though the request may seem unusual, at least one district court recently applied
precisely this remedy in extremely similar circumstances. In *Federal Defenders of New York,
Inc. v. Federal Bureau of Prisons*, Case No. 19-CV-660 (E.D.N.Y. Feb. 4, 2019), plaintiffs
sought emergency relief on behalf of their clients detained at the Metropolitan Detention Center
("MDC") in Brooklyn, New York, after access to counsel had been restricted for days. *Id.*, ECF
No. 1 (complaint alleging Sixth Amendment violations due to detainees' prevention from
meeting with counsel), 5 (memorandum in support of temporary injunction). Although facts
were initially confused, it first became clear that the MDC had suffered a power outage, then that

conditions at the prison had become intolerable due to the lack of power. Attorneys learned that inmates were not only cut off from counsel, but their cells were without heat or hot water, and they lacked laundry service, electric lights, and access to the commissary. *See Id.*, ECF No. 7 at ¶¶ 8-11 (attorney affirmation describing status of detainees). Notably, officials from the Federal Bureau of Prisons consistently either refused to confirm the situation or suggested that the inmates were lying about conditions. *Id.* at ¶¶ 12-18. Nevertheless, District Judge LaShann Hall granted emergency relief in that case the same day it was sought, restoring counsel's access to clients. *Id.*, ECF No. 9 (Memorandum and Order granting temporary injunctive relief). The following day, in light of the ongoing dispute over conditions at MDC, District Judge for the Southern District of New York Analisa Torres adjourned an evidentiary hearing in two parallel cases, *U.S. v. Segura-Genao*, Case No. 18-CR-219, and *U.S. v. Perez*, No. 17-CR-513, in order to visit the MDC in person. A true and correct copy of the transcript of the evidentiary hearing held at the MDC is attached to the Motion as Exhibit B.

Judge Torres' inspection, conducted fully on the record and including numerous conversations with inmates at the MDC confirmed that, contrary to the Bureau of Prisons' assurances, conditions at the MDC were unacceptable. At the height of winter, inmates were without power and heat, and prisoners' medical needs had gone ignored by prison officials for days or weeks. *See*, *e.g.*, Exhibit B at 176:1-23 (prisoner with colitis and mental health issues was denied medical care for bleeding rash). The MDC facility itself was in disrepair in places, due to factors such as ongoing water leaks. *Id.* at 170:1-4. Conditions are comparable at Parchman if not worse, and similar relief is therefore called for. *See* P. 4-5, *supra.* This Court must examine the prison in person if it is to gain a full understanding of the circumstances.

Plaintiffs stress that this is not intended to sway the Court or introduce emotional elements into its judgment. Rather, Plaintiffs submit that this Court not only has the right and ability to inspect Parchman, but that doing so is necessary for the Court's full and accurate review of the facts. Moreover, review of the state of the prison and inmates by an impartial arbiter is not prejudicial to Defendants: they do not stand to bear any burden or expense as a result, nor is it inherently unfair for the Court to see the facilities Defendants are responsible for firsthand.

### B.  Appointment of a Special Master or Independent Special Monitor

Following the Court's in-person examination of Parchman, the Court should appoint an appropriate special master or independent special monitor to assume control of day-to-day operations. Such an individual should be able to step into the shoes of the warden, with all corresponding power to make the changes required to render Parchman livable, or at a minimum, remove Plaintiffs from their life-threatening conditions. The Mississippi Department of Corrections and the current administration of Parchman is responsible for the state of the prison, and there is no indication that they have the resources, energy, or inclination to correct it. Third-party intervention is critical if conditions are to be restored to a livable minimum.

As the Fifth Circuit recently reaffirmed, a district court's power to appoint a special master is rooted in its "inherent authority in fashioning equitable remedies." *Moore ex rel. Moore v. Tangipahoa Parish Sch. Bd.*, 912 F.3d 247, 250 (5th Cir. 2018) (quoting *Moore v. Tangipahoa Parish Sch. Bd.*, 843 F.3d 198, 201 (5th Cir. 2016)). That power is shaped by Rule 53 of the Federal Rules of Civil Procedure, and in the specific context of prison litigation, by 18 U.S.C. § 3626. Those provisions do not counsel against the appointment of a special master in

this case, let alone prohibit it. On the contrary: case law is clear that the situation in this case is ideally suited for the appointment of a special master.

First, Rule 53 is no obstacle to Plaintiffs' request. As relevant here, it requires only that appointment be warranted by "some exceptional condition[,]" or that the special master "address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district[,]" and that the parties first be given notice and an opportunity to be heard. Fed. R. Civ. P. 53(a) & (b)(1). The life-threatening crisis of conditions at Parchman is indisputably an "exceptional condition." *See* P. 4-5, *supra*. Further, a special master would be better positioned than the Court to take prompt action as needed to ensure Plaintiffs' safety and health while this lawsuit proceeds, particularly given the Court's many competing concerns and limited judicial resources. Plaintiffs have no objection to Defendants' notice of this request nor their being heard on the matter. Thus, Plaintiffs' request complies fully with Rule 53.

18 U.S.C. § 3626, likewise, does not weigh against the appointment of a special master in this case. As a threshold matter, the subsection governing special masters in particular begins with a reaffirmation that the court has broad discretion to appoint a special master where circumstances merit.[4] Plaintiffs do not dispute that the same statute cabins the Court's otherwise-broad discretion to particular circumstances: both prospective relief and preliminary injunctive relief in an action concerning prison conditions must be tailored to correct specific violations of specific plaintiffs' rights. *See* 18 U.S.C. § 3626(a). But Plaintiffs' request is entirely consistent with this requirement. The appointment of a special master with specified powers to cure Plaintiffs' unconstitutional conditions at Parchman entails a clear and limited

---

[4] *See* 18 U.S.C. § 3626(f)(1)(A) ("In any civil action in a Federal court with respect to prison conditions, the court may appoint a special master . . . to conduct hearings on the record and prepare proposed findings of fact."); *see also U.S. v. Dillman*, 15 F.3d 384, 389 (5th Cir. 1994) ("The word 'may' [in Fed. R. Crim. P. 15(a)] signifies that the district court retains broad discretion . . . .").

mission; does not overreach into unnecessary relief for prisoners elsewhere; and is the least intrusive and most efficient way of vindicating Plaintiffs' Eighth Amendment and Sixth Amendment rights with the urgency required. It would be more unusual, more burdensome, less workable, and less effective if, for instance, this Court attempted to manage the necessary improvement in Plaintiffs' conditions itself, by direct injunctions.

Case law confirms that appointment of a special master in a case such as this one is entirely proper. Courts faced with litigation over prison conditions have a long history of appointing special masters.[5] The Prison Litigation Reform Act ("PLRA") imposed limits on the practice, but as noted above, the statute explicitly confirms that district courts retain discretion to appoint a special master as long as the appropriate conditions are met. *See* 18 U.S.C. § 3626(f)(1)(A). Likewise, the Supreme Court has confirmed that where courts are faced with unconstitutional prison conditions, appointment of special masters and receivers remain appropriate remedies. *Brown v. Plata*, 563 U.S. 493, 211 (2011); *see also id.* at 526 ("The PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations.").

The appointment of special masters in prison litigation continues to be familiar in this Circuit after the PLRA; *see*, *e.g.*, *Ball v. Leblanc*, Civil Action No. 13-00368-BAJ-SCR, 2015 WL 4454779, at *2 (M.D. La. July 20, 2015). Moreover, although Plaintiffs' research has not disclosed an appellate case in which the Fifth Circuit expressly blessed the use of a special

---

[5] *See*, *e.g.*, *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982), *amended in part and vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982) (per curiam); *Union Cty. Jail Inmates v. Di Buono*, 713 F.2d 984, 988 (3d Cir. 1983); *Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1998); *see also Gary W. v. Louisiana*, 61 F.2d 240, 244-45 (5th Cir. 1979) (affirming district court's appointment of special master overseeing injunctive relief for children institutionalized by the state).

master in post-PLRA prison litigation, many of its sister circuits have.[6]  In particular, the Third

Circuit recently noted that prison oversight remains the quintessential role for a special master.

*Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 939 F.3d 567, 589 (3d Cir. 2019).  In

short, both courts' historic and recent practices and the express dictates of appellate courts,

including the nation's highest court, make it clear that a special master remains within a court's

discretion to grant as an appropriate remedy—and at times, a necessary one.

This is just such a case.  As set forth above and in the Affirmations at Exhibit A to the

Motion, conditions at Parchman are not only unconstitutional, they are lethal.  Inmates are dying

at an appalling rate, and there is every indication that they will continue to do so without targeted

emergency action—by someone other than Defendants, who are responsible for conditions at

Parchman in the first place.  Plaintiffs respectfully submit that this Court does not have the

institutional capacity, resources, or time to undertake such action itself.  A special master with

tailored authority, by contrast, would be able to focus entirely on the task at hand, and act

quickly and appropriately.  No lesser remedy will suffice to stop the deaths and torturous

conditions that are the basis for this Motion.

In the alternative, if the Court deems appointment of a special master to be inappropriate

at this juncture, Plaintiffs respectfully urge that the Court appoint an independent special

monitor.  The difference is not semantic: an independent special monitor would have less power

to effect immediate change—hence Plaintiffs submit that a special master is the appropriate

remedy—but would at least provide neutral and close oversight of conditions at Parchman.

Moreover, because an independent special monitor has a distinct role from a special master, it

---

[6] *See In re Bayside Prison Litig.*, 477 F. App'x 16, 17 (3d Cir. Apr. 17, 2012); *Montez v. Hickenlooper*, 640 F.3d 1126, 1129 (10th Cir. 2011); *see also Armstrong v. Brown*, 768 F.3d 975, 988 (9th Cir. 2014) ("We also note that the PLRA itself provides for the appointment of a special master in any civil action in a Federal court with respect to prison conditions . . . .") (citing 18 U.S.C. § 2626(f)) (internal punctuation omitted).

has been held not to be subject to the same restrictions imposed on special masters by the PLRA. *See Handberry v. Thompson*, 446 F.3d 335, 351-52 (2d Cir. 2006).

Defendants have not yet filed responsive pleadings in this matter, nor has counsel entered an appearance. In order to comply with the Court's Order dated January 24, 2020 (ECF No. 12), upon completion of service, Plaintiffs will file a supplemental certificate of service detailing their efforts and confirming the time at which service was effected.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that this Honorable Court grant the instant Motion and provide the relief sought herein and any other such relief that the Court deems to be just and appropriate under the circumstances.

Date: January 24, 2020

Respectfully submitted,

*/s/ Marcy B. Croft*
Marcy B. Croft (MS Bar #10864)
Carson Thurman (MS Bar #104871)
MARON MARVEL BRADLEY ANDERSON
& TARDY LLC
200 South Lamar Street
Jackson, MS 39201
Telephone: (601) 960-8630
Telefax: (601) 206-0119
***ATTORNEY FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 24, 2020, a copy of the foregoing pleading was filed electronically with the Clerk of the Court using the CM/ECF system. Defendants have not yet filed responsive pleadings in this matter. Therefore, Plaintiffs are undertaking the following steps to effect service: (1) contemporaneous with filing, Plaintiffs will transmit the motion papers to counsel for Defendants, Lynn Fitch, the Attorney General for the State of Mississippi, via electronic mail at her official email address; and, (2) Plaintiffs will attempt to personally serve Attorney General Fitch with true and correct copies of the motion papers at both her workplace and her home. In order to comply with the Court's Order dated January 24, 2020 (ECF No. 12), upon completion of service, Plaintiffs will file a supplemental certificate of service detailing their efforts and confirming the time at which service was effected.

  */s/ Marcy B. Croft*                     
Marcy B. Croft (MS Bar #10864)