UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

| | |
|---|---|
| MICHAEL AMOS, PITRELL BRISTER, ANTONIO DAVIS, WILLIE FRIEND, CHARLES GAYLES, DANIEL GUTHRIE, JONATHAN J. HAM, DESMOND HARDY, BILLY JAMES, JR., JUSTIN JAMES, QUENTEN JOHNSON, DEAUNTE LEWIS, LARRY MAXWELL, TERRANCE MCKINNEY, DERRICK PAN, BRANDON ROBERTSON, KURIAKI RILEY, DERRICK ROGERS, TYREE ROSS, H.D. ALEXANDER SCOTT, DEANGELO TAYLOR, LEMARTINE TAYLOR, CONTI TILLIS, DEMARCUS TIMMONS, CARLOS VARNADO, PHILLIP DECARLOS WEBSTER, ADRIAN WILLARD, CURTIS WILSON, CALEB BUCKNER, WILLIAM GREEN, ARIC JOHNSON, IVERY MOORE, and KEVIN THOMAS, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOMMY TAYLOR, in his official capacity as the Interim Commissioner of the Mississippi Department of Corrections, and MARSHAL TURNER, in his official capacity as the Superintendent of the Mississippi State Penitentiary,<br><br>Defendants. | Case No. 4:20-CV-007-DMB-JMV |

**MEMORANDUM IN SUPPORT OF LEAD PLAINTIFFS'
MOTION TO COMPEL EXPEDITED DISCOVERY**

1

Lead Plaintiffs respectfully submit this Memorandum in Support of Lead Plaintiffs' Motion to Compel Expedited Discovery pursuant to the Court's order dated January 31, 2020 [Dkt #37], Rule 37 of the Federal Rules of Civil Procedure and Rule 37 of the Local Uniform Civil Rules of the United States District Courts for the Northern and Southern Districts of Mississippi.[1]

**Introduction**

On January 29, 2020, the Court conducted a telephonic status conference with the Parties. During the conference, the Court determined that a more developed factual record is necessary before the Court can address properly Lead Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") [Dkt #20]. Given the exigent nature of the Motion, the Court allowed the Parties to forego formal discovery requests and ordered Lead Plaintiffs to provide Defendants a written description of the types of facts needed to "flesh out" allegations against Defendants. Defendants were to respond to these requested categories of information and confer with Lead Plaintiffs by 4:00 p.m. the following day, January 30, 2020. The Court's stated intention during the telephonic conference was for Lead Plaintiffs and Defendants to act in good faith attempting to agree on most of the informal discovery required to present the Court with a complete factual record.

Shortly after the telephonic conference with the Court, Lead Plaintiffs forwarded Defendants their initial fact-finding request seeking generally: (1) access for a third-party medical provider to conduct medical assessments of the inmates in Unit 29 at Parchman to document their medical condition; (2) a streamlined process to complete inmate interviews in order to document

---

[1] In lieu of a Good Faith Certificate, when "a party fails to cooperate in the attempt to resolve a discovery dispute," L.U. Civ. R. 37(a) requires the moving party to execute an affidavit or 28 U.S.C. § 1746 declaration" attesting to the failure to cooperate. [Croft Declaration, Ex. A].

inmate testimony; and (3) escorted access inside the prison for Lead Plaintiffs' experts and video crew to document conditions. Specifically, the request states:

> a. Access for a third-party medical team of our selection to immediately triage and conduct medical assessments of all inmates presently in Unit 29 (and anyone transferred from Unit 29 since the filing of our motion). Assessments would take place in the old gym of Unit 29. Medical teams will consist of insured, Mississippi licensed NPs, EMTs, MDs, and private security. There will be two triage stations utilizing EMTs to take vital signs and past medical history. There will be ten (10) Assessment Stations utilizing MDs/NPs to perform (1) a focused physical exam based on triage findings and immediate complaints or needs, and (2) simple wound care. All supplies, exam tables, and any other materials needed for the work will be provided. This process would start on Monday, January 31, and will extend until all Unit 29 inmates have been assessed. Our clients will pay all costs and expenses related to the assessments.
>
> b. Stream-lined access for our attorneys and staff to complete our inmate interviews in all Units where they are housed including, but not limited to, Unit 29, Unit 30, Unit 26, and Unit 42.
>
> c. Access for our experts and video crew to inspect and document all areas of Unit 29, Unit 30, Unit 26, Unit 28, Unit 30 [sic], Unit 31, and Unit 42. Starting on Friday, January 31. This access is to extend for a period of ten (10) days, through February 10.[2]

*See* Email from M. Croft to T. Jones, dated January 29, 2020, at 7:34 p.m. [Ex. B].

On Thursday, January 30 at 10:38 a.m., Lead Plaintiffs' Counsel contacted Defense Counsel stating "we haven't heard from you guys. Is there time we can talk? I'm on my cell phone all day…." *See* composite exhibit of emails between M. Croft and T. Jones [Ex. F]. Then at 11:43 a.m., Lead Plaintiffs' Counsel again contacted Defense Counsel stating, "[w]e haven't heard from anyone since we sent our proposal yesterday. Is there a particular time you are available to discuss?" *Id*. Defense Counsel responded saying, "I'll call you early afternoon." *Id*.

---

[2] Additionally, Lead Plaintiffs asked Defendants permission to bring each inmate at Parchman a care package containing "desperately needed supplies like soap, [bottled] water, socks, blankets, etc. Again, all at our clients' expense." *Id*. *See* Email from M. Croft to T. Jones, dated January 29, 2020, at 7:34 p.m. [Ex. B].

At 1:42 p.m., Lead Plaintiffs' Counsel sent yet another email stating, "It's almost 2:00 and we haven't heard from you guys.  We are going to need some time to confer once we receive and consider your response before we report to the Judge at 4:00 p.m.  Could you please give us an update on when you will be able to provide a response to our initial requests?" *Id*.  Finally, at 2:45 p.m., a mere hour and fifteen minutes before the Court's deadline, Lead Plaintiffs' Counsel was informed that Defendants would not be responding to the proposal at all.  No objections, no comments, no agreement in principle with details to work out; simply nothing.

Stated differently, in the 24 hours afforded by the Court, Defendants could not decide whether free medical assessments for the inmates and basic wound care were something the State, which struggles with prison funding annually, could accept.  Nor could Defendants and their lawyers decide whether to cooperate with Plaintiffs' Counsel to provide streamlined access to their clients or to allow Lead Plaintiffs' experts access to the facility to document conditions.[3]

After refusing to respond at all, Defense Counsel sent the Court an email claiming that Defendants "have conferred with plaintiffs' counsel …, and unfortunately we have not been able yet to reach an agreement concerning the scope and duration of fact finding."  *See* composite exhibit of emails between M. Croft and T. Jones re: Defendants' response to discovery [Ex. F]. Defense Counsel's email implies that the Parties' respective positions were discussed in good faith, but there simply was no room for agreement.  This was not the case.  There was no response from Defendants, there was no discussion, and there was no attempt at agreement.

---

[3] Recall, Defendants have asserted repeatedly, and supported that assertion with affidavits under oath, that conditions inside Parchman, generally, and Unit 29, specifically, are not nearly as bad as alleged and, in fact, have improved. *See* Mallett Declaration, Ex. C, ¶ 7; Sprayberry Declaration, Ex. D, ¶ 6; and Sean Smith Declaration, Ex. E, ¶ 10. Yet, Defendants have gone to great lengths, including thwarting the Court's informal discovery effort, to prevent Lead Plaintiffs from discovering the actual conditions within the prison.

On Friday, January 31, 2020, Lead Plaintiffs learned why Defendants sought to delay the Court's informal discovery. The very day Lead Plaintiffs had planned to begin documenting the conditions inside the prison by video, inmate work crews were observed making hasty repairs inside Unit 29. [Austin Declaration re: repairs, Ex. G]. Moreover, Defendants used their delay to bring their own lawyers, including the Mississippi Attorney General, to Parchman - accompanied by a full tactical security detail - to observe, presumably for the first time, the conditions at Unit 29.[4]

Sadly, while Defendants were working to conceal the conditions inside Parchman, another inmate attempted suicide at Unit 29. As the work crews were painting and plastering over evidence, and the Attorney General and her entourage were taking the tour, yet another young man hanged himself at Parchman.[5] [Austin Declaration re: hanging, Ex. H].

## Legal Standard

It is hornbook law that, as a threshold matter, a district court has broad discretion in all matters related to discovery. *See Moore v. CITGO Refining & Chem. Co., L.P.*, 735 F.3d 309, 315 (5th Cir. 2013) (citing *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000)). Rule 37 of the Federal Rules of Civil Procedure applies this wide discretion to the particular context of a party's failure to provide appropriate disclosure or discovery. Specifically, Rule 37 provides that upon motion, the Court may compel disclosure or discovery where a party has failed to provide it. Fed. R. Civ. P. 37(a)(1). In such a case, "an evasive or incomplete disclosure, answer, or response" is to be treated as a failure to respond altogether. Fed. R. Civ. P. 37(a)(4).

---

[4] On January 29, 2020, Lead Plaintiffs sent Defendants, through Counsel, a spoliation letter instructing Defendants to preserve photographically the conditions inside the prison if any repairs are made. [Spoliation Letter, Ex. I].

[5] The young man's suicide attempt was unsuccessful. He was "cut down" by a Mississippi state trooper, and his identity (and whether he is a client of undersigned counsel), his whereabouts and his condition are unknown to Lead Plaintiffs. [Austin Declaration re: hanging, attached as Ex. H].

Rule 26 informs the scope of the Rule 37 power to compel, by defining what is subject to discovery. Familiarly, "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case" is discoverable. Fed. R. Civ. P. 26(b)(1). The Court may, therefore, compel disclosure or discovery of any matter which meets this highly permissive condition.

Motions to compel are ordinarily based on a party's failure to respond to specific forms of discovery requests and should set forth each specific request to which the motion is addressed. *See* Fed. R. Civ. P. 37(a)(3); *see also* N.D. Miss. Civ. R. 37(b). However, this Motion comes before the Court in an unusual posture. Because this Motion is filed pursuant to the Court's Jan. 31, 2020 Order (ECF No. 31) in connection with Plaintiffs' motion for temporary and preliminary injunctive relief, and formal exchanges of discovery requests have not yet taken place, Plaintiffs instead cite herein the informal requests for disclosure, discovery, and inspection that have been exchanged to date.

Courts also enjoy discretion to grant expedited discovery where the circumstances warrant. Neither Fifth Circuit precedent, a decision of this Court, nor the Federal Rules of Civil Procedure dictate the standard. However, the majority of courts in the Fifth Circuit require the party seeking accelerated discovery to show "good cause" for it. *See*, *e.g.*, *ELargo Holdings, LLC v. Doe-68.105.146.38*, 318 F.R.D. 58, 61 (M.D. La. 2016) (collecting cases); *Doe v. Marine-Lombard*, Civil Action No. 16-14876, 2016 WL 6658965, at *2 (E.D. La. Nov. 10, 2016).[6]

---

[6] A minority of courts have adopted the standard applied in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982), which requires a showing similar to that required for a preliminary injunction: (1) irreparable injury, (2) probability of success on the merits, (3) a connection between the expedited discovery and the avoidance of that injury, and (4) evidence that the movant's injury if she is denied expedited discovery outweighs the respondent's injury if she must provide it. *See Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 259 F.R.D. 385, 386 (E.D. Wis. 2009) (citing *Notaro*, 95 F.R.D. at 405). Although neither this Court nor the Southern District of Mississippi have expressly rejected the *Notaro* standard, district courts elsewhere in the Fifth Circuit generally apply the "good cause" standard instead.

The "good cause" standard requires courts to consider the reasonableness of the request for expedited discovery in light of all relevant factors, including the need for expedited discovery; the interests of justice; the scope of the discovery requested; and the timing of the request. *ELargo Holdings*, 318 F.R.D. at 61. "Good cause generally exists 'where the need for expedited discovery outweighs the prejudice to the responding party.'" *Id.* at 63 (quoting *BKGTH Prods., LLC v. Does 1-20*, Civil Action No. 13-5310, 2013 WL 5507297, at *5 (E.D. La. Sept. 30, 2013)).

Due to the need for quick fact-gathering, expedited discovery is particularly appropriate in connection with a pending motion for preliminary injunction. *See*, *e.g.*, *Rodale, Inc. v. U.S. Preventive Medicine, Inc.*, Case No. 4:08-CV-120, 2008 WL 4682043, at *1 (E.D. Tex. Oct. 21, 2008) ("An order for expedited discovery would be appropriate in a case seeking a preliminary injunction.") (citing 8 CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2046.1 (West 1994)). Courts have similarly found expedited discovery appropriate where relevant material may become unavailable as time passes, whether intentionally or not. *See Monsanto Co. v. Woods*, 250 F.R.D. 411, 413 (E.D. Mo. 2008) (citing *Pod-Ners, L.L.C. v. N. Feed & Bean of Lucerne Ltd. Liability Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002); *The Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645 (D. Minn. 2002)). These decisions seem particularly applicable to the instant action, where daily it seems there is spoliation of evidence and the risk of death.

## Discovery Requests

Based on the foregoing, Plaintiffs respectfully request that the Court compel, on an expedited basis, the following discovery:

1. **Immediate Access for Expert Inspections and Video and Photographic Documentation of Conditions Inside Parchman**

Lead Plaintiffs request expedited fact-finding access to Parchman – specifically Unit 26, Unit 28, Unit 29, Unit 30, Unit 31, Unit 32, and Unit 42 – for their experts and videographers to inspect and document the conditions inside the facility.  Plaintiffs specifically request a fourteen-day window of time in which to complete this inspection and documentation beginning at 9:00 a.m. on Tuesday, February 4, 2020.

Included among the experts who will be conducting the inspections and directing the documentation effort are individuals who are nationally recognized with decades of experience studying conditions of correctional confinement.  These experts include:

a) Mr. Eldon Vail:  Mr. Vail is a former correctional administrator with thirty-five years' experience administrating adult institutions including both line and supervisor positions, as Superintendent for three Washington state correctional facilities, and as the Deputy Secretary, then Secretary, for the Washington Department of Corrections.  [Vail Declaration, Ex. J, ¶¶ 1-2].  Mr. Vail has served as an expert witness and correctional consultant over fifty times in multiple jurisdictions including in Mississippi. [*Id.*, ¶¶ 5, 11].

b) Craig Haney, Ph.D., J.D.:  Dr. Haney is a Professor of Psychology at the University of California, Santa Cruz, a Distinguished Professor in the University of California system, and was formerly the UC Presidential Chair.  [Haney Declaration, Ex. K, ¶ 2].  Dr. Haney has served as a consultant on criminal just matters for over forty years in many jurisdictions, including for several governmental bodies- including the Dept. of Homeland Security, the U.S. Senate, and the U.S. House of Representatives.  [*Id.*, ¶¶ 3-4].  Dr.  Haney has personal experience visiting Parchman prison.  [*Id.*, ¶ 4].

c) Marc Stern, M.D., M.P.H.: Dr. Stern is an Affiliate Assistant Professor at the University of Washington School of Public Health. [Stern Declaration, Ex. L, ¶ 1]. Throughout his career, Dr. Stern has visited dozens of prisons and has conducted thousands of individual visits. [*Id.*, ¶ 3].

d) Madeleine LaMarre, MN, FNP-BC: Ms. LaMarre is a Family Nurse Practitioner with over thirty-five years' experience in correctional health care and expert correctional consulting. [LaMarre Declaration, Ex. M, ¶¶ 2-3]. She has performed investigations and overseen settlements in more than 100 prisons in many jurisdictions including the Mississippi State Penitentiary in Parchman, Mississippi. [*Id.*, ¶ 4].

e) Frank Edwards, Ch. Eng.: Mr. Edwards is a Chemical Engineer with thirty-six years of experience with environmental assessment and remediation. [Edwards Declaration, Ex. N, ¶¶ 2-3]. Mr. Edwards has vast knowledge of both State and Federal environmental regulations concerning pollutants/contaminants, and has experience inspecting and remediating over 1,000 sites including structures the same age or older than the Parchman facility. [*Id.*, ¶¶ 4-6].

f) Ms. Debbie Graham, RD, LD/N, REHS/RS, CJM, CPFM: Ms. Graham is a Registered Environmental Health Specialist/Registered Sanitarian, certified by the National Environmental Health Association. [Graham Declaration, Ex. O, ¶ 2]. Ms. Graham has over thirty-two years' experience with governmental services, including twenty-nine years specifically related to correctional facilities. [*Id.*, ¶¶ 3-5]. Ms. Graham has visited approximately 30-40 distinct correctional facilities and conducted in excess of one thousand individual inspections therein. [*Id.*, ¶ 6].

g) Terry Kupers, M.D., M.S.P.: Dr. Kupers is a board-certified Psychiatrist, a Professor at The Wright Institute in Berkeley, California, and a Distinguished Life Fellow of the American Psychiatric Association. [Kupers Declaration, Ex. P, ¶ 2]. Dr. Kupers has conducted a private practice for nearly fifty years in addition to teaching graduate students for nearly forty years. [*Id.*, ¶ 3]. Dr. Kupers has participated as an expert correctional consultant and witness in approximately twenty states and for the U.S. Department of Justice, Civil Rights Division. He has inspected and conducted interviews in over one-thousand prisons. [*Id.*, ¶ 4].

Lead Plaintiffs, through their experts, have developed a tiered approach to the expert inspections and video documentation which will involve only 2-3 experts conducting inspections at a time (with counsel and video documentation). Each expert team will require three-four days during the requested fourteen-day time period.

The experts have opined in their affidavits, based on their vast experience inspecting prisons, that there will be no significant security implications as a result of the proposed tiered approach. [Vail Declaration, Ex. J, ¶¶ 12-16]. All other experts agreed with Mr. Vail's opinion in this regard. [*See* Haney Declaration, Ex. K, ¶ 9; Stern Declaration, Ex. L, ¶ 9; LaMarre Declaration, Ex. M, ¶ 9; Edwards Declaration, Ex. N, ¶ 14; Graham Declaration, Ex. O, ¶ 13; Kupers Declaration, Ex. P, ¶ 7].

The experts will work in tandem, spaced out over a reasonable time, to preserve MDOC security resources. Dr. Stern and Ms. LaMarre will work together [Stern Declaration, Ex. L, ¶ 6; LaMarre Declaration, Ex. M, ¶ 8], as will Mr. Edwards and Ms. Graham [Edwards Declaration, Ex. N, ¶ 12; Graham Declaration, Ex. O, ¶ 12]. Dr. Haney and Mr. Vail will "float," and Dr. Kupers will not be attending at this time.

Lead Plaintiffs' experts all have sworn under penalty of perjury that they are comfortable in correctional environments, have never been involved with a security breach, and will comply with MDOC directions should security concerns arise during their respective inspections. [Vail Declaration, Ex. J, ¶ 12; Haney Declaration, Ex. K, ¶ 5; Stern Declaration, Ex. L, ¶ 4; LaMarre Declaration, Ex. M, ¶ 5; Edwards Declaration, Ex. N, ¶ 7; Graham Declaration, Ex. O, ¶ 7].

Lead Plaintiffs' exerts require access to Plaintiffs themselves at cell-front and in private settings along with access to the following readily accessible documentation:

a) Dr. Haney: the entire prisoner file of each prisoner that Dr. Haney interviews at cell-front and/or confidentially. [Haney Declaration, Ex. K, ¶ 6].

b) Dr. Stern and Ms. LaMarre: sick call request forms, emergency equipment and inspection logs, full medical records files for inmates that Dr. Stern and Ms. LaMarre interview, and the current health care systems policy and procedure manual(s). [Stern Declaration, Ex. L, ¶ 5; LaMarre Declaration, Ex. M, ¶ 7].

c) Mr. Edwards and Ms. Graham: appropriate documents regarding existing potable water test results, lead and asbestos testing and abatement reports/plans, mold test results and abatement plans, and sanitary sewage test results [Edwards Declaration, Ex. N, ¶ 11]; and cleaning, sanitation, and disinfecting policies and procedures ("P&Ps"), food service P&Ps, laundry P&Ps, disposal and biohazard P&Ps, housekeeping and environmental P&Ps, and housekeeping and environmental P&Ps [Graham Declaration Ex. O, ¶ 11].

Mr. Edwards will require the ability to conduct non-intrusive testing for contaminants in Unit 29, Unit 30, Unit 32, and Unit 42. [Edwards Declaration, Ex. N, ¶ 10].

Ms. Graham will require the ability to test food and food storage temperatures. [Graham Declaration, Ex. O, ¶ 11].

**2. Provide a More Streamlined Process for Inmate Interviews by Lead Plaintiffs' Counsel**

Lead Plaintiffs request that Defendants make accommodations for Lead Plaintiffs' Counsel to complete inmate interviews in the most expeditious manner possible.

For the past 10 days, Lead Plaintiffs' Counsel has attempted with MDOC's general counsel and inmate legal affairs ("ILA") to find a workable solution to facilitate expedited, streamlined access to inmates who are clients of Lead Plaintiffs' Counsel. Despite these efforts, the interview process remains cumbersome and inefficient resulting typically in only a few interviews per day despite having multiple lawyers on site and available to conduct interviews.

To add to the difficulty, Lead Plaintiffs' Counsel are required to send a daily list to ILA renaming the legal team members who will be arriving the following day and matching those lawyers with the exact names of inmate clients each lawyer wishes to interview. Therefore, many days available for interviews go underutilized or unused at all.

Lead Plaintiffs therefore request a more efficient process as described below:

    a.    Lead Plaintiffs' Counsel will provide MDOC general counsel and ILA the full list of their legal team, so that everyone on the list can be vetted and approved for access at any time during normal visiting hours.

    b.    Lead Plaintiffs' Counsel will provide MDOC general counsel and ILA the entire list of inmate clients that need to be interviews and will update this list accordingly.

    c.    Each day, anyone on the vetted list of interviewers can arrive and interview inmate clients as they appear on the previously provided list of inmate clients to be interviewed.

    d.    Any reasonable request for deviation from this process by MDOC will he communicated through MDOC general counsel and ILA.

### 3. Allow Third-Party Medical Team to Offer Inmates Free Medical Examination and Treatment for Minor Wounds

In order for the Court to be fully apprised of the deplorable conditions inside Parchman in general, and in Unit 29, particularly, and the impact those conditions have on the inmates housed there, the medical condition of the inmates in Unit 29 must be assessed. The inmates' physical condition is critical evidence of whether Defendants are satisfying their Constitutional obligations. In order to reliably discover the inmates' actual physical condition, Lead Plaintiffs have offered to provide medical assessments involving (1) a focused physical exam based on triage findings and immediate complaints or needs; and (2) simple wound care. All supplies, exam tables, and any other materials needed for the work will be provided. Of course, these services will only be provided to inmates who wish to participate and consent.[7]

Lead Plaintiffs propose to bring a third-party medical team to Parchman consisting of one or two medical doctors, between seven and nine nurse practitioners, and two emergency medical technicians, all of whom will have appropriate Mississippi licenses. [8]

Inmates will be brought to the gymnasium in Unit 29 in groups up to 10 inmates, where they will check in and be identified. They will sign the appropriate consent forms accepting or declining examination and treatment, and those who consent will proceed to a station where basic vitals and a brief medical history are taken. Then, each inmate will proceed to one of 10 exam stations. The entire process should take approximately 30 minutes per inmate, and we propose to provide the examinations and treatment, if any, to each inmate free of charge for the 700-1100

---

[7] Each inmate covered by this discovery request must be brought by MDOC officials into the exam area to be presented with a consent form. Lead Plaintiffs are not comfortable with Defendants relaying consent decisions, as that procedure would be ripe for abuse through intimation of inmates to discourage consent.

[8] The exact identity of each member of this medical team is not currently available, as it will be comprised of medical professionals whose schedules will allow them to participate on the dates the Court allows.

inmates we believe are, or have been since the filing of this action, housed in Unit 29 since the inception of this action.

If an inmate is found to have basic first aid needs, the medical team will treat the condition with over the counter medications or wound care present on site provided the inmate consents to treatment. Inmates found to have critical medical issues will be seen by the physician and, if necessary, a care recommendation will be made to the senior representative of MDOC available on site at the time.

Mathematically, the process can be completed in 4-5 days, but the efficiency of the process will depend solely on whether Defendants cooperate by moving inmates in and out of the exam area on schedule.

The third-party medical provider will have an insurance policy specifically for this event, and Lead Plaintiffs' Counsel can provide said policy to Defendants prior to inmates being examined.

At the conclusion of the examinations, a data compilation (absent personal identification) will be provided to Defendants, Lead Plaintiffs and the Court. The consent form signed by each inmate who chooses to participate will contain a HIPAA authorization allowing dissemination to Counsel and the Court of the data compilation summarizing the findings of the medical exam and the treatment related thereto.[9] The entire medical exam process will be undertaken solely by the third-party medical provider.[10]

---

[9] Each inmate's underlying medical records will not be a part of this process. Lead Plaintiffs' Counsel will not keep at the time of the assessment any individual medical records created by the third-party medical team as a result of the assessment.

[10] Lead Plaintiffs' Counsel does not intend to, and will not, seek to sign up additional clients as part of the medical assessment process. The medical examinations on site will be solely medical in nature.

The third-party medical provider is prepared to bring its own security team to the examinations. This team will consist of 10 certified law enforcement officers from jurisdictions in Mississippi. Lead Plaintiffs also seek from Defendants a level of security commensurate with that provided to the Mississippi Attorney General and Defense Counsel on their visit to the facility on January 31, 2020.

## Conclusion

Based on the foregoing, as well as the Motion, and the extreme exigencies at issue, Lead Plaintiffs respectfully request that the Court enter its order compelling the discovery requested herein.

Date: February 1, 2020                                    Respectfully submitted,

                                                         */s/ Marcy B. Croft*
                                                         Marcy B. Croft (MS Bar #10864)
                                                         Carson H. Thurman (MS Bar # 104871)
                                                         MARON MARVEL BRADLEY ANDERSON & TARDY LLC
                                                         200 South Lamar Street
                                                         Jackson, MS 39201
                                                         Telephone: (601) 960-8630
                                                         Telefax: (601) 206-0119

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 1st day of February 2020, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system.

                                                            */s/ Marcy B. Croft*
                                                           Marcy B. Croft (MS Bar #10864)
                                                           Carson H. Thurman (MS Bar #104871)