**EXHIBIT F**

**Affidavit of Marc Stern, MD MPH**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

| | |
|---|---|
| MICHAEL AMOS, PITRELL BRISTER, ANTONIO DAVIS, WILLIE FRIEND, CHARLES GAYLES, DANIEL GUTHRIE, JONATHAN J. HAM, DESMOND HARDY, BILLY JAMES, JR., JUSTIN JAMES, QUENTEN JOHNSON, DEAUNTE LEWIS, LARRY MAXWELL, TERRANCE MCKINNEY, DERRICK PAN, BRANDON ROBERTSON, KURIAKI RILEY, DERRICK ROGERS, TYREE ROSS, H.D. ALEXANDER SCOTT, DEANGELO TAYLOR, LEMARTINE TAYLOR, CONTI TILLIS, DEMARCUS TIMMONS, CARLOS VARNADO, PHILLIP DECARLOS WEBSTER, ADRIAN WILLARD, CURTIS WILSON, CALEB BUCKNER, WILLIAM GREEN, ARIC JOHNSON, IVERY MOORE, and KEVIN THOMAS, on behalf of themselves and all other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TOMMY TAYLOR, in his official capacity as the Interim Commissioner of the Mississippi Department of Corrections, and MARSHAL TURNER, in his official capacity as the Superintendent of the Mississippi State Penitentiary, <br><br> Defendants. | No. 4:20-cv-00007-DMB-JMV |

**DECLARATION OF MARC STERN, MD MPH**
**IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND MANDATORY TEMPORARY INJUNCTION AS TO COVID-19**

08198-00002/11314292.1

On this 16th day of March, 2020, I hereby declare:

1. My name is Marc Stern. I am an Affiliate Assistant Professor at the University of Washington School of Public Health.

2. I received a Bachelor of Science degree from State University of New York (Albany) in 1975, a medical degree from State University of New York (Buffalo) in 1982, and a Master of Public Health from Indiana University in 1992.

3. I am a board certified internist specializing in correctional health care. I have managed health care operations and practiced health care in multiple correctional settings. Most recently, I served as the Assistant Secretary of Health Care for the Washington State Department of Corrections.

4. On a regular basis I investigate, evaluate, and monitor the adequacy of health care delivery systems in correctional institutions on behalf of a variety of parties including federal courts; the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security; the Special Litigation Section of the Civil Rights Division of the U.S. Department of Justice; and state departments of corrections and county jails.

5. Through 2013, I taught on behalf of the National Commission on Correctional Health Care (NCCHC) the NCCHC's correctional health care standards semi-annually to correctional health care administrators at NCCHC's national conferences. I authored a week-long curriculum commissioned by the National Institute of Corrections of the U.S. Department of Justice to train jail and prison wardens and health care administrators in the principles and practice of operating safe and effective correctional health care operations, and served as the principal instructor for this course.

6. In the past four years alone, I have been qualified as an expert in seven different lawsuits involvement correctional health care systems and conditions of confinement, including one such case in the Southern District of Mississippi. My full *curriculum vitae* is attached hereto as Exhibit A.

7. On February 11, 2020, I personally inspected housing units in Unit 29 at the Mississippi State Penitentiary ("Parchman") located in Sunflower County, Mississippi. I also conducted the medical evaluations of 17 of the named Plaintiffs to this lawsuit from February 12-14, 2020. Further, I have inspected the medical clinics at Unit 29 and Unit 30, as well as many areas of Unit 42, Parchman's medical unit, and have studied the policies and procedures related to health care systems at Parchman produced by the Defendants and Centurion in this matter.

8. Overall, the health-related and environmental conditions I observed at Parchman are the worst conditions I have observed in any US jail, prison, or immigration detention facility in my 20 years working in this field. The conditions under which residents exist at Parchman are sub-human and deplorable; on a daily basis, residents are exposed to a significant risk of serious harm to their health.

9. Due to the recent COVID-19 pandemic affecting the nation and world, I have recently familiarized myself with the virus, its causes and conditions, its transmission – especially in crowded and unsanitary conditions – and its ability to quickly spread through correctional facilities.

3

10. In my opinion, to a reasonable degree of medical certainty, the potential for an outbreak of COVID-19 through Parchman prison creates a significant risk of immediate harm to both the Plaintiffs in this lawsuit and all other residents and employees of Parchman. The results of such an outbreak through Parchman would be catastrophic, and potentially fatal to many residents with already compromised immune systems and underlying chronic conditions.

11. In order to mitigate the potential for an outbreak of COVID-19 at Parchman, the following steps should immediately be mandated by the Defendants:

　　a. **Immediate testing**. Patients who require testing, based on public health recommendations and the opinion of a qualified medical professional, should be tested for COVID-19.

　　b. **Immediate Screening**. Defendants must be required to screen each employee or other person entering the facility *every day* to detect fever over 100 degrees, cough, shortness of breath, recent travel to a high risk country, and/or exposure to someone who is symptomatic or under surveillance for COVID-19 or screening as required by public health authorities. A record should be made of each screening.

4

c. **Quarantine.** The prison must establish non-punitive quarantine for all individuals believed to have been exposed to COVID-19, but not yet symptomatic, and non-punitive isolation for those believed to be infected with COVID-19 and potentially infectious. Any individual who must interact with those potentially or likely inflicted with COVID-19 must utilize protective equipment as directed by public health authorities. In short, every possible effort must be made to separate infected or potentially infected individuals from the rest of the incarcerated population. Finally, it must be ensured that no individual is incarcerated past their release date, even if quarantine or isolation is warranted, so individuals requiring continued quarantine, isolation, or health care should be transferred from the institution to the appropriate outside venue.

d. **Institutional Hygiene.** The prison must be required to increase the sanitation and cleaning protocol and frequency for all public spaces, highly traveled areas, and cells.

e. **Personal Hygiene.** The prison must be required to provide hand soap, disposable paper towels, and access to water to allow residents to wash their hands on a regular basis, free of charge and ensure replacement products are available as needed. Further, hand sanitizer with alcohol must be declassified temporarily as contraband. Correctional staff should be allowed to carry hand sanitizer with alcohol on their person, and residents should be allowed to use hand sanitizer with alcohol when they are in locations or activities where hand washing is not available.

    f. **Limit Contact Visitation.** I understand that the prison already has limited visitation that allows residents to come into physical contact with visitors, but officials must be required to implement or increase non-contact visitation such as video conferencing and/or telephone calls at no charge.

    g. **Waive Copays.** There must be a waiving of copays for medical evaluation and care related in any way to COVID-19 and/or its symptoms. A waiver of these types of copays is necessary to avoid disincentivizing patients from requesting medical treatment. Patients with symptoms of possible COVID-19 should be seen quickly. Those with a cough should be provided masks as soon as they inform staff of this symptom or staff notice this symptom.

    h. **Supply Chain.** The prison must be required to identify the supplies and other materials upon which the institution is dependent, such as food, medical supplies, certain medicines, cleaning products, etcetera and prepare for shortages, delays or disruptions in the supply chain.

12.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 16, 2020.

_____
Marc Stern, MD MPH