**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**MICHAEL AMOS,** *et al.* **PLAINTIFFS**

**VS.** **CIVIL ACTION NO. 4:20-CV-07-DMB-JMV**

**TOMMY TAYLOR,** *et al.* **DEFENDANTS**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AS TO COVID-19**

Despite having no facts and no apparent understanding of precautionary actions being taken by the Mississippi Department of Corrections ("MDOC") to protect inmates, staff, and the public from the potential spread of COVID-19 at the Mississippi State Penitentiary ("Parchman"), Plaintiffs ask the Court to intervene and order MDOC to take a litany of other measures—many of which MDOC is already taking. *See* Exhibits A, B, and C. Plaintiffs have no support for their assumption that their requested measures would be more effective in preventing the outbreak or spread of COVID-19 than those already being taken by MDOC. In fact, before filing their Motion, Plaintiffs did not even bother to confer with Defendants or inquire as to the current measures MDOC is taking. Instead, Plaintiffs allege that Defendants have a "woeful healthcare record," and speculate that Defendants therefore must not be taking measures to "confront the COVID-19 pandemic." Doc. 60 at 8. Plaintiffs present no evidence whatsoever to show that Defendants are acting with deliberate indifference to the impact of COVID-19 or that, absent Court intervention, Plaintiffs will be left "without any meaningful measures to protect them from the deadly pandemic unfolding on their doorstep." *Id.* Such conjecture and hyperbole

underscore the pretext of Plaintiffs' Motion – publicity, media attention, and inflaming the emotions of the public with misinformation.

If Plaintiffs had bothered to simply confer with Defendants to discuss MDOC's current COVID-19 measures before filing their Motion and involving the Court, Plaintiffs would have learned that MDOC is already actively engaged in significant courses of action to protect inmates and staff from COVID-19, including many of the measures identified by Plaintiffs.[1] MDOC and its third-party healthcare provider, Centurion of Mississippi, LLC ("Centurion"), are currently engaged in the following:

1. **Internal and External Consultation/Monitoring:** MDOC officials have been meeting internally and consulting externally with the proper officials and agencies to ensure appropriate preventative measures regarding COVID-19. MDOC is consulting with top public health and other officials, including the Mississippi Department of Health and the U.S. Department of Homeland Security's Office for State and Local Law Enforcement, regarding the appropriate precautions to be taken concerning COVID-19. *See* Agenda of Telephone Conference with DHS, attached as Ex. 1 to the Declaration of Jeworski Mallett (Ex. A). MDOC, in consultation with health officials, continues to monitor new developments and implement preventative and responsive measures related to COVID-19. *See* Declaration of Dr. Gloria Perry (Ex. B).[2]

2. **Collaboration between MDOC and Centurion:** MDOC is working closely with Centurion to implement the provisions of Centurion's Pandemic Preparedness and Emergency Response Plan (the "Centurion Plan"). *See* Ex. 2 to Mallett Declaration (Ex. A); *see also* Declaration of Willie Knighten of Centurion (Ex. C). The Centurion Plan provides written protocols or best practices for the diagnosis, treatment, and management of conditions related to infectious diseases such as COVID-19. The Centurion Plan includes, but is not limited to, protocols or guidance for: prevention; surveillance; inmate education; treatment, including medical insolation; follow-up treatment; reporting; monitoring current community and national trends; appropriate safeguards for inmates and staff; providing personal protective equipment ("PPE");

---

[1] Had Plaintiffs conferred with Defendants before filing their Motion, the parties could have also saved valuable time and resources that should be instead aimed at addressing the impact of COVID-19.

[2] The gravity and breadth of the potential impact of COVID-19 continues to evolve. MDOC and Centurion are actively engaged in following the recommendations and guidelines issued by global, national, and local health authorities and leaders, which change and develop daily. MDOC and Centurion have been monitoring the development of COVID-19 and adapting their prevention and response plans as necessary to protect inmates, staff, and the public. Updated recommendations, practices, and guidance materials are being assessed and implemented where appropriate.

education and training regarding PPE; and post-exposure management. The Centurion Plan sets "preparedness" action items based on the severity of the virus outbreak, and MDOC is following those action items. MDOC is also implementing Centurion's "Coronavirus Awareness" guide, attached as Ex. 3 to the Mallett Declaration (Ex. A), which includes, among other things, procedures for screening staff and other visitors and restrictions on staff from entering the facility with symptoms of the virus or if they have traveled to a high-risk area. *See* also Ex. C, discussing screening measures.

3. **Staff Screening:** MDOC officers and other staff are screened daily upon entering Parchman for symptoms and other indicators of exposure to COVID-19. Specifically, staff members are screened pursuant to a COVID-19 screening form provided by Centurion, attached as Ex. 4 to the Mallett Declaration. MDOC staff are routed to an alternative screening area at the visitation center to facilitate safe screening. The screening process includes questions about each staff member's symptoms, if any, including headaches, fevers, coughing, shortness of breath, and trouble breathing. MDOC subjects staff members to daily temperature screenings before they are permitted on the grounds. *Id.*

4. **Inmate Monitoring/Testing:** As discussed above, the Centurion Plan provides written guidance for diagnosis, treatment, and management of conditions related to infectious diseases such as COVID-19, including protocols for prevention, surveillance, and treatment, including medical insolation. In addition to implementing the Centurion Plan, MDOC officers are currently actively monitoring inmates for symptoms of COVID-19, such as headaches, fevers, coughing, shortness of breath, and trouble breathing. Should healthcare staff determine an inmate is exhibiting signs or symptoms of COVID-19, through screening or otherwise, specific measures will be taken as described in the declaration of Health Services Administrator Willie Knighten, attached as Exhibit C, and COVID-19 testing will be administered per local and Centers for Disease Control protocols and availability. *See* Ex. B and C.

5. **Inmate Quarantine/Isolation:** At this time, there are no confirmed cases of COVID-19 at Parchman. Should MDOC learn that an inmate or staff member has contracted COVID-19, MDOC will apply the Centurion Plan as well as its own policies developed to combat the spread of COVID-19. Under these plans and policies, inmates who either test positive for COVID-19 or is suspected of having COVID-19 will be isolated and any inmate or staff member suspected of being exposed will be quarantined. Further precautionary steps will also be taken, as more specifically described in the declaration of Willie Knighten, attached as Ex. C, including the use of personal protective equipment. In the unfortunate event there are insufficient numbers of negative-pressure rooms, MDOC will quarantine and isolate inmates from the remainder of the general population in alternative cells or housing areas. Ex. A.

6. **Suspension/Restriction of Transfers:** MDOC has suspended all transfers of inmates from county jails to MDOC facilities for the next 30 days. *See* Ex. 5 to Mallett Declaration (Ex. A). MDOC is monitoring conditions and developments and will extend the restriction as necessary to protect inmates and staff. MDOC has also substantially restricted all transfers between MDOC facilities for the next 30 days.

Transfers between facilities will be limited to those absolutely necessary. For those transfers that have been necessary, MDOC has screened inmates for COVID-19 symptoms upon arrival. Even if transferred inmates do not currently have symptoms, MDOC isolates those inmates so as to reduce the risk to the general population. MDOC is monitoring conditions and developments and will extend the restriction as necessary to protect inmates and staff. Ex. A.

7. **Suspension of In-Person Visitation / Increased Sanitation for Essential Visitations:** MDOC has temporarily suspended visitation at all MDOC facilities "in order to establish sanitation and prevention protocols to prevent the spread of COVID-19." *See* Ex. 6 to Mallett Declaration (Ex. A). MDOC is currently permitting visitation by attorneys who satisfy MDOC screening requirements and has established protocols requiring all visitation areas to be effectively sanitized at the completion of each visit.

8. **Non-Contact Visitation:** MDOC has undertaken measures to ameliorate the effects of the denial of in-person visitation. For instance, MDOC has implemented a policy permitting inmates to make two free phone calls per week. *See* Exhibit 7 to Mallett Declaration (Ex. A). According to Interim Commissioner Tommy Taylor, "[t]his is another way to help inmates stay connected with their loved ones and to be reassured of their welfare during this trying time." *Id.*

9. **Common Health Practices:** MDOC is recommending and reinforcing common health practices and other guidelines provided by the Mississippi Department of Health and the CDC, including:

    - Coughing or sneezing into the bend of the arm, not the hand;
    - Frequent hand washing for at least 20 seconds or use of hand sanitizer;
    - Avoiding touching of eyes, nose, or mouth with unwashed hands;
    - Avoiding social contact such as shaking hands, hugging, or sharing personal items; and
    - Use of disinfectants to sanitize high-touch surfaces, such as workstation surfaces, computer keyboards, countertops, doorknobs, light switches, handrails, control panels, buttons, and tabletops. Ex. A.

10. **Education of Staff and Inmates:** MDOC is educating staff and inmates regarding the above-referenced universal common health practices. MDOC has distributed materials outlining the above common health practices to the inmates. These materials are posted in all inmate housing units as well as on bulletin boards in hallways and other common areas. Further, wardens, deputy wardens, and other MDOC officers have visited each housing unit to verbally inform inmates of the above-referenced common health practices. *Id.*

11. **Institutional Hygiene:** MDOC is ensuring that additional chemicals and other cleaners are available to providing additional sanitation at Parchman. MDOC has thoroughly cleaned and sanitized all areas at Parchman and will continue to do so to ensure proper sanitation is achieved. *Id.*

> **12. Personal Hygiene:** MDOC has provided extra supplies of liquid and solid soap to inmates to ensure that each inmate's supply is sufficient to follow the recommended universal common health practices outlined above. *Id.* MDOC, like other correctional agencies across the country, does not provide inmates with their own bottles of hand sanitizer containing at least 60% alcohol because it can be used to make drinking alcohol. However, hand sanitizer is available to MDOC staff. According to the Centers for Disease Control and Prevention, the most effective method of good hand hygiene is handwashing with soap and water for 20 seconds. *See* Ex. B.

MDOC's COVID-19 measures are consistent with, if not more preventative than, those being taken by other correctional agencies and institutions across the country, including the federal bureau of prisons. *See* Ex. A, B, and C. The attached declarations refute Plaintiffs' baseless claim that MDOC's response "has been merely to cancel visitation and limit transfers." Doc. 60 at 3. Plaintiffs offer no factual support whatsoever to show that their points of requested emergency relief are not already being addressed by MDOC to the extent feasible and appropriate. *Id.* at 3-6. Plaintiffs also offer no support to show that their requested measures are as effective or are more effective than MDOC's current actions. In fact, the only exhibit utilized by Plaintiffs that even mentions their specific requests is a declaration from Dr. Marc Stern, but Dr. Stern does not allege that MDOC's current preventative measures are inadequate. *See* Doc. 59-6. It does not appear that Dr. Stern is even aware of the current measures being taken by MDOC and Centurion. *Id.* Moreover, Dr. Stern is not an infectious disease specialist, and he admits he has only "recently familiarized [himself] with the virus." *Id.*

To be clear, Defendants do not dispute that COVID-19 presents serious health risks, but MDOC is currently taking the proper and reasonable proactive measures to prevent infiltration of COVID-19 into Parchman and to be prepared to respond to any outbreak at Parchman. *See* Ex. A, B, and C. Accordingly, Plaintiffs' Motion is unfounded and improper; it fails to even present a claim to be addressed by the Court and should be denied.

**ARGUMENT**

Plaintiffs are correct that "Defendants are charged by law with protecting the inmates under their care and custody," Doc. 60 at 3, but there are guidelines for determining the extent and reasonableness of the measures to be taken. The Prison Litigation Reform Act ("PLRA") was enacted to limit court involvement in directing state prison operations. Plaintiffs are asking the Court for an order of so-called "relief" that is premature, unsupported by any evidentiary basis, inconsistent with the PLRA, and fails under the deliberate-indifference and preliminary-injunction standards. As shown below, Plaintiffs have failed to meet their "heavy burden" to demonstrate entitlement to the extraordinary remedy of granting preliminary injunctive relief.[3]

## I. The "relief" requested by Plaintiffs is not appropriate under the PLRA.

Congress enacted the Prison Litigation Reform Act in 1996 to bring prison condition litigation under control and "restrict the authority of federal courts to issue and enforce compliance with orders for prospective relief, and thus to curb the involvement of the federal judiciary in prison management." *United States v. Territory of the Virgin Islands*, 884 F. Supp. 2d 399, 406–08 (D.V.I. 2012) (quoting *Gilmore v. California*, 220 F.3d 987, 991 (9th Cir. 2000) ("It is clear that Congress intended the PLRA to revive the hands-off doctrine," the former "rule of judicial quiescence" that the federal judiciary not be involved with the problems of state-run prisons)); *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997).

The purpose of a temporary restraining order ("TRO") is typically "to preserve the status quo and prevent irreparable harm, but only until the court can hold an adversarial hearing for a

---

[3] Plaintiffs offer no factual support for their assertion that MDOC's response to COVID-19 is "feckless." Doc. 60 at 2. Instead, it is clear that Plaintiffs' Motion, filed without first making any good-faith effort to determine the measures being implemented by MDOC, is about garnering attention in the media. *See id.*; *see also* Exhibit D, a collection of Plaintiffs' counsel's recent social media postings related to their COVID-19 Motion for preliminary relief. At the February 3, 2020 motion hearing, the Court was clear that counsel should not interject this case into the media. *See* hearing transcript at page 118, lines 11–20.

6

preliminary injunction[,]" and the purpose of a preliminary injunction is typically to "preserve the status quo during the course of litigation until the court can hold a trial on the matter." *Walker v. Turner*, 2019 WL 615360, at *1 (N.D. Miss. Feb. 11, 2019). However, Plaintiffs do not seek to preserve the status quo. Rather, Plaintiffs seek affirmative "relief" from a problem that has not been shown to exist and from constitutional violations that they have not established. A request for a mandatory injunction, seeking relief well beyond the status quo, is "particularly disfavored, and should not be issued unless the facts and the law clearly favor the [Plaintiffs]." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). ). Here, they do not.

The PLRA "greatly limits the ability of a court to fashion injunctive relief." *Dockery v. Hall*, No. 13-cv-326, Doc. 850 at 14 (S.D. Miss. Dec. 31, 2019). It provides that "prospective relief in any civil action with respect to prison conditions shall extend no further than necessary <u>to correct the violation of the Federal right</u> of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A) (emphasis added). It follows that under the PLRA, the Court must first find a "violation of [a] Federal right" to "correct." *Id.* Next, before preliminary injunctive relief can issue, a district court must find that such relief is "narrowly drawn, extend[s] no further than necessary to correct the harm the court finds requires preliminary relief, and [is] the least intrusive means necessary to correct that harm." *Id*. at § 3626(a)(2).

There is no harm or violation here to be addressed by the Court because MDOC's measures are a reasonable response to the COVID-19 crisis, which is all that is required under the deliberate indifference standard, and Plaintiffs have offered no evidence to the contrary. *See* Ex. A, B, C. Even if there were some harm to be remedied, which there is not, the so-called "relief" requested by Plaintiffs is not the "least intrusive means necessary" to prevent harm. Thus, Court intervention is not warranted or appropriate.

7

The "relief" requested in Plaintiffs' Motion and memorandum seeks to require Defendants to implement measures that are either already being undertaken, that are in many respects not possible or recommended (such as testing every single inmate), or that have not been shown by Plaintiffs to have any reasonable relation to preventing the alleged harm:

a. **Immediate Testing:**[4] Plaintiffs request that MDOC immediately "implement testing protocols for the identification and containment of COVID-19," and further demand that such protocols include "the immediate testing of all inmates, Parchman employees, and all other individuals entering Parchman." Doc. 60 at 3. Testing protocols have been implemented by Centurion, but it is not feasible or recommended that every inmate, employee, or other person entering Parchman be tested for COVID-19. The shortage of tests has been widely reported by the national and local media and acknowledged by numerous Federal and State officials.[5] *See also* Ex. B. There are approximately 2,700 inmates and MDOC staff at Parchman. Ex. A. Even if testing every one of these individuals were advisable, it is doubtful the CDC would appropriate such testing resources. Current guidance from public health officials requires physicians to issue tests as needed only to individuals who meet certain criteria, including "symptomatic individuals at higher risk for poor outcomes."[6] Centurion is responsible for inmate testing for COVID-19. Testing is done per local protocols and availability. It is currently not feasible, advisable, or recommended under any applicable guidelines to test individuals unless they have traveled to any area with an outbreak of COVID-19 or with sustained (ongoing) transmission; have a fever or cough; are short of breath; have been in close contact (less than six feet) with someone exhibiting COVID-19 symptoms or a confirmed case of COVID-19; or have a temperature of greater than 100.4 F. *See* Ex. B. And even if one or more of those factors applies, a test for influenza must also be conducted. *Id.* Plaintiffs' mere disagreement with these testing protocols is not a basis for finding deliberate

---

[4] For ease of reference, Defendants use the headings included in Plaintiffs' Motion with no admission as to their validity or legitimacy.

[5] *E.g.,* Peter Whoriskey and Neena Satija, *How U.S. Coronavirus Testing Stalled*, THE WASHINGTON POST (Mar. 16, 2020), online at https://www.washingtonpost.com/business/2020/03/16/cdc-who-coronavirus-tests/ (last visited March 18, 2020).

[6] Guidance from the CDC and Mississippi Department of Health make clear that not all individuals should be tested. Physicians, in their best judgment, "may" choose to test patients who: "within 14 days of symptom onset had close contact with a suspected or laboratory-confirmed COVID-19 patient, or who have a history of travel from affected geographic areas;" "[h]ospitalized patients who have signs and symptoms compatible with COVID-19, such as fever and/or symptoms of acute respiratory illness . . . and do not have an alternative explanatory diagnosis;" and "[o]ther symptomatic individuals at higher risk for poor outcomes." Mississippi Public Health Laboratory SARS-CoV-2 (virus that causes COVID-19) Specimen Collection and Shipping Guidance, attached as Ex. E. As of March 17, 2020, the MSDH Public Health Laboratory has performed only 389 tests. Coronavirus Disease 2019 (COVID-19), online at https://msdh.ms.gov/msdhsite/_static/14,0,420.html (last visited March 18, 2020).

indifference.[7] Plaintiffs offer no proof that any Plaintiff would fall within the accepted criteria for testing, and Plaintiffs do not allege that any Plaintiff has requested and warranted testing but been refused.

b. **Immediate Screening:** MDOC is already conducting the screening requested by Plaintiffs. Ex. A, B, C. As described above, under its current protocols, MDOC screens each employee or other person entering Parchman every day to determine whether the individual has any symptoms of COVID-19, including headaches, fevers, cough, shortness of breath, and trouble breathing. The individuals are also questioned regarding their recent travel, the travel of their friends and family, and whether they have been exposed to individuals who are experiencing COVID-19 symptoms. MDOC subjects each employee or other person entering Parchman to daily temperature screenings before they are permitted on the grounds. Moreover, if inmate transfers are necessary, those inmates are screened and then isolated even if they do not currently have symptoms.

c. **Current Inmate Quarantine:** Plaintiffs ask that the Court require MDOC to establish non-punitive quarantine "for all individuals who test positive for COVID-19, who were directly exposed to individuals who test positive for COVID-19, or who exhibit symptoms of the virus." Doc. 60 at 4. Plaintiffs make additional requests regarding where such inmates should be quarantined and what PPE should be worn by individuals interacting with such inmates. *Id.* at 4, 5. Again, the Centurion Plan implemented by MDOC provides best practices for diagnosis, treatment, and management of conditions related to infectious diseases such as COVID-19, including protocols or guidelines for, among other things: surveillance; treatment, including medical quarantine and insolation; follow-up treatment; safeguards for inmates and staff; providing PPE, education and training regarding PPEs; and post-exposure management. *See* Ex. A, B, C. MDOC, in conjunction with Centurion, have developed appropriate protocols for isolating inmates who contract the virus. These protocols include isolating symptomatic and virus-positive inmates in negative-pressure rooms and isolated housing units at Parchman. Additionally, all scheduled releases from Parchman will occur as planned, with necessary precautions taken. *Id.* Plaintiffs offer no evidence that their suggested protocol is not being followed.

d. **New Inmate Quarantine:** Plaintiffs request that MDOC establish a 14-day, non-punitive quarantine for all new inmates entering Parchman. Doc. 60 at 4. MDOC has suspended all transfers of inmates from county jails to MDOC facilities for the next 30 days and will extend the restriction as necessary to protect inmates and staff. MDOC has also substantially restricted all transfers between MDOC facilities for the

---

[7] A prisoner's belief that he should have received *different* treatment does not implicate the Eighth Amendment because a mere disagreement with the treatment that was provided, absent exceptional circumstances that do not exist here, does not support a claim of deliberate medical indifference. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). To succeed on a Section 1983 claim for lack of medical care under the deliberate indifference standard, a prisoner must establish that the defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dept. of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).

next 30 days and will extend that restriction as necessary to protect inmates and staff. Transfers between MDOC facilities have been limited to those absolutely necessary. In the event such a transfer is necessary, MDOC has and will screen arriving inmates for COVID-19 symptoms and temporarily isolate those inmates even if they do not have symptoms. *See* Ex. A.

e. **Institutional Hygiene:** Plaintiffs ask that the Court order MDOC to increase the sanitation and cleaning protocol and frequency for all public spaces, highly traveled areas, and cells. Doc. 60 at 4. As stated above, MDOC is already taking precautionary measures to ensure that additional chemicals and other cleaners are made available at Parchman for the purpose of providing additional sanitation. *See* Ex. A. MDOC has thoroughly cleaned and sanitized all areas at Parchman, and its staff will continue to do so to ensure proper sanitation is achieved. *Id.*

f. **Personal Hygiene:** Plaintiff asks that MDOC be required to "provide hand sanitizer with 60% or more alcohol, antibacterial soap, antibacterial wipes and other hygiene products to each inmate free of charge and ensure replacement products are available as needed." Doc. 60 at 4-5. Plaintiff further requests that the Court order MDOC to declassify hand sanitizer with 60% or more alcohol as contraband, since it is "one of the only methods proven to slow and prevent the spread of coronavirus." *Id.* at 5. MDOC has distributed additional solid and liquid soap to inmates in sufficient qualities to ensure all are able to adhere to the common health practices outlined by the CDC and others. Ex. A. MDOC has not and cannot safely de-classify as contraband hand sanitizer with 60% or more alcohol. *Id.* Given that the CDC's common health practices state that proper hygiene is achieved primarily through hand washing, the security risk of permitting use of individual hand sanitizer outweighs the alleged health concern in not providing bottles of it to inmates. Ex. B. MDOC's policy in this regard is consistent with other institutions across the nation. *Id.*

g. **Limit Contact Visitation:** Plaintiffs acknowledge MDOC has already limited physical contact visitation, but claims MDOC "must be required to implement or increase non-contact visitation options such as video conferencing and/or telephone calls for all types of visits[.]" Doc. 60 at 5. MDOC has undertaken measures to mitigate the effect of the denial of in-person visitation, in part by implementing a policy permitting inmates to make two free phone calls per week "to help people contact their loved ones." *See* Ex. A. Plaintiffs have no constitutional right to video conferencing, and it is not deliberate indifference for MDOC not to provide it.[8] Furthermore, requiring MDOC to provide video conferencing services, which are not currently available at Parchman, would not be narrowly drawn or the least intrusive means necessary to "correct" any alleged violation. 18 U.S.C. § 3626(a)(2).

---

[8] "Convicted prisoners have no absolute constitutional right to visitation." *Lynott v. Henderson*, 610 F.2d 340, 342 (5th Cir. 1980). "The very object of imprisonment is confinement," and therefore restrictions on visitation do not violate the Constitution so long as they "bear a rational relation to legitimate penological interests." *Overton v. Bazzetta*, 539 U.S. 126, 131–32 (2003). The Court "must accord substantial deference to the professional judgment of prison administrators" in this regard. *Id.* at 132.

h. **Waive Copays:** Plaintiffs claim MDOC and "healthcare providers working under [its] direction" "must be required to waive copays for inmate medical evaluation and care related in any way to COVID-19 and/or its symptoms." Doc. 60 at 5. As stated above, even though non-indigent inmates have no constitutional right to a waiver of copays, and it is not deliberate indifference for MDOC to not waive copays, MDOC has already decided to waive copays related to COVID-19.[9] *See* Ex. B.

i. **Supply Chain:** Plaintiffs ask that the Court require MDOC to "identify the supplies and other materials upon which the institution is dependent … and prepare for shortages of these items, and delays or disruptions in the supply chain." Doc. 60 at 5-6. This is a perfect example of Plaintiffs' desire to have the Court "micromanage" MDOC, an impermissible exercise even if Plaintiffs had proven a constitutional deprivation, which they have not.[10] The request is premature and based solely on the unsupported assertion that MDOC will run out of supplies. MDOC has already been taking inventory of their current supplies and planning for potential shortages and delays. MDOC has adequate stockpiles and has adequate plans in place to maintain necessary food and supplies. Ex. A. Plaintiffs' proposed micromanagement is not the least intrusive means of preventing any perceived, but nonexistent, constitutional violation with regard to COVID-19 measures.

j. **Reporting:** Plaintiffs want the Court to require MDOC to report weekly "to apprise the Court of the progress made in implementing the foregoing and the results of testing of employees and inmates; the numbers of COVID-19 cases at Parchman, if any; and the measures in place to separate inmates who have tested positive, or who may have been exposed, from the general population." Doc. 60 at 6. This is the type of court involvement the PLRA sought to limit, particularly where there has been no showing whatsoever to justify the proposed reporting requirements.

Accordingly, the requested "relief" is redundant to the protocols, best practices, and guidelines already being implemented by MDOC, and such "relief" is premature, inappropriate, and unnecessary under the PLRA. Thus, the Court should deny the Motion.

---

[9] *See Morris v. Livingston*, 739 F.3d 740, 746–47 (5th Cir. 2014) (upholding inmate charges for medical services).

[10] The Fifth Circuit has explained that federal courts "are not to micromanage state prisons." *Gates v. Cook,* 376 F.3d 323, 338 (5th Cir. 2004) (citing *Bell v. Wolfish,* 441 U.S. 520, 562 (1979)). The Fifth Circuit has further noted that "courts are ill-equipped to deal with the increasingly urgent problems of prison administration . . . and that it is not wise . . . to second-guess the expert (or any other) administrators on matters on which they are better informed." *Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir. 1981) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). Problems associated with operating prison facilities "are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." *Procunier*, 416 U.S. at 405.

**II. Plaintiffs have failed to satisfy their burden to show that the Court should grant the requested temporary and preliminary injunctive relief.**

Even if Plaintiffs' requests complied with the PLRA, which they do not, Plaintiffs fail to satisfy their heavy burden under the test for allowing the extraordinary remedy of preliminary injunctive relief. In *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974), the Fifth Circuit established the four prerequisites for granting a preliminary injunction:

> (1) a substantial likelihood that plaintiff will prevail on the merits;
>
> (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;
>
> (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and
>
> (4) that granting the preliminary injunction will not disserve the public interest.

*Id.* "In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Id.* at 573. To obtain temporary or preliminary injunctive relief, Plaintiffs "must carry 'a heavy burden of persuading the district court that all four elements are satisfied,' and failure to carry the burden on any one of the four elements will result in the denial of the preliminary injunction.'" *Leachman v. Harris Cty., Texas*, 779 F. App'x 234, 237 (5th Cir. 2019), as revised (Oct. 2, 2019) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)).

It is critical to bear in mind that Plaintiffs are not just asking the Court to maintain the status quo—they are asking for mandatory relief in the form of an order requiring MDOC to take specific actions regarding COVID-19. Doc. 59; Doc. 60. Again, Plaintiffs' request for preliminary relief, which "goes beyond maintaining the *status quo*," is "particularly disfavored,

and should not be issued unless the facts and the law clearly favor the moving party." *Martinez*, 544 F.2d at 1243. As discussed below, Plaintiffs are not "substantially likely" to prevail on the merits of their claims, particularly given the "deliberate indifference" standard. Accordingly, Plaintiffs have failed to carry their burden on all four *Canal* prerequisites, and therefore, the Court should deny Plaintiffs' motion for temporary and preliminary injunctive relief.[11]

### a. Plaintiffs are not substantially likely to succeed on the merits of their claims.

It is clear that Plaintiffs do not understand the standard for prevailing on a motion for preliminary relief related to a constitutional claim under the Eighth Amendment. Plaintiffs state: "Given that the entire World is in a state of emergency, there is substantial likelihood that Plaintiffs will succeed on the merits of their motion seeking reasonable protections for themselves and the other inmates, who are particularly at risk, but who are not allowed the means available to other citizens to protect themselves." Doc. 60 at 7.[12] First, Plaintiffs do not represent "other inmates." Second, to show that they are "substantially likely to succeed on the merits of their claims," Plaintiffs must show that it is substantially likely they will be able to prove that Defendants are acting with "deliberate indifference" to their health or safety. *Wilson v. Seiter*,

---

[11] The grant or denial of a preliminary injunction is within the discretion of the trial court. *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984).

[12] Plaintiffs' burden to prove deliberate indifference is even greater given that COVID-19 virus is an "emergency". Doc. 60 at 7. "In deciding whether the [Defendants] were deliberately indifferent to the needs of the plaintiffs, however, [the Court] must also consider any relevant constraints." *Alberti v. Sheriff of Harris Cty.*, 937 F.2d 984, 998 (5th Cir. 1991). The Supreme Court has made clear that in the deliberate indifference analysis, the Court must look to the "constraints facing the official." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). If a widespread emergency is facing the official, courts are far less likely to find deliberate indifference. *E.g.*, *Francis v. United States*, 2007 WL 2332322, at *2 (E.D. La. Aug. 13, 2007) (finding no deliberate indifference in conditions of confinement claim because "[p]etitioner, his jailers, and many free residents of Greater New Orleans area suffered substantially similar conditions in the aftermath of Hurricane Katrina").

501 U.S. 294, 302–03 (1991).[13] "Deliberate indifference is an extremely high standard to meet." *Sanchez v. Young Cty.*, 866 F.3d 274, 280 (5th Cir. 2017).

To satisfy "deliberate indifference," it must be shown that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).[14] "A prison official acts with deliberate indifference 'only if he knows that inmates face a substantial risk of serious harm and <u>disregards that risk by failing to take reasonable measures to abate it.</u>'" *Jones v. Texas Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (quoting *Farmer*, 511 U.S. at 847) (emphasis added); *see also Dockery*, 3:13-cv-326-WHB-JCG, Doc. 850 at 23, 36.

There are simply no factual allegations, much less evidence to support, that Defendants are actively disregarding the risks posed by COVID-19 or ignoring the impact that COVID-19 could have on the prison population. Quite the contrary, MDOC is actively engaged in attempting to prevent the infiltration of COVID-19 and implementing measures to protect inmates and MDOC staff should the virus infect those at Parchman. *See* Ex. A, B, and C. As shown by the declarations from MDOC and Centurion, the prison officials have continuously and dutifully taken reasonable measures in an effort to address risks. *Id.* Prison officials cannot be deemed to be deliberately indifferent if they "responded reasonably" to substantial risks to

---

[13] "[O]nly the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment." *Wilson*, 501 U.S. at 297. "It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Id.* at 299 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis in *Wilson*)).

[14] The "same subjective deliberate indifference standard has been applied to pre-trial detainees under the Fourteenth Amendment as well as convicted inmates under the Eighth Amendment." *Caston v. Harris*, 2013 WL 5724127, at *1 (N.D. Miss. Oct. 21, 2013) (citing *Hare v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996)). The Eighth Amendment applies to the states via the Fourteenth Amendment. *See State of Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947).

inmate health or safety, "even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844-45. In other words, MDOC cannot guarantee that COVID-19 will not eventually infiltrate Parchman. But as required, MDOC is taking all necessary and reasonable precautions to protect inmates and MDOC staff. Plaintiffs have presented no evidence to show otherwise, much less evidence that Parchman officials are ignoring the issue and failing to take reasonable measures.[15]

While there is limited case law in the Fifth Circuit discussing and applying the deliberate indifference standard to viral outbreaks on the scale of COVID-19, some guidance can be found in cases arising out of the swine flu epidemic that impacted prisons in 2009. Courts have recognized that prisons may not ultimately be able to prevent the introduction of diseases like COVID-19 into the population, but corrections officials are expected to take reasonable steps to prevent inmates from being exposed, just like MDOC is doing now. "Absent any indication that the defendants ignored willfully the swine flu outbreak in their facilities, the plaintiff's infection, though unfortunate, is insufficient to support an Eighth Amendment claim." *Ayala v. NYC Dep't of Corr.*, 2011 WL 2015499, *2 (S.D.N.Y. May 9, 2011) (prisoner who contracted swine flu could not prevail on deliberate indifference claim because prison officials took reasonable measures to sanitize contaminated facility and prevent inmate infections); *Jackson v. Rikers Island Facility*, 2011 WL 3370205, *2–3 (S.D.N.Y. Aug. 2, 2011) (corrections officials were not deliberately indifferent to prisoner's medical needs when they responded timely to request for swine flu treatment); *Washington v. Harrington*, 2012 WL 3763964, *2–6 (E.D. Cal. Aug. 29, 2012), *aff'd*, 549 F. App'x 679 (9th Cir. 2013) (inmate suffering from asthma could not state

---

[15] As stated, "there is no Eighth Amendment violation if the official 'responded reasonably to the risk, even if the harm ultimately was not averted." *Johnson*, 385 F.3d at 525 (quoting *Farmer*, 511 U.S. at 844). "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

deliberate indifference claim where symptoms of swine flu were recognized and monitored and inmate was transferred outside of prison for medical treatment).

It is clear that MDOC is working dutifully to prevent the infiltration of COVID-19 and to install effective protocols should inmates or MDOC staff become infected. *See* Ex. A, B, and C. Accordingly, it is not substantially likely that Plaintiffs will be able to show that MDOC or Defendants have acted with deliberate indifference to the risks of COVID-19. For that reason alone, the Court should deny the Motion.

### b. Plaintiffs have not established a substantial threat that they will suffer irreparable harm unless their requested "relief" is granted.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Trinity USA Operating, LLC v. Barker*, 844 F. Supp. 2d 781, 786 (S.D. Miss. 2011) (quotation omitted). The test is whether there is a substantial threat that Plaintiffs will suffer irreparable harm unless the Court grants the requested relief. But Plaintiffs have offered no support to show that their requested relief would operate to prevent COVID-19 better than the measures currently being implemented by MDOC and Centurion. *See* Ex. A, B, and C. Plaintiffs' many, conclusory allegations are wholly insufficient to meet the "heavy burden" under this element.

"Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (emphasis added). Plaintiffs set forth no such "independent proof" of irreparable harm. "Indeed, where no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate." *Canal Auth.*, 489 F.2d at 574. Plaintiffs have simply not shown that there is a substantial threat that they will suffer irreparable harm unless their requested "relief" is granted. Plaintiffs offer no support

to show that their requested measures are as effective or are more effective than MDOC's current protocols. In fact, the only exhibit utilized by Plaintiffs that mentions their specific requests is a declaration from Dr. Marc Stern, but Dr. Stern does not allege that MDOC's current preventative measures related to COVID-19 are inadequate. *See* Doc. 59-6.[16] In other words, Plaintiffs have not shown, or even alleged, that MDOC's actions regarding COVID-19 are inadequate and will cause harm to Plaintiffs absent Court intervention. Therefore, the Court should deny the Motion.

### c. Interfering with MDOC internal operations based only on Plaintiffs' suggestion, without factual backing, that MDOC should take alternative measures to protect inmates is harmful to the public and unlawful.

Because Mississippi's interest is indistinguishable from the "public's interest," the final two prerequisites of the *Canal Authority* test are considered together. Plaintiffs must make a "clear showing," *White*, 862 F.2d at 1211, "that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and . . . that granting the preliminary injunction will not disserve the public interest." *Canal Auth.*, 489 F.2d at 572. The public interest would be best served by implementing MDOC's own measures without further interference, and Plaintiffs have failed to make a "clear showing" that their proposed measures would serve the public (or even their own) interest. *White*, 862 F.2d at 1211.

As Congress's passage of the PLRA demonstrates, it is in the public's interest that prison officials are free to institute measures to promote the safety of inmates, staff, and the public without "micromanage[ment]" from plaintiffs or federal courts. *Gates*, 376 F.3d at 338; *Bell,* 441 U.S. at 562. With regard to public interest analysis, "[c]onsiderations of federalism weigh heavily against interference by federal courts through the issuance of preliminary injunctions against state agencies." *Edwards v. Livingston*, 2016 WL 7674806, at *2 (E.D. Tex. Nov. 14,

---

[16] Plaintiffs have offered nothing to show that any of the Plaintiffs are of a particular age, or have a particular health history, that makes them especially susceptible to contracting COVID-19. In fact, of the named Plaintiffs who are still residing at Parchman, the oldest is 53 years old.

17

2016). Even before the PLRA, the Fifth Circuit stated "courts are ill-equipped to deal with the increasingly urgent problems of prison administration . . . and that it is not wise . . . to second-guess the expert (or any other) administrators on matters on which they are better informed." *Jones*, 636 F.2d at 1368 (quotation omitted). "Proper respect for the State and for its governmental processes requires that the . . . court exercise its jurisdiction to accord the State considerable latitude to find mechanisms and make plans to correct the violations in a prompt and effective way consistent with public safety." *Brown v. Plata*, 563 U.S. 493, 543 (2011); *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (federal courts should not allow themselves to become "enmeshed in the minutiae of prison operations").

      To be frank, the exigencies of COVID-19 require that prison officials devote all their resources to meeting the COVID-19 threat head-on, not to responding to requests for measures that MDOC is already implementing, that are inappropriate, or that are not feasible. To be sure, the threatened injury to the public, inmates, and staff from COVID-19 is significant, and MDOC is acting reasonably to attempt to prevent the infiltration of COVID-19 into Parchman and to ameliorate damage of any infiltration. Yet, having the Court interfere with MDOC operations every time Plaintiffs believe they might do something differently than MDOC is harmful and unlawful. Here, as in other cases, "interference with prison operations in such circumstances would not be in the public's interest as it would be a waste of judicial resources micromanaging prison affairs." *Valigura v. Mendoza*, 2005 WL 3279275, at *2 (S.D. Tex. Dec. 2, 2005).

      As shown, the public interest, as well as the interests of Plaintiffs, will be best served by permitting MDOC to continue to implement their protocols. *See* Ex. A, B, and C. The Fifth Circuit requires that courts do not "second-guess the expert (or any other) administrators on matters on which they are better informed." *Jones*, 636 F.2d at 1368. Here, MDOC is far more

informed than Plaintiffs with regard to appropriate COVID-19 measures at Parchman. MDOC is on the front lines of prevention and has been collaborating with top health officials, including the CDC, Mississippi Department of Health, and United States Department of Security regarding measures to prevent and reduce COVID-19. Ex. A. MDOC is collaborating with Centurion to ensure that the most up-to-date data and guidance from public health officials is gathered, studied, and followed if appropriate. Ex. B and C. The public interest would not be better served by following Plaintiffs' uninformed recommendations. Accordingly, the Court should deny Plaintiffs' motion for preliminary injunction.

## CONCLUSION

For the reasons discussed above, Defendants respectfully request that the Court deny Plaintiffs' motion for temporary restraining order and mandatory preliminary injunction as to COVID-19 and request such other and further relief as the Court deems appropriate under the circumstances.

Date: March 19, 2020.

> Respectfully submitted,
>
> **TOMMY TAYLOR, in his official capacity as the Interim Commissioner of the Mississippi Department of Corrections, and MARSHAL TURNER, in his official capacity as the Superintendent of the Mississippi State Penitentiary**
>
> By: */s/ Trey Jones*
> William Trey Jones, III
> One of Their Attorneys

        **OF COUNSEL:**

        R. David Kaufman (MSB #3526)
        dkaufman@brunini.com
        William Trey Jones, III (MSB #99185)
        tjones@brunini.com
        Karen E. Howell (MSB #102243)
        khowell@brunini.com
        Cody C. Bailey (MSB #103718)
        cbailey@brunini.com
        Jacob A. Bradley (MSB #105541)
        jbradley@brunini.com
        BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
        The Pinnacle Building, Suite 100
        190 East Capitol Street (39201)
        Post Office Drawer 119
        Jackson, Mississippi 39205
        Telephone: (601) 948-3101
        Facsimile: (601) 960-6902

## **CERTIFICATE OF SERVICE**

I, Trey Jones, hereby certify that on March 19, 2020, I caused the foregoing pleading to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record and registered participants.

        */s/ Trey Jones*
        William Trey Jones, III
        One of the Attorneys for the Defendants