## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

**MICHAEL AMOS, et al.**                                          **PLAINTIFFS**

**V.**                                                    **NO. 4:20-CV-7-DMB-JMV**

**TOMMY TAYLOR, et al.**                                          **DEFENDANTS**

### ORDER

The plaintiffs, all inmates at the state penitentiary in Parchman, Mississippi, seek emergency injunctive relief requiring the Mississippi Department of Corrections' interim commissioner and superintendent to implement certain measures to prevent or mitigate the spread of COVID-19. Because the plaintiffs have not satisfied the requisite elements for injunctive relief, their request for injunctive relief will be denied.

### I
### Procedural History

On January 28, 2020, thirty-three inmates at the Mississippi State Penitentiary at Parchman filed a "First Amended Class-Action Complaint and Demand for Jury Trial" against Tommy Taylor, in his official capacity as the Interim Commissioner of the Mississippi Department of Corrections, and Marshal Turner, in his official capacity as the Superintendent of Parchman. Doc. #22. In their complaint, the plaintiffs allege that the defendants' policies and practices caused years of neglect at Parchman, which placed them in imminent danger of serious physical injury, in violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment, as incorporated by the Fourteenth Amendment. The pleading, which includes a proposed class action, seeks monetary and injunctive relief.

On March 16, 2020, the plaintiffs filed an emergency motion for a temporary restraining order and mandatory preliminary injunction. Doc. #59. The motion seeks an "order directing mandatory and affirmative action to safeguard Plaintiffs at Parchman from SARS-CoV-2, also

known as COVID-19." *Id.* at 1.

After this Court directed expedited briefing on the motion, the defendants filed a response on March 19, 2020. Doc. #62. The plaintiffs replied a day later. Doc. #64. Three days after the completion of the expedited briefing, the Centers for Disease Control and Prevention issued a document titled, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities."[1]   Accordingly, the Court directed the parties to supplement their filings in light of the CDC's guidance. Doc. #70. The parties complied with this directive. Docs. #74, #75.

## II
## Relevant Facts

The facts relevant to this motion are derived from the numerous exhibits submitted by the parties, including (1) an affidavit of Marc Stern, an expert for the plaintiffs; (2) redacted declarations and questionnaires executed under penalty of perjury by six inmates housed in Unit 30; (3) affidavits from various MDOC officials;[2] (4) affidavits from employees of Centurion of Mississippi, LLC,[3] MDOC's third-party health care provider; (5) affidavits from one of the plaintiffs' attorneys and a private investigator retained by the plaintiffs; and (6) an array of documentary evidence.   Because these documents reveal no material disputed facts, and because no party has requested an evidentiary hearing, the Court concludes that no hearing on the plaintiffs' motion is unnecessary.   *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

### A.  Background

The unfortunate backdrop to this case is known to all.   The United States of America, and

---

[1]  Accessible at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[2]  The officials are Jeworski Mallett, MDOC's Acting Deputy Commissioner of Institutions; Gloria Perry, MDOC's Chief Medical Officer; and Marshal Turner, the Superintendent of Parchman.

[3]  The employees are John May, Centurion's Chief Medical Officer; Willie Knighten, Centurion's Health Services Administrator at Parchman; and Clayton Ramsue, Centurion's Mississippi Statewide Medical Director.

most of the world, is in the midst of an outbreak of a respiratory illness known as COVID-19. As of April 22, 2020, the Centers for Disease Control reported 828,441 cases in American territories, resulting in 46,379 deaths.[4] Also as of April 22, 2020, the State of Mississippi reported 5,153 cases, with 201 resulting deaths.[5]

"The virus that causes COVID-19 is spreading very easily and sustainably between people," typically through respiratory droplets produced by an infected person.[6] Symptoms of the disease include fever, cough, and shortness of breath. Doc. #74-1 at 4. Transmission "mainly" occurs "[b]etween people who are in close contact with one another (within about 6 feet)."[7] Because, according to the CDC, "[l]imiting face-to-face contact with others is the best way to reduce the spread" of the virus,[8] the CDC recommends that people "practice social or physical distancing" by staying at least six feet from other people, not gathering in groups, and avoiding "crowded places" and "mass gatherings."[9]

### B. Pre-COVID-19 Parchman Conditions

According to Marc Stern, a board-certified internist with a specialty in correctional healthcare, the pre-COVID-19 "health-related and environmental conditions" at Parchman were

---

[4] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 24, 2020). The Court takes judicial notice of this and other CDC statements regarding the virus. *See In re Abbott*, 954 F.3d 772, 779 (5th Cir. 2019) (apparently taking judicial notice of CDC facts related to COVID-19); *Gent v. CUNA Mut. Ins. Soc.*, 611 F.3d 79, 84 & n.5 (1st Cir. 2010) (taking judicial notice of CDC guidance and facts related to Lyme disease). The Court will also take judicial notice of state and local statements. *See Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of information on state website).

[5] Mississippi State Department of Health, Coronavirus Disease 2019 (COVID-19): COVID-19 in Mississippi and the U.S., https://msdh.ms.gov/msdhsite/_static/14,0,420.html (last visited April 24, 2020).

[6] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): How COVID-19 Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited April 24, 2020).

[7] *Id.*

[8] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Social Distancing, Quarantine, and Isolation, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited April 24, 2020).

[9] *Id.*

the worst he had seen in his twenty-year career. Doc. #59-6 at ¶¶ 3, 8. In his affidavit, Stern states that a COVID-19 outbreak at Parchman "would be catastrophic, and potentially fatal to many residents with already compromised immune systems and underlying chronic conditions." *Id*. at ¶ 10.

Based on the conditions at Parchman, which Stern observed during a February 11, 2020, inspection of the facility, Stern opines the defendants "should immediately … mandate[]" the following steps: (1) test patients who require testing, "based on public health recommendations and the opinion of a qualified medical professional; (2) screen on a daily basis every visitor to the facility (including employees) for a fever over 100 degrees, cough, shortness of breath, recent travel to a high risk country, or exposure to a symptomatic individual; (3) isolate inmates "believed to have been exposed to COVID-19" and those "believed to be infected … and potentially infectious;" (4) "increase the sanitation and cleaning protocol and frequency for all public spaces, highly traveled areas, and cells;" (5) provide inmates sufficient "hand soap, disposable paper towels, and access to water, … free of charge," and lift Parchman's ban on hand sanitizer and allow use of sanitizer by inmates; (6) "require[] or increase non-contact visitation;" (7) waive copays "related in any way to COVID-19 and/or its symptoms; and (8) "identify the supplies and other materials upon which the institution is dependent, such as food, medical supplies, certain medicines, cleaning products, etcetera and prepare for shortages, delays or disruptions in the supply chain." Doc. #59-6 at ¶ 11.

### C. The CDC Guidance

On March 23, 2020, the CDC issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" ("CDC Guidance"). Doc. #74-1. The document "provides … recommended best practices specifically for correctional and detention facilities." *Id*. at 3.

4

The CDC Guidance is divided into three categories: (1) "operational preparedness" strategies, which focus "on operational and communications planning and personnel practices" "intended to help facilities prepare for potential COVID-19 transmission in the facility;" (2) "prevention" strategies, which focus "on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals); and (3) "management" strategies, such as "medical isolation" and quarantines, "intended to help facilities clinically manage confirmed and suspected COVID-19 cases inside the facility and prevent further transmission." *Id*. at 5.

Of relevance to the plaintiffs' motion, the CDC Guidance, which "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions,"[10] includes the following recommendations for correctional facilities:

1. Post signage "throughout the facility" which communicates the "symptoms of COVID-19 and hand hygiene instructions," and which informs inmates to "report symptoms to staff." Doc. #74-1 at 6.

2. Provide to inmates on a regular basis "up-to date information about COVID-19," including "[s]ymptoms of COVID-19 and its health risks," and "[r]eminders to report COVID-19 symptoms to staff at the first sign of illness." Doc. #74-1 at 12.

3. "If soap and water are not available," "[c]onsider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow." *Id*. at 8.

4. "Provide a no-cost supply of soap to [inmates], sufficient to allow frequent hand washing." Doc. #74-1 at 8. The soap should preferably be liquid and should be

---

[10] Doc. #74-1 at 1.

in sufficient quantities to allow the inmate to "[re]gularly wash [his] hands with soap and water for at least 20 seconds." *Id*. at 8, 10.

5. "Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms)." Doc. #74-1 at 10. Hand sanitizer should be placed "in visitor entrances, exits, and waiting areas." *Id*. at 13.

6. "[C]onsider suspending co-pays for [inmates] seeking medical evaluation or respiratory symptoms." Doc. #74-1 at 9.

7. Implement "intensified cleaning and disinfecting procedures" by cleaning and disinfecting "[s]everal times per day … surfaces and objects that are frequently touched, especially in common areas," such as "doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones." Doc. #74-1 at 9.

8. Consider eliminating in-person visits and, if eliminated, promote non-contact by reducing or eliminating the cost of telephone calls, and increasing telephone privileges. Doc. #74-1 at 13.

9. "Perform verbal screening … and temperature checks for all visitors and volunteers on entry" to screen for COVID-19 symptoms and potential exposure to the virus. Doc. #74-1 at 13. The screening process should be administered by staff wearing personal protective equipment (such as respiratory protection) and should exclude visitors who do not clear the screening process or who decline screening. *Id*. Perform the same screening daily for staff. *Id*. at 12.

10. "Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals regardless of the presence of symptoms)." Doc. #74-1 at 11. Example strategies include, staggering recreation and meal times, rearranging seating in the dining halls, providing meals to inmates in cells, limiting group activities, reassigning bunks, and arranging bunks so that individuals sleep head to foot. *Id.*

11. When an inmate develops COVID-19, the inmate should wear a face mask and "should be immediately placed under medical isolation in a separate environment from other individuals." Doc. #74-1 at 15. Facility staff "should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated." *Id.* at 22.

### D. Parchman's COVID-19 Measures and Procedures

Before the issuance of the CDC Guidance, MDOC and Centurion officials were working to implement the provisions of "Centurion Pandemic Preparedness and Emergency Response Plan" ("Centurion Plan"), a document setting forth "protocols for the diagnosis, treatment, and management of conditions related to infectious diseases such as COVID-19." Doc. #62-1 at ¶ 8. Since then, the following measures and procedures have been established at Parchman:

1. Centurion staff distributed COVID-19 informational handouts to health care staff, security staff, and inmates at Parchman. Doc. #75-2 at PageID #1477. The forms all listed the symptoms of COVID-19 and provided additional instructions and procedures for each group. Doc. #75-3 at PageID #1491–97. The inmate forms recommended that inmates wash hands "often with soap and water," practice social distancing of six feet or more, cover coughs and sneezes, and stop smoking. *Id.* at PageID #1497. The healthcare staff forms provided that if an inmate was exposed

7

to COVID-19 or displayed symptoms of COVID-19, the inmate should be placed in a separate and closed room for further testing. *Id.* at PageID #1491–92.

2.   MDOC suspended in-person visitation and allowed inmates to make two free phone calls per week through April 13, 2020. Doc. #62-1 at 6 & PageID #1042.

3.   MDOC posted signs at the entrances to all housing units at Parchman stating that anyone experiencing fever, coughing, sneezing, cold symptoms, or difficulty breathing should not enter the facility. Doc. #75-2 at PageID #1477. MDOC also posted signs regarding handwashing in Parchman's restrooms. *Id.*

4.   MDOC is supplying Parchman inmates extra hand soap and placed signage "in each unit, building, and zone to remind inmates to regularly wash their hands and to do so for at least 20 seconds." Doc. #75-5 at ¶ 8. Hand sanitizer is available to staff "at the areas where they clock-in and clock-out" but has not been made available to inmates. *Id.*

5.   MDOC requires that all staff wear masks and gloves "while inside the buildings and zones of a unit at [Parchman] and while interacting with inmates." Doc. #75-5 at ¶ 8. Inmate workers are provided masks and gloves "to wear while they are performing their duties or interacting with other inmates." *Id.* Centurion imposed a similar requirement for its staff on April 15, 2020. Doc. #75-2 at 3.

6.   Three times per day, MDOC issues cleaning supplies to inmate workers to disinfect common areas in each zone. Doc. #75-5 at ¶ 9. MDOC staff have also "been instructed to frequently clean any shared equipment and upon conclusion of any use of that equipment." *Id.*

7.   MDOC requires screening of "staff and all visitors at [Parchman] daily upon entrance to the facility for symptoms and other indicators of exposure to COVID-

19." Doc. #75-5 at ¶ 10. This process "includes questions about symptoms, if any, including headaches, fevers, coughing, shortness of breath, and any trouble breathing, travel history, and includes the administration of a temperature reading." *Id*. Staff or visitors with temperatures greater than 100 degrees are asked to leave the premises. *Id*.

8.  MDOC directed staff "to announce daily to all inmates in each zone that they should immediately report any symptoms of COVID-19 to MDOC staff." Doc. #75-5 at ¶ 10. If an inmate exhibits symptoms of COVID-19, Centurion screens all inmates in that zone. *Id*.

9.  When dealing with a symptomatic inmate, Centurion employees are to follow an "Assessment Protocol for Patients Presenting with Febrile Respiratory Illness." Doc. #75-3 at ¶ 23 & PageID #1499. Under this protocol, the on-duty RN must apply a surgical mask to the inmate before conducting an assessment. *Id*. at PageID #1499. If the RN determines the inmate does not have a fever and is "not exhibiting respiratory symptoms consistent with viral illness" then the patient should be educated and returned to housing. *Id*. Otherwise, the RN should confirm whether there is a "flu-like illness" and then administer a rapid Influenza test. *Id*. If the influenza test is positive, the patient should be isolated. *Id*. If the influenza test is negative or not available, the RN may test one or two patients in the area for COVID-19 or presume the population to be positive, if tests are unavailable. *Id*. If the patient has a fever and is otherwise "ill or compromised" the inmate should be transported to the ER. *Id*.

10. MDOC ceased in-person visits with inmates, except for visits with attorneys. Doc. #75-5 at ¶ 10. Attorneys are asked to wear gowns, gloves, and masks. *Id*. All

visitation areas are sanitized after each visit.   *Id.*

11.   MDOC posted signage at Parchman to advise inmates of social distancing recommendations and directed staff "to verbally encourage social distancing," including encouraging sleeping head to foot.   Doc. #75-5 at ¶ 11.

12.   MDOC suspended inter-facility transfers of inmates in and out of Parchman, "except for cases of an emergency or a serious security threat."   Doc. #75-5 at ¶ 12.   When a new inmate is transferred into Parchman, the new inmate is screened and isolated for fourteen days.   *Id.*   However, intra-facility transfers are still occurring.   *Id.*   Parchman inmates who are transported outside Parchman for medical care are quarantined upon return.   Doc. #75-2 at ¶ 12.

13.   MDOC implemented a quarantine plan under which if an inmate or staff person is tested for COVID-1 or is suspected of having COVID-19, any housing unit in which the potentially sick person had direct contact is quarantined for fourteen days.   Doc. #75-5 at ¶ 13.   The potentially sick person is then medically isolated. *Id.*   Staff with direct contact with the individual must wear personal protective equipment (PPE), including masks and gloves.   Doc. #75-2 at ¶ 16.

14.   Centurion waived all co-pays related to COVID-19, effective March 19, 2020. Doc. #75-5 at ¶ 16; Doc. #75-3 at ¶ 20.

15.   Inmates with underlying medical conditions are housed separately in Parchman's medical unit.   Doc. #75-2 at ¶ 13.

16.   Centurion nurses travel to housing units twice a day to answer inmate questions. *Id.* at ¶ 10.

**E.  Challenges to Implementation of Measures and Procedures in Unit 30**

As explained above, the plaintiffs submitted questionnaires and declarations executed

under penalty of perjury by six inmates housed in Unit 30, as well as affidavits from a private investigator and the plaintiffs' counsel.  *See* Docs. #74-3, #74-4, #74-5, #74-6.  Taken together, these documents show:

1.  On March 24 and 25, 2020, Parchman staff did not wear personal protective equipment while screening visitors, did not ask screening questions, and did not disinfect the contact thermometer after each use.  Doc. #74-5 at ¶¶ 10–11, 14–15. On these dates, vehicles containing MDOC or Centurion employees were allowed to enter Parchman without any screening.  *Id*.

2.  As of March 25, 2020, the Parchman visitor center had no COVID-19 signage. Doc. #74-6 at ¶ 11.  The visitor restroom had no hand soap or hand sanitizer.  *Id*. at ¶ 8.

3.  Inmates in Unit 30 are receiving two bars of soap weekly, rather than the one they are normally provided.  *See* Doc. #74-4 at PageID #1375.

4.  Except for the quarantines, the defendants have made no effort to enforce social distancing guidelines between the inmates in Unit 30.  *See* Doc.# 74-4 at PageID #1388.  For example, inmates can play basketball.  Doc. #74-4 at PageID #1392.

5.  Inmates in Unit 30 have received limited information on the virus and some were not informed by the defendants that co-pays had been waived.[11]  *See* Doc. #74-3 at PageID #1331, #1338.

6.  The defendants did not clean the bedding and property of an inmate in Unit 30 who was taken to the medical unit for COVID-19 related symptoms.  Doc. #74-4 at PageID #1375.

---

[11] Of the six inmate declarants, three stated definitively they were not told of the waiver, one said he was told "3rd hand," one said it was not "emphasized," and one is "not sure" he was told.  *See* Doc. #74-3.  In their accompanying declarations, two of the inmates who stated they were not told, and the inmate who stated he was "not sure," all clarified that the waiver was not "emphasized."

7.      While inmates in Unit 30 are provided supplies to clean portions of Parchman, bunks are never cleaned, and laundry service is not used often by inmates because inmates believe the laundry "comes back dirty." Doc. #74-4 at PageID #1375.

8.      During daily temperature checks in Unit 30, nurses do not ask about symptoms. Doc. #74-4 at PageID #1375. Inmates with fevers and coughs are not consistently referred to the medical unit or evaluated in any way. Doc. #74-4 at PageID #1392. On at least one occasion an inmate was threatened with mace when he tried to inform a nurse of his COVID-19 symptoms. *Id*. at PageID #1376.

9.      Inmates in Unit 30 have not been provided paper towels, tissues, or no-touch trash cans. Doc. #74-4 at PageID #1375, #1377–78.

10.    Guards in Unit 30 do not always use masks or maintain social distancing. Doc. #74-4 at PageID #1374.

11.    "Most" but not all medical staff wear gloves. Doc. #74-4 at PageID #1374.

### F.  Quarantines in Unit 30

On or about March 26, 2020, Parchman officials learned that a staff member who worked with inmate kitchen workers had tested positive for COVID-19. Doc. #75-2 at ¶ 18. In response to this development, MDOC "quarantined" for fourteen days all inmates housed with the exposed inmate kitchen workers. *Id*. From March 26 until April 2, 2020, inmates in Buildings C and D of Unit 30 (the impacted buildings) were still eating meals with inmates in other buildings. Doc. #74-4 at ¶ 4. It was not until April 2, 2020, that the buildings were locked down. *See id*. at PageID #1373, #1377, #1389, #1383, #1386, #1390. Regardless, no inmates developed a fever before the quarantine ended on April 9, 2020. Doc. #75-2 at ¶ 18.

On April 8, 2020, an inmate previously admitted to the Parchman hospital was tested for COVID-19. *Id*. at ¶ 19. Two days later, after his condition deteriorated, the inmate was

transferred to a hospital off the Parchman site.  *Id*.  On April 11, 2020, the inmate passed away.  *Id*.  Later that evening, the defendants learned that the inmate tested positive for COVID-19.  *Id*.

Following the positive test, Parchman officials cleaned with Biovex and bleach both the medical unit and the building where the inmate had been housed.  Doc. #75-2 at ¶ 20.  Additionally, the defendants quarantined for fourteen days all inmates housed in the buildings where the sick inmate was previously housed and all inmates housed in the buildings where the sick inmate previously worked.  *Id*. at ¶ 21.  The quarantined inmates were provided face masks and are being monitored for COVID-19 symptoms two times a day.  *Id*.  Inmates who had been "in close contact" with the sick inmate were tested for COVID-19 in addition to being placed in quarantine.  *Id*. at ¶ 22.

### III
### Standards for Injunctive Relief

"Federal court procedural rules distinguish preliminary injunctions from temporary restraining orders. Issuance of an injunction may occur only after notice to the parties, while a temporary restraining order may be issued *ex parte* and without notice."  *Knoles v. Wells Fargo Bank, N.A.*, 513 F. App'x 414, 415 (5th Cir. 2013) (comparing Fed. R. Civ. P. 65(a) and (b)(1)).  Nevertheless, the standards are similar.   To issue a temporary restraining order or a preliminary injunction, a court must find (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury in the absence of injunctive relief; (3) the threatened injury outweighs the harm in granting the injunction; and (4) granting the injunction would not harm the public interest.   *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (elements for preliminary injunction); *Turner v. Epps*, 460 F. App'x 322, 325 n.3 (5th Cir. 2012) (elements for TRO).

While the elements are the same, a plaintiff seeking a temporary restraining order must ordinarily make a stronger showing than a plaintiff seeking a preliminary injunction.  *Esparza v. Bd. of Trs.*, 182 F.3d 915 (5th Cir. 1999) (table decision).   "Mandatory preliminary relief, which

goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

In addition to the above standards applicable to injunction motions generally, the Prison Litigation Reform Act provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). Necessarily, "when a district court fashions prospective relief in prison litigation, the relief must meet the standards set forth in the Act." *Williams v. Edwards*, 87 F.3d 126, 133 (5th Cir. 1996). However, "[a]lthough the PLRA significantly affects *the type* of prospective injunctive relief that may be awarded, it has not substantially changed the threshold findings and standards *required to justify an injunction*." *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001) (emphases added).

**IV**
**Analysis**

As supplemented, the plaintiffs' motion seeks a court order requiring that the defendants: (1) implement the CDC Guidance;[12] (2) implement the Centurion Plan;[13] (3) enact a variety of screening, visitation, and cleaning protocols;[14] (4) make regular reports to the Court and the

---

[12] "Defendants shall immediately, or as soon as practicable, implement at Parchman, and shall follow through the life of this pandemic, or until further order of this Court, the [CDC Guidance]." Doc. #74 at 18.

[13] "Defendants shall immediately, or as soon as is practicable, implement at Parchman, and shall follow throughout the life of this pandemic, or until further order of this Court, their plans, policies and procedures pertaining to their response to this pandemic including, without limitation, [the Centurion Plan]." *Id.*

[14] The requested procedures are: (1) daily screening of all persons entering Parchman; (2) active monitoring of all inmates for symptoms of COVID-19; (3) implementation of isolation policies for inmates who test positive for COVID-19, have symptoms of COVID-19, and new inmates; (4) continuing to offer free telephone calls to inmates;

14

plaintiffs;[15] and (5) provide access to a Mississippi Department of Health official who will monitor compliance with the Court's order, and report to the Court and the plaintiffs.[16] Doc. #74 at 18–21.

The defendants contend that the relief the plaintiffs' seek is inappropriate because (1) there is no underlying violation of a federal right which would justify the relief; (2) even if there was an underlying constitutional violation, the requested relief is more intrusive than necessary; and (3) all the requested measures "are either already being undertaken, … are in many respects not possible or recommended (such as testing every single inmate), or … have not been shown by Plaintiffs to have any reasonable relation to preventing the alleged harm." Doc. #63 at 7–8.

## A. Likelihood of Success

"[T]here must be a relationship between the injury claimed in [a] motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation Oncology, LLC v. Queens' Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (collecting cases). "The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.'" *Id.* (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). Accordingly, the substantial likelihood of success inquiry focuses on the "merits of [the]

---

(5) ensuring Parchman has "sufficient cleaning agents;" (6) ensuring inmates have "a continuous supply" of soap and access to running water; and (7) waiver of all co-pays related to COVID-19. *Id.* at 19–20.

[15] The plaintiffs ask that the reports include (1) the number of inmates who have tested positive for COVID-19, and the names of such people if they are named plaintiffs; (2) the number of inmates who are in medical isolation related to COVID-19, and the names of such people if they are named plaintiffs; (3) "confirmation" that cleaning supplies are available and being utilized; and (4) "confirmation" that soap is available to each inmate and that each inmate has access to clean running water. *Id.* at 20. The plaintiffs also ask that the defendants "report to the Court weekly by email, with copy to Named Plaintiffs, and provide a copy of all filed reports as required by local, state, and federal laws and regulations, as is required by Centurion's Infectious Disease Prevention and Control Policy, Policy No. P-B-02, p. 2." *Id.*

[16] "Defendants shall allow a competent employee of the Mississippi Department of Health, who is educated on the CDC's COVID-19 Guidelines, to be given reasonable access at any given time to Parchman for the purpose of ensuring compliance with the Court's order and reporting his/her findings to the Court, with a copy to Named Plaintiffs." *Id.* at 20.

underlying claim." *Walgreen Co. v. Hood*, 275 F.3d 475, 478 (5th Cir. 2001). "The importance of this requirement varies with the relative balance of threatened hardships facing each of the parties." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

The plaintiffs' ground their motion for injunctive relief related to COVID-19 protections in their underlying Eighth Amendment claims regarding the defendants' "duty to provide adequate medical care, shelter, and to take reasonable measures to guarantee the safety of inmates." Doc. #60 at 6–7 (quotation marks omitted). The question, therefore, is whether the plaintiffs are likely to succeed on their claims that the defendants' response to COVID-19 violates the plaintiffs' Eighth Amendment rights. *See Valentine v. Collier*, __ F.3d __, No. 20-20207, 2020 WL 1934431, at *3 (5th Cir. Apr. 22, 2020) (prisoners' entitlement to injunctive relief depends on showing of deliberate indifference); *see generally Baxley v. Jividen*, 2020 WL 1802935, at *3 (S.D.W.V. Apr. 8, 2020) ("[T]his case as pled is about statewide claims related to how inmates generally receive medical and mental health treatment upon admission. The Court believes this language is sufficiently broad to encompass claims for medical treatment for COVID-19.") (cleaned up).

Section 1983[17] claims brought against defendants in their official capacities are suits against the entity the officials represent. *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 417 (5th Cir. 2018). "To establish liability against a governmental entity … a plaintiff must … show the existence of (1) a policy maker; (2) an official policy; and (3) causation, or a violation of rights whose moving force is the policy." *Doe v. United States*, 831 F.3d 309, 317–18 (5th Cir. 2016). While this standard ordinarily requires a policy, "a custom may also suffice." *Id.* (quotation marks omitted). A custom is "a persistent widespread practice of governmental officials or

---

[17] As this Court has previously explained, 42 U.S.C. § 1983 "is the exclusive vehicle for an Eighth Amendment claim against a state actor." *Duren v. Carroll-Montgomery Reg'l Corr. Facility*, No. 4:17-cv-154, 2019 WL 4482531, at *4 n.6 (N.D. Miss. Sep. 18, 2019) (citing *Berger v. City of New Orleans*, 273 F.3d 1095 (5th Cir. 2001) (table decision)).

employees that is so common and well-settled as to constitute a custom that fairly represents policy." *Id.* (cleaned up). A claim for injunctive relief against a governmental entity or a supervisory official must be likely to satisfy this standard. *Gale v. O'Donohue*, 751 F. App'x 876, 884 (6th Cir. 2018); *see also Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir. 1994); *Zinter v. Salvaggio*, No. 5-18-cv-680, 2018 WL 5098785, at *4 (W.D. Tex. Oct. 19, 2018); *Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 115 (D.D.C. 2018).

The Eighth Amendment imposes on prison authorities a duty to protect prisoners. *Jason v. Tanner*, 938 F.3d 191, 195 (5th Cir. 2019). This duty is violated by an official "only when two requirements are met. First, as an objective matter, the deprivation or harm must be sufficiently serious. Second, the official must have been deliberately indifferent." *Id.* (cleaned up). To satisfy the first element, "the plaintiff must show an objectively intolerable risk of harm." *Valentine*, 2020 WL 1934431, at *3 (quotation marks omitted). The second requirement is subjective and requires that the plaintiff show the defendant "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk." *Id.* (cleaned up). Here, the defendants do not dispute that "COVD-19 presents serious health risks." Doc. #63 at 5. Rather, they contend they are not responding to this threat with deliberate indifference. *Id.*

Even if the plaintiffs could establish likelihood of success on the objective prong, they cannot make a similar showing as to the subjective prong. The deliberate indifference standard may be satisfied when officials respond to an infectious disease "outbreak with a series of negligent and reckless actions." *DeGidio v. Pung*, 920 F.2d 525, 533 (8th Cir. 1990). "[K]nown noncompliance with generally accepted guidelines for inmate health strongly indicates deliberate indifference to a substantial risk of serious harm." *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 943 (N.D. Cal. 2015). Such guidelines may include CDC guidance, even if the

17

guidance is not mandatory. *Id.* However, mere departure from recommended best practices is insufficient to show deliberate indifference. *See M.D. ex rel Stukenberg v. Abbot*, 929 F.3d 272, 289 (5th Cir. 2019) (Higginbotham, J., concurring in part) ("Best practices are not the handmaiden of deliberate indifference."). Rather, the known noncompliance must result in an excessive risk to inmate health or safety. *Tanner*, 938 F.3d at 195.

Analytically, the deficiencies identified by the plaintiffs fall into one of two categories—deficiencies in Parchman's measures and procedures or deficiencies in implementation of those measures and procedures. Claims premised on deficiencies in the measures and procedures themselves must likely meet the deliberate indifference standard. When a claim is premised on a failure to implement, the failure must be so prevalent to be deemed a custom *and* must rise to the level of deliberate indifference.

Here, the defendants have undoubtedly taken steps to address the risk of COVID-19 in Parchman. Such undisputed steps include the creation and updating of the Centurion Plan, posting of signs, promulgation of quarantine and screening policies for both inmates and visitors, suspension of in-person visitation except for attorneys, implementing cleaning procedures in the housing units, the waiving of co-pays for inmates, limitations on transfers, and the provision of extra soap to inmates. However, the record is also undisputed that the implementation of these steps has been inconsistent or ineffectual. On at least two occasions, Parchman staff did not verbally screen attorney visitors, and did not screen staff at the entrance to the facility. Signage and hygiene at the visitors center appears insufficient and contrary to the CDC Guidance. In Unit 30, not all inmates were notified of the waiver of co-pays; not all prison employees wear PPE; bunks are not cleaned; a quarantine was apparently not enforced for a week; and inmates with fevers, sore throats, or coughs are allowed to remain in their units and, in at least one instance, have been threatened with mace when discussing symptoms.

Additionally, portions of the defendants' stated policies conflict in some ways with some of the general recommendations of the CDC Guidance. The CDC Guidance recommends taking affirmative steps to produce social distancing, such as the staggering of meals and recreation times, limiting group activities, and reassigning bunks. Doc. #74-1 at 11. However, it is undisputed the defendants have made no efforts to enforce, rather than merely recommend adherence to, social distancing guidelines.[18] The CDC Guidance also recommends that facilities provide inmates "hand drying machines or disposable paper towels for hand washing" and "tissues and no-touch trash receptacles for disposal." *Id.* at 10. None of these items are provided as a part of Parchman's response.

The facts of this case are very similar to those in *Valentine v. Collier*, a case in which the Fifth Circuit stayed pending appeal an injunction issued by a district court against a prison because the plaintiffs were unlikely to be able to show deliberate indifference.[19] 2020 WL 1934431, at *4. In *Valentine*, as here, the prison took numerous steps to prevent transmission, including employee screenings, copay waivers, suspension of in-person visits, isolation for symptomatic inmates, masks for staff, increased cleaning in inmate areas, and increased soap access. No. 4:20-cv-1115, 2020 WL 1916883, at *10 (S.D. Tex. Apr. 20, 2020). Also as here, the *Valentine* plaintiffs submitted evidence showing that at least one symptomatic inmate was not isolated; some cleaning policies were not being implemented; the prison refused to give inmates hand sanitizer,

---

[18] The plaintiffs have advanced other arguments regarding alleged non-compliance which are facially frivolous. First, the plaintiffs seem to suggest that the failure to provide sanitizers is contrary to the CDC Guidance. However, the CDC Guidance only recommends the use of sanitizer "[i]f soap and water are not available." Doc. #74-1 at 8. The plaintiffs also contend, without support, that the extra bar of soap provided to the inmates is insufficient to support frequent hand washing. No support is offered for this proposition and no evidence is cited that inmates who run out of soap are denied extra soap. Similarly, the plaintiffs argue in conclusory fashion that the defendants' laundry practices violate the CDC Guidance's provisions requiring that facilities "launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting …." *Id.* at 18. While the plaintiffs have offered some evidence that the laundry services are not particularly efficient, there is no evidence of what procedures the laundry service follows.

[19] The Fifth Circuit's decision in *Valentine* addressed the issue of a stay of an ordered injunction rather than the ultimate entitlement to the injunction itself. In this sense, the opinion is not dispositive of the case. However, the evaluation of the merits of the *Valentine* plaintiffs' claims should not be ignored.

19

facial tissues or paper towels; information on co-pays and COVID-19 were not adequately presented to inmates; and social distancing was not being enforced.   *Id*. at *4–6.

While the district court in *Valentine* found the plaintiffs were likely to succeed on the deliberate indifference claim, the Fifth Circuit stayed the injunction, concluding the prison was likely to succeed on the merits of its appeal because "the Plaintiffs lack evidence of the Defendants' subjective deliberate indifference" to the risk of COVID-19.   *Valentine*, 2020 WL 1934431, at *4. In reaching this conclusion, the Fifth Circuit held:

> Though the district court cited the Defendants' general awareness of the dangers posed by COVID-19, it cited no evidence that they subjectively believe the measures they are taking are inadequate. To the contrary, the evidence shows that TDCJ has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus. Although the district court might do things differently, mere "disagreement" with TDCJ's medical decisions does not establish deliberate indifference.

*Id*. (citations omitted).

Here, as in *Valentine*, there is insufficient evidence to support a finding of deliberate indifference, at least with respect to COVID-19.[20]   The defendants have taken numerous proactive steps to prevent the transmission of COVID-19, which they believe to be consistent with the CDC Guidance.   Doc. #75-2 at ¶ 5.   While there is some evidence showing incomplete implementation of the procedures, the evidence is either limited to sporadic instances, limited to two buildings in a single unit of Parchman, or both, and therefore fails to show a policy or custom which would justify the facility-wide injunctive relief sought by the plaintiffs.   *See Foster v. Tarrant Cty. Sheriff's Dep't*, No. 4:20-cv-113, 2020 WL 1906095, at *3 (N.D. Tex. Apr. 17, 2020) ("The general rule is that allegations of isolated incidents are insufficient to establish a custom or policy.") (collecting cases).

---

[20] Stern's affidavit, which is uncontradicted by any evidence, paints a very grim picture of the general conditions at Parchman.   *See* Doc. #59-6.

Similarly, while elements of Parchman's protocols appear to conflict with a handful of provisions in the CDC Guidance (provision of paper towels and tissues and policies enforcing social distancing), these departures are insufficient on their own to show a likelihood of success regarding deliberate indifference, particularly in light of the comprehensive and far reaching steps taken by the defendants. *Valentine*, 2020 WL 1934431, at * 4; *cf. Hernandez*, 110 F. Supp. 3d at 943 ("At least since the CDC released its guidelines, and since Puisis issued his report showing Defendants' policies and practices fell below the constitutional standard of care, Defendants have known about the risks of harm but have not changed their practices."). Indeed, as in *Valentine*, the evidence shows that Parchman "has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus." 2020 WL 1934431, at * 4. Accordingly, the Court concludes that the plaintiffs are unlikely to succeed on their claims.

### B. Substantial Threat of Irreparable Injury

The plaintiffs must show "that they will suffer irreparable injuries *even after* accounting for the protective measures" in place. *Valentine*, 2020 WL 1934431, at *5. There is no evidence to support such a finding.

### C. Whether Threatened Injury Outweighs Harm to Non-Movant

"[A]ny time a state is enjoined by a court from effectuating from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Valentine*, 2020 WL 1934431, at *4. Accordingly, when a legislature assigns prison policy to an administration, an injunction modifying such policy "imposes irreparable injury." *Id*. Here, the Mississippi legislature has responsibility for prison policy to MDOC. *See* Miss. Code Ann. § 47-5-23. Accordingly, the injunction sought in this case would impose irreparable injury which outweighs the potential threat to the plaintiffs.

### D. Public Interest

When "state officials are the parties against whom the injunction is sought, ….

consideration of the harm to them should the injunction issue merges with consideration of the

public interest." *Dean v. Leake*, 550 F. Supp. 2d 594, 605 (E.D.N.C. 2008); *see also Planned*

*Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013)

("As the State is the appealing party, its interest and harm merges with that of the public.").

Accordingly, for the reasons above, the Court concludes that the public interest would be harmed

by granting the injunction.

### V
### <u>Conclusion</u>

The plaintiffs' motion for a temporary restraining order and a preliminary injunction [59]

is **DENIED**.

**SO ORDERED**, this 24th day of April, 2020.

/s/Debra M. Brown_____
**UNITED STATES DISTRICT JUDGE**