**EXHIBIT "A"**

Eldon Vail Expert Report and Addendum

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

| | |
|---|---|
| MICHAEL AMOS, PITRELL BRISTER, ANTONIO DAVIS, WILLIE FRIEND, CHARLES GAYLES, DANIEL GUTHRIE, JONATHAN J. HAM, DESMOND HARDY, BILLY JAMES, JR., JUSTIN JAMES, QUENTEN JOHNSON, DEAUNTE LEWIS, LARRY MAXWELL, TERRANCE MCKINNEY, DERRICK PAN, BRANDON ROBERTSON, KURIAKI RILEY, DERRICK ROGERS, TYREE ROSS, H.D. ALEXANDER SCOTT, DEANGELO TAYLOR, LEMARTINE TAYLOR, CONTI TILLIS, DEMARCUS TIMMONS, CARLOS VARNADO, PHILLIP DECARLOS WEBSTER, ADRIAN WILLARD, CURTIS WILSON, CALEB BUCKNER, WILLIAM GREEN, ARIC JOHNSON, IVERY MOORE, and KEVIN THOMAS, on behalf of themselves and all other similarly situated, | No. 4:20-cv-00007-DMB-JMV |
| Plaintiffs, | |
| v. | |
| TOMMY TAYLOR, in his official capacity as the Interim Commissioner of the Mississippi Department of Corrections, and MARSHAL TURNER, in his official capacity as the Superintendent of the Mississippi State Penitentiary, | |
| Defendants. | |

**EXPERT REPORT / DECLARATION OF ELDON VAIL
In support of Plaintiffs' request for injunctive relief**

1

## I.      Scope

1.      I have been asked by Plaintiffs' counsel to offer my opinions regarding the current conditions of confinement at the Mississippi State Penitentiary ("MSP") (also known and referred to as "Parchman"), in light of contemporary correctional standards, both national and international, and to address emergency needs based on the conditions currently existing at Parchman.

2.      My opinions expressed herein are made in support of the Plaintiffs' request for injunctive relief, and based only on my personal observations of the limited areas I and other experts were allowed access to inspect on February 11-12 and February 28, 2020, certain limited documentation produced by the Defendants in this matter, further documents obtained through Freedom of Information Act requests, the pleadings in this lawsuit and the Plaintiffs' sworn Affirmations and interview transcripts as cited.

## II.     Summary of Qualifications

3.      I am a former correctional administrator with 35 years of experience working in and administering adult institutions. Before becoming a corrections administrator, I held various line and supervisory level positions in a number of adult prisons and juvenile facilities in the State of Washington. I have served as the Superintendent (Warden) of three adult institutions, including facilities that housed people classified as maximum, medium and minimum-security. Two of those facilities housed men and one housed women.

4.      I served for seven years as the Deputy Secretary for the Washington State Department of Corrections (WDOC), responsible for the operation of prisons and community corrections. I briefly retired, but was asked by former Governor of Washington, Chris Gregoire, to come out of retirement to serve as the Secretary of the Department of Corrections in the fall of 2007. I served as the Secretary for four years, until I again retired in 2011. In sum, I served for a total of eleven years in the top one or two positions over the agency for the State of Washington.

5.      As a Superintendent, Assistant Director of Prisons, Assistant Deputy Secretary, Deputy Secretary, and Secretary, I was progressively responsible for the safe and secure operations of adult prisons in the State of Washington, a jurisdiction that saw and continues to see a significant downward trend in prison violence. In the last fifteen

2

years in the WDOC, violent incidents have decreased over 30%, due in part to improved treatment of the mentally ill and reduced use of segregation. When I became Secretary, the rate of violent infractions throughout the prison system was 1.23 events per 100 persons confined. When I left it was 0.66 per 100, a 46% reduction in 4 years. This was largely accomplished by the use of data and the study of patterns of violence to determine interventions by institution, by living unit, by shift, by staffing posts and by individual officer behavior. Increasing incentives for people incarcerated also proved to be a productive tactic to reduce violence.

6.    My opinions are based upon my thirty-five years of work in corrections as a practitioner with substantial experience running correctional institutions and presiding over a statewide prison system for more than a decade, a system that successfully addressed the challenges created by the rapid influx of the mentally ill into the prison environment as well as the growth of prison gangs. I am experienced in sound correctional practice.

7.    Since my retirement I have served as an expert witness and correctional consultant for cases and disputes over 50 times in multiple jurisdictions—state, local and federal—in twenty-one different states. As an expert witness and correctional consultant, I have been retained to evaluate and offer my opinions on a variety of issues in the correctional environment.

8.    Specifically, over the last few years, I have testified in the following cases:

*Coleman, et al. v. Brown, et al.*; No. 2:90-cv-0520-LKK-JMP, United State District Court, Eastern District of California; Testified, October 1, 2, 17 and 18, 2013

*Graves v. Arpaio*; No. cv-77-00479-PHX-NVW, United States District Court of Arizona; Testified, March 5, 2014

*Corbett v. Branker*; No. 5:13 CT-3201-BO, United States District Court, Eastern District of North Carolina, Western District; Special Master appointment November 18, 2013, Testified, March 21, 2014

*C.B., et al. v. Walnut Grove Correctional Authority, et al.*; No. 3:10-cv-663-DPS-FKB, United States District Court for the Southern District of Mississippi, Jackson Division; Testified, April 1, 2 and 27, 2015

*Fontano v. Godinez*; No. 3:12-cv-3042, United States District Court, Central District of Illinois, Springfield Division; Testified, June 29, 2016

*Doe v. Wolf*; Case 4:15-cv-00250-DCB, United States District Court for the District of Arizona; Testified, November 14, 2016 and January 13, 14 and 22, 2020

*Braggs, et al. v. Dunn, et al.*; No. 2:14-cv-00601-WKW-TFM, United States District Court, Middle District of Alabama; Testified, December 22, 2016, January 4, 2017, February 21, 2017 and December 5, 2017

*Wright v. Annucci, et al.*; No. 13-CV-0564-MAD-ATB, United States District Court, Northern District of New York; Testified, February 13, 2017

*Padilla v. Beard, et al.*; Case 2:14-at-00575 United States District Court, Eastern District of California, Sacramento Division; Testified April 19, 2017

*Cole v. Livingston*; Civil Action No. 4:14-cv-1698, United States District Court, Southern District of Texas, Houston Division; Testified, June 20, 2017

*Holbron v. Espinda*; Civil No. 16-1-0692-04-RAN, Circuit Court of the First Circuit, State of Hawai'i; Testified, December 20, 2017

*Dockery v. Hall*; No. 3:13-cv-326-TSL-JMR, United States District Court for the Southern District of Mississippi, Jackson Division; Testified March 5-7, 2018

9.    A complete copy of my resume, detailing my work experience as a practitioner and as an expert witness/correctional consultant is attached to this declaration as **Exhibit A**.

## III.    Bases for My Opinions

10.    I have reviewed the MDOC prison file material made available for the thirty-three named plaintiffs, redacted transcripts of interviews with each plaintiff conducted by Plaintiffs' counsel (some of whom were interviewed twice), sworn affirmations submitted by the named plaintiffs, MDOC and Centurion policies produced by Defendants, reports of internal and external inspections of Parchman both produced by Defendants and part of the public record, further MDOC documents obtained through

4

Freedom of Information Act requests, court documents related to this case and thousands of photographs taken of the facility during site inspections. A complete list of the materials I reviewed is attached to this report as **Exhibit B**.

11.     I traveled to Parchman and inspected Units 25, 26, 30 and 32 on February 12, 2020. I returned to Parchman and inspected Unit 29H, B-zone on February 28, 2020. I was also able to witness three prisoner interviews on February 13, 2020.

12.     I have previously been involved in two other cases involving the MDOC, ***Dockery v. Hall,*** and ***C.B., et al. v. Walnut Grove Correctional Authority, et al***. As a result of my involvement in those cases I am well aware of MDOC's policies, even though few policies have been disclosed for review in this case by Defendants.

13.     I also rely on my own substantial experience as a correctional administrator, including presiding over a statewide prison system for more than a decade, and my knowledge of other prison systems that I have gained during my career in corrections and as a consultant and expert witness.

## IV.     Summary of Opinions

14.     Parchman is a prison in a state of descending crisis. As of the writing of this report, at least twenty-three prisoners have died at Parchman this year, at least five from apparent homicide and three from suicide. This is an extraordinary rate of death in such a short amount of time in any prison, far beyond anything I have seen or experienced in my forty-plus years working in corrections. There is an ongoing and serious risk of significant and actual harm being experienced for the prisoners housed at Parchman.

15.     The physical plant is a disaster, perhaps beyond repair, especially in Units 29 and 30. There are major problems with the plumbing and electrical systems. The prison is filthy and by multiple accounts, infested with rodents and roaches. The physical plant itself is a significant security risk as there are multiple failures of basic security systems.

16.     The number of staff available to supervise the prisoners at Parchman is grossly inadequate. The result is that corrections staff and prisoners alike are afraid, prisoners are not properly supervised, and the facility has devolved to ceding the authority of correctional officers to some prisoners who are often powerful gang leaders.

17.     The application of MDOC policy, strongly tied to the prison standards of the American Correctional Association (ACA), has collapsed. The prison is operating on

an ad hoc basis, creating safety and security risks for the staff who work there and the prisoners in their care.

18.     Particularly egregious are the reported use of force (UOF) practices. Reflecting the ongoing collapse of the prison's operation, it appears that basic control at Parchman has devolved to the point where they believe it is necessary to commonly rely on the presence of firearms in living units in close proximity to prisoners. I witnessed this very dangerous practice during my inspections and it is now apparently the routine at the facility. I have never seen this practice in any other jurisdiction. By multiple accounts, less lethal rounds are used to control and sometimes gratuitously punish prisoners.

19.     The conditions of confinement for prisoners held in Parchman are far below contemporary correctional standards. Extraordinary and immediate actions are required to prevent any more unnecessary deaths, and to protect the staff working at the facility as well as the prisoners who are confined at the facility. The downward spiral at Parchman is real, ever-present and will likely escalate unless serious and dramatic reforms happen quickly. The facility cannot begin to operate safely unless the physical plant is dramatically improved and there are no more prisoners confined at Parchman than what the number of currently available staff can safely supervise

**V.     Opinions**

   ***A.     The Physical Plant is Collapsing and Basic Needs Are Not Met***

20.     The American Correctional Association is the primary body that establishes standards for the operation of prisons. Those standards set the minimum or the floor for the operation of such facilities. In inspecting the housing units at Parchman, I rely on those standards for my evaluation.

21.     In 2014, while I cannot speak to the quality or the accuracy of the audit, Parchman was fully accredited to the standards of ACA. Unfortunately, according to the current Superintendent of Parchman, compliance with ACA standards "was dismantled due to staffing shortages by previous management."[1]

22.     When I inspected Unit 29H, zone-B, the unit had been recently emptied of prisoners. The unit has an open bar cell front design and the cells surround an interior

---

[1] MDOC-Amos 006991.

tower. This design is similar to several other buildings in Unit 29, of which I reviewed hundreds of pictures of from the February 11, 2020 inspection. The absence of prisoners gave me the opportunity to inspect and check the functionality of the sinks, toilets and lights in twenty-five of the forty cells in the unit. Only five of those cells were without a problem in at least one, and sometimes more than one, in each of these three critical areas (sinks, toilets, and lights). Fourteen of the cells had a problem with the sink to include leaks, minimal flow of water, water that exploded out of the bubbler and shot a stream of water across the cell, to cells with no water at all. I found no evidence of hot water in any of the sinks. Eight cells had a problem with the lights or had no lights at all. Two of the cells had toilets that were not functional.

23.     There is an applicable ACA standard for sinks that says in part, "[i]nmates have access to operable wash basins with hot and cold running water…"[2]

24.     The ACA standard related to toilets and sinks says:

> Inmates have access to toilets and hand-washing facilities 24 hours per day and are able to use toilet facilities without staff assistance when they are confined in their cells/sleeping areas.[3]

25.     The ACA standard for lighting in cells requires "at least 20-foot-candle at desk level and in personal grooming areas."[4] This standard was not met in at least eight of the cells I inspected in 29H, B zone.

26.     The unit was filthy and indicated in my opinion and experience that it had not been adequately cleaned in years. A common complaint in the interviews and affirmations of the named plaintiffs is that cleaning supplies, including sufficient supplies of cleaning chemicals and cleaning equipment are not made available for the prisoner population in order for them to maintain an adequate level of cleanliness in their individual cells. It is reported in those same documents that the floors outside of the cells of the unit are sometimes swept but rarely, if ever, mopped. The result is the accumulated filth that I witnessed in my inspection of this zone. It is generally unhealthy for the prisoners confined in such an environment and sends a powerful message to the prisoners about the prison

---

[2] ACA Standard 5-ACI-2C-07.
[3] ACA Standard 5-ACI-2C-05.
[4] ACA Standard 5-ACI-2D-02.

administrations concern for their health and welfare.

27.     Other problems in 29H, B-zone included holes in the cell walls that were open all the way to outside and sprinkler heads that are a hanging hazard, perceptions that are directly related to prison security. *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 76-81, including specifically Plaintiffs-00007125, 00007147, 00007166, 00007175, 00007177, 00007185, 00007196, 00007198, and 00007203.

28.     From the photographs of the other building and zones in Unit 29 that I have observed, the condition of Unit 29H, B-zone is typical if not slightly better than in those other units. The photos of the other zones indicate much worse lighting in the common areas of the zone as well as illustration of the leaks from the ceiling in those units, many of which were taken on a day when it was raining. *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 4-106. It was not raining when I inspected 29H B-zone.

29.     I do not know the depth of the problems with the electrical, plumbing and roofs of the housing areas within Unit 29 and what it would take to correct them. But in order to make them habitable, each of these problems must be corrected if MDOC wishes to house prisoners in these buildings in Unit 29. It is likely that the cost of repair and bringing these units up to standards may well exceed the cost of building new facilities.

30.     I also inspected Unit 32 at Parchman. It is my understanding that this unit was abandoned in 2010 due to litigation. However, in a response to the riots at Parchman earlier this year, that unit was reopened for a time to house prisoners.[5] That was a serious mistake. During my inspection I found even worse conditions in Unit 32 than I found in 29H, B-zone. In Unit 32 there was clearly visible mold, cell windows that could not be controlled and were either stuck open or shut, as well as severe problems with toilets and sinks. In the three zones I inspected, which had sixteen cells in each, the most striking and disgusting evidence were how many toilets remained full of feces or toilets that were sealed so they could not be used. The smell of feces in the unit was overwhelming. In one of the

---

[5]  https://www.clarionledger.com/story/news/2020/01/07/ms-prison-riots-inmates-moved-parchmans-closed-notorious-unit-32/2824615001/.

zones fourteen of the toilets were in such shape. In two of the zones, seven of the sixteen cells had no lights and in another zone fourteen of the sixteen cells were also without lights. Some of the cells had no water at all. Each of the zones had two showers for a total of six in the zones I inspected. There were functioning lights in only one out of the six showers. Two cell doors were stuck in half open positions and at least one cell had an exposed sprinkler head, a known hazard for hanging. The light on the tiers of these zones was sporadic at best with many locations where the overhead lights were clearly not working. This unit is uninhabitable. It is my strong opinion and recommendation that MDOC never attempt to house prisoners in this unit again. *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 166-172, including specifically Plaintiffs-00004117, 00004125, 00004127, 00004203, and 00004212.

31.     I also inspected Unit 25, A-zone. The unit has a capacity of about fifty-eight beds and there were about forty-nine prisoners housed there the day I inspected. This zone has a dormitory design with prisoners in shared cubes with beds for four to six prisoners. There is an elevated booth or tower that can oversee the zone. There are a few pedestal tables and stools in a rather large dayroom. The unit was dirty, with exposed wiring and several lights that were not functioning. There were holes in the wall. The absence of sufficient lighting would make it very difficult to supervise the zone after dark. All prisoners assigned share the toilet area for this zone. There was room for five sinks but two had been removed. Of the ones that remained they were all hanging off of the wall and they were leaking water onto the floor. At the shower area there was a sign that said the showers were "out of order". There were four toilets but two of them were broken. There was a single urinal but it too was broken. There were exposed electrical wires in multiple locations. *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 208-217, including specifically Plaintiffs-00004285, 00004287, 00004296, 00004299, 00004301, 00004360, and 00004365.

32.     There are applicable ACA standards for dormitories. The standard for toilets in a dormitory setting says in part:

> Toilets are provided at a minimum ratio of 1 for every 12 inmates in male facilities…Urinals may be substituted for up to one-half of the

toilets in male facilities.[6]

For fifty-eight prisoners, there should be five toilets. There were only two that functioned in this zone.

33.     The standard for sinks/wash basin is:

> Inmates have access to operable wash basins with hot and cold running water in the housing unit at a minimum of one basin for every 12 occupants, unless national or state building or health codes specify a different ratio.[7]

The three sinks in this zone are not sufficient to meet this standard, which would require five sinks.

34.     On the day of my inspection, the showers were out of order. The ACA standard requires the same number of showers as they do for toilets, one for every twelve prisoners.[8]

35.     I also inspected zones A and B in Unit 26. In one zone, I counted five rooms where prisoners sleep in a dormitory setting with sixteen prisoners in each room for a total population of eighty-six. In one zone, I counted five toilets, some of which were loose from the wall. I counted three sinks and five showers. The condition of the shower area was awful. Per ACA standards there should be seven toilets, seven sinks and seven showers for this zone. In the second zone with beds for fifty-four prisoners, I counted four toilets, two of which were broken and three urinals, but none of them worked. This zone would be in compliance with ACA standards if they were functional. It appeared that the showers in this zone were not working. Both zones lacked wastebaskets, had breaks in their panel ceilings and several of the mattresses were ripped and held together by tape. These zones were not in compliance with ACA standards. *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 187-207, including specifically Plaintiffs-00004943, 00004561 and 00004212

36.     The sleeping areas in these two zones had multiple examples of exposed wiring, a safety and security hazard. Prisoners may suffer electrical shock from exposed

---

[6] ACA Standard 5-ACI-2C-05.
[7] ACA Standard 5-ACI-2C-07.
[8] ACA Standard 5-ACI-2C-09.

wiring or use those exposed wires to start fires. This is a very dangerous situation. Also of concern is that the ceilings in this unit were made of panels, several of which appeared to be damaged. This makes for a nearly endless opportunity for prisoners to conceal contraband. It is very rare to see a panel ceiling in a housing unit for prisoners, and I would not advise the use of such. *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 187-207, including specifically Plaintiffs-00004602, 00004624, 00004661, 00004668, and 00004810.

37.    I also inspected zones 30A, 30B, 30C and 30D. Each of the zones houses one hundred and eight prisoners in bunk beds in a dormitory style setting. The zones are divided down the middle with bunks for fifty-four prisoners on one side and fifty-four on the other. There was a tower/booth that oversaw two zones for a total of two hundred and sixteen prisoners. The prisoners were ordered to sit and sometimes lay on their bunks during our walk through.  *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 130-165, including specifically Plaintiffs-00002978, 00003164, 00005276, 00005615, 00005930, 00005940, 00006290, 00006364, and 00006547.

38.    Deviations from the ACA standards for functioning toilets, sinks/washbasins and showers in these zones are as follows:

|  | Toilets--# required | Sinks--# required | Showers--# required |
|---|---|---|---|
| 30A, A-zone | 6/9 | 6/9 | 5/9 |
| 30A, B-zone | 6/9 | 7/9 | 2/9 |
| 30B, A-zone | 7/9 | 8/9 | 4/9 |
| 30C, B-zone | did not record | 8/9 | 5/9 |
| 30D, A-zone | 3/9 | 7/9 | 6/9 |
| 30D, B-zone | 5/9 | 7/9 | 6/9 |

In none of the units do the bathroom facilities comply with ACA standards. But the numbers alone do not accurately reflect the reality of these personal hygiene areas. There was frequently standing water, so deep in one of the showers that my socks got wet as I waded through the shower area to check on whether or not the showers were working. The showers area had multiple broken tiles and layers of dirt and visible mold. None of the showers were wheelchair accessible, yet I counted four prisoners with wheelchairs and one

with a walker. According to the interviews with the named plaintiffs, it is very rare for there to be hot water in the showers, a situation that can best be described as inconsistent. Prison authorities want prisoners to be able to clean themselves. It is healthier and safer for a group living situation. The state of the bathrooms in the Unit 30 zones is a disincentive to good personal hygiene practices. *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 130-165, including specifically Plaintiffs-00005299, 00005307, 00006290, and 00006307.

39. But beyond the state of the bathrooms, the sleeping portion of the zones is a catastrophe. There are holes in the ceiling, exposed wire in multiple locations, cardboard boxes used for trash cans, broken lights, lights missing fluorescent tubes and standing water on the floor, due to the rain we experienced on this day of the inspection.

30B, B-zone appeared to have only emergency lights, which were but a few light bulbs on each side of the zone. It was very difficult to see in the daytime, which is a problem for supervision. It would be worse when the sun goes down. In 30A, B-zone, there were no functioning lights at all in the back on the right side of the zone, an obvious safety and security risk. *See* Plaintiffs' photo submission, attached as an Exhibit to Plaintiffs' Supplemental Briefing, pgs. 130-140, including specifically Plaintiffs-00005317, 00005396, 00005412, 00006364, and 00006370.

40. We were not allowed to speak with the prisoners during our inspection, a very different experience for me in inspecting a correctional facility. Prisoners in Unit 30 were told they could not speak with us. However, several attempted to do so. Prisoners mimed or whispered such things to us as, "Help us, please," "Thank you," and "Appreciate it". I will say more about the inspection of Unit 30 in another section of this report. It was clear the prisoners in these zones were suffering.

41. In interviews of the named plaintiffs, there is a universal concern expressed about the prevalence of rodents in the zones. The general disrepair and lack of cleanliness in the zones exacerbates this problem.

42. ACA also has standards about routine internal inspections for all areas occupied by prisoners. The specific standard says:

> Written policy, procedure, and practice provide that supervisory staff conduct a daily patrol, including holidays and weekends, of all areas occupied by inmates and submit a daily written report to their

12

supervisor. Unoccupied areas are to be inspected weekly.

> *Comment:* Matters requiring attention (for example, staff and inmate concerns, faulty, unsafe, or dirty conditions) should be reported in writing for review and further action.[9]

Several such inspections were provided for this report. With rare exception, they do not begin to document the detail or volume of the problems I identified during my inspection or those reported by the named plaintiffs or those documented by outside inspections.

43.     For example, there are a number of available daily inspections of Parchman for January 2020 but not for every day, as required by the ACA standards. Daily Inspection Forms were made available for January 1 -3, 6, 7, 9, 10, 13, 14, 16 – 28. Eight out of the thirty-one days of January, there was no record provided for daily inspections in any of the buildings in Unit 29. At least one inspection form was provided for twenty-three days in January. But when you look closer, the number of inspections provided for each of the buildings varies widely.

- 29A          3 inspections
- 29B          4 inspections
- 29C          2 inspections
- 29D          2 inspections
- 29E          0 inspections
- 29F          3 inspections
- 20G          10 inspections
- 29H          16 inspections
- 29I          4 inspections
- 29J          6 inspections
- 29K          4 inspections
- 29L          12 inspections[10]

While MSP is making some effort to do inspections, it is clear from the above list that they are not happening according to the ACA standard. These inspections are important as they

---

[9] ACA Standard 5-ACI-3A-10.
[10] MDOC-Amos 007383-MDOC-Amos 007625.

provide an opportunity, an early warning, to identify problems and correct them before the problem deteriorates.

44.     But, in my opinion and experience, the inspections are very poor and they are not thorough. For example, looking for documentation of problems with toilets, sinks, showers or lights, as I explored and identified in my inspections, for the month of January, I found only the following comments related to those areas of concern:

- B-zone shower constantly running; urinal on top not working[11]
- All security lights inside the building is inoperable[12]
- Need lights in some of the showers on both zones[13]
- Some cells need lights[14]

As the reader can tell from the footnotes, these four comments that relate to toilets, sinks, lights and showers were reported a few times. But they are not consistent with my own findings, done one month later, when I inspected Parchman. They also appear to be done in some kind of boilerplate fashion in that the inspection forms for the same and sometimes different zones contain exactly the same comments. If I were the Superintendent, I would first be concerned that the inspection reports don't match what I have seen with my own eyes and second, several of them may have been completed by simply changing the date on an existing form from a previous inspection.

45.     There is another source of information that does speak to these cell and bathroom issues that, in my opinion, is much more accurate. In June of 2019, there was a health inspection of Parchman, presumably by an outside source. Offering as an example the findings for just one zone in 29A, A-zone, the health inspection identified twenty-two cells with no lights, one toilet inoperable and problems with two sinks.[15] 29A, B-zone reported six cells with no lights and problems with sinks and water in fourteen cells.[16] Reported for 29B, A-zone were fourteen cells with no lights, one toilet inoperable, three cells with inoperable sinks and one shower constantly running and one shower with no cold

---

[11] MDOC-Amos 007390, 007515.
[12] MDOC-Amos 007399, 007404, 007564.
[13] MDOC-Amos 007406, 007420, 007423, 007452, 007474, 007568.
[14] MDOC-Amos 007471, 007474, 007568.
[15] MDOC-Amos 004502 & 4503.
[16] MDOC-Amos 004503 – 4505.

water and a broken hot water knob.[17] This inspection goes on in great detail for the other zones in a very similar fashion and is much closer to the reports of the named class members and the findings from my own inspection.

46.     Moving to 30A, A-zone findings included problems with four sinks, four toilets and five of the showers.[18] In B-zone there were problems with three sinks, one urinal, three toilets and three showers.[19] In 30B, A-zone there were problems with four sinks, one urinal, three toilets and the shower was backed up and one missing a knob.[20] The reports for the other zones in Unit 30 are similar.

47.     The health inspection form includes a column for a response from the institution. Some of the problems identified indicated work orders were projected to be complete about six weeks later, three were repaired within a few days and work orders were completed for other items without a projected completion date. There was no information provided to show that the work orders projected for future work were ever completed, an action I would expect to see if I were the Superintendent or the person supervising the Superintendent.

48.     Copies of these outside inspections were provided for four years, 2016 – 2019. The conditions described in 2019 and that I viewed during my inspection are not substantially different in the inspections in 2016, 2017 and 2018, indicating the neglect of the physical plant at Parchman is not a new problem. Reports of problems with water, lights, toilets and showers are longstanding.

49.     The ACA has standards on clothing for prisoners. The related standard says:

> Inmates are provided the opportunity to have three complete sets of clean clothing per week. The facility may provide this clean clothing in several ways, including access to self-service washer facilities, central clothing exchange, or a combination of the two. Wash basins in cells or rooms are not compliant.[21]

MDOC policy[22] complies with the standard of three complete sets of clothes, but that is

---

[17] MDOC-Amos 004505 & 4506.
[18] MDOC-Amos 004535.
[19] *Id.*
[20] MDOC-Amos 004536.
[21] ACA Standard 5_ACI-5D-10.
[22] MDOC-Amos 004435-MDOC-Amos 004500 (03512197), page 12.

not the practice at Parchman.

50.     During their interviews, several prisoners reported having only one set of clothing, although some reported having two. One prisoner reported that he only had the clothes on his back, a t-shirt and pair of pants, (he had no underwear), and had to borrow shoes to exit the unit and come to the interview. This prisoner was stabbed during one of the previous riots and showed us (I sat in on this interview) that there was still blood on his t-shirt.[23]

51.     The ACA standard immediately above also addresses laundering of clothes. Identical language is also in the MDOC policy.[24] Universally reported by the named plaintiffs is that no such service exists for laundering clothes in Unit 29. The alternative for the prisoners is that they must wash their clothes in their sinks or in their toilets, often depending on which fixture was working. The size of the sinks in Unit 29, the lack of hot water, and for that matter, the size of the toilets, does not make this a viable option. Clothes are simply not going to be able to be cleaned in this manner. The lack of a laundry for Unit 29 prisoners is degrading.

52.     The ACA standard for showers says:

> There are sufficient bathing facilities in the housing areas to permit inmates in the general population to shower at least three times a week.[25]

From my memory of the work I have done in previous cases involving MDOC prisons, their policy tracked with this standard.

53.     But once again, the practice is much different. The affirmations of the named plaintiffs were taken the last week of January 2020. Here is a sample of what was reported:

- No shower since 12/25/19[26]

- No shower between 12/12/19 and 1/23/20[27]

---

[23] D. Lewis Transcript (redacted), page 16.
[24] MDOC-Amos 004435-MDOC-Amos 004500 (03512197), page 13.
[25] ACA Standard 5-ACI-5D-13.
[26] Brister, Pirtrell – Affirmation, page 4.
[27] Friend, Willie – Affirmation, page 4.

16

- No shower between 12/22/19 and 1/28/20[28]
- No shower from Thanksgiving 2019 until 1/27/20[29]
- No shower between 12/31/19 and 1/27/20[30]
- No shower between 10/24/19 and 1/23/20[31]

The affirmations from the other named plaintiffs tell a similar story.

54.     When the interviews of the named plaintiffs were conducted, roughly the last week of February 2020, it is clear that more effort on the part of Parchman was being made to get prisoners out of their cells for a shower, sometimes two or three times a week. In their interviews, several of the prisoners attributed this change to the involvement of the attorneys associated with this lawsuit. Whatever the reason for the change, it represents a modest improvement but raises other issues.

55.     During the interviews most class members indicated that there is no hot water in the showers. A few said there was hot water occasionally. But the nearly all described the short amount of time out of their cell they have to take a shower. The overwhelming response was five minutes with a couple of the men saying 15 minutes. But they all also reported that this very brief time out of their cell was also the only time they had access to the state pay phone to call home. Most prisoners chose the shower but regretted missing the opportunity for the call. Given the plague of contraband cell phones at Parchman, I would think they would want to encourage calls from the state phone, and not create disincentives for their use.

56.     A look at current MDOC policies and their requirements sheds light on how far Parchman has fallen.

57.     MDOC policy for Linens/Clothing, Personal Hygiene & Hair Care Services states:

> Inmates are provided the opportunity to have three complete sets of clothing per week. The facility may provide this clean clothing in several ways, including access to self-serve washer facilities, central clothing exchange or a combination of the two. **Water basins in cells or rooms are not**

---

[28] Gayles, Charles – Affirmation, page 4.
[29] Hardy, Desmond – Affirmation, page 3.
[30] Lewis, Deaunte – Affirmation, page 3.
[31] Robertson, Brandon – Affirmation, page 5.

**compliant.** (Emphasis added)

> Written policy, procedure, and practice provide for the issue of suitable, clean bedding and linen, including two sheets, pillow and pillowcase, one mattress, not to exclude a mattress with integrated pillow, and sufficient blankets to provide comfort under existing temperature controls. There is provision for linen exchange, at least weekly.[32]

58.     The MDOC Standard Operating Procedure (SOP) for Clothing and Linens establishes the clothing issue for prisoners:

- Three (3) work shirts
- Three (3) tee-shirts
- Three (3) pairs of underwear
- Three (3) pairs of socks
- Three (3) bath towels
- Three (3) face towels
- One (1) pair of shoes based on assignment
- Three (3) pants
- One (1) winter coat (returned/exchanged annually[33]

59.     The SOP for Personal Hygiene and Hair Care Services states:

> Inmates have access to operable showers with temperature controlled hot and cold running water, at a minimum of one shower for every eight inmates, unless national or state building or health codes specify a different ratio. Water for showers is thermostatically controlled to temperature ranging for 100 degrees Fahrenheit to 120 degrees Fahrenheit to ensure the safety of inmates and to promote hygienic practices.[34]

60.     "It is the policy of the Mississippi Department of Corrections (MDOC to provide the safety and well-being of both offenders and staff within the offender-housing areas."[35]  Based on my first-hand observations, nothing could be further from the truth. The problems described in the above paragraphs relate to basic human functions—the ability to wash oneself in a sink or a shower; the ability to use a toilet or a urinal that works without having to wait to use a toilet because there are too few that are working; the ability

---

[32] MDOC 24-02, Linens, Clothing, Personal Hygiene & Hair Care Services, page 2.
[33] MDOC SOP Number 24-02-01, Clothing and Linens, page 4.
[34] MDOC SOP 24-02-02, Person Hygiene and Hair Care Services, page 2.
[35] MDOC 44-02, Offender Housing, page 1.

to have one's clothes regularly laundered; and, the ability to be able to have sufficient light in one's cell in order to simply see are clearly what must be in place in any correctional institution. Providing anything less is irresponsible and disrespectful and in my experience leads to a prison that is neither safe nor secure.

### B. Staffing Levels Are a Primary Crisis at Parchman

61. It is undisputed that Parchman suffers from inadequate numbers of correctional officers.

> In 2014, MDOC employed 1,591 correctional officers. Although the inmate population in state prisons has fallen slightly, the number of correctional officers has plummeted to 731 — a loss of more than half the workforce. Parchman is unable to fill its open positions. This year, the prison had the authority to employ 512 officers but hired only 261.[36]

The result is that there are not enough officers to properly supervise the prisoners.

62. Interviews were conducted with the thirty-three named plaintiffs regarding the time they spent in at least one of the buildings in Unit 29. Most of the buildings in Unit 29 are similar in construction to 29H, B-zone, the zone that I inspected, with a tower in the middle of the unit. Twenty-eight of the plaintiffs were asked about how the zones that they lived in were supervised, how many officers were assigned, where the officers were stationed and how often they actually came into the zones in Unit 29. Their responses were remarkably consistent with very few deviations. Twenty-six of them reported that there was one officer assigned and that they spent their time in the hallway adjacent to the unit and that they were never in the tower. Two of the named plaintiffs said there were two officers assigned but they were never in the tower either. When asked about how often officers actually came into the zone, the overwhelming report was only for counts and to escort the nurse for pill call.

63. Prisoners in Unit 29 are classified as high security prisoners. You cannot adequately supervise such prisoners from the hallway. It is bizarre and unexplained why the towers in these units are not staffed. The location of the tower is of a reasonably good

---

[36] https://mississippitoday.org/2020/01/08/parchman-at-the-center-of-state-prison-system-plagued-by-neglect-and-lack-of-funding/.

design and if officers were assigned there they would have a good view into the cells in the zone and at least provide for observation of prisoner behavior.

64.    Instead the officers rely on "floorwalkers"[37], prisoners selected to perform some of the officers' functions. This is a very dangerous practice and predictably leads to problems. The named plaintiffs report that the prisoners selected to be floorwalkers are often powerful gang members.[38] It is reported that, "They come out when breakfast trays come all the way to the end of the shift".[39]

65.    The floorwalkers serve the food. The food arrives on a cart with trays that have been prepared for each individual prisoner. Universally, the named plaintiffs report that this result is that sometimes all the prisoners are not fed. Sometimes, if the count of trays is short and there are not enough to feed everyone in the zone, there are some who do not get a tray.

66.    There are abuses when prisoners are passing out the food. One prisoner indicated that if the floorwalkers don't want you to eat, you are not eating.[40]

67.    Another said:

> And the way to eat, you've got to depend on other inmates to feed you. And they might wake up one day and want to take your tray or something.[41]

68.    One prisoner, talking about his cellmate, said the following:

> His name is Tony and Tony is a diabetic. Tony receives a shot in the morning and at night. He also receives a snack bag for his sugar. They don't give him the snack bag. The inmates that are on the floor working for the officers, they're not…What they doing is stealing…[42]

69.    Another prisoner said in his interview:

> Sometimes, like I said, the floorwalker if they don't get along with you, you probably don't get no meal, but I ain't gonna sit and lie to you. I ain't going to even sit and lie to you. For three days now, I

---

[37] This practice is akin to the "building tenders" system once in place in the Texas Department of Corrections and addressed in *Ruiz v. Estelle.*
[38] *For example see,* D. Timmons Transcript (redacted), pages 8 & 9.
[39] *Id.*, page 10.
[40] C. Buckner Transcript (redacted), page 15.
[41] D. Timmons Transcript (redacted), page 21.
[42] D. Lewis Transcript (redacted), page 10.

> probably ate two tray for three days not. And me, like I said, me going to the CO with it and me telling the CO what's going on, that's a whole 'nother problem I got to deal with. You know what I am saying?[43]

70. And another prisoner said:

> If felons are dealing with the trays period, you know [inaudible 00:16:53] It's not a good spot [inaudible 00:16:57] Because you're going to have all kind of conflict. "He owe me this. He owe me that." You know. "I'ma scheme to get him." You know how it goes.[44]

71. One final example, the prisoner said:

> Sometimes if the floorwalkers don't like it, you get into it with them, you might not even eat. And there's nothing you can do about it because the officer, you ain't never going to see an officer.[45]

72. These are typical complaints that I found in the interviews when the floorwalkers are passing out the food. It is not unusual for prisoners to deliver food to prisoners locked in their cells but it must be under the direct supervision of correctional officers, a practice that is clearly not in place at Parchman. With one officer assigned to the zone, it is unlikely that person would feel safe doing so.

73. The behavior of floorwalkers is of concern in areas that go beyond serving the food. Prisoners are dependent on floorwalkers to get access to sick call slips.

> You ask officer for it. But, the office don't... You get inmates, the inmates bring you a sick call. You fill them out, then you give them back to the inmates and hopefully they turn them in.[46]

This is a clear violation of the Centurion policy that says, "Inmates are not permitted to distribute or collect sick-call notes."[47]

74. Equally bad, the floorwalkers collect the grievances filed by prisoners.[48] These ARP's (Administrative Remedy Program) are the way in which Parchman prisoners lodge their complaints or their appeals. Other prisoners should not handle them. They

---

[43] W. Friend Transcript (redacted), page 47.
[44] W. Green Transcript (redacted), page 16.
[45] D. Guthrie Transcript (redacted), page 16.
[46] W. Green Transcript (redacted), page 26.
[47] MDOC Centurion Policies and Procedures, page 119.
[48] D. Pam Transcript (redacted), page 17.

should go to officers, or better yet a secure locked box that is emptied daily by the grievance coordinator.

75. Because there are so few officers assigned to the zones, response time when an incident occurs is very slow. In those situations, the floorwalkers inappropriately play a role. One prisoner reported:

> They will come ask the inmates what's going on. Asking us what's going on or take their time or then they will have to call somebody because they can't come on the zone because of the problem with staff back there so they have to wait until two or three officers finally decide to come and then they will come on the zone and assess the situation. But if a guy actually was going to kill himself and the inmates weren't there to help, they would be dead.[49]

76. Another prisoner describing his experience in 29K and the role of floorwalkers said:

> When I was in K-building, the officers used to listen to the inmates. If I call my mama and tell my mama that I got a problem, I feel my life in danger, and the officer would call up here. The officer comes to the gate and asks the inmate. If the inmate say there ain't nothing wrong with him, and it still be the same inmate that got the problem with me, they going to leave him and go right back to what they was doing. They used to tell the inmates that they got to govern their own house. Basically, giving them the green light to do whatever they want to do.[50]

77. Due to short staffing at Parchman, sometimes inmates set fire in their cells in an attempt to get attention from the staff. One prisoner said the fires are set as an SOS.[51] Another prisoner, when asked about officer's response to the setting of a fire shared that even this drastic measure does not always work. He said:

> Normally, the floor walker or whatever going to come up and put it out. They probably won't even never hear about the fire. Normally.[52]

78. Equally disturbing, sometimes floorwalkers pass contraband. One prisoner describing an assault he experienced by his cellmate said, "The floorwalker tried to slip

---

[49] D. Taylor Transcript (redacted), page 23.
[50] D. Timmons Transcript (redacted), page 12.
[51] Tillis, Conti – Affirmation, page 5.
[52] D. Guthrie Transcript (redacted), page 29.

him knife".[53]

79.     Another prisoner described being denied medical care after a gang member stabbed him:

> One time back in August I had gotten jumped on. They had bust my mouth. I was trying to tell the CO to let me go to medical, but she was, what you call a flower, a Vice Lord girl-
>
> And the Vice Lords had jumped on me, so they were like, "He ain't talking about nothing, get him in his cell." [inaudible 00:20:44] I ain't never receive medical attention.[54]

80.     The current practice of floorwalkers at Parchman violates the related ACA standard:

> Written, policy, procedure, and practice provide that no inmate or group of inmates is given control or authority over other inmates.[55]

Allowing prisoners to decide who eats, decide who gets medical care, handling confidential forms and being first responders to an incident clearly meet the threshold of giving "control or authority over other inmates."

81.     The current practice of using floorwalkers to perform duties that should be performed by officers must cease. As illustrated by the examples above (there are more), the current practice creates a risk of harm for other prisoners. There is nothing wrong with having prisoners serve the food as long as they are under the direct supervision of officers, but they should not be involved in such activities as responding when a fire is set or handling forms submitted by other prisoners that should otherwise be processed in a confidential manner. Parchman has fallen into these dangerous patterns as a result of not having enough officers to properly supervise the prisoner population.

### C.     Operation by Policy Has Collapsed

82.     As I documented earlier, Parchman abandoned ACA accreditation some time ago, with the last time they were accredited being in 2014. Written MDOC policies are more directly aligned with ACA standards than I have ever seen in any other

---

[53] W. Friend Transcript (redacted), page 45.
[54] C. Tillis Transcript (redacted), pages 18 & 19.
[55] ACA Standard 5-ACI-3A-08.

jurisdiction. But in recent years, MDOC policies have not been regularly reviewed, as required by ACA standards. The related standards say:

> The policies and procedures for operating and maintaining the institution and its satellites are specified in a manual that is accessible to all employees and the public. The manual is reviewed at least annually and updated as needed.[56]

> Each department and major administrative unit in the institution maintains and makes available to employees a manual of standard operating procedures that specifies how policies are to be implemented. These procedures are reviewed at least annually and are updated as needed.[57]

83.     Through discovery in this case I was provided with 179 MDOC policies[58] for review. Since MDOC's last accreditation in 2014, MDOC has conducted an annual review for only 43 of those policies; 5 in 2015; 6 in 2016; 9 in 2017; 13 in 2018; 9 in 2019 and 1 so far this year. Annual policy review is important to determine if the policies and practices of an agency or prison are operating effectively and if they have been informed by new information and knowledge gained in the corrections profession. While annual review is not always achieved, in my experience most well managed agencies accomplish policy reviews within a year and sometimes two years, MDOC is far below such a benchmark. The ACA published significant revisions to their standards in 2019, another reason for a thorough review of existing policies for each correctional agency. The new standards made extensive changes to the practices for segregation, or as ACA calls it, "Special Management" or "Restricted Housing".

84.     Policy, but more importantly, actual practices are the bedrock of the operation of any correctional institution. But some policies and practices are more important than others, particularly those policies and practices that have to do with the direct supervision of the prisoner population. The clear abandonment of ACA standards is reflected in the current practices at Parchman in these critical areas of basic prisoner supervision: first of all, in the fundamental tasks of counting prisoners and second, in doing

---

[56] ACA Standard 3-ACI-1A-12.
[57] ACA Standare 3-ACI-1A-13.
[58] From my experience in prior litigation in Mississippi, there are several policies that were not provided for review in this case.

regular security checks of the prisoners in their cells in the zones.

85. My memory of the MDOC policy from my involvement in the *Dockery* and the *Walnut Grove* cases is that counts were required three times a day.[59] The overwhelming response from the class members is that counts are only conducted twice and this is a recent change with counts sometimes not being conducted at all in recent times. This was repeated time and again in the interviews. Counts are one of the very few times when officers even enter the zones in Unit 29, the other being to escort the nurse for pill call.

86. Not regularly entering the zones in Parchman to do security checks (which are different than counts) in Unit 29 is a significant problem. Describing the nature of security checks the ACA says:

> The ability of staff to complete regular security checks, maintain visual and auditory contact, maintain personal contact and interaction with inmates, and be aware of unit conditions."[60]

No MDOC policy regarding security checks was provided in this case.

87. Another related ACA standard says:

> Written policy procedure, and practice facilitate personal contact and interaction between staff and inmates.[61]

88. ACA understands the importance of positioning officers so that they can regularly supervise the prisoners by maintaining sight and sound contact and allowing interaction between staff and inmates. Such practices are simply good security. A practice of only entering the zones at shift change to do a count or to escort the nurse for pill call does not meet this threshold. As a result, prisoners at Parchman are too often left to fend for themselves. This is the major contributor to their level of violence, including the recent homicides and suicides that have plagued the institution in recent weeks.

89. Security checks of prisoners confined in segregation units are critical to the safety of those prisoners. The research is clear that prisoners in segregation face an increased risk of self-harm and suicide.

90. The relevant ACA standard says:

---

[59] MDOC policy on counts was not provided by Defendants in this case.
[60] ACA Standard, 5-ACI-2B-03.
[61] ACA Standard, 5-ACI-3A-06.

> Written policy, procedure, and practice require that all special management inmates are personally observed by a correctional officer twice per hour, but no more than 40 minutes apart, on an irregular schedule.[62]

MDOC related policy language tracks with this standard.[63] There is no evidence that this policy is followed in practice at Parchman, creating a significant risk for prisoners. The standard also require that these inspections be documented. It is undisputed that prisoners in Unit 29, some of whom are assuredly in segregation, are not being checked consistent with this standard. Parchman simply does not have the staff to do so.

91.     The risk of harm to prisoners posed by infrequent checks of prisoners in segregation have been studied and established. Multiple studies have illustrated than the risk of suicide is much greater for inmates in segregation compared to those in general population. One of them, a three-year study in the New York City jail, clearly illustrates the risk of suicide and self-harm attempts for inmates in restrictive housing:

> In 1303 (0.05%) of these incarcerations, 2182 acts of self-harm were committed, (103 potentially fatal and 7 fatal).

> Although only 7.3% of admissions included any solitary confinement, 53.3% of acts of self-harm and 45.0% of acts of potentially fatal self-harm occurred within this group.

> After we controlled for gender, age, race/ethnicity, serious mental illness, and length of stay, we found self-harm to be associated significantly with being in solitary confinement at least once, serious mental illness, being aged 18 years or younger, and being Latino or White, regardless of gender.[64]

92.     If officers are only going into the zones a couple of times a day for counts and pill call, prisoners held in segregation are at great risk. But at Parchman, it is difficult to tell what prisoners are in segregation and what prisoners are on lockdown. Either way,

---

[62] ACA Standard, 5-ACI-4A-11.

[63] MDOC 19-01-01, Offender Segregation, page 18.

[64] Solitary Confinement and Risk of Self-Harm Among Jail Inmates, March 2014, Vol. 104, No. 3 American Journal of Public Health, Research and Practice, Fatos Kaba, MA, Andrea Lewis, PhD, Sarah Glowa-Kollisch, MPH, James Hadler, MD, MPH, David Lee, MPH, Howard Alper, PhD, Daniel Selling, PsyD, Ross MacDonald, MD, Angela Solimo, MS, Amanda Parsons, MD, MBA, and Homer Venters, MD, MS, page 1.

the conditions described by the prisoners being held in Unit 29 are the same as segregation, which is generally defined as 23 out of 24 hours a day confined to a cell. As I will explain later in this report, prisoners at Parchman do not even get this one-hour out of their cell each day.

93.     The ACA has extensive standards on the process for placing prisoners in segregation and for the ongoing review of that placement and whether or not it continues to be necessary. These standards require notification to health care staff so they can review the placement[65]; that reviews of the placement be conducted every seven days for the first two months and at least every 30 days thereafter[66]; and, that a qualified mental health professional interviews and prepares a report for anyone held in segregation for more than thirty days.[6768] MDOC policy tracks with these standards.[69]

94.     During their interviews, eleven of the named plaintiffs said they believed they were in segregation. One would expect to find documentation of the required ACA reviews in their file material if they were in segregation. I have searched the available file material for these prisoners to see if I could find such documentation from Parchman and I cannot.[70] I did find such documentation from earlier years at Parchman[71], one in 2013 and one from 2004, but nothing current. This is further evidence that policy and practice that was once in place in Parchman has since broken down. These regular reviews are important to make sure that prisoners held in segregation are able to manage such stressful

---

[65] ACA Standard 5-ACI-4A-01.

[66] ACA Standard 5-ACI-4A-07.

[67] ACA Standard 5-ACI-4A-10.

[68] The Centurion policy tracks with the requirement for the initial health care review upon placement but not for the 30-day mental health review. *See* Centurion Policy and Procedures, page 339.

[69] MDOC 19-01-01, Offender Segregation, pages 2, 3 and 17.

[70] MDOC-Amos 000056-MDOC-Amos 000168 (03511859); MDOC-Amos 002734-MDOC-Amos 002820 (03512208); MDOC-Amos 003828-MDOC-Amos 003887 (03512190); MDOC-Amos 003603-MDOC-Amos 003641 (03512213); MDOC-Amos 001977-MDOC-Amos 002051 (03511871); MDOC-Amos 003712-MDOC-Amos 003827 (0351289); MDOC-Amos 003509-MDOC-Amos 003602 (03512212); MDOC-Amos 004228-MDOC-Amos 004356 (03512194); MDOC-Amos 003404-MDOC-Amos 003508 (03512211); MDOC-Amos 002944-MDOC-Amos 003403 (03512210).

[71] MDOC-Amos 002734-MDOC-Amos 002820 (03512208)—2013; MDOC-Amos 002944-MDOC-Amos 003403 (03512210).

confinement. Without regular reviews of these prisoners and twice per hour security checks, they are at increased risk of harm from such confinement.

95.    Other important ACA standards have gone away at Parchman, in this example, exercise for prisoners. The ACA standard says:

> Both outdoor and covered/enclosed areas for general population inmates are provided in sufficient number to ensure that each inmate is offered at least one hour daily. Use of outdoor areas is preferred, but covered/enclosed areas must be available for use in inclement weather.[72]

MDOC policy tracks closely with this ACA standard.[73]

96.    Prolonged denial of outdoor exercise violates both domestic and international correctional standards, and is harmful to inmates' physical and mental well being. The United Nations Standard Minimum Rules for the Treatment of Prisoners requires "Every prisoner who is not employed in outdoor work . . . have at least one hour of suitable exercise in the open air daily if the weather permits."[74] The U.S. State Department created a handbook to provide embassy officials around the world with a basic understanding of international standards for correctional systems. That handbook states, "[P]risoners should have access to recreation for no less than one hour per day."[75]

97.    When asked about access to recreation in Unit 29 during their interviews prisoners universally reported that it simply does not exist. One prisoner reported he had not been outside or in the gym for recreation since 2018.[76] Another prisoner said he was allowed outside once for recreation in November 2019.[77] When asked how long it had been since he had been allowed outside for recreation said:

> I can't remember the last time I was outside besides walking up here or, you know what I'm saying, to the dining hall. Before unit 29, I ain't seen outside in probably two years, besides leaving the

---

[72] ACA Standard 5-ACI-2E-01.
[73] MDOC 19-01-01, Offender Segregation, page 12.
[74] Standard Minimum Rules for the Treatment of Prisoners, Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders Standard 21(1).
[75] A Practical Guide to Understanding and Evaluating Prison Systems, United States Department of State, page 23.
[76] D. Hardy Transcript (redacted), page 16.
[77] C. Buckner Transcript (redacted), page 12.

building. Two, two and a half years.[78]

This same prisoner said he never has been allowed in the Unit 29 gym. Another prisoner said, "Ma'am, it's been about two years since we had any recreation.[79]

98.     These statements are representative of what other named plaintiffs reported. What makes this even worse is that the gym and outdoor recreation spaces for Unit 29 appeared in my inspection to be completely adequate. In my opinion, the lack of providing access to recreation is caused by the staffing shortage at Parchman.

### D.     Abusive and Dangerous Use of Force Practices

99.     During my inspection of Parchman on February 12th, we were accompanied by a large number of Parchman security staff, ranging from four to eight, and their attorneys. Superintendent Turner led the tour. As we approached each zone we were asked to pause so the Superintendent could first instruct the prisoners in the zone in what he expected of them during our walk through. A single correctional officer who was carrying a shotgun accompanied him. I was shocked. In my experience I have never seen nor would have I ever approved as a correctional administrator, carrying a firearm into a living unit without an appropriate emergency response team back up to protect that firearm. Even though I am confident that the ammunition for the shotgun was likely, a less lethal round, the risk of losing that firearm to the prisoners existed. It is not that such weapons aren't ever authorized inside the security perimeter of prisons but movement of those weapons occurs when prisoners are locked down so the risk of losing control of the weapon is nearly eliminated. I have never seen a firearm carried so routinely or openly in such close proximity to prisoners. But on reflection, I realized that the presence of this weapon in the zone so close to prisoners said much about the level of control Parchman staff perceive they have over their prisoner population. Given their dramatic level of short staffing and the likely delay in back up should an incident occur, they must believe the firearm is necessary to maintain control. This is an extraordinary measure to take and says much about the operation of Parchman.

100.     Since we were not allowed to interview prisoners during this inspection,

---

[78] D. Guthrie Transcript (redacted), page 20.
[79] W. Green Transcript (redacted), page 13.

Plaintiffs' counsel asked me to suggest questions they should ask of the named plaintiffs. I did so and included questions about use of force. I anticipated hearing about the use of pepper spray or cell extractions and other such use of force techniques typical of prisons. But what I heard about was use of the shotgun. From the statements of the named plaintiffs, use of the shotgun appears to be the primary use of force technique employed at Parchman. This is more than rare. In my experience it is unprecedented and says much about the de-evolution of control at Parchman.

101.     The named plaintiffs describe the use of the shotgun in their own words:

> Yeah I've seen it, this was it was. It was January the 14th, yeah it was the day before my birthday. I seen MDOC come in because we had, we was trying to get one out at the incident site and he hadn't had an incident site. So boom MDOC came in they were using live rounds they shot four guys in the back. Face down, they were face down they shot them in the back through the bars, behind the bars.[80]

> Yeah, there's a lot of that going on in 29. Extensive force. I'd say about a month ago they come in and shot the guy with live rounds. Well not live rounds but like little rubber BBs inside the shell casings. They was behind, in the cell, laying face down and got shot. Like four or five of them got shot over there.[81]

> Yes ma'am in G building. When I was in G building. They shot, well hold on, they shot a guy named Ismail in E building when that banging kicked out. They shot him in the ass. He had the ball in his ass. Then they come up in G building, not too long ago, they shot about four guys. They was already in the cells so if ... I can't harm you right here. And these bars you got to go to them, these bars. Even if I don't get on the floor. I still can't cause no harm to you. You can sit right there and I can sit right here all day ... to whoever inside. But instead they, "Get on the floor, get on the floor, get on the floor." He ain't move fast enough so they shot four of these guys and they wasn't causing no threat or violent themselves, their rec partner or the person with the gun.[82]

> Yeah. Every time they come around. I don't know if it'd be the highway patrol, or they be MSP guards or whatever, but there's some guards that come around and they don't have no understanding, no understanding. They come around and shoot you when you in

---

[80] P. Brister Transcript (redacted), page 7.
[81] D. Guthrie Transcript (redacted), page 7.
[82] D. Lewis Transcript (redacted), page 21.

> compliance and everything. I ain't resisting or nothing. They still go shoot you.[83]

> I actually saw guys being on the cell instead of [inaudible 00:18:45] and them folks come in with 12 gauge shotguns, rubber bullets, shooting guys just because you're not laying on the floor…They in a cell, behind a door. What can they do to you? Why are you shooting off in the cell? Then they're bullets piercing guy.[84]

> I've seen guards shoot rubber bullets at pointblank, while inmates were on the ground.[85]

It may be that these shooting incidents occurred in the context of the disturbances that took place at Parchman earlier this year but that does not justify or excuse shooting prisoners when they are behind bars and locked in their cells.

102.    Other use of force events were also reported by the named plaintiffs. In response to questions about use of force one prisoner said:

> He got his teeth knocked out a row. He got his teeth knocked out. That's my brother in law. He got his teeth knocked out a row. L did before he went home. So, yeah, man, they do all kind of low stuff around here.[86]

103.    Another prisoner said:

> Say for instance they will come around and count and if that person don't move, or they show them that they laugh, or something, they'll go to cussing and fussing, and then they'll call canine in. When canine come, they come in and beat the stink out of us.[87]

104.    Another prisoner describes the correctional officer's authority to use force ceded directly to the floorwalkers:

> Well, really they going to try to get the inmates to do it to you. Really they use trick tactics to get another inmate to do it to another inmate. Like, "He jeopardizing your shower call. If he on lockdown, then y'a'll won't get no shower." For to get them to jump on you and force you back into your cell, and stuff like that.[88]

---

[83] D. Pam Transcript (redacted), page 19.
[84] A. Willard Transcript (redacted), page 19.
[85] Amos, Michael – Affirmation, page 2.
[86] W. Green Transcript (redacted), page 28.
[87] Q. Johnson Transcript (redacted), page 10.
[88] C. Tillis Transcript (redacted), page 8.

105.    Control at Parchman has deteriorated to the point where a shotgun is taken to the units, teeth are getting knocked out, dogs are being used and floorwalkers are using force with the approval of correctional officers. This is far beyond what I have seen in other prisons in my role as a correctional consultant and expert and I have inspected many troubled prisons. The risk of serious and substantial harm is ever present at Parchman today and immediate actions need to be quickly put in place. This is an ongoing emergency.

## VI.    Emergency Action Items

106.    The most basic and fundamental elements of operating a correctional facility have been abandoned at Parchman. Prisoners are left unsupervised and unchecked in their cells, reliant at times on prisoner floorwalkers for assistance who have been ceded the authority of the correctional officers. Recreation opportunities are nearly non-existent, while adequate facilities go unused. A minimal amount of clothing is provided but it must be washed in the sink or in the toilet. Showers are inconsistent but are too often without hot water and prisoners are faced with a Hobson's choice between a shower and a call home. Many of the named plaintiffs have said they fear for their life.

107.    The Acting Deputy Commissioner of Institutions for MDOC says, "[i]t is my observation that the destruction of Parchman's facilities is caused primarily by inmates".[89] His statement is outrageous and causes me great concern about whether or not current MDOC administrators are really aware of the conditions at Parchman and what it will take to correct the situation. The prisoners did not create short staffing so that their basic needs could not be met. The prisoners did not allow for the absence of hot water necessary to get their bodies clean. The prisoners did not decide to not provide laundry service so they have to wash their clothes in their toilet or sink, one of which is often broken or in disrepair. The prisoners did not decide to abandon ACA standards. The prisoners did not allow mold to permeate the spaces where they live. These conditions were caused, at least in part, by an inadequate budget and resources necessary to maintain an aging facility.

108.    Parchman or MDOC in general does not house prisoners who are worse than prisoners in other jurisdictions. Given the high incarceration rate in the State of

---

[89] Doc. 17-1, Exhibits to Response.

Mississippi, it is very likely than many of those incarcerated don't need to be in prison and would instead be handled by community alternatives in other jurisdictions. It should be an easier set of prisoners to manage, not harder. Prisoners will sometimes tear something up in a prison and when that happens they are held accountable, the damage is repaired and life in the prison goes on. There is nothing unique going on in Mississippi that justifies the barbaric conditions at Parchman, other than the absence of funds to attract and retain staff and make necessary repairs to their aging physical plant. It is not the prisoners' fault and making that claim makes me doubt the capacity of MDOC's administration to correct this very dangerous situation. Immediate reforms are necessary to correct this very dangerous, life-threatening situation.

109.    Given the deeply troubling history of Parchman and the decades of related litigation, I have no confidence in MDOC administrators' ability to make the changes necessary to make the facility safe, secure and humane for prisoners and the employees who work there. Blaming the prisoners for the impacts of a grossly deteriorating physical plant and the lack of sufficient staff illustrates an appalling lack of understanding of the nature of the problems that have been plaguing the facility for many years. For these reasons, it is my opinion that a court appointed monitor needs to be put in place to oversee the required changes.

110.    Unit 29 should be closed or completely abandoned until the necessary physical plant repairs can be made to make it habitable for housing human beings. It is quite likely that a sophisticated analysis of the physical plant of Unit 29 would find that it would cost less in construction and ongoing maintenance costs to build new facilities. The following recommendations are made on the basis that there will be a delay in closing Unit 29 or the unit does not close.

111.    Until the time Unit 29 can be closed (and even more important if it is not) the current ways that floorwalkers are used must cease. Parchman is ceding their authority to prison gangs. Five named plaintiffs described officers giving up their keys to prisoners.[90] That is unthinkable in any other prison. Inmate workers can and should be deployed but

---

[90] J. Ham Transcript (redacted), page 27; D. Guthrie Transcript (redacted), page 23; C. Tillis Transcript (redacted), page 2; K. Thomas Transcript (redacted), page 8; and T. Ross Transcript (redacted), page 25.

their primary function should be to clean the zones and surrounding shared areas of the prison. Establish in policy and practice the specific job duties for such inmate workers and monitoring must occur to make certain they are followed. The monitor should oversee the process of selecting these inmate workers so that gang affiliation can be assessed when these job assignments are made.

112. In the near term all of the units, including 29, need a deep and thorough cleaning. Adequate cleaning supplies should be brought to each zone for a one time deep cleaning. Prisoners can do this work. After a deep cleaning, establish in policy and practice that cleaning supplies must be regularly available and workers assigned so that hygienic levels of cleanliness are sustained.

113. Unit 32 should never be used to house prisoners again. It is now vacant and should stay that way.

114. Parchman must dramatically increase resources for maintenance staff to repair the problems with lights, towers, toilets and showers. In cells or zones where those problems cannot be corrected, those cells or zones should be taken off line until the repairs can be made.

115. Immediately establish in policy and practice laundry service be made available so that the clothing and linens of prisoners can be regularly cleaned.

116. Immediately establish in policy and practice a schedule for use of the outside yard and gymnasium in Unit 29 and the other Parchman units so that prisoners have the opportunity for recreation and exercise one hour each day.

117. Immediately establish in policy and practice that prisoners in Unit 29 be given adequate time to take a shower and use the phone without having to choose between the two.

118. Establish in policy and practice that routine and meaningful inspections of the facility occur on a regular basis. The monitor must spot check the inspection reports to determine their quality.

119. Parchman must limit the number of buildings they operate consistent with their existing staff levels. The number of prisoners that exceed their capacity must be transferred. No zone should ever be supervised by a single correctional officer without immediate backup. And, the towers in Units 29 and 30 must be regularly staffed. In Unit

29 two officers should be on the floor when officers enter the living unit. In Unit 30 three officers should be assigned for each two zones.

120.    Once it is determined which buildings are salvageable at Parchman, an objective outside staffing analysis[91] should be performed. Parchman must only house the number of prisoners that they can properly supervise. Available staffing must drive capacity.

121.    Cease the use of shotguns as a first response to a use of force situation. Follow existing MDOC policy that requires in a planned use of force incident that it be video taped from start to finish and that a camera be brought to a spontaneous use of force situation as soon as possible. In a planned use of force situation regarding a mentally ill prisoner, follow MDOC policy, which requires that mental health staff attempt to de-escalate the situation before force is used. If determined to be necessary by the monitor, provide use of force training to correctional officers

122.    Survey the functionality of existing cameras at Parchman. Repair as necessary and add more cameras as determined by the monitor.

123.    Establish in policy and practice that all suicide threats and all medical problems are immediately reported to health care staff.

124.    Establish a meaningful grievance system. The current ARP program is perceived to be useless by the prisoners. Grievance forms are often not available and complaints that do get filed rarely receive a response. A functioning and secure grievance system is a critical function of any correctional institution. Data from grievances in a properly tracked system will be a useful tool for the monitor and for Parchman officials to ensure that reforms are taking place as required.

125.    These recommendations are the bare minimum of what must occur at Parchman. If successfully followed they would allow further changes to take place. For

---

[91] A staffing analysis is an accepted process in the field of corrections to determine the number of correctional officers and supervisory staff necessary to supervise a prisoner population. Physical plant design, the custody level of prisoners, officer's days off and leave time available are some of the factors that are studied to determine the appropriate staffing levels for a correctional institution. This process is taught by the National Institute of Corrections, free of charge to state and local jurisdictions, but the first such analysis for Parchman must be done by an outside, objective and neutral expert.

example, in my opinion there is profound idleness at the facility. When prisoners are productively occupied in school, at work or in treatment programs, the prison is safer and more secure. When the prisoners are idle, the power and influence of gangs proliferate. It is also my opinion that it is very likely the classification system at Parchman has broken down. In my review of prisoner files there is very little documentation of routine classification actions at Parchman, much less than what I anticipated. The RVR (Rule Violation Report) process must be examined. It appears from my review that an adequate disciplinary system is not in place at the facility. Compliance with PREA (Prison Rape Elimination Act) should be examined. If the facility can establish the basics of cleanliness, hygiene, and supervision of prisoners, it it likely that other issues will emerge. My inspection of Parchman and the lack of discovery documents so far in this case limit my ability to opine more fully on these issues. For that reason it is my opinion the monitor should be empowered to identify and make recommendations as necessary to end the nightmare that exists today at the Parchman facility.

126. I have inspected dozens of prisons and jails in thirteen different states during my tenure serving as a correctional expert or consultant and I have seen several other prisons during my work as a practitioner. Several of these facilities were troubled with problems in their physical plant, conditions of confinement and correctional staffing levels. It is not hyperbole to say the conditions at Parchman falls far below anything I have ever seen in any other jurisdiction in this country. The best solution would be to abandon the entire facility and start anew. Recognizing that is unlikely to happen, the recommendations I offer in this report from a correctional perspective are the bare minimum necessary to establish improved control and a minimally adequate level of conditions of confinement. I am certain that other subject matter experts in this case will have other critical areas that are also in dire need of immediate repair.

**[Signature on following page]**

36

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the ___7th___ day of June, 2020.

Eldon Vail

**Exhibit A**

Curriculum Vitae

Eldon Vail

**ELDON VAIL**
1516 8th Ave SE
Olympia, WA. 98501
360-349-3033
Nodleliav@comcast.net

## WORK HISTORY

Nearly 35 years working in and administering adult and juvenile institutions, and probation and parole programs, starting at the entry level and rising to Department Secretary. Served as Superintendent of 3 adult institutions, maximum to minimum security, male and female. Served as Secretary for the Washington State Department of Corrections (WADOC) from 2007 until 201l.

- Secretary     WADOC     2007-2011
- Deputy Secretary     WADOC     1999-2006
- Assistant Deputy Secretary     WADOC     1997-1999
- Assistant Director for Prisons     WADOC     1994-1997
- Superintendent     McNeil Island Corrections Center     1992-1994
- Superintendent     WA. Corrections Center for Women     1989-1992
- Correctional Program Manager     WA. Corrections Center     1988
- Superintendent     Cedar Creek Corrections Center     1987
- Correctional Program Manager     Cedar Creek Corrections Center     1984-1987
- Juvenile Parole Officer     Division of Juvenile Rehabilitation     1984
- Correctional Unit Supervisor     Cedar Creek Corrections Center     1979-1983
- Juvenile Institution Counselor     Division of Juvenile Rehabilitation     1974-1979

## SKILLS AND ABILITIES

- Ability to analyze complex situations, synthesize the information and find practical solutions that are acceptable to all parties.

- A history of work experience that demonstrates how a balance of strong security and robust inmate programs best improves institution and community safety.

- Leadership of a prison system with very little class action litigation based on practical knowledge that constitutional conditions are best achieved through negotiation with all parties and not through litigation.

- Extensive experience as a witness, both in deposition and at trial.

- Experience working with multiple Governors, legislators from both political parties, criminal justice partners and constituent groups in the legislative and policymaking process.

- Skilled labor negotiator for over a decade. Served as chief negotiator with the Teamsters and the Washington Public Employees Association for Collective Bargaining Agreements. Chaired Labor Management meetings with Washington Federation of State Employees.

## HIGHLIGHTS OF CAREER ACCOMPLISHMENTS

- Reduced violence in adult prisons in Washington by over 30% during my tenure as Secretary and Deputy Secretary even though the prison population became more violent and high risk during this same time period.

- Long term collaboration with the University of Washington focusing on improving treatment for the mentally ill in prison and the management of prisoners in and through solitary confinement.

- Implemented and administered an extensive array of evidence based and promising programs:

  o Education, drug and alcohol, sex offender and cognitive treatment programs.

  o Implemented sentencing alternatives via legislation and policy, reducing the prison populations of non-violent, low risk offenders, including the Drug Offender Sentencing Alternative and, as the Secretary, the Parenting Sentencing Alternative. http://www.doc.wa.gov/corrections/justice/sentencing/parenting-alternative.htm

  o Pioneered extensive family based programs resulting in reductions in use of force incidents and infractions, as well as improved reentry outcomes for program participants.

  o Established Intensive Treatment Unit for mentally ill inmates with behavioral problems.

  o Established step down programs for long-term segregation inmates resulting in significant reduction in program graduate returns to segregation.

- Initiated the Sustainable Prisons Project http://blogs.evergreen.edu/sustainableprisons/

- Improved efficiency in the agency by administrative consolidation, closing 3 high cost institutions and eliminating over 1,200 positions. Housed inmates safely at lowest possible custody levels, also resulting in reduced operating costs.

- Increased partnerships with non-profits, law enforcement and community members in support of agency goals and improved community safety.

- Successful settlement of the Jane Doe class action law suit, a PREA case regarding female prisoners in the state's prisons for women.

- Resolved potential class action lawsuit regarding religious rights of Native Americans.
  https://www.seattletimes.com/opinion/a-precedent-for-native-americans-religious-freedom-in-washington-prisons/

- Led the nation's corrections directors to support fundamental change in the Interstate Compact as a result of the shooting of 4 police officers in Lakewood, WA.

- Dramatically improved media relations for the department by being aggressively open with journalists, challenging them to learn the difficult work performed by corrections professionals on a daily basis.

## EDUCATION AND OTHER BACKGROUND INFORMATION

- Bachelor of Arts - The Evergreen State College, Washington – 1973

- Post graduate work in Public Administration - The Evergreen State College, Washington - 1980 and 1981

- National Institute of Corrections and Washington State Criminal Justice Training Commission - various corrections and leadership training courses

- Member of the American Correctional Association

- Associate member, Association of State Correctional Administrators (ASCA)

- Guest Speaker, Trainer and Author for the National Institute of Corrections (NIC)

- Instructor for Correctional Leadership Development for the National Institute of Corrections

- Author of *Going Beyond Administrative Efficiency—The Budget Crisis in the State of Washington*, published in Topics of Community Corrections by NIC, 2003

- Consultant for *Correctional Leadership Competencies for the 21st Century*, an NIC publication

- Consultant for Correctional Health Care Executive Curriculum Development, an NIC training program, 2012

- Commissioner, Washington State Criminal Justice Training Commission 2002-2006, 2008-2011

- Member, Washington State Sentencing Guidelines Commission 2007-2011

- Advisory Panel Member, *Correctional Technology—A User's Guide*

- Co-chair with King County Prosecutor Dan Satterberg, *Examining the Tool Box: A Review of Supervision of Dangerous Mentally Ill Offenders*

- Guest lecturer on solitary confinement, University of Montana Law School in 2012

- On retainer for Pioneer Human Services from July 2012 - July 2013

- On retainer for BRK Management Services from September 2012 – April 2013

- Guest Editorials, Seattle Times, February 22, 2014 and April 5th, 2019
  http://www.seattletimes.com/opinion/guest-opinions-should-washington-state-abolish-the-death-penalty/
  https://www.seattletimes.com/opinion/washington-state-is-ready-to-put-an-end-to-the-death-penalty/

## CURRENT ACTIVITIES

- Serve on the Board of Advisors for Huy, a non-profit supporting Native American Prisoners

- Serve on the Board of Directors for HEAL for Reentry, a non-profit supporting Native Americans' transition to the community from prison

- Retained as an expert witness or correctional consultant in the following:

  - *Mitchell v. Cate*
    No. 08-CV-1196 JAM EFB
    United States District Court, Eastern District of California,
    Declarations, March 4, May 15 and June 7, 2013
    Deposed, July 9, 2013
    Case settled, October 2014

  - *Ananachescu v. County of Clark*
    No. 3:13-cv-05222-BHS
    United States District Court, Western District of Tacoma
    Case settled, February 2014

  - *Gifford v. State of Oregon*
    No. 6:11-CV-06417-TC
    United States District Court, For the District of Oregon,
    Eugene Division,
    Expert report, March 29, 2013
    Case settled, May 2013

4

- o ***Parsons, et al v. Ryan***
  No. CV 12-06010 PHX-NVW
  United States District Court of Arizona
  Declarations and reports, November 8, 2013,
  January 31, February 24 and September 4, 2014
  Deposed, February 28 and September 17, 2014
  Case settled, October 2014

- o ***Coleman, et al v. Brown, et al***
  No. 2:90-cv-0520 LKK JMP P
  United State District Court, Eastern District of California,
  Declarations, March 14, May 29 and August 23, 2013;
  February 11, 2014
  Deposed, March 19 and June 27, 2013
  Testified, October 1, 2, 17 and 18, 2013

- o ***Peoples v. Fischer***
  No. 1:11-cv-02694-SAS
  United States District Court, Southern District of New York
  Interim settlement agreement reached February 19, 2014
  Case settled, March 2016
  Continuing assignment monitoring for the Plaintiffs

- o ***Dockery v. Hall***
  No. 3:13-cv-326 TSL JMR
  United States District Court for the Southern District of
  Mississippi, Jackson Division
  Reports, June 16, 2014, December 29, 2016;
  March 23, 2017; November 16, 2018
  Deposed, April 7, 2017
  Testified March 5-7, 2018

- o ***C.B., et al v. Walnut Grove Correctional Authority, et al***
  No. 3:10-cv-663 DPS-FKB,
  United States District Court for the Southern District of
  Mississippi, Jackson Division
  Memo to ACLU and Southern Poverty Law Center,
  March 14, 2014, filed with the court
  Reports, August 4, 2014 and February 10, 2015
  Testified, April 1, 2 and 27, 2015

- o ***Wright v. Annucci, et al***
  No. 13-CV-0564 (MAD)(ATB)
  United States District Court, Northern District of New York
  Reports, April 19 and December 12, 2014
  Testified, February 13, 2017

- o ***Graves v. Arpaio***
  No. CV-77-00479-PHX-NVW,
  United States District Court of Arizona
  Declarations, December 15, 2013, April 1, 2016,
  December 22, 2017; February 9 and October 22, 2018;
  August 19 and 30, 2019
  Testified, March 5, 2014

- o ***Corbett v. Branker***
  No. 5:13 CT-3201-BO
  United States District Court, Eastern District of North Carolina,
  Western District
  Special Master appointment November 18, 2013
  Expert Report, January 14, 2014
  Testified, March 21, 2014

- o ***Fontano v. Godinez***
  No. 3:12-cv-3042
  United States District Court, Central District of Illinois,
  Springfield Division
  Report, August 16, 2014
  Testified June 29, 2016
  Case settled June 30, 2016

- o ***Atencio v. Arpaio***
  No. CV12-02376-PHX-PGR
  United States District Court of Arizona
  Reports, February 14 and May 12, 2014
  Deposed, July 30, 2014
  Case settled, March 2018

- o ***Larry Heggem v. Snohomish County***
  No. CV-01333-RSM
  United States District Court,
  Western District of Washington at Seattle
  Report, May 29, 2014
  Deposed, June 27, 2014

- o ***Doe v. Michigan Department of Corrections***
  No. 5:13-cv-14356-RHC-RSW
  United States District Court, Eastern District of Michigan,
  Southern Division
  Declarations, September 12, 2018 and September 30, 2019
  Deposed, October 17, 2019

- ***Disability Rights, Montana, Inc. v. Richard Opper***
  No. CV-14-25-BU-SHE
  United State District Court for the District of Montana,
  Butte Division

- ***Padilla v. Beard, et al***
  Case 2:14-at-00575
  United States District Court, Eastern District of California,
  Sacramento Division
  Declaration, February 26, 2016
  Deposed June 3, 2016
  Testified April 19, 2017
  Case settled, April 24, 2017

- ***Braggs, et al v. Dunn, et al***
  No. 2:14-cv-00601-WKW-TFM
  United States District Court, Middle District of Alabama
  Declarations, September 3, 2014, April 29, 2015,
  June 3, 2015
  Expert Report, July 5, 2016
  Declarations, February 9 and October 19, 2017
  Expert Report, July 1, 2018
  Deposed August 21, 2016
  Testified, December 22, 2016, January 4, February 21, December
  5, 2017; February 13, October 23, November 29, 2018; April 3,
  2019

- ***Sassman v. Brown***
  No. 2:14-cv-01679-MCE-KJN,
  United States District Court, Eastern District of California,
  Sacramento Division
  Declaration, August 27, 2014; Report, December 5, 2014
  Deposed, December 15, 2014

- ***Robertson v. Struffert, et al***
  Case 4:12-cv-04698-JSW
  United States District Court, Northern District of California
  Declaration, March 16, 2015
  Deposed May 4, 2015
  Case settled, October 2015

- ***Commonwealth of Virginia v. Reginald Cornelius Latson***
  Case No: GC14008381—00
  General District Court of the County of Stafford
  Report, January 12, 2015
  Pardon granted

- o ***Flores v. United States of America***
  - Civil Action No 14-3166
  - United States District Court, Eastern District of New York
  - Report, August 14, 2015

- o ***Latson v. Clarke***
  - No. 1:16-cv-00447-GBL-MSN
  - United States District Court, Eastern District of Virginia
  - Reports, November 16, 2016 and January 6, 2017
  - Deposed, December 13, 2016
  - Case settled, May 2, 2017

- o ***Latson v. Clarke***
  - Civil No. 1:16-cv-00039
  - United States District Court, Western District of Virginia, Abingdon Division
  - Report, September 29, 2017
  - Deposed, December 28, 2017

- o ***Star v. Livingston***
  - Case No: 4:14-cv-03037
  - United States District Court, Southern District of Texas, Houston Division
  - Reports, March 3, 2015 and October 12, 2016
  - Case settled, March 2018

- o ***Doe v. Wolfe***
  - Case 4:15-cv-00250-DCB
  - United States District Court for the District of Arizona
  - Reports, December 4, 2015; March 10, 2016; September 23 and November 20, 2017
  - Deposed, January 5, 2018
  - Testified, November 14, 2016 and January 13, 14 and 22, 2020

- o ***Redmond v. Crowther***
  - Civil No. 2:13-cv-00393-PMW
  - United States District Court, Central Division, State of Utah
  - Report, April 28, 2015
  - Deposed, July 28, 2015

- o ***Fant v. The City of Ferguson***
  - Case No. 415-cv-00253 E.D. MO
  - United States District Court, Eastern District of Missouri
  - Report, January 8, 2016

8

- o ***Cole v. Livingston***
  Civil Action No. 4:14-cv-1698
  United States District Court, Southern District of Texas,
  Houston Division
  Reports, August 5, 2015 and April 28, 2017
  Deposed, December 2, 2015
  Testified, June 20, 2017
  Case settled, March 2018

- o ***State of Arizona, Appellee, v. Pete J. Van Winkle, Appellant***
  No. CR–09–0322–AP
  Testified, March 28, 2016

- o ***Rasho v. Godinez***
  Civil Action No. 07-CV-1298
  United States District Court, Central Division of Illinois,
  Peoria Division
  Case settled, December 2015

- o ***Morgal v. Williams***
  No. CV 12-280-TUC-CKJ
  United States District Court for the District of Arizona
  Report, February 1, 2016
  Deposed, February 25, 2016

- o ***Sacramento County Sheriff***
  Retained by Sacramento County Sheriff to evaluate housing units
  in the Sacramento County jails, including maximum custody,
  segregation and protective custody
  Report, June 27, 2016
  Case settled, June 2019

- o ***Community Legal Aid Society, Inc. v. Robert M. Coupe***
  Case No. 1:15-cv-00688
  United States District Court for the District of Delaware
  Report, March 31, 2016
  Case settled, August 2016

- o ***C-Pod Inmates of Middlesex County Adult Correction Center, et al. v.***
  ***Middlesex County***
  Civil Action No. 15-7920 (PGS)
  United States District Court for the District of New Jersey
  Report, July 29, 2016
  Case settled, September 2018

9

- ○ ***Williams v. Snohomish County***
    Case No. 15-2-22078-1 SEA
    Superior Court for the State of Washington, King County

- ○ ***P.D. v. Middlesex County***
    Case No. MID-L-3811-14
    Superior Court of New Jersey
    Report, July 29, 2016

- ○ ***Gould v. State of Oregon, et al***
    Case No. 2:15-cv-01152-SU
    United States District Court for the District of Oregon
    Case settled, October 2016

- ○ ***Johnson v. Mason County***
    NO. 3:14-cv-05832-RBL
    United States District Court, Western District of Washington at Tacoma
    Declaration, April 5, 2016
    Deposed, October 26, 2016
    Case settled, March 2017

- ○ ***United States Department of Justice***
    Retained by DOJ to join a team investigating conditions for LGBT inmates including sexual harassment, sexual abuse and sexual assaults by inmates and staff in the Georgia Department of Corrections
    Report, October 2016

- ○ ***Daniel Evans v. Management and Training Corporation, et al***
    NO. 3:15-cv-770-DPJ-FKB
    United States District Court, Southern District of Mississippi, Northern Division
    Report, October 17, 2016
    Case settled, January 2017

- ○ ***Webb v. Collier***
    Civil Action NO. 6:13cv711
    United States District Court, Eastern District of Texas, Tyler Division
    Report, March 13, 2017
    Deposed, May 5, 2017
    Case settled, March 2018

- ○ *Holbron v. Espinda*
  Civil No. 16-1-0692-04 RAN
  Circuit Court of the First Circuit, State of Hawai'i
  Reports, February 1 and November 20, 2017
  Testified, December 20, 2017

- ○ *Carruthers v. Israel*
  Case No. 76-6086-civ-Middlebrooks
  United States District Court, Southern District of Florida

- ○ *Dahl v. Mason County*
  Case 3:16-cv-05719
  United States District Court, Western District of Washington at Tacoma
  Report, August 21, 2017, Declaration, December 4, 2017
  Case settled, August 2018

- ○ *Adams, James, Hudson v. Livingston*
  Civil Action No. 4:14-cv-03326
  United States District Court, Southern Division of Texas
  Houston Division
  Report, June 15, 2017
  Case settled, March 2018

- ○ *Ashker v. Governor of the State of California, et al*
  Case No. 4:09 CV 05796 CW
  United States District Court, Northern District of California, Oakland Division
  Declaration, December 6, 2017

- ○ *Togonidze v. Livingston*
  Civil Action No. 3:13-cv-229
  United States District Court, Southern District of Texas, Galveston Division
  Report, October 3, 2017
  Case settled, March 2018

- ○ *Martone v. Livingston*
  Civil Action No 4:13-CV-3369
  United States District Court, Southern Division of Texas, Houston Division
  Case settled, March 2018

11

- o ***Cody v. City of St. Louis***
  Case 4:17-cv-02707-AGF
  United States District Court, Eastern District of Missouri,
  Eastern Division
  Affidavit, August 30, 2018, Report September 27, 2019

- o ***Sabata v. Nebraska Department of Correctional Services***
  Case No. 4:17-CV-3107
  United States District Court for the State of Nebraska
  Declarations, August 24, 2018, February 14, 2019 and
  June 26, 2019
  Deposed, April 9, 2019

- o ***Pickens v. Management & Training Corporation***
  Civil Action No. 3:16cv-913-CWR-FKB
  United States District Court for the Southern District of
  Mississippi, Northern Division
  Report, December 19, 2018
  Case settled, January 2019

- o ***Davis v. Baldwin***
  Case No. 3:16-cv-600
  United States District Court, Southern Division of Illinois
  Report, September 6, 2019
  Deposed, November 13, 2019

**Exhibit B**

List of Materials Reviewed

**Exhibit B**

**List of Materials Reviewed**

I reviewed the following documents for this report.

1. Complaint and Demand for Jury Trial, filed on January 14, 2020 in *Amos et al. v. Tommy Taylor et al.*; in the N.D. of Miss., Greenville Division, Case No. 4:20-CV-007-DMB-JMV (the "Lawsuit").

2. Plaintiffs' First Amended Class Action Complaint, filed on January 28, 2020 in the Lawsuit.

3. Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, with Exhibits and supporting Memorandum, filed on January 24, 2020 in the Lawsuit.

4. Defendants' Response in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction and associated Memorandum, with Exhibits and supporting Memorandum, filed on January 27, 2020 in the Lawsuit.

5. Plaintiffs' Reply in Further Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction, filed on January 28, 2020 in the Lawsuit.

6. Other pleadings filed in this matter.

7. Press Release: Immediate Mississippi Department of Corrections Actions to Restore Order at Parchman. Mississippi Department of Corrections. January 22, 2020.

8. Mississippi State Penitentiary Health Inspection Annual Report (2019).

9. Plaintiffs' Affirmations.

10. Plaintiffs' Prison Files.

11. Plaintiffs' interview transcripts (redacted).

12. Miscellaneous documents produced by the MDOC, including: various Standard Operating Procedures; various security and inspection reports; various fire inspection reports; various accreditation reports; and various building inspection reports.

13. Miscellaneous documents produced by MDOC pursuant to various Freedom of Information Act requests,

14. Pictures taken by Plaintiffs' photographer of the February 11 & 12, 2020 inspections.

15. *Performance Based Standards and Expected Practices for Adult Correctional Institutions,* American Correctional Association, 5th Edition, October 2019.

16. *Standard Minimum Rules for the Treatment of Prisoners,* Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders.

17. *A Practical Guide to Understanding and Evaluating Prison Systems,* United States Department of State.

18. *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, March 2014, Vol. 104, No. 3 American Journal of Public Health, Research and Practice, Fatos Kaba, MA, Andrea Lewis, PhD, Sarah Glowa-Kollisch, MPH, James Hadler, MD, MPH, David Lee, MPH, Howard Alper, PhD, Daniel Selling, PsyD, Ross MacDonald, MD, Angela Solimo, MS, Amanda Parsons, MD, MBA, and Homer Venters, MD, MS.

19. MSP Centurion Policies and Procedures.

**ADDENDUM TO EXPERT REPORT / DECLARATION OF ELDON VAIL**

I have been asked by Plaintiffs' counsel to review declarations filed by prisoners at Parchman, including four named Plaintiffs from this litigation that continue to reside at Parchman,[1] related to the COVID-19 pandemic and what is currently happening at the facility. These declarations took the form of a questionnaire developed by Plaintiffs' counsel. I have also reviewed the Court's order of April 24, 2020 denying the Plaintiffs' request for a temporary injunction related to the pandemic.

I have written four declarations and testified twice on COVID-19 related issues in the following federal court matters:

- *Valentine v. Collier*, Cause No. 4:20-cv-01115, in the Southern District of Texas, where I testified and wrote a declaration;
- *Frazier v. Kelley*, Cause No. 4:20-cv-00434, in the Eastern District of Arkansas, where I testified and wrote a declaration; and
- *Cullors v. County of Los Angeles*, Cause No. 2:20-cv-03760, in the Central District of California, where I wrote a declaration.

I have also been retained in two other COVID-19 related cases but have yet to produce work product. I am familiar with the issues the pandemic presents from a correctional perspective.

It is clear from my review of the declarations that the promises made to the Court by the MSP officials regarding their plan to respond to the pandemic, as recounted in the Court's April 24, 2020 Order, are at best being applied inconsistently and in many cases, not at all.

***Social Distancing***

Social distancing is a critical protective measure to control the spread of the virus. While social distancing guidelines may be difficult to completely achieve in prisons or jails, these guidelines should be given serious attention. Correctional authorities need to work to achieve these guidelines, or get as close to achieving them as possible whenever and wherever they can. The Center for Disease Control ("CDC") says:

---

[1] Aric Johnson, Addendum-1, MDOC 101119; Daniel Guthrie, Addendum-2, MDOC 105808; Derrick Rogers, Addendum-3, MDOC 160736; and Kuriaki Riley, Addendum-4, MDOC 110851.

> Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19.[2]

Of great concern to me are the prisoners' reports that officers do not follow social distancing guidelines for themselves, nor do they enforce it with the prisoners. This observation is made near universally in the prisoner declarations I have reviewed. If the prisoners don't see the officers exercising the discipline of social distancing, it is highly unlikely it will be adopted in the prisoner culture.

One of the simplest, no cost example from the CDC to improve social distancing has to do with arranging how prisoners sleep. In this regard, the CDC says:

> Arrange bunks so that individuals sleep head to foot to increase the distance between them.[3]

Yet from the declarations of the prisoners there is almost no indication that this simple change has been shared or implemented with the prisoners at Parchman; it appears that very little effort has been made to implement this practice at the facility. From my review of all the declarations only three prisoners indicate they have been instructed to arrange their beds in this manner. Two of these prisoners were from Unit 29F and one from Unit 29B, units comprised of individual or double cells. This is deeply troubling in that no one from the dormitories reported they had been instructed to follow the guidance. All of the other prisoners report they had never heard of this.

Mr. Rogers, housed in Unit 30D, a dormitory unit says: "It's a [sic] 107 people on our zone and we are not six (6) feet away from each other it's within (4) four feet that's how close the racks are."[4]

---

[2] CDC Guidance, March 23, 2020, page 4.
[3] CDC Guidance, March 23, 2020, page 11.
[4] Derrick Rogers, Addendum-3, 160736, page 4.

Another simple suggestion offered by the CDC regards what should happen at mealtimes. The CDC says:

- Stagger meals
- Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
- Provide meals inside housing units or cells

There is no indication in the declarations that meals at Parchman are being staggered. There is indication that some meals are served to prisoners in their cells. But my biggest concern is the last of social distancing required in dining halls where they are being used. Regarding meals Mr. Riley, who resides in 30A, a dormitory unit, says:

And no, we are sitting about 2 feet apart.[5]

Similarly, Mr. Chatman, who resides in 30D, also a dormitory unit, says:

No, they sit right beside each other, 4 inmates one bench, shoulder to shoulder.[6]

This is a problem in several living units. From the declarations is it reported that there is no social distancing at meals in Units 25A, 25B, 25C, 26A, 28B, 28D, 30A, 30B, 30C and 30D. Again, this would be a simple, no cost option for Parchman to pursue. For the most part they are ignoring this simple guidance from the CDC.

From my inspection of the living units in Parchman, I am extremely concerned with the lack of possibility for social distancing in the dormitory style living units at Parchman, especially in units 25 and 30. There is little evidence that Parchman is seriously committed to increase social distancing.

I inspected Unit 25A when I was at Parchman. This zone has a dormitory design with prisoners living in shared cubes with beds for four to six prisoners. There is a rather large dayroom. One prisoner from 25A reports that five people sleep within 6 feet from his bed and 3 of them sleep within 2 feet of his bed, and that nothing has changed in the face of the COVID-19 pandemic.[7] This is astonishing. Given the large dayroom in this unit it would be very easy to simply move some of the bunks into the dayroom space. In my opinion this is clear evidence that officials at Parchman are not focused on efforts that can

---

[5] Kuriaki Riley, Addendum-4, 110851, page 6.
[6] Frank Chatman, R7457, page 6.
[7] Ron Fairly, 22518, page 4.

3

help make the prisoners safer.

Facing the limitations and doing the best one can in a particular correctional environment; there are still steps that can be taken by redefining where prisoners are housed. For example, in my home state of Washington, "[d]epartment staff repurposed various areas within the facility, including a classroom and extended family visit units, to spread the population out."[8] In the California Department of Corrections and Rehabilitation, "CDCR has moved more than 500 inmates from dormitory housing into vacant space within state institutions in an effort to increase physical distancing in these living environments."[9]

Parchman should pursue similar strategies. During my inspection I viewed two gymnasiums that could accommodate sleeping space for prisoners. If this were done, some of the worst crowding in the dormitories, especially Unit 30, could be alleviated. There is much progress that could be made at Parchman to improve social distancing. I have offered some simple suggestions here. I am puzzled why Defendants have not done more.

***Facility Cleaning***

Regarding cleaning of the facility, the Center for Disease Control says:

> Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).[10]

The information from the declarations reveals this guidance has been inconsistently applied, depending on which living unit the prisoner lives. The Plaintiffs' questionnaire asked whether or not there are supplies to disinfect telephones—an example of a common touch area—after each use. Here is what I found:

| | |
|---|---|
| Unit 25A | No reports of supplies to clean phones |
| Unit 25B | 1 prisoner says supplies are provided |
| Unit 25C | No reports of supplies to clean phones |
| Unit 26A | No reports of supplies to clean phones |
| Unit 26B | No reports of supplies to clean phones |

---

[8] Respondents' Report on the Department of Corrections' COVID-19 Response, *Colvin v. Inslee*, No. 98317-8, filed 4/13/20 in the Washington State Supreme Court, page 35.
[9] https://www.cdcr.ca.gov/covid19/.
[10] CDC Guidance, March 23, 2020, page 9.

4

| | |
|---|---|
| Unit 28B | 2 out of 4 prisoners say supplies are provided |
| Unit 28D | 2 out of 4 prisoners say supplies are provided |
| Unit 29A | No reports of supplies to clean phones |
| Unit 29B | 1 out of 2 prisoners say supplies are provided |
| Unit 29F | 4 out of 13 prisoners say supplies are provided |
| Unit 29G | No reports of supplies to clean phones |
| Unit 29J | No reports of supplies to clean phones |
| Unit 29L | No reports of supplies to clean phones |
| Unit 30A | 2 out of 12 prisoners says supplies are provided |
| Unit 30B | 2 out of 9 prisoners say supplies are provided |
| Unit 30C | 9 out of 23 prisoners says supplies are provided |
| Unit 30D | No reports of supplies to clean phones |
| Unit 31D | No reports of supplies to clean phones |
| Unit 31L | No reports of supplies to clean phones |
| Unit 42 | No reports of supplies to clean phones |

Twelve out of the twenty units surveyed say that no supplies to clean the phones after each use are provided. While telephones are but an example of a common touch area, the lack of consistent methods to clean the phone cause me to believe that other common areas are not being cleaned and disinfected several times a day as recommended by the CDC.

When I was the Deputy Secretary of the Washington DOC during a flu epidemic, at one of our 2,000 plus bed facilities we had nearly 1,000 prisoners infected with the flu; we took several steps to fight the flu epidemic in that facility. One of those steps was to add inmate janitors, give them the appropriate protective gear, and have them continually clean common touch surfaces with disinfectant or bleach such as prisoner telephones, doorknobs, tables, chairs and bathroom facilities. This step was guided by our medical staff and was an important tool to gain control of the flu epidemic we were experiencing. Defendants should consider doing the same.

### Personal Hygiene

Regarding personal hygiene the Center for Disease Control says:

> **Provide incarcerated/detained persons and staff no-cost access to:**
> **Soap**—Provide liquid soap where possible. If bar soap must be used, ensure that

it does not irritate the skin, as this would discourage frequent hand washing.

**Running water, and hand drying machines or disposable paper towels for hand washing**

**Tissues** and no-touch trash receptacles for disposal[11]

Parchman has increased the issue of soap for prisoners but the frequency of the issue appears to be different between the living units. Mr. Johnson, who lives in 29F says, "Yes, one bar of soap a month".[12] But Mr. Rogers, who lives in 30D, says, "Once a week".[13] Other declarations illustrate the inconsistency of Defendants' issuance of an additional bar of soap depending on the living unit where the prisoner resides.

But none of the other items recommended by the CDC have been issued to prisoners at Parchman. There are no paper towels, or hand drying machines or tissues being issued.

As I said on p. 5, par. 15, of my report, "[t]he physical plant is a disaster, perhaps beyond repair, especially in Units 29 and 30." My finding is reflected in the declarations about COVID-19 regarding access to hot water. Thirty-two prisoners reported that access to hot water was either non-existent or inconsistent in their cell or dorm. Not having hot water makes it more difficult to properly wash one's hand, a fundamental principle to avoid catching the virus.

One solution to the absence of consistent hot water would be to allow supervised access to alcohol-based hand sanitizer. In this regard, the CDC recommends use of "Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)."[14] The CDC is cautious in their recommendation about alcohol-based hand sanitizer, but other authorities are not.

In the face of the flu epidemic in Washington referenced above, I temporarily suspended our prohibition against allowing prisoners to have supervised access to alcohol-based hand sanitizer. Based on that experience, as well as that of other correctional systems, in order to combat the spread of COVID-19, supervised access to alcohol-based hand sanitizer should be provided to inmates. Access to the frequent hand washing (and soap) required to prevent the spread of COVID 19 is limited in prison settings, and

---

[11] CDC Guidance, March 23, 2020, page 10.
[12] Aric Johnson, Addendum-1, 101119, page 5.
[13] Derrick Rogers, Addendum-3, 160736, page 5.
[14] CDC Guidance, March 23, 2020, page 4.

especially at Parchman given the physical plant challenges at the facility. MSP obviously recognizes this need by permitting staff to carry hand sanitizer on their person. While there is some risk associated with the misuse of alcohol-based hand sanitizer (potential abuse by some prisoners with substance abuse problems, and its flammability being the two most prominent), that risk pales in comparison to the benefit for a much larger number of prisoners. This moment is about balancing risks, and the overriding consideration is protecting the prisoners from the threat of this lethal virus by providing them with supervised access to alcohol-based hand sanitizer.

Other states have already taken such a measure. For example, the Washington State DOC has taken this step again in the face of the COVID-19 pandemic. On April 18, 2020, Washington authorities published a memo making alcohol-based hand sanitizer available to all of their incarcerated population.[15] Additionally, the State of New York has said they are "[i]ssuing hand sanitizer to all facilities for staff and the incarcerated population to use, as well as community supervision offices."[16] The State of California announced:

> On March 29, CDCR institutions began receiving extra hand sanitizer dispensing stations along with the new production of the type of alcohol-based hand sanitizer recommended by the Centers for Disease Control and Prevention (CDC) to help eliminate coronavirus produced by California Prison Industry Authority (CALPIA). The dispensers have been placed inside institution dining halls, work change areas, housing units, and where sinks/soap are not immediately available.[17]

The State of New York operates 52 prisons and houses nearly 43,000 prisoners. The State of California operates 22 prisons and houses almost 118,000 prisoners. The State of Washington operates 12 prisons and houses over 16,000 prisoners. The total is 86 different prisons that house more than 175,000 prisoners. Each state has made the decision to balance the risk of alcohol-based hand sanitizer in favor of the safety of their prison

---

[15] Washington Dep't of Corrections, *Appropriate Use of Hand* Sanitizer, (April 18, 2020) https://doc.wa.gov/news/2020/docs/2020-0418-incarcerated-individuals-memo-appropriate-use-of-hand-sanitizer.pdf.

[16] New York Dep't of Corrections and Community Supervision, *DOCCS COVID-19* Report, (accessed May 21, 2020) https://doccs.ny.gov/doccs-covid-19-report.

[17] California Dep't of Corrections, *COVID-19 Preparedness*, (accessed May 21, 2020) https://www.cdcr.ca.gov/covid19/.

populations. The high risk of COVID-19 to both staff and prisoners requires Parchman do the same.

### *Communication with Prisoners*

Finally, ongoing education and communication about the virus is important according to the CDC. They say:

> Communicate clearly and frequently with incarcerated/detained persons about changes to their daily routine and how they can contribute to risk reduction.
>
> Provide <u>up-to-date information about COVID-19</u> to incarcerated/detained persons on a regular basis, including:
> <u>Symptoms of COVID-19</u> and its health risks
> Reminders to report COVID-19 symptoms to staff at the first sign of illness.[18]

This is simply not occurring. Nurses go to the units twice a day for pill line but the prisoner declarations clarify that is their sole function for this visit. Several of the declarations report that what they have learned about COVID-19 has come from medial reports and not from staff.

### *Summary*

I have no confidence that MSP officials are consistently following CDC Guidelines in the areas where I have opined in this addendum—social distancing, facility cleaning, personal hygiene, and regular communication with prisoners—all critical areas to stem the tide of COVID-19 in a correctioanl facility. I am deeply concerned and fear for the health of the prisoners at Parchman.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this the ___7 th___ day of June, 2020.

Eldon Vail

---

[18] CDC Guidance, March 23, 2020, page 12.