**EXHIBIT "C"**

Craig Haney, PhD, J.D. Expert Report

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

| | |
|---|---|
| MICHAEL AMOS, PITRELL BRISTER, ANTONIO DAVIS, WILLIE FRIEND, CHARLES GAYLES, DANIEL GUTHRIE, JONATHAN J. HAM, DESMOND HARDY, BILLY JAMES, JR., JUSTIN JAMES, QUENTEN JOHNSON, DEAUNTE LEWIS, LARRY MAXWELL, TERRANCE MCKINNEY, DERRICK PAN, BRANDON ROBERTSON, KURIAKI RILEY, DERRICK ROGERS, TYREE ROSS, H.D. ALEXANDER SCOTT, DEANGELO TAYLOR, LEMARTINE TAYLOR, CONTI TILLIS, DEMARCUS TIMMONS, CARLOS VARNADO, PHILLIP DECARLOS WEBSTER, ADRIAN WILLARD, CURTIS WILSON, CALEB BUCKNER, WILLIAM GREEN, ARIC JOHNSON, IVERY MOORE, and KEVIN THOMAS, on behalf of themselves and all other similarly situated, | |
| Plaintiffs, | No. 4:20-cv-00007-DMB-JMV |
| v. | |
| TOMMY TAYLOR, in his official capacity as the Interim Commissioner of the Mississippi Department of Corrections, and MARSHAL TURNER, in his official capacity as the Superintendent of the Mississippi State Penitentiary, | |
| Defendants. | |

## EXPERT REPORT / DECLARATION OF CRAIG HANEY
### In support of Plaintiffs' request for injunctive relief

I, Craig Haney, Ph.D., J.D., declare as follows:

1

## I.    Expert Qualifications

1.     I am a Distinguished Professor of Psychology and UC Presidential Chair at the University of California, Santa Cruz. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards.

2.     I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of solitary or "supermax"-type confinement. In addition to these scholarly articles and book chapters, I have published three sole-authored books: Death by Design: Capital Punishment as a Social Psychological System (Oxford University Press, 2005), Reforming Punishment: Psychological Limits to the Pains of Imprisonment (American Psychological Association Books, 2006), and Criminality in Context: The Psychological Foundations of Criminal Justice Reform (American Psychological Association Books, 2020). I was also a member of the National Academy of Sciences committee that co-authored The Growth of Incarceration in the United States: Exploring the Causes and Consequences (Washington, DC: The National Academies Press, 2014).

2

3.      In the course of my academic work in psychology and law, I have lectured and given invited addresses throughout the country on the role of social and institutional histories in explaining criminal violence, the psychological effects of living and working in institutional settings (typically maximum security prisons), and the psychological consequences of solitary confinement. I have given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

4.      I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations on jail- and prison-related issues. Those agencies and organizations include the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the United States Department of Justice, the Department of Health and Human Services (HHS), the Department of Homeland Security, and the White House (several different administrations). In 2012, I testified as an expert witness before the Judiciary Committee of the United States Senate in a hearing that focused on the use and effects of solitary confinement and was appointed as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. A copy of my curriculum vitae is attached to this Declaration as **Exhibit A**.

5.      My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner"

3

or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a "classic" study in the field, demonstrating the power of institutional settings to change and transform the people who enter them.[1]

6.      Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and "supermax"-type confinement). In the course of that work, I have toured and inspected numerous maximum security state prisons and related facilities (in Alabama, Arkansas, Arizona, California, Florida, Georgia, Hawaii, Idaho, Illinois, Louisiana, Massachusetts, Mississippi, Montana, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), and prisons in Canada, Cuba, England, Hungary, and Mexico. I also have conducted numerous interviews with correctional officials, guards, and prisoners to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.[2]

---

[1] For example, see Craig Haney, Curtis Banks & Philip Zimbardo, Interpersonal Dynamics in a Simulated Prison, 1 International Journal of Criminology and Penology 69 (1973); Craig Haney & Philip Zimbardo, The Socialization into Criminality: On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society: Psychological and Legal Issues. (J. Tapp and F. Levine, eds., 1977); and Craig Haney & Philip Zimbardo, Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, Personality and Social Psychology Bulletin, 35, 807-814 (2009).

[2] For example, Haney & Zimbardo, The Socialization into Criminality: On Becoming a Prisoner and a Guard, supra note 1; Craig Haney, Infamous Punishment: The Psychological Effects of Isolation, 8 National Prison Project Journal 3 (1993); Craig Haney, Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, Psychology, Public Policy, and Law, 3, 499-588 (1997); Craig Haney, The

7.     I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Alabama, Arkansas, California, Georgia, New Mexico, Pennsylvania, Texas, and Washington, and in numerous state courts, including courts in Arizona, Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo counties. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[3]

## II.    Basis of Expert Opinion and Executive Summary

8.     I have been retained by the law firm of Maron Marvel Bradley Anderson & Tardy, LLC, on behalf of the Plaintiffs in *Michael Amos, et al. v. Tommy Taylor, et al.* [Case 4:20 cv-00007-DMB-JMV], to render an opinion on several inter-related issues, including the conditions of confinement at the Mississippi State Penitentiary ("Parchman"), the psychological impact of those conditions on the prisoners subjected to them, and the nature of the remedies that I believe are essential to address the identified

---

Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence, University of Missouri-Kansas City Law Review, 77, 911-946 (2009); Craig Haney, Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners," Connecticut Public Interest Law Review, 9, 139-196 (2010); Craig Haney, The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, American Criminal Law Review, 48, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications (2012)]; and Craig Haney, Prison Effects in the Age of Mass Imprisonment, The Prison Journal, 92, 1-24 (2012).

[3] For example, see Brown v. Plata, 563 U.S. 493 (2011); see also Exhibit A for a list of cases citing my work.

problems, including both emergency remedies that can and should be implemented immediately *and* longer-term but nonetheless essential remedies that must be implemented to address a range of important problems and to ensure that the Parchman facility does not return to its current crisis state. The opinions contained in this report relate specifically to the allegations and requests for relief in the Plaintiffs' request for injunctive relief, and are based on both my personal observations and the narrow discovery produced by the Defendants as discussed immediately below.

9.     In order to reach my expert opinions, I have reviewed the relevant scientific literature on the effects of imprisonment and solitary confinement, especially as they pertain to and are exacerbated for persons who suffer from mental illness. In addition, I reviewed the pleadings filed in this matter, the limited documents provided by the Defendants that pertain to practices and procedures of the Mississippi Department of Corrections, other documents received through various Freedom of Information Act requests, prison files and partial medical records of the plaintiffs, and redacted transcripts of attorney-conducted interviews with Plaintiffs. (A complete list of the documents I have been provided and reviewed is attached to this Declaration as **Exhibit B.**) I also traveled to Parchman prison myself on two separate occasions: on January 30-31, 2020, I participated in interviews of Plaintiff-prisoners and other prisoners housed in Unit 30 and 42 (the medical facility) and Unit 29. I returned to Parchman on February 28, 2020 and I toured and inspected certain holdings cells and H Building in Unit 29.

10.     Based on my document review, the Plaintiffs' and other prisoner interviews, and facility inspection, I have reached the following expert opinions:

a.     Plaintiffs and other Prisoners (collectively, "Prisoners") at the Mississippi State Penitentiary at Parchman are in grave, imminent danger.

6

b.      The conditions and practices that exist at Parchman threaten the physical and mental well-being of the Prisoners housed there.

c.      These grave, imminent dangers and threats to well-being appear to have been created by a profound level of neglect and disregard for the prisoners themselves, including gross underfunding of the prison, unprecedented of levels of understaffing, an abject failure to maintain a livable physical environment for prisoners, and a systemic disregard for the prisoners' medical and mental health needs.

d.      In many instances, the dangers and threats to well-being have resulted in actual injuries and fatalities, including a shocking number of recent homicides and suicides at Parchman.

e.      These imminent dangers and threats necessitate an urgent, emergency set of decisive responses that should include: immediately removing all prisoners from the harmful and deteriorated Parchman housing units where many have died and the rest are still in grave danger (including, at a minimum, those housed in Unit 29); a rapid and substantial increase in the level of staffing in the Mississippi Department of Corrections (so that Prisoners are safe and receive adequate care wherever they are housed), and an immediate, drastic increase in access to proper medical and mental health care services.

f.      In addition to the urgent, emergency responses that must be immediately implemented, there are a number of additional measures that must be taken to elevate the Mississippi State Penitentiary to a viable, functioning correctional institution, and to ensure that the shocking conditions, forms of mistreatment, and other violations of human dignity that currently characterize the facility do not recur.

7

## III.    The Adverse Psychological Effects of Incarceration

11.    Many studies of prison life in general have documented the extraordinary physical and psychological toll that incarceration incurs. Research shows that many prisoners are adversely affected by their prison experiences, and these adverse effects often persist long after the prisoners have been released back to free society. Indeed, what are commonly described as the "pains of imprisonment" are now well understood, their negative psychological effects are well documented, and we know them to be truly severe.[4] For example, Cambridge University penologists Alison Liebling and her colleagues reported that the measured levels of distress in 11 of the 12 otherwise well-functioning British prisons they studied were "extraordinarily high" and above the threshold that ordinarily triggers an inquiry into whether a patient is suffering from a treatable emotional or psychological illness.[5]

12.    In addition, reviews of the literature on the prevalence of PTSD (and interrelated trauma-based symptoms that include depression, emotional numbing, anxiety, isolation, and hypervigilance) among prisoners suggest that this disorder may occur as much as *10 times* more often than in the general population.[6] The severity of

---

[4] Much of this evidence is summarized in several book-length treatments of the topic. For example, see: Haney, C., Reforming punishment: Psychological limits to the pains of imprisonment. Washington, DC: American Psychological Association (2006); Liebling, A., & Maruna, S. (Eds.), The effects of imprisonment. Cullompton, UK: Willan (2005); and National Research Council (2014). The Growth of Incarceration in the United States: Exploring the Causes and Consequences. Washington, DC: The National Academies Press. In addition, there are numerous empirical studies and published reviews of the available literature. For example, see: Haney, C., Prison effects in the age of mass incarceration. Prison Journal, 92, 1-24 (2012); Johns, D., Confronting the disabling effects of imprisonment: Toward prehabilitation. Social Justice, 45(1), 27-55.

[5] Liebling, A., Durie, L., van den Beukel, A., Tait, S., & Harvey, J., Revisiting prison suicide: The Role of Fairness and Distress. In A. Liebling & S. Maruna (Eds.), The effects of imprisonment. Cullompton, UK: Willan (2005), p. 216.

[6] E.g., see: Gibson, L., Holt, J., Fondacaro, K., Tang, T., Powell, T., & Turbitt, E. (1999). An examination of antecedent traumas and psychiatric co-morbidity among male inmates with PTSD. Journal of Traumatic Stress, 12, 473-484 (1999); Goff, A., Rose, S., & Purves, D., Does PTSD occur in sentenced prison

environmental stress to which prisoners are exposed significantly affects the levels of anxiety and depression that prisoners experience during confinement.[7] Moreover, University of Pennsylvania researcher Jason Schnittker and his colleagues have shown that many of these psychiatric symptoms (especially anxiety- and depression-related disorders) persist long after release and represent significant obstacles to successful re-entry.[8]

13. Moreover, imprisonment is so stressful that prisoners' physical health is adversely affected. Having been in prison can increase rates of morbidity (i.e., elevates one's chances of becoming ill), especially the likelihood of contracting infectious and stress-related illnesses.[9] It also affects mortality rates (i.e., leads to earlier death).[10] In

populations? A systematic literature review. Criminal Behavior & Mental Health, 17, 152-162 (2007); Heckman, C., Cropsey, K., & Olds-Davis, T., Traumatic stress disorder treatment in correctional settings: A brief review of the empirical literature and suggestions for future research. Psychotherapy: Theory, Research, Practice, Training, 44, 46-53 (2007).

[7] E.g., see: Cooper, C., & Berwick, S., Factors affecting psychological well-being of three groups of suicide-prone prisoners. Current Psychology, 20, 169-182 (2001). It is important to be reminded of exactly what such stress consists of. For example, noting that "[n]o one leaves unscarred," Mika'il DeVeaux provided powerful firsthand account of the traumatic nature of the prison life he experienced, ones whose aftereffects he still struggled to overcome long after his release: "I found the prison experience traumatic because of the assaults and murders I witnessed while incarcerated, because of the threat of violence, because of the number of suicides that took place, and because I felt utterly helpless about the degree to which I could protect myself." DeVeaux, M., The trauma of the incarceration experience. Harvard Civil Rights-Civil Liberties Law Review, 48, 257-277 (2013), at p. 264-265.

[8] Schnittaker, J., The psychological dimensions and the social consequences of incarceration. Annals of the American Association of Political and Social Science, 651, 122-138 (2014); Turney, K., Wildeman, C., & Schnittker, J., As fathers and felons: Explaining the effects of current and recent incarceration on major depression. Journal of Health and Social Behaviour, 53(4), 465-481 (2012). See, also: Listwan, S., Colvin, M., Hanley, D., & Flannery, D., Victimization, social support, and psychological well-being: A study of recently released prisoners. Criminal Justice and Behavior, 37(10), 1140-1159 (2010).

[9] E.g., see: Massoglia, M. Incarceration as Exposure: The Prison, Infectious Disease, and Other Stress-Related Illnesses. Journal of Health and Social Behavior, 49(1), 56-71 (2008); and Massoglia, M., & Remster, B., Linkages Between Incarceration and Health. Public Health Reports, 134(Supplement 1), 85-145 (2019).

[10] E.g., see: Binswanger, I., Stern, M., Deyo, R., et al., Release from prison: A high risk of death for former inmates. New England Journal of Medicine, 356, 157-165 (2007).

fact, Evelyn Patterson's study of New York prisoners concluded that each year spent in prison reduced a person's life span by two years.[11] Many of the adverse effects on physical and mental health are long-lasting, persisting well beyond a person's time in prison.[12] That is, research shows that *formerly incarcerated persons* suffer from high rates of depression and especially high mortality rates that appear to be the lasting aftereffects of their prison experiences.

14. It is important to emphasize that the above-cited research has been conducted in reasonably well-run prisons, and the measured adverse effects provide a baseline of the physical and psychological damage that can be created by incarceration per se. These and other studies have not been conducted in prisons that are plagued by the truly extraordinary conditions, forms of treatment, and levels of violence that currently characterize Parchman prison. There is every reason to expect that the much more onerous, dangerous, dehumanizing, and deprived conditions that exist at Parchman will have even more severe long-lasting effects. The Mississippi prisoners confined there are not just suffering but their suffering is likely to have lasting, perhaps even

[11] Patterson, E., The dose-response of time served in prison on mortality: New York state, 1989-2003. American Journal of Public Health, 103(3), 523-528 (2013).

[12] E.g., see the discussions in: Archibald, P., Criminal justice contact, stressors, and depressive symptoms among Black adults in the United States. American Journal of Criminal Justice, 43, 486-508 (2018); Assari, S., Miller, R., Taylor, R., et al., Discrimination fully mediates the effect of incarceration history on depressive symptoms and psychological distress among African American men. Journal of Racial and Ethnic Health Disparities, 5, 243-252 (2018); Cox, R., Mass incarceration, racial disparities in health, and successful aging. Generations: Journal of the American Society on Aging, 42(2), 48-55 (2018); Grounds, A., & Jamieson, R., No sense of an ending: Researching the experience of imprisonment and release among Republican ex-prisoners. Theoretical Criminology, 7(3), 347-362 (2003); Kubiak, S., The effects of PTSD on treatment adherence, drug relapse, and criminal recidivism in a sample of incarcerated men and women. Research on Social Work Practice, 14(6), 424-433 (2004); Kim, Y., The effect of incarceration on midlife health: A life-course approach. Population Research Policy Review, 34, 827-849 (2015); Turney, et al., As fathers and felons, *supra* note 8; and Udo, T. (2019). Chronic medical conditions in U.S. adults with incarceration. Health Psychology, 38(3), 217-225 (2019).

10

permanently disabling effects. It is urgent that the damaging conditions and degrading treatment be addressed as soon as possible to minimize the immediate and longer lasting harm.

## IV. The Adverse Psychological Effects of Prison Isolation

15. "Solitary confinement," "segregated living," and "restrictive housing" are terms of art in correctional practice and scholarship, but they mean essentially the same thing. For perhaps obvious reasons, prisoners have never been placed in *total and complete* solitary confinement, where they have absolutely no contact with other human beings. Instead, solitary confinement has always meant a degree of isolation from others-even if a prisoner is given one cell-mate. In fact, from a psychological perspective, "solitary confinement" is defined less by the purpose for which it is imposed or the exact amount of time during which prisoners are confined to their cells than by the degree to which they are deprived of normal, direct, meaningful social contact and denied access to positive environmental stimulation and activity.

16. Using this conventionally agreed-upon definition, based on what I was able to glean from the Prisoner interviews I directly observed and participated in, the redacted transcripts of Prisoner interviews I reviewed, the MDOC documents I was provided, and my own tour of Parchman holding cells and Building H in Unit 29, I have concluded that most if not all of the Prisoners housed in Unit 29 *are* being subjected to some form of solitary confinement. That is, most are confined in their cells nearly around-the-clock (i.e., they eat, sleep, and defecate within a small area that is roughly the size of a king-sized bed or parking space), are denied access to prison programming, engage in very

11

little if any congregate activity, and are rarely or (in some instances it would appear) never taken to outdoor recreation.

    17.    Not surprisingly, perhaps, it is now a largely settled scientific fact that prisoners who are subjected to solitary confinement experience a host of very serious negative psychological and physical consequences. These consequences are severe enough to raise serious questions about the constitutionality of solitary confinement and its potential status as form of torture.[13] In any event, many scientific studies have identified numerous negative symptoms from which prisoners in solitary confinement disproportionately suffer. They include: appetite and sleep disturbances; anxiety, panic, and a sense of impending emotional breakdown; hypersensitivity, irritability, aggression, and rage; ruminations, paranoia, and hallucinations; cognitive dysfunction; loss of emotional control and mood swings; and feelings of hopelessness, depression, and social withdrawal.[14]

---

[13] For summaries of and citations to the research that establishes these damaging effects and the statements by legal and human rights organizations questioning the constitutionality and torturous nature of solitary confinement, see: Haney, C., Restricting the use of solitary confinement. Annual Review of Criminology, 1, 285-310 (2018); Haney, C., Ahalt, C., & Williams, B., Consensus statement of the Santa Cruz summit on solitary confinement. Northwestern Law Review, in press; and Haney, C., & Bakhshay, S. (2017). Contexts of ill-treatment: The relationship of captivity and prison confinement to cruel, inhuman, or degrading treatment and torture. In M. Başoğlu (Ed.), Torture and its definition in international law: An interdisciplinary approach (pp. 139-178). New York: Oxford. See, also: Lobel, J., Prolonged solitary confinement and the Constitution. University of Pennsylvania Journal of Constitutional Law, 11, 115-138 (2008).

[14] These many studies have been carefully reviewed in a number of publications. For example, see: K. Cloyes, D. Lovell, D. Allen & L. Rhodes, Assessment of psychosocial impairment in a supermaximum security unit sample, Criminal Justice and Behavior, 33, 760-781 (2006); S. Grassian, Psychiatric effects of solitary confinement. Washington University Journal of Law & Policy, 22, 325-383 (2006); Haney, Restricting the use of solitary confinement, supra note 13; C. Haney & M. Lynch, Regulating prisons of the future: The psychological consequences of solitary and supermax confinement. New York Review of Law & Social Change, 23, 477-570 (1997); and Smith, P., The effects of solitary confinement on prison inmates: A brief history and review of the literature, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006). There are a few outlier studies that purport to find few if any negative effects. For a detailed discussion of the serious methodological flaws that plague these studies, see: Haney, C., The psychological effects of solitary confinement: A systematic critique. Crime and Justice, 47, 365-416 (2018).

12

18.     Not every isolated prisoner will suffer all of these adverse psychological reactions to isolated confinement. However, the overall nature and magnitude of the negative psychological reactions that I have documented in my own research and that have been reported by others in the scientific literature underscore the stressfulness and painfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the significant risk of serious harm that it creates.

19.     In addition to these symptoms of psychological trauma and harm, prisoners in isolated confinement are at especially heightened risk of self-harm and suicide.[15] As two national prison suicide experts, Raymond Patterson and Kerry Hughes, summarized their research: "We found that the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[16]

20.     There are additional studies that document the added *long-term* destructive effects of solitary confinement. Thus, research indicates that there are few if any positive effects of solitary confinement on subsequent behavior in prison (i.e., it does not reduce the rates at which prisoners engage in subsequent disciplinary infractions).[17] On the other

---

[15] For example, see Frottier, P., et al., Suicide Prevention in Correctional Institutions: The Significance of Solitary Cell Accommodation, International Journal of Prisoner Health 3, no. 3 225–32 (2012); Hayes, L., National Study of Jail Suicides: 20 Years Later, Journal of Correctional Health Care, 18, no. 233–45 3 (2012); Liebling, A., Prison Suicide and Prisoner Coping, Crime and Justice, 26, 283–359 (1999); Roma, P., et al., Incremental Conditions of Isolation as a Predictor of Suicide in Prisoners, Forensic Science International, 23, no. 3 (2013): e1–e3; and Way, B., et al., Inmate Suicide and Time Spent in Special Disciplinary Housing in New York State Prison, Psychiatric Services, 58, no. 4, 558–60 (2007).

[16] Patterson, R., & Hughes, K., Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999–2004, Psychiatric Services, 59, no. 6 676–82 (2008), p. 678.

[17] E.g, see: Medrano, J., Ozkan, T., & Morris, R. (2017). Solitary confinement exposure and capital inmate misconduct. American Journal of Criminal Justice, 42, 863-882; and Morris, R., Exploring the effect of exposure of short-term solitary confinement among violent prison inmates. Journal of Quantitative Criminology, 33, 1-22 (2016).

13

hand, it does appear to have negative long-term effects. For example, a number of studies indicate that the experience of isolated prison confinement places formerly incarcerated persons at heightened risk of harm after they have been released back into free society. Thus, Lauren Brinkley-Rubinstein and her colleagues found that persons released from prison who had been placed in solitary confinement were significantly more likely to die the first year following their release (especially from suicide, homicide, and opioid overdose) than persons who had not been in solitary confinement.[18] Similarly, Christopher Wildeman and Lars Andersen found that persons who spent time in solitary confinement while they were incarcerated had significantly higher mortality rates five years after their release then those who had not spent time in solitary confinement.[19] Some research also indicates that the experience of having been in solitary confinement actually elevates the risk that a person will recidivate—that is, be returned to prison or commit certain kinds additional crimes once released from prison.[20]

21.    Here, too, the published research on the harmful effects of solitary confinement was not conducted in prisons plagued by the truly extraordinary conditions and forms of treatment and widespread violence that now plague Parchman prison. There is every reason to expect that the much more onerous, dangerous, dehumanizing, and

---

[18] See: Brinkley-Rubinstein, L., Sivaraman, J., Rosen, D., Clous, D., et al. (2019). Association of restrictive housing during incarceration with mortality after release. JAMA Network Open, 2(10), e1912516. doi:10.1001/jamanetworkopen.2019.12516

[19] Wildeman, C., & Andersen, L. (2020). Solitary confinement placement and post-release mortality among formerly incarcerated individuals: A population-based study. Lancet Public Health, 5, e107-113.

[20] E.g., see: Brinkley-Rubinstein, L., Sivaraman, J., Rosen, D., Clous, D., et al. (2019), *supra* note 18; Clark & Duwe, (2018). From solitary to the streets: The effect of restrictive housing on recidivism. Corrections, Advance online publication. doi:10.1080/23774657.2017.141 6318; Lovell, D., Johnson, L., & Cain, K. (2007). Recidivism of supermax prisoners in Washington State. Crime & Delinquency, 53, 633-656; Mears, D., & Bales, W. (2009). Supermax incarceration and recidivism. Criminology, 47, 1131-1166; and Zgoba, K., Pizarro, & Salerno, L. (2019). Assessing the impact of restrictive housing on inmate post-release criminal behavior. American Journal of Criminal Justice, https://doi.org/10.1007/s12103-019-09496-2.

deprived conditions that exist inside the solitary confinement units at Parchman's Unit 29 will have even more severe long-lasting effects than those identified in the research I have cited. The Mississippi Prisoners confined in these solitary confinement units are likely to suffer more significant and longer lasting effects, including ones that may be permanently disabling. Thus, it is urgent that the damaging conditions, degrading treatment, and rampant violence be addressed as soon as possible to minimize the immediate and longer lasting harm.

## V. Observations, Interviews, and Evidence from Parchman

22. I have been provided with documentation provided by the Defendants and an extensive number of photographs by Plaintiffs' counsel that have served as a partial basis for my assessment and conclusions about the nature of the conditions, forms of treatment, and levels of violence that currently exist at Parchman prison. In addition, I also personally inspected one of the housing units (Building H in Unit 29) and holding cells located near the front administration building onsite.

23. As noted above, I also personally participated in interviews of a number of Prisoners in Unit 30 prior to the Court-ordered inspections (including Plaintiff Kuriaki Riley, among others) and an additional number of Prisoners from Unit 29 (including Plaintiff Lemartine Taylor, among others). In addition, I reviewed the redacted transcripts of interviews conducted by Plaintiffs' attorneys in conjunction with Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

24. In both my in-person interviews and in the redacted transcripts of the interviews I reviewed, Prisoner after Prisoner reported feeling frightened and unsafe. As one of them told me: "There no safety here. Guys are at risk." [Unit 30 Inmate No. 1,

Haney Interview, January 30, 2020]. These observations were born out by the frighteningly high levels of lethal violence that have occurred at Parchman over the last month to six weeks. Several Prisoners said they witnessed assaults—prisoners being attacked and stabbed—and that officers simply ignored them. One Prisoner who told me that there were frighteningly few correctional officers on duty at any one time and that: "We feel unsafe as a result. I fear for my life. I'm traumatized by this place." [Unit 29 Inmate No. 1, Haney Interview, January 31, 2020].

25. Many Prisoners reported seeing staff actively involved in mistreating and abusing Prisoners. Here is how one described it:

First thing they do when they come in... 'Get on the ground.' They come in with some... gear, you know. Combat mode. Shooting people. I seen them shoot people with the rubber... guns and stuff while we behind doors, on the floor. Now what kind of threat is they posing to you? What's your reason for shooting your gun? It's just being excessive. That's excessive.

[Interview Transcript of C. Tillis (Redacted), H Building, Unit 29, p. 28.]

26. Prisoners reported that there are very few correctional officers working in the housing units. As a result, they are left to fend for themselves at multiple levels in multiple ways, including washing their own clothes in the sinks of their cells and cutting each other's hair with the razors and combs they are allowed to have. Even more importantly, significant understaffing means that the officers rarely check directly on the Prisoners. In fact, there are so few correctional officers that they cannot respond to emergencies in a timely manner. One Prisoner told me of a recent incident in which correctional staff could not respond to a prisoner having a seizure because there was only one officer in the "tower" and she could not leave her post; when staff finally responded, only correctional officers rather than medical personnel arrived. [Unit 30 Inmate No. 2, Haney Interview, January 30, 2020.]

16

27. Another said, "plenty of guys can't take it anymore, and that's what the suicides are about." [Unit 29 Inmate No. 2, Haney Interview, January 31, 2020.] One Prisoner described what happened when his cellmate tried to commit suicide: "The COs... they telling me, 'Get, get, get down!' They tell them, 'Get him down, untie him, untie him!' But then when they tell him, 'We fixing to come back and get him,' [they] never come back." [Interview Transcript of C. Tillis (Redacted), H Building, Unit 29, p. 26.] Another Prisoner reported that:

> I've seen a couple inmates hang themselves but I don't know their names...
> [M]atter of fact... somebody trying to hang themselves when I was in G
> building, like two weeks ago. They ain't know he was dead till like the next
> morning when they had came round [to] serve the breakfast traying. They
> didn't know then because the inmates, the floor walkers had to come in
> when they were handing out the trays they seen him in the room..."

[Interview Transcript of P. Brister (Redacted), Building H, Unit 29, p. 25].

28. The lack of even remotely adequate staffing has led to an unbelievably lax security practices. For example, correctional officers allow "floor walkers" – inmates favored by the officers and who are allowed out of their cells for extensive periods of time and typically permitted to assume some of the officers' duties – to exercise a dangerous amount of power and control over other Prisoners. Among other things, I was told that correctional officers apparently give keys to prisoners with which they are permitted to open cells doors and let other prisoners out. Even those Prisoners who had working locks on their cell doors said they tied their doors shut because they did not know who the officers would give keys to in order to enter and harm them.

29. Moreover, "the officers, they never in the towers so you know what's going on in the building period. They be in the halls with us..." [Interview Transcript of P. Brister

17

(Redacted), p. 3.] More specifically, as this prisoner continued his description of the lack of officer coverage in Unit 29:

> [The officer] ain't in the tower, she in the hallway. Like she in the hallway [and] she monitoring two zones at one time. She in the hallway watching two zones at one time...[T]here's 80 people on each zone so she monitoring 160 people at one time by herself. Like if something happen, how do you monitor both zones at one time?

[Interview Transcript of P. Brister (Redacted), H Building, Unit 29, p. 3.]

30.     Thus the dangerous lack of staff resulted in a dangerous lack of safety and security. Prisoners not only voiced heartfelt fears for their own safety and survival also reported that the correctional staff shows callous disregard for Prisoner well-being. A Prisoner recounted staff assaults that apparently occurred this past January 14th: "MDOC came in [the unit], they were using live rounds. They shot four guys in the back. Face down. They were face down. The shot them in the back, through the bars, behind the bars." [Interview Transcript of P. Brister (Transcript), H Building, Unit 29, p. 7.]

31.     One Prisoner showed me the buckshot that was still in his body after being shot by an officer, and said that he had to provide his own first aid because he received no medical attention after the incident. [Unit 29 Inmate No. 3, Hancy Interview, January 31, 2020.] He said it was not uncommon for Prisoners to have to provide medical care to each other. Another Prisoner who said he had been stabbed in his shoulder showed me the wound. He reported that he was given no medical attention for it, "not even Neosporin..." [C. Varnado, Unit 29, Haney Interview, January 31, 2020.]

32.     Not surprisingly, the Prisoners are traumatized by what has happened to them directly and by the violence that they have witnessed occurring around them. As one of them recounted: "[T]o be honest, like if I go to sleep I still see people dying, people getting hung, I see, like one time I had a dream not too long ago about how all this had

happened, people running around bloodied, people getting stabbed. I then had dreams about that and it fucks with me..." [Interview Transcript of P. Brister (Redacted), H Building, Unit 29, p. 18.] Or, another: "[W]e suffering post traumatic stress disorder... Everything have us uptight and scared... [W]e saw guys get stabbed down in they room, and nobody helped them. At one point, my roommate was going through so much dealing with these situations, he was trying to hang hisself. It just been so much." [Interview Transcript of C. Tillis (Redacted), H Building, Unit 29, pgs. 24, 26.] And yet another: "I'm terrified. I can't sleep, don't know if I'll be killed. I'm losing my mind. I can't concentrate, remember, can't sleep, [have] flashbacks, I'm anxious all the time." [Unit 29 No. 2, Haney Interview, January 31, 2020.]

33. Largely because I am rarely called to inspect "good" or model prisons, I have toured and inspected many of the worst prisons in the entire United States. Yet, based on my own direct observations, and the photographs that I reviewed of Parchman housing units, it is clear the Prisoners are being subjected to truly horrendous living conditions. Many of the scenes are unprecedented in my forty years of examining prisons across the United States and throughout the world. Building II in Unit 29, that I personally inspected, was uninhabitable (although it is my understanding that it had been inhabited not long before we inspected it). Yet the photographs that I reviewed of other housing units indicate that H Building was not remotely the most dilapidated and deteriorated in Unit 29. *See, e.g.,* Plaintiffs' photo submission filed with their Supplemental Brief.

34. Prisoners in Unit 29 reported that they have had no water or electricity for a considerable period of time. They also reported that many of the sinks and toilets do not work. I was able to confirm this in my own inspection of H Building in Unit 29 and through my review of the inspection pictures taken in other housing areas. Fewer than

half of the toilets I tried to flush functioned, and the same was true of the faucets in the sinks. Some of the faucets that did work could not be shut off. Other Prisoners who were interviewed said that their toilets backed up consistently, that they had no water in their cells (other than the water in the toilets) and that the showers—which they were allowed to take only twice a week—also lacked hot water.

35.     Prisoners reported that the units they were living in are filthy and that they are not provided with cleaning utensils and chemicals needed to clean their cells. I confirmed this in my inspection of H Building in Unit 29, which was filthy throughout. Virtually all of the surfaces inside the cells and on the floors and stairs covered with grime and crud, as if they had not been cleaned—with real cleaning utensils and chemicals—for years or even decades. The inspection pictures I reviewed indicate that these conditions exist throughout all other Unit 29 housing areas, as well as in Unit 30. I was told that so-called "floor walkers" are tasked with sweeping the units but do no more cleaning than that; H Building in Unit 29 gave clear evidence of that.

36.     Virtually all of the Prisoners whom I interviewed and those whose redacted interview transcripts I reviewed complained of rodent and roach infestations in their housing units. Some Prisoners said the roaches were simply everywhere. For example: "You got 50 roaches in your cell. Me and my roommate, we just should have count. 'How many you killed today? I counted 30.' I'll be like, 'I'm at 32.'" [Interview Transcript of C. Tillis (Redacted), H Building, Unit 29, p. 15.] I was told that rats run so freely in the units that the Prisoners have to hang their storage boxes off the ground so they will not eat the Prisoners' food. [For example, Unit 30 Inmate No. 2, Haney Interview, January 30, 2020.] Prisoners said that they had to eat their food quickly when it came on the trays: "Rats are everywhere. If you sit your tray down and look away, the rat jumps up on your

20

tray and starts eating it." [Unit 29 Inmate No. 2, Haney Interview, January 31, 2020.] Another Prisoner said that because it is so hot in the summer, many are tempted to lie on the floor, to catch the breeze from the fans; however, if you do, he said, you see the rats scurrying back and forth across the unit. [Unit 30 Inmate no. 3, Haney Interview, January 30, 2020.] Prisoners also said the food was not only cold but sometimes had insects and bird or rodent droppings in it.

37.     Prisoner after Prisoner reported that the tap water in their cells is dirty and discolored—a brownish color—and some reported that it made them sick. Some speculated that the brown color and foul smell indicated that it was sewage water than had backed up in the pipes. Not only must they drink this water but, because Parchman does not provide adequate laundry services, they are forced to wash their clothes with it in the sinks in their cells. Their clothes are not laundered or washed in a timely manner, so some Prisoners pay others to wash them for them.

38.     In the Unit 29 zone I inspected, there appeared to be only two telephones to accommodate at least 80 men. Prisoners who do not have money on their books cannot make phone calls or get stamps (which means they cannot send letters). One Prisoner told me he sells his food trays to get enough funds to buy stamps. [K. Riley, Unit 30, Haney Interview, January 30, 2020.]

39.     Many Prisoners said that they and others in their unit had been denied showers for several weeks. The Prisoners complained of idleness and a lack of programming. According to many Prisoners, many of the severe deprivations and forms of mistreatment to which they were subjected over the last month or so were *not* imposed in response to the recent exigent circumstances and events at the prison; rather, Prisoners said, many occurred over a much longer period of time. For example, one Prisoner

21

reported that the "normal" routine of an hour of out of cell time every few days or once a week had not been adhered to for a number of months. [Lemartine Taylor, Unit 29, Haney Interview, January 31, 2020.] He had been in his unit since October (three months before this lawsuit was filed) and had not been to outside rec in that time. *Id.* Another said he had not gotten to go to yard in six months. [, Unit 29 Inmate No. 4, Haney Interview, January 31, 2020; *see also* Unit 29 Inmate no. 5, Haney Interview, January 31, 2020; and Unit 29 Inmate no. 2, Haney Interview, January 31, 2020.]

40.    Prisoners reported that large numbers of mentally ill prisoners at Parchman, including those with significant pre-prison mental health treatment histories as well as those receiving psychotropic medications. Many Prisoners report having witnessed multiple suicide attempts (e.g., Charles Gayles), yet there is little or no mental health staff presence in the zones. Prisoners consistently reported rarely if ever seeing mental health staff and, if and when they were present, their contact with Prisoners was cursory and unhelpful and uncaring. For example, one Prisoner who told me that he had been on psychotropic medications for depression said that his contact with a "psych lady" occurred no more than once a month, when she brought him from his cell out to the hallway and asked, within earshot of the correctional officers, just a few rote questions: "How are you? How are your meds? You're not going to hurt yourself?" [Unit 30 Inmate No. 1, Haney Interview, January 30, 2020.] He said that the exchanges never last more than two or three minutes and never included any actual counseling or therapy. *Id.* In other instances, Prisoners said that they openly requested mental health care—including for the trauma they experienced seeing other prisoners killed, hearing prisoners voice suicidal intentions—but that these requests were ignored or resulted in no more than superficial attention.

22

41.     Indeed, a number of Prisoners reported that they were and are so desperate to get staff attention for the serious problems from which they and others suffer that they have resorted to extreme measures that require staff to acknowledge and respond to them. That is, over time, many Parchman Prisoners feel so completely ignored and so completely neglected that their mental and physical well-being is literally at stake. They have come to the conclusion that their only recourse is to resort to extreme measures—"cutting up" or starting fires—as a way of finally getting staff to pay attention to the dire situation in which they have been placed.

## VI.     **Conclusions and Recommendations**

42.     Based on the documentary record, photographs, and Prisoner interview transcripts that I have reviewed, as well as my own personal and direct involvement with Prisoner interviews conducted before the Court-ordered inspections and my inspection of holding cells and a Unit 29 housing unit, I have reached a number of expert opinions about conditions of confinement at Parchman prison and their effects on the prisoners housed there. These opinions lead directly to a series of recommendations for both immediate and long-term court intervention.

43.     Specifically, I have concluded that:

a.     Prisoners at the Mississippi State Penitentiary at Parchman are in grave, imminent danger.

b.     The conditions and practices that exist at Parchman threaten the physical and mental well-being of the prisoners housed there.

c.     These grave, imminent dangers and threats to well-being appear to have been created by a profound level of neglect and disregard for the Prisoners

23

themselves, including gross underfunding of the prison, unheard of levels of understaffing, an abject failure to maintain a livable physical environment for the Prisoners, and a systemic disregard for the Prisoners' medical and mental health needs.

d.　In many instances, the dangers and threats to the Prisoners' well-being have resulted in actual injuries and fatalities, including a shocking number of recent homicides and suicides at Parchman.

44.　These conclusions lead directly to the following recommendations:

a.　These imminent dangers and threats necessitate an urgent, emergency set of decisive responses that should include: immediately removing all Prisoners from the harmful and deteriorated Parchman housing units where many have died and the rest are still in grave danger (including Unit 29 and Unit 30); a rapid and substantial increase in the level of vetted and trained staffing in the Mississippi Department of Corrections (so that prisoners are safe and receive adequate care wherever they are housed); and an immediate, drastic increase in access to proper medical and mental health care services.

b.　In addition to the urgent, emergency responses that must be immediately implemented, there are a number of additional measures that must be taken to elevate the Mississippi State Penitentiary to a viable, functioning correctional institution, and to ensure that the shocking conditions, forms of mistreatment, and other violations of human dignity that currently characterize the facility do not recur.

45.　I have reached these opinions within a reasonable degree of scientific certainty, based on the information and observations available to me. As more information and observations become available, I would expect to carefully consider it and incorporate it as appropriate.

24

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _8ᵗʰ_ day of June, 2020.

Craig Haney Ph.D., J.D.

Craig Haney, Ph.D, J.D.

25

**Exhibit A**

Curriculum Vitae

Craig William Haney, Ph.D., J.D.

CURRICULUM VITAE


Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

Co-Director,
UC Consortium on Criminal Justice Healthcare

Co-Director,
AMEND at UCSF: US-Norway Correctional Change/Exchange Program

home address:     317 Ocean View Ave.
                  Santa Cruz, California 95062
phone:            (831) 459-2153
fax:              (831) 425-3664
email:            psylaw@ucsc.edu

PREVIOUS EMPLOYMENT

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

HONORS AWARDS GRANTS

2018    Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections").

2016    Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council.

Psychology Department "Most Inspiring Lecturer"

2015    University of California Presidential Chair (2015-2018 Term)

Martin F. Chemers Award for Outstanding Research in Social Science

Excellence in Teaching Award (Academic Senate Committee on Teaching).

President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen).

Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council.

Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof]

2014    Distinguished Faculty Research Lecturer, University of California, Santa Cruz.

2013    Distinguished Plenary Speaker, American Psychological Association Annual Convention.

| | |
|---|---|
| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
| | Invited Expert Witness, United States Senate, Judiciary Committee. |
| 2011 | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009 | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
| | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006 | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for Death by Design). |
| | Nominated for National Book Award (by American Psychological Association Books, for Reforming Punishment: Psychological Limits to the Pains of Imprisonment). |
| | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005 | Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz. |
| | Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient). |
| | Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley). |
| 2004 | "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz. |
| | National Science Foundation Grant to Study Capital Jury Decision-making |
| 2002 | Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz. |
| | United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project. |

3

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

| | |
|---|---|
| 2000 | Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy. |
| | Excellence in Teaching Award (Academic Senate Committee on Teaching). |
| | Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists. |
| 1999 | American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future") |
| | National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension). |
| 1997 | National Science Foundation Grant to Study Capital Jury Decision-making. |
| 1996 | Teacher of the Year (UC Santa Cruz Re-Entry Students' Award). |
| 1995 | Gordon Allport Intergroup Relations Prize (Honorable Mention) |
| | Excellence in Teaching Convocation, Social Sciences Division |
| 1994 | Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice. |
| 1992 | Psychology Undergraduate Student Association Teaching Award |
| | SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities |
| 1991 | Alumni Association Teaching Award ("Favorite Professor") |
| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |

| | |
|---|---|
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |


UNIVERSITY SERVICE AND ADMINISTRATION

| | |
|---|---|
| 2010-2016 | Director, Legal Studies Program |
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |

1984-1986      Chair, Committee on Privilege and Tenure

WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

2020      Criminality in Context: The Psychological Foundations of Criminal Justice Reform. Washington, DC: American Psychological Association Books, in press.

2014      The Growth of Incarceration in the United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press.

2006      Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books.

2005      Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press.

Monographs and Technical Reports

1989      Employment Testing and Employment Discrimination (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.

Articles in Professional Journals and Book Chapters

2019   "Continuing to Acknowledge the Power of Dehumanizing
       Environments: Responding to Haslam, et al. (2019) and Le Texier
       (2019)" (with Philip Zimbardo), American Psychologist, in press.

       "Afterword," in Robert Johnson, Condemned to Die: Life Under
       Sentence of Death (pp. 136-141). Second Edition. New York:
       Routledge.

       "Changing correctional culture: Exploring the role of U.S.-Norway
       exchange in placing health and well-being at the center of U.S.
       prison reform" (with Cyrus Ahalt, Brie Williams, and Kim
       Ekhaugen), American Journal of Public Health, in press.

       "Solitary Confinement, Loneliness, and Psychological Harm," in
       Jules Lobel and Peter Scharff Smith (Eds.), Solitary Confinement:
       Effects, Practices, and Pathways to Reform. New York: Oxford
       University Press, in press.

2018   "Restricting the Use of Solitary Confinement," Annual Review of
       Criminology, 1, 285-310.

       "Death Qualification in Black and White: Racialized Decision-
       Making and Death-Qualified Juries" (with Mona Lynch), Law &
       Policy, in press.

       "Balancing the Rights to Protection and Participation: A Call for
       Expanded Access to Ethically Conducted Correctional Research.
       Journal of General Internal Medicine, 33(22).
       DOI: 10.1007/s11606-018-4318-9.

       "The Plight of Long-Term Mentally-Ill Prisoners" (with Camille
       Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.),
       The Criminalization of Mental Illness (pp. 163-180). Durham, NC:
       Carolina Academic Press.

       "The Psychological Effects of Solitary Confinement: A Systematic
       Critique," Crime and Justice, 47, 365-416.

       "The Media's Impact on the Right to a Fair Trial: A Content
       Analysis of Pretrial Publicity in Capital Cases (with Shirin
       Bakhshay), Psychology, Public Policy, and Law, 24, 326-346.

2017      "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). Analyses of Social Issues and Public Policy, 17, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," Punishment and Society, 19, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), Torture and Its Definition in International Law: An Interdisciplinary Approach (pp.139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, International Journal of Prisoner Health, 13, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), International Journal of Prisoner Health, 13, 41-48.

2016      "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), The Prison Journal, 96, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book Moral Disengagement: How People Do Harm and Live With Themselves, by A. Bandura], PsycCRITIQUES, 61(8).

2015      "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), Law & Social Inquiry, 40, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), <u>Routledge Studies in Education and Neoliberalism: Female Students and Cultures of Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014  "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health Affairs</u>, <u>33:3</u> (March), 1-6.

2013  "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books (in press).

"Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012  "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

"Prison Effects in the Age of Mass Incarceration," <u>Prison Journal</u>, <u>92</u>, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011  "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), <u>Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors</u> (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), <u>Michigan State Law Review</u>, 2011, 573-608.

2010 "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" <u>Connecticut Public Interest Law Review</u>, <u>9</u>, 139-196.

"Hiding From the Death Penalty," <u>Huffington Post</u>, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in <u>Sentencing and Justice Reform Advocate</u>, <u>2</u>, 3 (February, 2011).

2009 "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), <u>Law and Human Behavior</u>, <u>33</u>, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," <u>Prison Service Journal UK</u> (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: <u>California Prison Focus</u>, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), <u>Encyclopedia of Group Processes and Intergroup Relations</u>. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," <u>DePaul Law Review</u>, <u>58</u>, 689-740. (Reprinted: <u>Capital Litigation Update</u>, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," <u>University of Missouri-Kansas City Law Review</u>, <u>77</u>, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), <u>Personality and Social Psychology Bulletin</u>, <u>35</u>, 807-814.

2008    "Counting Casualties in the War on Prisoners," <u>University of San Francisco Law Review</u>, <u>43</u>, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," <u>Hofstra Law Review</u>, <u>36</u>, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," <u>Criminal Justice and Behavior</u>, <u>35</u>, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), <u>Psychology and Law: Bridging the Gap</u> (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), <u>Dictionary of Prisons</u> (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," <u>Washington University Journal of Law & Policy</u>, <u>22</u>, 265-293. [Reprinted in: N. Berlatsky, <u>Opposing Viewpoints: America's Prisons</u>. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," Golden Gate Law Review, 37, 131-173.

"Preface," D. Jones (Ed.), Humane Prisons. San Francisco, CA: Radcliffe Medical Press.

2005     "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), The Effects of Imprisonment (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), Harvard Journal of Hispanic Policy, 17, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), Report on Asylum Seekers in Expedited Removal. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004     "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), Psychology, Public Policy, and Law, 10, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), Psychology, Public Policy, and Law, 10, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), Psychology, Public Policy, and Law, 10, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," DePaul Law Review, 53, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), Analyses of Social Issues and Public Policy (ASAP), 4, 1-22.

"Abu Ghraib and the American Prison System," The Commonwealth, 98 (#16), 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," <u>Crime & Delinquency</u> (special issue on mental health and the criminal justice system), <u>49</u>, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), <u>Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities</u> (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," <u>Capital University Law Review</u>.

2002    "Making Law Modern: Toward a Contextual Model of Justice, <u>Psychology, Public Policy, and Law</u>, <u>7</u>, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001    "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000  "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

     "Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999  "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

     "Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998  "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions: Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

     "Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

     "Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997  "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

     "Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," <u>Stanford Law Review</u>, <u>49</u>, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, <u>America's Experiment with Capital Punishment</u>: <u>Reflections on the Past, Present, and Future of the Ultimate Penal Sanction</u>. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), <u>Law and Human Behavior</u>, <u>21</u>, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" <u>Studies in Law, Politics, and Society</u>, <u>16</u>, 3-69.

1995    "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," <u>Santa Clara Law Review</u>, <u>35</u>, 547-609. [Reprinted in part in David Papke (Ed.), <u>Law and Popular Culture</u>, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," <u>Indiana Law Journal</u>, <u>70</u>, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners, and Prisoners</u> (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," <u>Law and Human Behavior</u>, <u>17</u>, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). <u>Forum</u>, <u>19</u>, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. <u>Behavioral Science and Law</u>, <u>10</u>, 179-195.

1991    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," <u>Law and Human Behavior</u>, <u>15</u>, 183-204.

1988     "In Defense of the Jury," <u>Contemporary Psychology</u>, <u>33</u>, 653-655.

1986     "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277.

1984     "Editor's Introduction. Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

        "On the Selection of Capital Juries: The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

        "Examining Death Qualification: Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

        "Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

        "Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

        "Social Factfinding and Legal Decisions: Judicial Reform and the Use of Social Science." In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>. New York: John Wiley, pp. 43-54.

1983     "The Future of Crime and Personality Research: A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.: Lexington Books, pp. 471-473.

        "The Good, the Bad, and the Lawful: An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>. Lexington, Mass.: Lexington Books, pp. 107-117.

        "Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982     "Psychological Theory and Criminal Justice Policy: Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and</u>

American History: Cases and Materials. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) Introduction to Criminal Justice: A Sociological Perspective. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), The Analysis of Judicial Reform. Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination: A Dissenting Psychological Opinion," Industrial Relations Law Journal, 5, pp. 1-86.

"To Polygraph or Not: The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), Polygraph, 11, 185-199.

1981    "Death Qualification as a Biasing Legal Process," The Death Penalty Reporter, 1 (10), pp. 1-5. [Reprinted in Augustus: A Journal of Progressive Human Sciences, 9(3), 9-13 (1986).]

1980    "Juries and the Death Penalty: Readdressing the Witherspoon Question," Crime and Delinquency, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," Law and Human Behavior, 6, 191-235. [Reprinted in Loh, Wallace (Ed.), Social Research and the Judicial Process. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency: Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology: Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979    "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), <u>Law and Society Review</u>, <u>13</u>, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), <u>Criminal Law and Its Processes</u>. Boston: Little, Brown, 1983.]

1977      "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), <u>The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology</u>, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), <u>Law, Justice, and the Individual in Society: Psychological and Legal Issues</u> (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976      "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), <u>The Research Experience</u>, pp. 177-190. Itasca, IL: Peacock.

1975      "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  <u>Psychology</u> <u>Today</u>, 26ff.

"Implementing Research Results in Criminal Justice Settings," <u>Proceedings</u>, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), <u>Theory and Research in Abnormal Psychology</u>.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), <u>Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving</u>.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) <u>Contemporary Issues in Social Psychology</u>.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  <u>Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships</u>. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, <u>Revisita de Psicologia Social</u>, 1, 95-105 (1986).]

1973      "Social Roles, Role-Playing, and Education" (with P. Zimbardo), <u>The Behavioral and Social Science Teacher</u>, Fall, 1(1), pp. 24-45.

[Reprinted in: Zimbardo, P., and Maslach, C. (Eds.) Psychology For Our Times. Glenview, Ill.: Scott, Foresman, 1977. Hollander, E. and Hunt, R. (Eds.) Current Perspectives in Social Psychology. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer: A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine, April 8, Section 6, 38-60. [Reprinted in Krupat, E. (Ed.), Psychology Is Social: Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), International Journal of Criminology and Penology, 1, pp. 69-97. [Reprinted in: Steffensmeier, Darrell, and Terry, Robert (Eds.) Examining Deviance Experimentally. New York: Alfred Publishing, 1975; Golden, P. (Ed.) The Research Experience. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of Corrections. New York: John Wiley, 1977; A kiserleti tarsadalom-lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. Justice and Corrections. New York: John Wiley, 1978; Research Methods in Education and Social Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern Sociology. British Columbia: Open Learning Institute, 1980; Ross, Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison. Toronto: Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), Social Science in Law: Cases, Materials, and Problems. Foundation Press, 1985; Siuta, Jerzy (Ed.), The Context of Human Behavior. Jagiellonian University Press, 2001; Ferguson, Susan (Ed.), Mapping the Social Landscape: Readings in Sociology. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), Menschenversuche (Experiments with Humans). Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo). Naval Research Reviews, 1-17. [Reprinted in Aronson, E. (Ed.) Readings About the Social Animal. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) Key Studies in Psychology. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), Basic Themes in Law and Jurisprudence. Anderson Publishing, 2000.]

## MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

## INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC MEETINGS AND RELATED SETTINGS (SELECTED)

2019      "The Recent History of Corrections in Norway and the United States," Plenary Address, Justice Reinvestment Summit, Salem, OR, February.

"The Dimensions of Suffering in Solitary Confinement," Plenary Address, Washington College of Law at American University, Washington, DC, March.

"Implementing Norwegian Correctional Principles to Change Prison Culture in Oregon Prisons," Invited Address, Oregon Department of Corrections Leadership Team, Salem, OR, June.

"Humanizing American Jails and Prisons," Center for Court Innovation, International Summit, New York, NY, June.

"From the Stanford Prison Experiment to Supermax Prisons and Back Again: Changing the Narrative in Criminal Justice Reform," Invited Address, Norwegian Correctional Academy, Oslo, Norway, September.

Plenary Address, "Perspectives on Solitary Confinement," Northwestern University Law Review Symposium, Chicago, IL, November.

2018      "The Art and Science of Capital Mitigation," Federal Death Penalty Training Conference, Atlanta, Georgia, June.

"From Eastern State Penitentiary to Supermax Prisons," Safe Alternatives to Segregation Conference, Vera Institute of Justice, Philadelphia, PA, June.

Plenary Address, "Advancing Prisoners' Rights Through Law and Psychology," Denver Law Prisoners' Advocates Conference, University of Denver Sturm College of Law, Denver, CO, October.

"In Praise of Positivism in the Age of 'Fake News' and 'Alternative Facts,'" Research Frontiers Conference, Santa Cruz, CA, October.

2017    "Neuroscience in Policy: Solitary Confinement in California," Law & Neuroscience Conference, San Francisco, CA, February.

"In My Solitude: The Detrimental Effects of Solitary Confinement on the Brain," Exploratorium-Fisher Bay Observation Gallery, San Francisco, CA, February.

"Brief History of Correctional Reform in the United States," Community Corrections Partnership/Smart on Crime Community Forum, Santa Cruz Civic Auditorium, May.

"Reducing and Eliminating the Use of Solitary Confinement in Irish Prisons," Joint Conference with the Irish Prison Service, Department of Justice, and Irish Penal Reform Trust, Dublin, Ireland, June.

"The Emerging Consensus on When, for How Long, and On Whom Solitary Confinement Should Ever Be Imposed," Leadership, Culture and Managing Prisons: Knowledge Exchange between the USA and Europe (LEADERS), Trinity College, Dublin, Ireland, June.

"Sykes and Solitary: The Transformation of the Penal Subject in the Devolution from a 'Society of Captives' to Supermax Prisons," Power and Authority in Modern Prisons: Essays in Memory of Gresham Sykes Workshop, Centre for Prison Research, Cambridge University, Cambridge, England, September.

"Context Is Everything: The Social Psychology of Imprisonment," Joint USA/Scandinavian Correctional Exchange Program, Oslo, Norway, September.

2016    "The Culture of Punishment," American Justice Summit, New York, January.

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: Coleman and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S., National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014     "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013 "Isolation and Mental Health," Michigan Journal of Race and Law Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012 "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011 "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye

on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008      "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007      "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006      "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005 "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004 "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003    "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

29

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000     "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999     "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

31

1998    "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997    "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996    "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995    "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994      "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992      "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991      "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990      "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989      "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

          "Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

          "The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

1987      "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August.

          "The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July.

1986      Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August.

"Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985    "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons: What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983    "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982    "Psychology in the Court: Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982    "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982    "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980    "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

34

1975        "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.


## SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2016-present      Editorial Consultant, <u>Translational Issues in Psychological Science</u>.

2015-present      Editorial Consultant, <u>Criminal Justice Review</u>.

2014-present      Editorial Board Member, <u>Law and Social Inquiry</u>.

2013-present      Editorial Consultant, <u>Criminal Justice and Behavior</u>.

2012-present      Editorial Consultant, <u>Law and Society Review</u>.

2011-present      Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present      Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present      Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present      Editorial Consultant, <u>Journal of Offender Rehabilitation</u>.

2004-present      Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

2000-2003      Reviewer, Society for the Study of Social Issues Grants-in-Aid Program.

2000-present      Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues)

1997-present      Editorial Board Member (until 2004), Consultant, <u>Psychology, Public Policy, and Law</u>

1991        Editorial Consultant, Brooks/Cole Publishing

1989        Editorial Consultant, <u>Journal of Personality and Social Psychology</u>

| 1988- | Editorial Consultant, <u>American Psychologist</u> |
|---|---|
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985 | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-1985 | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |
| 1993-present | <u>Psychology, Public Policy, and Law</u>, Editorial Consultant |

## <u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCIRF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-2005.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety, August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of The Growth of Incarceration in the United States: Exploring the Causes and Consequences (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

## PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION

Hoptowit v. Ray [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)]. Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown (Marin Country Superior Court; September, 1982, Justice Burke). Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing). Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)]. Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983). Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)]. Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock (Monterey County Superior Court 1984). Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey (Sacramento County Superior Court, 1985). Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson (United States District Court, Southern District of Illinois 1984 1985). Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)]. Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya (United States District Court, 1987-1988). Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989). Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990). Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities. [See Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014)].

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# Exhibit B

List of Materials Reviewed

**Exhibit B**

**List of Materials Reviewed**

I reviewed the following documents for this report.

1. Complaint and Demand for Jury Trial, filed on January 14, 2020 in *Amos et al. v. Tommy Taylor et al.*; in the N.D. of Miss., Greenville Division, Case No. 4:20-CV-007-DMB-JMV (the "Lawsuit").

2. Plaintiffs' First Amended Class Action Complaint, filed on January 28, 2020 in the Lawsuit.

3. Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, with Exhibits and supporting Memorandum, filed on January 24, 2020 in the Lawsuit.

4. Defendants' Response in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction and associated Memorandum, with Exhibits and supporting Memorandum, filed on January 27, 2020 in the Lawsuit.

5. Plaintiffs' Reply in Further Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction, filed on January 28, 2020 in the Lawsuit.

6. Press Release: Immediate Mississippi Department of Corrections Actions to Restore Order at Parchman. Mississippi Department of Corrections. January 22, 2020.

7. Mississippi State Penitentiary Health Inspection Annual Report (2019).

8. Plaintiffs' Affirmations.

9. Plaintiffs' Prison Files.

10. Plaintiffs' partial medical records.

11. Plaintiffs' interview transcripts (redacted).

12. Miscellaneous documents produced by the MDOC, including: various Standard Operating Procedures; various security and inspection reports; various fire inspection reports; various accreditation reports; and various building inspection reports.

13. Pictures taken by Plaintiffs' photographer of the February 11 and 12, 2020 inspection.