**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**MICHAEL AMOS,** *et al.*                                                          **PLAINTIFFS**

**VS.**                                          **CIVIL ACTION NO. 4:20-CV-07-DMB-JMV**

**TOMMY TAYLOR,** *et al.*                                                          **DEFENDANTS**

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

**INTRODUCTION**

The relief now requested by Plaintiffs in their Supplemental *Emergency* Motion for

Temporary Restraining Order ("TRO") and Preliminary Injunction shows that there is no

emergency necessitating the extraordinary remedy of a TRO or preliminary injunction. After

four months of delay caused by COVID-19, and indisputable, significant improvements to the

conditions at the Mississippi State Penitentiary at Parchman ("MSP" or "Parchman") during that

time, Plaintiffs have abandoned their original request for appointment of a third-party receiver to

take over control of MSP. Plaintiffs now request only 20 specific items of relief for just four of

the original 33 named Plaintiffs (e.g., "repair the toilets and urinals in Johnson's zone"). Despite

Plaintiffs' failure to formally exhaust their administrative remedies, as discussed below,

Defendants have already remedied Plaintiffs' specific items of relief through their normal course

of operations, effectively nullifying the Motion. Because the 20 items of relief have been

resolved, or otherwise do not warrant immediate action, Plaintiffs cannot show that there is any

1

threat of irreparable injury, much less a substantial one. The Court should therefore deny

Plaintiffs' Motion, allowing the litigation to progress along its regular path.[1]

The vast majority of Plaintiffs' brief, and their thousands of pages of exhibits, are

devoted to broader allegations of alleged unconstitutional conditions at MSP that are not material

to, or determinative of, the very limited items of relief requested in Plaintiffs' Motion. Rather

than focus on the specific relief requested by the four named Plaintiffs at issue here, Plaintiffs'

six experts leap ahead to a class-certification stage, offering broad-stroke and highly generalized

assertions regarding conditions of confinement at MSP. Plaintiffs jumped the gun in what is

really just an improper attempt to stigmatize MSP. Of course, at this stage of the litigation,

Defendants have not yet even answered Plaintiffs' Complaint, much less engaged in the kind of

discovery necessary to evaluate Plaintiffs' broad, general allegations of constitutional violations,

which are far removed from the specific relief requested in the Motion.[2]

Notwithstanding, it is important that Plaintiffs' broad allegations are not based on *current*

conditions or supported by *current* evidence. The Supreme Court has held that in cases where an

---

[1] As with Plaintiffs' motion for TRO related to COVID-19, had Plaintiffs simply conferred with Defendants regarding the 20 items of newly requested relief before filing their Supplemental Emergency Motion, the items could have been resolved without involving the Court. Instead, Plaintiffs chose to file a 50-page brief, six expert reports, and more than 3,000 pages of exhibits in support of a Motion that is now a nullity. It is again apparent that actual relief for inmates is not the Plaintiffs' primary goal; rather, their goal is telling a story in the media. *See, e.g.*, *Jay-Z, Yo Gotti and Team Roc Are Still Fighting for Inmates at Mississippi's Parchman Prison*, NBC LX, https://www.lx.com/community/jay-z-yo-gotti-and-team-roc-file-lawsuit-for-mississippi-prison-reform/15068/ (Plaintiffs' counsel giving interview regarding alleged conditions). Plaintiffs continue to ignore and defy the Court's admonishment to refrain from "trying to make their case in the media." *See* Transcript of Feb. 3, 2020 hearing at 118:11-21. As shown below and in the exhibits attached to Defendants' Response, the truth does not fit the Plaintiffs' narrative.

[2] The Court was clear that this preliminary stage of litigation is limited to 33 named Plaintiffs and is not intended to reach into class-certification discovery or analyses. *See* Transcript of Feb. 3, 2020 hearing at 48:23-25, 49:1-12. Despite this known limitation, Plaintiffs' experts purport to offer prison-wide critiques without a prison-wide vantage point. Although MSP's population was over 3,200 inmates at the time of the February 2020 inspection, Plaintiffs' experts offer broad, sweeping opinions that are based on their evaluation of only 33 inmates—roughly 1% of the prison population. *See, e.g.*, [Doc. 101-1] (Stern Report at 2); [Doc. 101-4] (LaMarre Report, Appendix B).

inmate seeks injunctive relief, "the Eighth Amendment deliberate indifference standard 'should be determined in light of the prison authorities' current attitudes and conduct,'" not alleged past wrongs. *Dockery v. Hall*, 2019 WL 9046797, at *5 (S.D. Miss. Dec. 31, 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)). Plaintiffs' counsel and their experts conducted an inspection of conditions at MSP on February 12-13, 2020, *five months* ago.[3] Most of the conditions observed by Plaintiffs in February were caused in large part by an extraordinary, deadly gang disruption in late December 2019 and early January 2020. Since that time, as shown by the expert reports, photographs, declarations, and documents attached as exhibits to Defendants' Response, conditions at MSP have drastically improved, and the conditions will continue to improve under current Mississippi Department of Corrections ("MDOC") leadership. *See, e.g.*, Exhibit 1 (Declaration of Jeworski Mallett at ¶¶ 6-10, 13). Plaintiffs have attempted both in this action and in the media to paint a grim picture of conditions at MSP, but as shown below, Plaintiffs' depiction is inaccurate. The improvements made by MDOC at MSP, and their plan for additional improvements, preclude a finding of deliberate indifference.

As newly elected Governor Reeves acknowledged in his public remarks, conditions that existed at MSP earlier this year needed to improve. And they have. The improvements are due in large part to changes in leadership. The Governor recently appointed, and the legislature confirmed, Burl Cain as the new MDOC Commissioner. Commissioner Cain has already instituted many proven measures to better MSP. *See* Ex. 1, (Mallett Decl. at ¶ 9). Deputy Commissioner of MDOC Institutions Jeworski Mallett has settled into the role that he assumed on January 15, 2020, shortly after the gang-related disruptions at MSP, and he has been instrumental in making progressive and meaningful changes at MSP. *Id.* at ¶ 2, 6-10. In late

---

[3] Indeed, Plaintiffs attempt to prejudice the Court's analysis by referring to conditions that existed in 2004 and earlier. *See* [Doc. 99] at 25 (citing *Gates v. Cook*, 376 F.3d 323, 341 (5th Cir. 2004)).

April, the former Superintendent of MSP retired, and MDOC appointed Warden Timothy Morris as acting Superintendent. *Id.* at ¶ 9. Commissioner Cain recently expanded Superintendent Morris's authority in an effort to give the Superintendent a greater ability to timely address problems at MSP without administrative encumbrances. *Id.*

Moreover, since January of this year, MDOC has transferred approximately *1,600* inmates out of MSP, including roughly *800* inmates from Unit 29, bringing the officer-to-inmate ratio into compliance with American Correctional Association ("ACA") standards. *See* Ex. 1, (Mallett Decl. at ¶ 9). MDOC has closed six of the 12 buildings within Unit 29, and MDOC has begun efforts to close Unit 29-F, in which two of the named Plaintiffs reside, and move those inmates to newly refurbished Unit 29-C. *Id.* MDOC has also mounted a significant, continued attack on all maintenance issues at MSP, as demonstrated by hundreds of pages of purchase requisitions and construction maintenance worksheets attached to Defendants' Response. *See* Exhibit 2 (Declaration of John Sprayberry at ¶¶ 7-9 & Exhibits). Also, in mid-February 2020, Centurion of Mississippi, LLC ("Centurion"), MDOC's third-party healthcare provider, hired a new Medical Director and Chief Physician at MSP. *See* Exhibit 3 (Declaration of Dr. James Glisson at 1). Communications between MDOC and Centurion personnel have improved, bettering inmates' access to good medical and mental health care.

MSP is simply not the same prison it was earlier this year. *See* Ex. 1, (Mallett Decl. at ¶¶ 6-13); Ex. 2, (Sprayberry Decl. at ¶¶ 7-9); Exhibit 4 (Expert Report and Declaration of John D. Rees at 3-4); Exhibit 5 (Expert Report and Declaration of Stephen C. Tussey at 4); Exhibit 6 (Photographs from 6/24/20 Inspection). Of the 33 named Plaintiffs, only seven remain at MSP. *See* Ex. 1, (Mallett Decl. at ¶11). Contrary to the exaggerations in Plaintiffs' brief (which are based on outdated and mischaracterized evidence), only four of the seven named Plaintiffs who

remain at MSP even claim that their conditions of confinement require preliminary injunctive relief.[4] The relief requested by the four Plaintiffs has either already been remedied, or does not require remediation at all (e.g., two Plaintiffs claim that their units lack an air cooling system, but the buildings at MSP were not constructed to have such cooling systems, and they are not a constitutional requirement for adequate inmate living conditions). As such, Defendants have not been deliberately indifferent to Plaintiffs' claims, and there is no threat of irreparable harm to Plaintiffs in the absence of preliminary injunctive relief. Accordingly, the Court should deny Plaintiffs' Supplemental Emergency Motion, and MDOC should be permitted to continue its improvement efforts while the parties litigate the underlying claims in this action.

## ARGUMENT

I. **Plaintiffs cannot satisfy their heavy burdens under the TRO and preliminary injunction standard, the Prison Litigation Reform Act, or the Eighth Amendment.**

The law is well settled that issuing preliminary relief "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir.1989) (quotation omitted). An injunction "is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985). The purpose of a preliminary injunction is typically to "preserve the status quo during the course of litigation until the court can hold a trial on the matter." *Walker v. Turner*, 2019 WL 615360, at *1 (N.D. Miss. Feb. 11, 2019). "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir 1976).

---

[4] The evidence that exists today clearly shows that there is not a "humanitarian crisis" at MSP. Plaintiffs allege that the purported humanitarian crisis has "claimed 23 lives to date in 2020." [Doc. 99] at 1. That is false. While there have been a total of 24 deaths at MSP in 2020, 16 of those deaths were determined to be of natural causes, and three were suicides. *See* Ex. 1, (Mallett Decl. at ¶ 9).

In *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974), the Fifth Circuit established the four prerequisites for granting a preliminary injunction as: (1) a substantial likelihood of plaintiff's success on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury in the absence of injunctive relief; (3) that the threatened injury to plaintiff outweighs the harm the injunction may do to defendant; and (4) that granting the preliminary injunction will not disserve the public interest. *Id.* The same standard applies to a TRO. *See Amos v. Taylor*, 2020 WL 1978382, at \*7 (N.D. Miss. Apr. 24, 2020). Plaintiffs "must carry 'a heavy burden of persuading the district court that all four elements are satisfied,' and failure to carry the burden on any one of the four elements will result in the denial" of the requested relief. *Leachman v. Harris Cty., Tex.*, 779 F. App'x 234, 237 (5th Cir. 2019), as revised (Oct. 2, 2019) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)).

Because Plaintiffs are inmates seeking preliminary injunctive relief, the Prison Litigation Reform Act ("PLRA") also applies to restrict the available relief:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2). "Necessarily, 'when a district court fashions prospective relief in prison litigation, the relief must meet the standards set forth in the Act.'" *Amos*, 2020 WL 1978382, at \*8 (quoting *Williams v. Edwards*, 87 F.3d 126, 133 (5th Cir. 1996)). As the Fifth Circuit has explained, "[t]he PLRA greatly limits a court's ability to fashion injunctive relief." *Ball v. LeBlanc (Ball I)*, 792 F.3d 584, 598 (5th Cir. 2015). Fundamentally, any injunction must be carefully limited so that it provides only the relief necessary to correct an Eighth Amendment

violation: "Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Id.* at 599. The PLRA "significantly affects *the type* of prospective injunctive relief that may be awarded," but "has not substantially changed the threshold findings and standards *required to justify an injunction*." *Amos*, 2020 WL 1978382, at *8 (quotation omitted).

Still, requests for injunctive relief in the prison setting are granted only "with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quotation omitted). "It is well settled that the courts . . . are reluctant to interfere with the day-to-day operations of a prison," and "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Moody v. Handy*, 2007 WL 1610791, at *1 (N.D. Miss. June 1, 2007) (quoting *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)).

And because Plaintiffs claim that Defendants violated the Eighth Amendment's prohibition on "cruel and unusual punishments," the merits of this lawsuit require Plaintiffs must prove Defendants acted with a "sufficiently culpable state of mind" of "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). "Deliberate indifference is an extremely high standard to meet." *Sanchez v. Young Cty.*, 866 F.3d 274, 280 (5th Cir. 2017). As the Court stated in a previous Order, an Eighth Amendment violation is established:

> "only when two requirements are met. First, as an objective matter, the deprivation or harm must be sufficiently serious. Second, the official must have been deliberately indifferent." To satisfy the first element, "the plaintiff must show an objectively intolerable risk of harm." The second requirement is subjective and requires that the plaintiff show the defendant "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious

> harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk."

*Amos*, 2020 WL 1978382, at \*9 (quoting *Jason v. Tanner*, 938 F.3d 191, 195 (5th Cir. 2019) and *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020)).

The first prong objectively asks whether the alleged constitutional violation is "sufficiently serious," *Farmer*, 511 U.S. at 834, taking into account that the Eighth Amendment does not guard against "discomfort and inconvenience" and inmates "cannot expect the amenities, conveniences, and services of a good hotel," *Wilson v. Lynaugh*, 878 F.2d 846, 849 & n.5 (5th Cir. 1989) (quotation omitted).[5] To satisfy the "sufficiently serious" requirement, a prison official's act or omission must result in "extreme deprivation" of the "minimal civilized measures of life's necessities," *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (quotation omitted), such that an inmate is "incarcerated under conditions posing a substantial risk of serious harm," *Dockery*, 2019 WL 9046797, at \*5.

The second, subjective prong is more demanding. *See, e.g., Amos*, 2020 WL 1978382, at \*9-10 (no deliberate indifference where "defendants have undoubtedly taken steps to address the risk"). The determination hinges on whether officials possessed a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 297. "A prison official acts with deliberate indifference 'only if he knows that inmates face a substantial risk of serious harm and *disregards that risk by failing to take reasonable measures to abate it.*'" *Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756, 759

---

[5] Plaintiffs are incorrect in asserting that they can satisfy the objective "sufficiently serious" prong by "rely[ing] on the collective conditions of confinement in order to provide the Court with full context." [Doc. 99] at 6 (citing *Gates*, 376 F.3d at 333). As the Supreme Court explained in *Wilson v. Seiter*, while "*some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone," such combined effects are permissible "only when they have a mutually enforcing effect that produces the deprivation of *a single, identifiable human need* such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets." 510 U.S. at 304. In other words, "nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment." *Id.* Plaintiffs' attempt to allege a violation of their "collective conditions of confinement" is directly contrary to Supreme Court precedent.

(5th Cir. 2018) (quoting *Farmer*, 511 U.S. at 847) (emphasis added).[6] In other words, Plaintiffs must show that Defendants "'subjectively believe the measures they are taking are inadequate.'" *Amos*, 2020 WL 1978382, at *11 (quoting *Valentine*, 956 F.3d at 802).

Moreover, as noted above, the focus of the deliberate indifference evaluation is on the official's "current attitudes and conduct." *Farmer*, 511 U.S. at 841 (quotation omitted). The evaluation of conditions at a prison continues throughout the litigation, is not a snapshot in time, and certainly should not be based on an aberrant period that existed following the disruptive gang riots in late 2019 and early 2020. *See, e.g., Dockery*, 2019 WL 9046797, at *1 and *15. In a very similar case,[7] the Southern District of Mississippi denied injunctive relief relating to allegedly inadequate medical and mental health care, protection from harm, environmental conditions, and food on the basis that "many changes ha[d] been made at the subject prison that pertain to the claims alleged in this lawsuit." *Id.* at *1. The court stated the "conditions existing [at the prison] in the past may have been intolerable[,] [but] [t]hose conditions have changed." *Id.* Focusing on the measures taken by the defendants since the lawsuit was filed, the court concluded that the changes at the prison prevented a finding of deliberate indifference "and, therefore, that the injunctive relief sought by Plaintiffs ha[d] not been shown necessary." *Id.*

Even assuming Plaintiffs' allegations are truthful, the past conditions upon which Plaintiffs rely for their claims have been remediated. Because the alleged unconstitutional conditions have been addressed, and there are no ongoing violations as required for relief under the PLRA, the Court should deny Plaintiffs' Motion without further analysis. *See, e.g.*, *Barrett v.*

---

[6] "Best practices are not the handmaiden of deliberate indifference." *Id.* (quoting *M.D. ex. Rel. Stukenberg v. Abbott*, 929 F.3d 272, 289 (5th Cir. 2019) (Higginbotham, J., concurring).

[7] The plaintiffs in *Dockery* even relied on many of the same experts that Plaintiffs rely on: Marc Stern, Madeleine LaMarre, and Eldon Vail. *Id.* at *6 and *11–13; *see also id.* at *17 (dismissing expert opinion on the basis that expert testimony "does not create constitutional standards").

*MDOC*, 2007 WL 1139538, at *1 (S.D. Miss. Apr. 17, 2007) (preliminary injunction denied as "essentially moot" where inmate sought preliminary injunction for "medical treatment of his injured leg" and "expedit[ing] his request for 'lay-in' food tray status," but before the court ruled, the inmate "received knee surgery" and "receiv[ed] a 'lay-in' food tray three times a day"); *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998) (injunction denied where "no order of the court can affect the rights of the parties with regard to the requested relief" because the court "cannot enjoin that which has already taken place").

Under the high bars of the preliminary injunction standard, the PLRA and accompanying deference extended to prison administrators, and the deliberate indifference standard, the Court should deny Plaintiffs' requests for relief. Plaintiffs cannot establish that they, in the absence of the requested relief, will be irreparably harmed before this Court is able to hold a trial on the merits. Plaintiffs' 20 specific requests for relief have already been addressed, "essentially moot[ing]" the request for a preliminary injunction and absolving any threat of irreparable harm. *See, e.g.*, *Barrett*, 2007 WL 1139538, at *1. Plaintiffs cannot establish a current, ongoing violation of any constitutional rights, as required under the traditional preliminary-injunction analysis and the heightened standard of the PLRA. And considering the significant actions Defendants have taken and are taking to improve MSP, Plaintiffs cannot establish that Defendants are subjectively and deliberately indifferent under the Eighth Amendment.

For the reasons discussed below, Plaintiffs cannot demonstrate any of the four prerequisites for granting a TRO or preliminary injunction in connection with their 20 items of limited relief or otherwise, and because the requested relief has already been addressed or does not warrant action, any injunction mandating such relief would be overly broad in violation of the PLRA. Accordingly, the Court should deny Plaintiffs' Supplemental Emergency Motion.

10

II. **Plaintiffs' 20 specific items of limited relief have already been remedied, or do not warrant remediation, thus precluding a finding of irreparable harm. Moreover, the 20 items of relief do not amount to constitutional deprivations and do not invoke a basis for finding deliberate indifference.[8]**

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if [the requested relief] is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Trinity USA Operating, LLC v. Barker*, 844 F. Supp. 2d 781, 786 (S.D. Miss. 2011) (quotation omitted). "Without question, the irreparable harm element must be satisfied by independent proof, or *no injunction may issue*." *White*, 862 F.2d at 1211 (emphasis added). "Indeed, where no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate." *Canal Auth.*, 489 F.2d at 574.[9] It is Plaintiffs' burden to show that they "are likely to suffer irreparable harm absent the requested injunctive relief." *Hispanic Affairs Project v. Perez*, 141 F. Supp. 3d 60, 68 & 70 (D.D.C. 2015). Here, Plaintiffs have failed to do so.

As shown below, all 20 of Plaintiffs' requested items of relief have either been resolved or otherwise do not warrant action (such as installation of air cooling systems).[10] Thus, it is clear

---

[8] Plaintiffs previously requested appointment of a third-party receiver to take over the day to day operations at MSP, [Docs. 13 and 14], but they make no mention of that relief in their Supplemental Motion and Memorandum. Instead, Plaintiffs acknowledge the Court's prior Order prevents them from relying on relief they requested in their initial motion, stating: "Per the Court, [Plaintiffs'] Supplemental Memorandum supersedes and replaces the Original Memorandum." [Doc. 99] at 1, n.1 (citing [Doc. 55]). Noting that the transfer of the vast majority of named Plaintiffs "necessarily narrows the scope of th[eir] motion," Plaintiffs set forth only 20 specific items of limited relief related to four inmates, as addressed below. *Id.* at 4. Despite Plaintiffs' attempt to ascribe improper motives to Defendants' transfers of some named Plaintiffs, all transfers were part of a random and broad policy of transferring inmates in order to close parts of Unit 29 and improve officer-to-inmate ratios. *See* Ex. 1, (Mallett Decl. at ¶ 12).

[9] *Winter v. Nat'l Res. Defense Counsel, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

[10] The 20 specific, limited items of relief requested by Plaintiffs have been addressed by Defendants, and therefore, there is *no chance of any* irreparable harm, much less a substantial threat. Plaintiffs apparently

that Defendants have not acted with deliberate indifference and that Plaintiffs will not suffer irreparable harm in the absence of preliminary injunctive relief. In the earlier COVID-19 Order [Doc. 79], the Court made it clear that to prove irreparable harm "plaintiffs must show 'that they will suffer irreparable injuries *even after* accounting for the [] measures'" Defendants have taken. *Amos*, 2020 WL 1978382, at *12 (quoting *Valentine*, 956 F.3d at 804) (emphasis in original). Both this Court and the Fifth Circuit reasoned that a motion for preliminary injunction or TRO should be denied where measures already taken were adequate to alleviate the alleged threat of irreparable harm. That is the case here. Because Defendants have already addressed the limited items of relief requested by Plaintiffs, or because the items otherwise do not warrant action, Plaintiffs are not likely to suffer irreparable harm. *Id.*[11] Accordingly, even without examining the

---

hope that the Court might perform the role of Plaintiffs' counsel and award them more relief than they have identified or requested. In an effort to streamline the pleadings, Defendants asked Plaintiffs to confirm their requested relief, and Plaintiffs responded:

> [W]e believe the pleadings and the law speak for themselves. The [C]ourt has the latitude to grant the relief it deems appropriate and to address all of the constitutional violations described in the voluminous evidence if it so chooses, and we are not going to do anything to limit the relief the Court may choose to provide.

*See* Exhibit 7 (Correspondence Regarding Requested Relief). On the contrary, it is not for the Court to evaluate what Plaintiffs should have requested or to issue advisory opinions based on deficient pleadings. *See, e.g.*, *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (citing the "principle of party presentation" and reversing the court that performed the role of the party's counsel, stating "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present"); *see also United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J. concurring) ("courts are essentially passive instruments of government . . . . [They] do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties"); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 616 (5th Cir. 2017) (reversing grant of injunction because "[t]he injunction . . . exceed[ed] the scope of the parties' presentation, which was limited").

[11] Recent Fifth Circuit precedent and this Court's prior orders also show that an injunction may not issue merely to "'promote compliance' with [the prison's] own policies" which it has already implemented. *Valentine*, 956 F.3d at 802; *see Amos*, 2020 WL 1978382, at *11-12 (discussing *Valentine*).

other legal deficiencies of Plaintiffs' claims,[12] it is clear that Defendants have not acted with deliberate indifference and that the Court should deny Plaintiffs' Motion.

### a. Plaintiff Aric Johnson (Unit 29, Building F, Zone A)

Plaintiff Aric Johnson, residing in Zone A of Building F in Unit 29, requests six items of injunctive relief:[13]  (1) allow him to see a medical doctor to assess his high blood pressure; (2) refill his blood pressure medication; (3) repair water intrusion in his immediate living area; (4) repair exposed electrical wires in his shower; (5) repair toilets and urinals in his zone; and (6) repair the "air conditioning" in his zone. [Doc. 99] at 35-38, 48. His requests should be denied because the alleged defective conditions have either already been remedied, or as with the "air conditioning," do not warrant remediation. In addition, Defendants' documented repairs and voluntary remedial actions show that they are not acting with deliberate indifference.

Johnson's blood pressure and related medication

According to Johnson's declaration, his blood pressure had gone unchecked for two months as of June 5, 2020. [Doc. 104-2] at ¶ 2. Johnson also asserts that he frequently goes without his blood pressure medication because the medical staff does provide timely refills. *Id.* According to his medical records, and as verified by his treating physician, Dr. Glisson, however, Johnson has received routine follow-up visits in 2020, and his blood pressure is well

---

[12] For instance, as discussed in greater detail below, the four Plaintiffs have not exhausted their administrative remedies with regard to their requested relief.

[13] Throughout their requests, Plaintiffs request that certain actions be taken "within five (5) days" or "within twenty-four hours." It is unclear from what point in time Plaintiffs are measuring their arbitrary deadlines. Neither Plaintiffs' Supplemental Emergency Motion nor their Memorandum clarifies the deadlines. To the extent Plaintiffs are requesting relief from the date they filed their Supplemental Motion, such requests would be contrary to the Court's numerous Orders providing Defendants with no less than thirty days to respond to Plaintiffs' Supplemental Motion. *See* [Docs. 69, 81, and 91].

controlled. Exhibit 8, (Medical Records at 1-34).[14] Johnson is a chronic care patient due to his hypertension, and the frequency of his follow-up visits is determined by how well his blood pressure is controlled. Ex. 3, (Glisson Decl. at 3-4). Patients with poorly controlled blood pressure are seen each month or sooner; patients with fair control are scheduled for follow-up in three months; and those with well controlled blood pressure are seen again in six months. *Id*.

In January 2020, Johnson's blood pressure was found to be elevated, after previously being well controlled without medication. Ex. 3, (Glisson Decl. at 4). He was started on medication and rescheduled for monthly checks with providers in February and March. *Id*. Johnson's blood pressure was checked weekly from February 5, 2020 to March 9, 2020, and was found to be well controlled. *Id*. After refusing a May 6, 2020 appointment, Johnson was seen again by medical staff on June 3, 2020, at which time his blood pressure was checked and was still well controlled. *Id*. Because Johnson's blood pressure has been consistently well controlled, his next chronic care appointment is scheduled for December 2020. *Id*.

In addition, Johnson's blood pressure medication has been routinely refilled on a monthly basis. At MSP, blood pressure medications are designated keep-on-person ("KOP"), which means the prescription is filled by the pharmacy and the patient is provided with one month's supply at a time. Ex. 3, (Glisson Decl. at 3).[15] Since being prescribed blood pressure medication in January 2020, Johnson has received a thirty-day supply of the same every time he has

---

[14] Defendants are filing a contemporaneous motion for leave to file Exhibit 8 under seal, as it includes Plaintiffs' medical records.

[15] In the case of KOP medications, just as in the community, each patient is responsible for requesting refills when his medications are running low. Inmates may submit refill requests no more than 7 days in advance of finishing their supply. *See* Ex. 3, (Glisson Decl. at 3). Upon receipt of a refill request, medical staff submits the request to the pharmacy the day it is received from the inmate or the very next day. *Id*. If an inmate is consistently not receiving his KOP medications before his prior prescription runs out, it is due to the fact that he is not submitting refill requests timely.

requested a refill—on January 16, February 8, March 23, April 28, and June 3. *Id.* at 4-5. At no time has Johnson waited more than four days between requesting and receiving a refill. *Id.*

Thus, Johnson's allegations are defeated by his own irrefutable medical records and by Dr. Glisson's testimony regarding his treatment. Johnson's blood pressure has been routinely monitored and is well controlled, and his blood pressure medication has been refilled by medical staff every time he has requested it. *See* Ex. 3, (Glisson Decl. at 3-4). Johnson's characterization of the care provided to him is plainly inaccurate and unsupported.[16]

Demonstrating deliberate indifference on a claim for alleged deprivation of medical care requires showing Defendants "refused to treat [inmates], ignored [their] complaints, intentionally treated [inmates] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).[17] "A prisoner's belief that he should have received different medical treatment does not implicate the Eighth Amendment." *Dockery*, 2019 WL 9046797, at *6 (citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). Absent exceptional circumstances, mere disagreement with the provided medical treatment, or a delay in providing the treatment, does not support a claim of deliberate indifference. *Id.*; *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). There is no basis for finding that MSP's medical staff was deliberately indifferent to Johnson's medical condition. His request for emergency injunctive relief should be denied because his blood pressure is being properly monitored and controlled with medication.

---

[16] Though Nurse Practitioner Madeleine LaMarre opines that Johnson "has not received timely and appropriate follow-up," she readily admits she did not "adequately evaluate the patient[']s care." [Doc. 101-4], LaMarre App'x B-17 at 47. Ms. LaMarre's opinion that Johnson's care was inadequate when she has not even reviewed his records is incredible and should be discounted entirely.

[17] *See Thomas v. Carter*, 593 F. App'x 338, 342 (5th Cir. 2014) (stating that the same standard applies to claims of inadequate mental health care).

*See Kennedy v. Potter*, 344 F. App'x 987, 989–90 (5th Cir. 2009) (denying temporary injunctive relief where prison medical staff was aware of, and responsive to, inmate's health concerns).

<u>Johnson's alleged leaks, exposed electrical wires, toilets, urinals, and "air conditioning"</u>

As shown by Declarations of Jeworski Mallett and John Sprayberry, Defendants have devoted substantial resources over the last several weeks and months and undertaken extensive, continuing measures to repair MSP's housing unit roofs, restroom facilities, and other conditions of confinement. Specifically, in March 2020, MDOC repaired the roof over Unit 29, Building F, in which Johnson is housed. *See* Ex. 1, (Mallett Decl. at ¶ 13 & Ex. D); Ex. 2, (Sprayberry Decl. at ¶ 9 & Ex. B). On July 6, 2020, Johnson acknowledged that he was no longer experiencing any water intrusion or leak issues in his immediate living area. Ex. 1, (Mallett Decl. at ¶ 13). No known leaks or avenues of water intrusion currently exist in Johnson's immediate living area, as alleged. *Id*.; *see also* Ex. 2, (Sprayberry Decl. at ¶ 9).

In addition, water leaks are not sufficiently serious violations. As the Fifth Circuit has found, a "leak in [a] cell, alone or in combination with other conditions, was [not] sufficiently serious as to deprive [an inmate] of 'minimally safe housing.'" *Shannon v. Vannoy*, 682 F. App'x 283, 285 (5th Cir. 2017). The Court in *Shannon* stated that a hole allowing water into an inmate's cell and the fact that he slipped on the water and fell "is plainly insufficient" to prove a sufficiently serious deprivation of the minimal civilized measures of life's necessities. *Id*. And any leak is irrelevant so long as Defendants engage in reasonable remedial measures, even during the pendency of the suit. *See Dockery*, 2019 WL 9046797 at *5-6. For instance, in *Bunton v. Corrections Corp. of Am.*, 286 F. App'x 242, 243 (5th Cir. 2008), the Fifth Circuit stated: "Even if it is assumed arguendo that the leaking roof constituted a condition that posed a

16

substantial risk of serious harm to Bunton, the evidence established that the defendants took reasonable remedial measures and, thus, did not act with deliberate indifference."

On July 6, 2020, MDOC also confirmed that there were no exposed electrical wires in any of the showers in Johnson's zone, and that the majority of the toilets and urinals in Johnson's zone were in working order. *See* Ex. 1, (Mallett Decl. at ¶ 13 & Ex. D).[18] Of course, it is totally conceivable that an inmate in Johnson's zone may tomorrow expose additional electrical wires and break one or more of the toilets or urinals, and Defendants will then need to go back and repair those items again. MSP's maintenance crews routinely repair and replace fixtures, wiring, and other aspects of the facilities that are damaged or destroyed by the prisoners. *See id.* at ¶ 13; *see also* Ex. 2, (Sprayberry Decl. at ¶¶ 5, 9). Even assuming *arguendo* that exposed electrical wires or broken toilets and urinals pose a substantial risk of serious harm, which they do not, the evidence shows that Defendants have taken, and are taking, reasonable remedial measures to address those issues, and therefore, they have not acted with deliberate indifference.

As to Johnson's request for "air conditioning," Plaintiffs do not allege that there is not an adequate, working heating unit in Johnson's zone. *See* Plaintiffs' expert report from Debra Graham, [Doc. 101-3] at 16 (describing comfortable air temperature on a cold, rainy winter day); *see also* Ex. 1, (Mallett Decl. at ¶¶ 10, 13). However, there is no air *cooling* system in Johnson's building, as is the case with most housing units at Parchman, because it was not designed or constructed to have an air cooling system. *Id.* Instead, there are several, industrial-sized fans across his zone which are routinely monitored by MDOC and repaired or replaced, if necessary. *Id. See also* Ex. 2, (Sprayberry Decl. at ¶ 9). In addition, MDOC has recently purchased four

---

[18] Repairs to MSP facilities, especially remediation of exposed wires and repair of toilets, sinks, and showers, are often necessitated by inmate destruction, and therefore are an ongoing, continual process. *See* Ex. 2, (Sprayberry Decl. at ¶¶ 5, 9). When such destruction occurs, Defendants attempt to make repairs within a reasonable time. *Id.*

new, industrial-sized fans for each building at MSP, including 29-F, 30-A, and 30-B, which are the buildings at issue. *See* Ex. 1, (Mallett Decl. at ¶¶ 9, 10).

Moreover, air cooling systems are not constitutionally required, and it would violate the PLRA to order installation of the same. *See Ball v. LeBlanc (Ball II)*, 881 F.3d 346, 348 (5th Cir. 2018) (order of "air conditioning was 'unnecessary to correct the Eighth Amendment violation'" and violated PLRA).[19] "Extreme cell temperatures . . . can violate the Eighth Amendment," if Defendants are deliberately indifferent to "'an unreasonable risk of serious damage' to a prisoner's health." *Ball I*, 792 F.3d at 592 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). Rather, when prison cell temperatures are merely "uncomfortable," it does not violate the Eighth Amendment. *Id.* (constitutional violation only when inmates "housed in very hot cells without sufficient access to heat-relief measures, while [defendants] know[] that each [plaintiff] suffers from conditions that render him extremely vulnerable to serious heat-related injury.").

Here, Johnson and the other three named Plaintiffs merely allege they are uncomfortable. None have alleged exposure to extreme heat in their zones or that they are especially vulnerable to serious heat-related injury. *See* [Doc. 99] at 37. Defendants have repaired all fans in Johnson's zone, as well as in the other three Plaintiffs' zones, and Defendants are supplying four new fans to each building at MSP. *See* Ex. 1, (Mallett Decl. at ¶¶ 9, 10, 13). Accordingly, Johnson's requested relief is unnecessary to prevent any alleged constitutional violation or irreparable harm between now and a trial on the merits, and, therefore, should be denied.

Even assuming *arguendo* that the alleged conditions are sufficiently serious to constitute a constitutional deprivation, and they are not, the extensive, continuing measures undertaken by Defendants with respect to the alleged water intrusion issues, exposed electrical wires, toilets and

---

[19] Two other Plaintiffs, Webster and James, also request that MSP repair their "air conditioning" as part of Plaintiffs' Motion. The same analysis applies. There are no "air conditioning" (that is, cooling) systems in their buildings, and none are required.

urinals, and air circulation preclude a finding of deliberate indifference and any threat of irreparable harm. *See, e.g. Dockery*, 2019 WL 9046797, at *5.[20]

### b. Plaintiff Phillip Webster (Unit 29, Building F, Zone A)

Plaintiff Phillip Webster, who with Johnson also resides in Zone A of Building F in Unit 29, requests four items of injunctive relief:[21] (1) treat effectively the alleged infestation of rats and cockroaches in his immediate living area; (2) repair water intrusion in his immediate living area; (3) repair the "air conditioning" in his zone; and (4) allow him to see an ophthalmologist to treat his allegedly "burning eyes." [Doc. 99] at 38-41, 48. Webster's requests should be denied because the alleged defective conditions have either been remedied or do not warrant action. In addition, Defendants' documented actions show they are not acting with deliberate indifference

Webster's request for eye treatment

Plaintiff Phillip Webster claims he has suffered from a burning sensation in his eyes for four months, *see* [Doc. 104-1], and he seeks to have an ophthalmologist treat his eyes, *see* [Doc. 99] at 40-41, 48. Webster's medical records confirm, however, that he was seen by an optometrist on August 29, 2019, and was given an eye wash. *See* Ex. 8 (Medical Records at 72-74); Ex. 3, (Glisson Decl. at 5); Ex. 1, (Mallett Decl. at ¶ 13). Contrary to Plaintiffs' brief, [Doc. 99] at 40, the optometrist who treated Webster did *not* recommend any follow-up visits with an ophthalmologist. Ex. 3, (Glisson Decl. at 5). Plaintiffs and their expert, Ms. LaMarre, admit that Webster was seen about his eyes on at least three occasions. [Doc. 99] at 40 (citing [Doc. 101-4], LaMarre App'x B-46-47).

---

[20] Defendants' subjective state of mind must be determined by their "current attitudes and conduct." *Id.* at *5. Deliberate indifference cannot be found where evidence shows the allegedly deficient conditions "are attributable to prisoners who damage" the facilities, if the facilities "are routinely repaired." *Id.* at *14.

[21] Again, Plaintiffs request that these actions be taken "within five (5) days," but it is unclear from what point in time Plaintiffs are measuring their arbitrary deadlines.

As described in greater detail below, MSP has a sick call procedure that inmates use to request to be seen by medical staff. No records exists of any sick call requests by Webster since his August 2019 appointment related to his eye condition, to complain that the medication provided to him was ineffective, or to request to see an eye doctor. Ex. 3, (Glisson Decl. at 6).

Webster's belief that he should have been treated at a follow-up appointment is insufficient to constitute subjective deliberate indifference. *Stewart v. Murphy*, 174 F.3d 530, 534-35 (5th Cir. 1999) (failure to follow up was mere negligence, not deliberate indifference). If Webster believes that further eye treatment is needed, he should alert medical staff about his concerns through the sick call process, not ask this Court to address the issue for the first time in a TRO request. There is no basis for ordering injunctive relief requiring immediate specialty medical treatment for an eye condition that, so far as MSP's medical staff is aware, was properly treated and is no longer an issue. *See Valentine*, 956 F.3d at 804-05 (explaining that administrative exhaustion is mandatory before filing suit even when prisoner-plaintiff seeks TRO or other emergency relief). The Court should deny Webster's request for injunctive relief.

<u>Webster's alleged rat and cockroach infestation, leaks, and "air conditioning"</u>

Webster lives in the same zone as Johnson, discussed *supra*, but Johnson did not complain of any "infestation" of rats and cockroaches; in fact, Johnson's declaration never mentions such issues. *See* [Doc. 104-2]. MDOC regularly treats Webster's building for rodents, roaches, ants, and spiders, and has done so for the past several months as a matter of routine pest control procedures. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13 & Ex. E); Ex. 2, (Sprayberry Decl. at ¶ 9 & App'x II). On July 10, 2020, MDOC treated Webster's building again for rats, roaches, ants and spiders. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13); Ex. 2, (Sprayberry Decl. at ¶ 9). None of Plaintiffs' experts documented having seen any vermin at MSP, and Defendants' experts

20

likewise never saw vermin at MSP. Moreover, Deputy Commissioner Mallet has never seen a rat in housing units at MSP. *See* Ex. 1, (Mallett Decl. at ¶ 10).

"The presence of pests, by itself, is not a constitutional violation." *Walker v. Davis*, 2019 WL 2465298, at *13 (E.D. Tex. Jan. 10, 2019). Courts have recognized that in "rural" areas such as Parchman where prisons are often located, "creatures are a fact of life." *Id.* "It is not realistic for prison administrators to eliminate all such vermin from a unit." *Brooks v. Bell*, 2018 WL 8547665, at *7 (E.D. Tex. Dec. 26, 2018). Although an inundation of pests could create an inhumane condition that rises to a level of a constitutional violation, courts focus on pest-control management performed by prisons to eliminate pests. *See Dockery*, 2019 WL 9046797 at *17.[22]

Plaintiffs' anecdotal allegations of widespread rat and bug infestation are simply unsupported by any evidence. MSP is located in a rural area in the Mississippi delta. While pests undoubtedly attempt to infiltrate the prison units, Defendants are actively engaged in pest control measures aimed at eradicating any infestations. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13 & Ex. E).[23] Defendants have a contract with a licensed pest control applicator who provides pest control services at MSP three days a week. *Id*. Defendants' preventative measures to protect inmates from such pests preclude a finding of deliberate indifference and irreparable harm.

---

[22] *Allen v. Gusman*, 2006 WL 286007, at *2 (E.D. La. Feb. 2, 2006) (no showing of deliberate indifference to spider infestation where evidence showed prison routinely sprayed for pests); *Bennett v. Morris*, 2020 WL 60240, at *6 (N.D. Miss. Jan. 6, 2020) (Parchman case holding defendants were not deliberately indifferent where they attempted to alleviate bird problem by installing hawk call); *Knight v. McGee*, 2007 WL 3506462, at *4 (S.D. Miss. Nov. 14, 2007) (no deliberate indifference where proof showed defendants "sprayed routinely for insects and rodents").

[23] In *Dockery*, the finding of no deliberate indifference was based on the fact that the prison was "under contract with an outside vendor to provide pest control services, and that those services are provided on a monthly basis." *Dockery*, 2019 WL 9046797 at *17. The court found monthly treatment was sufficient to withstand a finding of subjective deliberate indifference despite plaintiffs' expert's testimony that "best practices for pest control" required weekly pest control services. *Id.* The expert's testimony "did not create constitutional standards." *Id.* (quoting *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986)).

As to water intrusion, and as stated above, in March 2020, MDOC repaired the roof over Unit 29, Building F, where Webster is housed. *See* Ex. 1, (Mallett Decl. at ¶ 13 & Ex. D). There are currently no known leaks or avenues of water intrusion in Webster's living area. *Id.* Again, water leaks alone are not sufficiently serious violations. *Shannon*, 682 F. App'x at 285.

And as to Webster's request for "air conditioning," his building was not designed or constructed with an air cooling system; instead, there are several, industrial-sized fans across his zone. *See* Ex. 1, (Mallett Decl. at ¶¶ 9, 10, 13); Ex. 2, (Sprayberry Decl. at ¶9). His zone is receiving additional new fans. *See* Ex. 1, (Mallett Decl. at ¶¶ 9, 13). Plaintiffs do not allege that there is not an adequate, working heating unit in Johnson's zone. *Id.* at ¶¶ 10, 13; Ex. 2, (Sprayberry Decl. at ¶ 9). And again, air cooling systems are not constitutionally required. *Ball II*, 881 F.3d at 348.

Accordingly, and in light of Defendants' documented efforts to address conditions at MSP, there is simply no basis for finding deliberate indifference or any entitlement to injunctive relief related to pest control, water intrusion, or "air conditioning."

### c. Plaintiff Kuriaki Riley (Unit 30, Building B, Zone A)

Plaintiff Kuriaki Riley, residing in Zone A of Building B in Unit 30, requests four items of injunctive relief: (1) allow him to see a psychiatrist to assess his mental health and develop a long-term mental health plan including periodic follow up visits, as medically indicated; (2) allow him to see a medical doctor to assess his high blood pressure; (3) refill his high blood pressure medication; and (4) restore the drinking water in his zone to acceptable standards.[24] [Doc. 99] at 41-44, 49. As discussed below, his requests should be denied because they have either already been remedied, or as with the drinking water, do not warrant remediation. In

---

[24] Again, Plaintiffs request that these actions be taken "within five (5) days" or "within twenty-four hours," but it is unclear from what point in time Plaintiffs are measuring their arbitrary deadlines.

addition, Defendants' remedial actions show they are not acting with deliberate indifference.

<u>Riley's alleged medical and mental health needs</u>

Riley makes complaints regarding his blood pressure that are similar to those of Johnson; he requests to see a doctor to assess his high blood pressure and that his blood pressure medication be refilled. [Doc. 99] at 41-43, 48-49. Riley also requests to see a psychiatrist to assess his mental health and develop a treatment plan. *Id.* In his declaration, Riley claims that he has been to the chronic care clinic only once for blood pressure treatment and that his blood pressure medication refills are always delivered late by the nurses. *See* [Doc. 104-4].

Riley's assertions are refuted by his medical records and his treating physician's testimony regarding the care he receives. *See* Ex. 8, (Medical Records at 35-71). Like Johnson, Riley is designated as a chronic care patient for hypertension. Riley has been consistently seen by a provider to monitor his blood pressure every three months, as is standard practice for those individuals with fairly well controlled blood pressure levels. Ex. 3, (Glisson Decl. at 5); Ex. 1, (Mallett Decl. at ¶ 13). Most recently, Riley was seen in chronic care on April 7, 2020. *Id.* Riley also receives regular refills (a month's supply each time) of his KOP blood pressure medications. Riley's medication was refilled on January 14, February 6, February 25, March 21, April 28, May 14 (a seven day supply upon discharge from hospital), May 19, and July 9. *Id.* Given these regular refills, there has been no time at which Riley should have been without a sufficient supply of his medication.[25]

---

[25] It should be noted that Plaintiffs appear to mischaracterize Riley's declaration. *Compare* [Doc. 99], Supplemental Brief at 42, with [Doc. 104-4], Riley Dec. at ¶7. Riley states: "I have been without my high blood pressure medication for up to two weeks." [Doc. 104-4], Riley Dec. at ¶7. Riley seems to be stating that at some point in time he was without his medication for "up to two weeks." *Id.* Plaintiffs' Supplemental Brief by contrast states that "as of" June 5, 2020, "Riley has been without his blood pressure medication for two weeks." [Doc. 99] at 42. Regardless, it is not true. *See* Ex. 3, (Glisson Decl. at 5); Ex. 1, (Mallett Decl. at ¶ 13).

Turning to his mental health concerns, Riley alleges he received no follow-up care after spending time in the hospital for cutting his wrists, [Doc. 104-4], and he requests to be seen and treated by a psychiatrist, [Doc. 98] at 49. In fact, Riley did not cut his wrists. He was, however, seen by mental health professionals following a hospital admission after threatening suicide. On May 11, 2020, Riley was admitted to the MSP hospital for observation after threatening to hang himself. Exhibit 9 (Declaration of Dr. May J. Leflore at 3). He was monitored and then discharged on May 14. *Id.* at 3-4. A psychiatric nurse practitioner saw him two days later. *Id.* Riley was seen again two days after that by a mental health professional, who determined Riley was not a threat to himself and did not require psychiatric intervention. *Id.* at 4.

Riley has received regular medical and mental health treatment for the conditions about which he complains. While he may disagree with the prescribed course of treatment or prefer other treatment, his views on alternative courses of treatment are not sufficient to support a deliberate indifference claim, much less emergency injunctive relief. *See Kennedy*, 344 F. App'x at 989–90. Defendants have implemented a policy to provide Riley with adequate medical and mental health care, and the Fifth Circuit has held that Supreme Court precedent "plainly prohibits . . . an injunction" designed to "promote compliance" with the prison's "own policies." *See Valentine*, 956 F.3d at 802.

Thus, Plaintiffs have not shown that the medical or mental health care Defendants provided to Riley was constitutionally inadequate, that Defendants were deliberately indifferent to Riley's alleged physical ailments, or that any basis exists for finding irreparable harm in the absence of preliminary relief before a hearing on the merits. Again, a prisoner's disagreement with the care he has received and allegations of negligence and unsuccessful treatment outcomes

24

do not support a claim of deliberate medical indifference. *Thomas v. Carter*, 593 F. App'x 338, 342 (5th Cir. 2014); *Gobert*, 463 F.3d at 346; *Domino*, 239 F.3d at 756.

      <u>Riley's drinking water</u>

      Riley is housed in Zone A of Building B in Unit 30, and he complains that when he drinks the water in his zone, he becomes ill. *See* [Doc. 104-4].[26] All prisoners, staff, and administrators at MSP drink the same water, regardless of the building in which they live or work. *See* Ex. 1, (Mallett Decl. at ¶ 10); Ex. 2, (Sprayberry Decl. at ¶ 9). The most recent potable water test results for MSP show that the drinking water is well within acceptable standards. *See id.* at ¶ 9 & Ex. E (water test results). Plaintiffs cite to no water tests that MSP has failed in any recent years, instead pointing to "historical results" from 2013 to 2018, before MDOC replaced much of the current water system at MSP. *Id.* at ¶ 9.[27] Defendants have improved the water-supply system at MSP in recent years, installing a new, state-of-the-art water treatment system in 2019 to ensure safe and clean drinking water for MSP inmates. *See id.*

      Plaintiffs have zero evidence to support their misrepresentation that "Defendants know of unconstitutional unclean water conditions in Riley's zone." [Doc. 99] at 43. That is not true. In fact, Plaintiffs' own expert, Frank Edwards, confirmed that there no harmful contaminants in MSP's water system. *See* [Doc. 101-5]. Plaintiffs lament that "it is not surprising that Riley's water is brown and makes him ill when he drinks," but Mr. Edwards clarified that "you cannot tell by the look, taste, or smell of the water if disease-causing organisms are in it." *Id.* at 4. The analytical water test results included Mr. Edwards' expert report clearly show that the water at

---

[26] It is also possible that Plaintiff James, discussed below, intended to ask for similar relief related to water. [Doc. 98] at 3. Curiously, both items 4 and 5 under James' section of Plaintiffs' Supplemental Motion request that Defendants "repair the air conditioning in James' zone." *See id.*

[27] Water tests from years ago are irrelevant so long as Defendants' "current attitudes and conduct" evince that Defendants are not "knowingly and unreasonable disregarding an objectively intolerable risk of harm." *See Dockery*, 2019 WL 9046797, at *5 (quoting *Farmer*, 511 U.S. at 841).

MSP is not deficient or unclean. *See* [Doc. 101-5], Edwards, at 16 and 29. Accordingly, Riley's requested relief is unnecessary to prevent any alleged constitutional violation or irreparable harm between now and a trial on the merits and should be denied.

There is no evidence, other than Riley's bald and unsupported declaration, that the water does not meet applicable standards, and Riley's testimony is directly refuted by his own expert.[28] Accordingly, the requested relief is unnecessary, and Plaintiffs cannot show a constitutional violation or subjective deliberate indifference on the part of Defendants.

### d. Plaintiff Justin James (Unit 30, Building A, Zone B)

Plaintiff Justin James, residing in Zone B of Building A in Unit 30, requests five items of injunctive relief:[29] (1) treat effectively the alleged infestation of rats and cockroaches in his immediate living area; (2) repair water intrusion in his immediate living area; (3) remediate the alleged mold in the shower in his zone; (4) repair the "air conditioning" in his zone; and (5) arrange for him to "have the required one hour of recreation daily." [Doc. 99] at 38-41, 49. James's requests should be denied because the alleged defective conditions have either already been remedied or do not warrant action, and Defendants have not been deliberately indifferent.

<u>James's alleged rat and cockroach infestation, leaks, mold, and "air conditioning"</u>

As with Webster, MDOC regularly treats James's building for rodents, roaches, ants, and

---

[28] Courts regularly disregard inmates' "self-serving affidavit[s]." *See, e.g.*, *Norman v. Prince*, 2011 WL 6369977, at *5 & n.4 (M.D. La. Nov. 3, 2011) (granting summary judgment on protection-from-harm claim despite three inmate declarations that inmates informed officers of potential for violence because declarations were "inherently self-serving [and] uncorroborated by anything in the record"); *Davie v. Wingard*, 958 F. Supp. 1244, 1251 n.2 (S.D. Ohio 1997) ("self-serving abstract declarations made by inmates are entitled to little weight compared with the judgment of experienced prison officials who have the day-to-day responsibility for providing a safe living environment for all inmates. Courts should give substantial deference to prison officials' hard-earned, practical judgments about security issues"); *Dohner v. McCarthy*, 635 F. Supp. 408, 417 n.21 (C.D. Cal. 1985) ("Inmate testimony about urination in mop sinks and contamination of food is entitled to little weight.").

[29] Again, Plaintiffs request that these actions be taken "within five (5) days," but it is unclear from what point in time Plaintiffs are measuring their arbitrary deadlines.

spiders, and has done so for the past several months as a matter of routine pest control procedures. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13 & Ex. E); Ex. 2, (Sprayberry Decl. at ¶ 9 & App'x II). On July 10, 2020, MDOC treated James's building again for rats, roaches, ants, and spiders. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13); Ex. 2, (Sprayberry Decl. at ¶ 9). Again, none of Plaintiffs' experts documented having seen any vermin at MSP, and likewise, Defendants' experts did not see any vermin at MSP. Deputy Commissioner Mallet has never seen a rat in the housing units at MSP. *See* Ex. 1, (Mallett Decl. at ¶ 10). There is simply no basis for claiming there is an "infestation" at MSP or in James's zone.

Furthermore, as discussed above, the "presence of pests, by itself, is not a constitutional violation." *Walker*, 2019 WL 2465298, at *13. This is because in rural areas like Parchman, "creatures are a fact of life." *Id.* Defendants are engaged in adequate pest-control measures aimed at eradicating any infestations. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13 & Ex. E); Ex. 2, (Sprayberry Decl. at ¶ 9 & App'x II). Defendants have a contract with a licensed pest control applicator who provides pest control services at MSP three days a week. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13); Ex. 2, (Sprayberry Decl. at ¶ 9). Defendants' preventative measures preclude a finding of deliberate indifference and irreparable harm.

As to claims of leaks, MDOC recently repaired the roof over Unit 30, Building A, in which James is housed. *See* Ex. 1, (Mallett Decl. at ¶ 13 & Ex. F). There are currently no known leaks or avenues of water intrusion in James' immediate living area. *Id.* And as discussed *supra*, water leaks alone are not sufficiently serious violations. *Shannon*, 682 F. App'x at 285.

As to James's request for "air conditioning," again, his building was not designed or constructed with an air cooling system; instead, there are several, industrial-sized fans across his zone. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13); Ex. 2, (Sprayberry Decl. at ¶ 9). His zone is also

receiving additional new fans. *Id.* Plaintiffs do not allege that there is not an adequate, working heating unit in Johnson's zone. *See id.* Again, air cooling systems are not constitutionally required. *Ball II*, 881 F.3d at 348.[30]

Finally, James states, without support: "There is mold in the shower in my zone." [Doc. 104-3] at ¶4. However, MDOC confirmed on July 6, 2020, that there is no appearance of mold in the shower in James' zone. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 13). Plaintiffs do not submit any competent evidence to the contrary. *See* [Doc. 99] at 46. Neither Plaintiffs nor their experts have actually conducted any testing for mold. Other than the unsupported declaration from James, Plaintiffs' only "evidence" of mold is Edwards' purported expert opinion that there is "*potential mold growth*" in *other areas* of MSP caused by water intrusion. *See* [Doc. 101-5], Edwards, at 15. Again, the water intrusion issues have already been addressed at MSP. *See* Ex. 1, (Mallett Decl. at ¶ 10, 13). Despite sweeping hyperbolic statements, neither Edwards nor anyone else has confirmed the existence of mold at MSP, much less in James' shower. During Defendants' recent tour of MSP, mold was not observed, as confirmed by Defendants' experts. *See* Exs. 4, 5.

Even if mold was present, which it is not shown to be, cases from within this Circuit routinely hold that "the mere fact that mold is present does not render an inmate's confinement unconstitutional." *Billizone v. Jefferson Parish Correctional Ctr.*, 2015 WL 1897683, at *3 (E.D. La. Apr. 27, 2015); *Eaton v. Magee*, 2012 WL 2459398, at *5 (S.D. Miss. June 27, 2012) ("Plaintiff's claim that the bathroom and shower area are unsanitary and contain black mold fails to rise to the level of a constitutional violation."); *McCarty v. McGee*, 2008 WL 341643, at *3 (S.D. Miss. Feb. 5, 2008) ("Plaintiff's claim that the shower he was forced to share with other

---

[30] Plaintiffs' Supplemental Motion and Memorandum each describes items (4) and (5) of James' requests for relief as "repair the air conditioning in James' zone." [Doc. 98] at 3; [Doc. 99] at 49. If Plaintiffs' intent was to instead include a request regarding drinking water, the relief is inappropriate for the reasons stated above as to Riley. MDOC's potable water test results and Plaintiffs' own evidence show that no contaminants have been found in the water supply for Unit 30. *See* Ex. 2, (Sprayberry Decl. at ¶ 9).

inmates is polluted and covered in mold and fungus, causing him to catch athlete's foot and ringworm, fails to rise to the level of a constitutional violation."); *Knight v. McGee*, 2007 WL 3506462, at *4 (S.D. Miss. Nov. 14, 2007) (same). Notwithstanding, if there was mold in James's shower, MDOC would act promptly to remedy it. Plaintiffs cannot show any deliberate indifference on the part of Defendants.

Accordingly, and in light of Defendants' documented efforts to address conditions at MSP, there is simply no basis for finding deliberate indifference or any entitlement to injunctive relief related to pest control, water intrusion, mold, or "air conditioning."

James's request for recreation

Plaintiffs complain that James "has not been offered recreation in three weeks." [Doc. 99] at 46. MDOC's records show that James had recreation ("yard call") multiple times over the past month: June 10, June 12, June 30, July 1, and July 2. *See* Ex. 1, (Mallett Decl. at ¶ 13 & Ex. G). MDOC's goal is to provide inmates, including James, with as much recreation as possible. *See id*. Deputy Commissioner Mallett has directed all MSP wardens to ensure that general population inmates, like James, receive at least one hour of recreation or "yard time" per day. *Id.* Thus, James' requested injunctive relief is unnecessary to prevent any alleged constitutional violation or irreparable harm between now and a trial on the merits and should be denied.

Regardless, denial of recreation does not constitute a sufficiently serious risk to health and safety under the Eighth Amendment in most cases. *See*, *e.g., Hernandez v. Velasquez*, 522 F.3d 556, 559-64 (5th Cir. 2008). In *Hernandez*, the court found that there was no constitutional violation where an inmate was deprived of recreation for 13 months. Moreover, there is no deliberate indifference where there is a justifiable reason for such a denial, such as a lockdown or measures implemented due to COVID-19 precautions. *Id*. Even if the denial of recreation did

pose a serious risk in this case, which it does not, that risk has been absolved by Defendants' actions and directives, and no basis exists for a finding of deliberate indifference.

Accordingly, as shown above, all 20 of Plaintiffs' items of specific relief have been remediated or do not otherwise warrant action. Plaintiffs therefore cannot meet their burden to show that there is a threat of irreparable harm. Because the requested relief either has already been addressed by Defendants or is not warranted, the Supplemental Motion is effectively nullified since "no order of the court can affect the rights of the parties with regard to the requested relief." *Harris*, 151 F.3d at 189. Further, Plaintiffs cannot show any constitutional violations or deliberate indifference by Defendants as to the requested relief. Therefore, no further analysis of the elements of injunctive relief is necessary, and the Court should deny Plaintiffs' Supplemental Emergency Motion.

**III.    In addition to being unable to demonstrate a substantial threat of irreparable harm, Plaintiffs have not satisfied the other prerequisites for preliminary injunctive relief.**

Plaintiffs' Motion is nullified by Defendants' remediation of Plaintiffs' specific items of relief, and an analysis of the remaining three prerequisites for granting a preliminary injunction under the PLRA therefore is not necessary. Moreover, as shown below, Plaintiffs have failed to exhaust their administrative remedies as required by the PLRA. Notwithstanding, the current evidence shows that Plaintiffs are unlikely to succeed on the merits of their underlying claims. Also, Plaintiffs have not shown that their injury outweighs the harm to Defendants or that the public interest would not be harmed by granting the Supplemental Emergency Motion.

**a.    Plaintiffs have not exhausted their administrative remedies.**

The PLRA requires inmates to exhaust "administrative remedies" before filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). Plaintiffs can "show a substantial likelihood of success on the merits only if the defendants [are] unlikely to

30

demonstrate a lack of PLRA exhaustion." *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020) (holding district court erred in granting preliminary injunction and TRO against prison after "refusing to consider defendants' arguments with respect to PLRA exhaustion"). "This exhaustion obligation is mandatory—there are no 'futility or other [judicially created] exceptions [to the] statutory exhaustion requirements.'" *Valentine*, 956 F.3d at 804 (quoting *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001)). "So long as the State's administrative procedure grants 'authority to take *some* action in response to a complaint,' that procedure is considered 'available,' even if it cannot provide 'the remedial action an inmate demands.'" *Id.* Under the Fifth Circuit's "strict approach" to exhaustion, "[d]istrict courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their [§ 1983] complaint . . . and the case must be dismissed if available administrative remedies were not exhausted." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).[31]

"[I]t is the prison's requirements, and not the PRLA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 923 (2007). Miss. Code Ann. § 47-5-801 grants the MDOC the authority to adopt an administrative review procedure at each of its correctional facilities. "Pursuant to this statutory authority, the MDOC has set up an Administrative Remedy Program ('ARP') through which an offender may seek formal review of a complaint relating to any aspect of his incarceration." *Kelly v. Mgmt. & Training Corp.*, 2017 WL 4284598, at *3 (S.D. Miss. Sept. 27, 2017). The ARP is a two-step process:

---

[31] Exhaustion is not required only when: (1) the procedure "operates as a simple dead end" because "the relevant administrative procedure lacks authority to provide any relief," or "administrative officials have apparent authority, but decline ever to exercise it;" (2) the "administrative scheme [is] so opaque that ... no reasonable prisoner can use them;" or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Valentine*, 956 F.3d at 804 (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016)). MDOC's grievance procedure is "available," and, thus, Plaintiffs were required to exhaust, but they failed to do so.

> Inmates are required to initially submit their grievances within thirty days of the incident. If, after screening, a grievance is accepted into the ARP, the request is forwarded to the appropriate official, who will issue a First Step Response. If the inmate is unsatisfied with this response, he may continue to the Second Step by using ARP form ARP-2 and sending it to the Legal Claims Adjudicator. A final decision will then be made by the Superintendent, Warden, or Community Corrections Director. If the offender is not satisfied with the Second Step Response, he may file suit in state or federal court.

*Id.* (citing MDOC Handbook, at Ch. VIII); *see also Wilson v. Epps*, 776 F.3d 296, 300 (5th Cir. 2015) (dismissing MSP inmate's complaint because MSP inmate failed to appeal after MDOC did not respond to his initial ARP letter).

"The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion is mandatory. *Booth*, 532 U.S. at 740-41 & n.6. The purpose of the exhaustion requirement "is to give an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court' and to encourage the efficient resolution of claims." *Missouri v. Domino*, 2018 WL 7051035, at *2 (S.D. Miss. Nov. 15, 2018) (quoting *Woodford v. Ngo*, 548 U.S. 81, 89 (2006)).

Here, the four named Plaintiffs seeking relief do not even attempt to allege that they have exhausted their available administrative remedies. There is no evidence that they even tried to exhaust. Instead, Plaintiffs' counsel and experts argue that the Administrative Remedy Program ("ARP") at MSP is "broken," and therefore, any attempt to exhaust would have been futile. [Doc. 99] at 6, n.9. Nonsense. As shown by the declaration from Richard Pennington, MDOC's custodian of ARP records at MSP, none of the four named Plaintiffs even submitted grievances relating to their conditions of confinement at MSP. *See* Exhibit 10 (Declaration of Richard Pennington at 1-2 & Ex. A). In other words, the four Plaintiffs who seek relief in the Supplemental Emergency Motion have not submitted grievances to the ARP department related

to the relief they now request from the Court. *Id.* Thus, they have not exhausted their administrative remedies and are substantially unlikely to prevail on the merits of their claims. For this reason alone, the Court should deny Plaintiffs' Supplemental Emergency Motion.

        **b.  Plaintiffs are not substantially likely to succeed on the merits of their underlying Eighth Amendment claims.**

Despite the limited scope of Plaintiffs' "emergency" requests for relief, they devote approximately 30 pages of their Memorandum and more than 3,000 pages of exhibits to broad allegations concerning general conditions at MSP. Plaintiffs attempt to paint MSP in a negative light, as they have done in the media throughout this lawsuit. However, Plaintiffs' reliance on outdated evidence, including photographic and expert evidence of conditions existing five months ago during Plaintiffs' February inspection, skews the current reality at MSP.[32] The *current* evidence paints an entirely different picture. *See* Ex. 4, (Expert Report of J. Rees at 3-4); Ex. 5, (Expert Report of S. Tussey at 4); Ex. 6, (Photographs). Therefore, Defendants take this opportunity to edify the Court as to the current conditions at MSP, the current attitude and conduct of Defendants, the substantial improvements that have been made since the inmate violence and destruction in January, and Defendants' plan for continued improvement at MSP.

The *current* evidence demonstrates Plaintiffs do not have a substantial likelihood of success on the merits of their underlying claims because Plaintiffs cannot show that existing

---

[32] Plaintiffs' experts go far beyond their stated areas of expertise and reach overly generalized, speculative, and unsupported conclusions about broad conditions at MSP, including with regard to areas that they have never even inspected. *See, e.g.*, [Doc. 100-1], Vail Report at 7-8 (extrapolating alleged conditions from Unit 29-H and Unit 32, buildings that were not inhabited when Plaintiffs' inspected them and, in the case of Unit 32, is still not inhabited, to attempt to describe overall prison conditions); [Doc. 101-1], Stern Report at 14-16 (offering opinions on environmental conditions, food and water, and "electrical wires," to name a few, which are far outside his purported area of expertise); [Doc. 101-2], Haney Report at 6, 15-23 (offering opinions about all areas at MSP even though he admits he only inspected Unit 29-H, and also opining about several aspects of security and environmental conditions of which he has no expertise whatsoever). Many of Plaintiffs' experts' opinions are insufficiently supported and well outside of their purported areas of expertise.

conditions at MSP are sufficiently dangerous such that they constitute violations of the Eighth Amendment. Likewise, Plaintiffs cannot show that Defendants' current attitudes and conduct evince subjective deliberate indifference. *See Amos*, 2020 WL 1978382, at *9 (substantial likelihood of success inquiry focuses on merits of underlying claims). The current declarations of MDOC officials and contractors, documentation of repairs performed at MSP over the last few months, photographs of the facilities, and reports of Experts John Rees and Stephen Tussey detail the remarkable improvements that have taken place at MSP since earlier this year. Defendants' experts confirm there are not presently any sufficiently serious deprivations of life's necessities at MSP such as would warrant a finding of an Eighth Amendment violation. *See* Ex. 4, (Expert Report of J. Rees at 4-8); Ex. 5, (Expert Report of S. Tussey at 4-7). Further, the photographs of MSP taken during Defendants' June 24, 2020 inspection depict a constitutionally adequate correctional facility that is only improving. *See* Ex. 6, (Photographs).

But perhaps most encouraging are the plans that have been made for MSP in recent weeks since the confirmation of new MDOC Commissioner Burl Cain. *See* Ex. 1, (Mallett Decl. at ¶ 9). Notably, conditions are not the sole test for Eighth Amendment violations. The principal and necessary inquiry is whether Defendants currently possess the subjective state of mind of deliberate indifference. *See Farmer*, 511 U.S. at 847; *Dockery*, 2019 WL 9046797, at *5. The focus for deliberate indifference is whether Defendants "know[] that inmates face a substantial risk of serious harm and *disregard[] that risk by failing to take reasonable measures to abate it.*'" *Farmer*, 511 U.S. at 847. To show subjective deliberate indifference Plaintiffs must show Defendants "subjectively believe that the measures they are taking are inadequate." *Amos*, 2020 WL 1978382, at *11 (quoting *Valentine*, 956 F.3d at 802). That certainly is not the case here.

34

The appointment of the new officials and Defendants' campaign of remedial, preventative, and forward-looking measures since early 2020 preclude a finding of deliberate indifference. Conditions at MSP at the beginning of 2020 needed to improve; they have, and they will continue to improve under the new MSP leadership appointed precisely for that purpose. MSP's actions since January 2020 includes, among other things:

- The Appointment of Deputy Commissioner Jeworski Mallett. Mr. Mallett was appointed on January 15, 2020, as acting Deputy Commissioner of MDOC. *See* Ex. 1, (Mallett Decl. at ¶ 2). Mallett's role was made official in February 2020. *Id.* Mallett has succeeded in spurring and facilitating the ongoing changes and improvements now evident at MSP. *Id.* at ¶ 9. Among other things, Mallett has made instrumental personnel changes at MSP and has demanded a new level of responsiveness to maintenance issues and security. *Id.*

- The Retirement of Marshall Turner and Appointment of Timothy Morris as Acting MSP Superintendent. MSP's former Superintendent retired in April 2020, making room for the appointment of Warden Timothy Morris as the new acting Superintendent of MSP. *See* Ex. 1, (Mallett Decl. at ¶ 9). MDOC expects and demands that Morris' appointment will be an improvement designed to propel MSP to ACA accreditation. *Id.* Commissioner Cain recently expanded Superintendent Morris's authority in an effort to give the Superintendent a greater ability to timely address problems at MSP without administrative encumbrances. *Id.*

- The Appointment of Burl Cain as MDOC Commissioner. In June 2020, Governor Reeves appointed Burl Cain, former warden at the Louisiana State Penitentiary, to be the new MDOC Commissioner. *See* Ex. 1, (Mallett Decl. at ¶ 9). Cain was successful during his tenure at the Louisiana State Penitentiary in decreasing violence in that prison. Defendants' expert John Rees, a highly respected prison administrator in his own right, is among the many who are confident that violence will decrease and conditions will improve at MSP under Cain's leadership. *See* Ex. 4, (Expert Report of J. Rees at 3, 7); *see also* Ex. 1, (Mallett Decl. at ¶ 9).

- Inmate Transfers. Since January 2020, Defendants have transferred more than 1600 inmates out of MSP, including nearly 800 from Unit 29, in order to close parts of Unit 29 and bring the officer-to-inmate ratio at MSP into compliance with ACA standards. *See* Ex. 1, (Mallett Decl. at ¶¶ 10, 12). The transfer of inmates has also allowed MDOC to accelerate repairs and structural improvements at MSP. *Id.* at ¶ 9.

- Closure of Buildings and Zones. With the transfer of inmates and repair and improvements of other buildings and zones, MSP has successfully closed six buildings in Unit 29, where MSP was experiencing the highest levels of maintenance issues and inmate violence and destruction. *See* Ex. 1, (Mallett Decl. at ¶ 9). MDOC has begun

efforts to close Unit 29-F at MSP, in which two of the named Plaintiffs reside, and move those inmates to newly refurbished Unit 29-C. *Id.*

- <u>Campaign of Repairs and Improvements</u>. Defendants have mounted a significant, continued attack on the maintenance issues at MSP. The extensive repairs are well-documented. Since February, Defendants have repaired roofs, showers, and bathrooms. MSP replaced two of its six sewage/wastewater lift stations in 2018-2019, and it has plans and funding to replace the rest. *See* Ex. 2, (Sprayberry Decl. at ¶ 9). MSP has additional improvements to make to become ACA accredited, but it is presently a constitutionally adequate facility. *See* Ex. 4, (Expert Report of J. Rees at 4-8); Ex. 5, (Expert Report of S. Tussey at 4-7).

- <u>Improved Communication with Centurion</u>. In part as a result of personnel changes, including MSP's new Acting Superintendent and Centurion's new Medical Director at MSP, communication and cooperation between MSP officials and Centurion have drastically improved, leading to improvement in access to already good medical care provided to inmates. *See* Ex. 1, (Mallett Decl. at ¶ 9). Among other things, the increased cooperation has led to more efficient and timely transport of inmates and inmate medications to and from the medical units at MSP. *Id.*

These ameliorative measures and others have led to improved conditions at MSP in recent months. The improved conditions not only prevent Plaintiffs from showing sufficiently serious constitutional deprivations, but also prevent Plaintiffs showing subjective deliberate indifference. Defendants address each of Plaintiffs' categorical allegations in turn.

### i. There is not a lack of basic safety and protection from violence at MSP.

Plaintiffs claim generally that the conditions at MSP fail to provide basic security and protection from violence. [Doc. 99] at 7. However, in support, Plaintiffs mostly cite statements from inmates who no longer reside at MSP. [Doc. 99] at 8. Kuriaki Riley is the only named Plaintiff residing at MSP who alleged that Defendants "don't pay any attention to" alleged violence "or try to stop it." [Doc. 104-4]. Riley provides no support for his bald, self-serving allegation, and he *does not seek any relief* related to the allegation. Indeed, Plaintiffs' failure to seek any remedy whatsoever with respect to "protection from violence" impeaches the argument that MSP's current measures to protect inmates from one another are constitutionally deficient.

*See High Tech Med. Instr., Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (failure to seek relief weighs against a finding of irreparable harm).

Defendants have not turned a blind eye to inmate violence and safety. Since the gang riot occurred in December 2019 and January 2020, Defendants have worked to find solutions to prevent inmate-on-inmate violence, and it is now obvious that many of their measures have been successful. *See* Ex. 1, (Mallett Decl. at ¶ 10). Defendants successfully transferred more than 1,600 inmates out of MSP, including nearly 800 out of Unit 29, resulting in improved inmate-to-officer ratios, within ACA standards. *See* Ex. 5, (Expert Report of S. Tussey). Defendants also relocated certain inmates within MSP after reclassifying them according to security-threat groups, and Defendants are in the process of a reclassification analysis for all inmates at MSP. *See* Ex. 1, (Mallett Decl. at ¶¶ 9, 10); Ex. 4, (Expert Report of J. Rees at 3). Defendants have increased screening, training, and supervision of correctional officers, and they have focused efforts on recruiting additional officers. *See* Ex. 1, (Mallett Decl. at ¶ 10). In fact, MDOC has hired 11 new correctional officers for MSP since June 3, 2020. *Id.* at ¶ 9. MDOC has increased pay for correctional officers by $1,500 per year, and MDOC has altered its hiring process to eliminate unnecessary delay. *Id.* MDOC has also hired one of the country's top security and staffing experts to assess MSP's staffing needs and provide an analysis of the same. *Id.*[33]

Plaintiffs allege inmate violence is caused by "critical understaffing in the housing units where Plaintiffs live." [Doc. 99] at 8. Understaffing, in and of itself, does not necessitate a finding of deliberate indifference. *See Walker v. Reese*, 2008 WL 4426123, at *18 (S.D. Miss. Sept. 25, 2008). The Court must take into account relevant constraints when assessing deliberate indifference. *Wilson*, 501 U.S. at 300. For instance, in *Walker v. Reese*, while it was conceded

---

[33] These are just a few of the measures that MDOC has instituted recently for MSP, many of which are directly from newly appointed Commissioner Burl Cain. *See* Ex. 1, (Mallett Decl. at ¶ 9). Defendants aim to have MSP back to ACA-accreditation levels by July 2022. *Id.*

that the staff at the prison "was not at full complement," the proof showed that the deficient

staffing was due to Yazoo City's "remoteness" and the facility's "salary constraints." 2008 WL

4426123, at *18 n.31. The court noted the defendants' "extensive recruitment efforts" to hire

additional staff. *Id.* at *18. In doing so, the Court found that there was no deliberate indifference.

*Id.* MDOC of course faces similar salary and recruitment challenges for MSP, given its

budgetary limitations and rural location, but MDOC is anything but deliberately indifferent to

those challenges. *See* Ex. 1, (Mallett Decl. at ¶ 9). On the contrary, MDOC and Commissioner

Cain are facing those challenges head on. MDOC has ramped up its recruiting efforts. *Id.* As an

example, there are double the number of correctional officers in the training academy for MSP in

July 2020 than there were even in June 2020. *Id.*

  As a result of Defendants' inmate transfers and recruiting efforts, the inmate-to-officer

ratio at MSP is now approximately 40:1, which is within ACA standards. *See* Ex. 5, (Expert

Report of S. Tussey at 6); Ex. 1, (Mallett Decl. at ¶ 10). MDOC's planned goal is to continue

recruiting efforts and to continue to improve the inmate-to-officer ratio at all facilities, including

MSP. *Id.* at ¶ 9. The measures instituted by Defendants preclude Plaintiffs from proving

deliberate indifference. *See Dockery*, 2019 WL 9046797, at *13 (no deliberate indifference

where defendants instituted several measures to improve staff shortages and actually "increased

the staffing level" although less than plaintiffs alleged was necessary).

  To support their generalized grievances, Plaintiffs rely on outdated evidence. They

submit anecdotal accounts of inmate violence and deaths that occurred months ago, during and

immediately after the gang riot in December 2019 and January 2020. There are no allegations

that such violence has occurred recently, and the evidence confirms it has not. *See* Ex. 1, (Mallett

Decl. at ¶¶ 9, 10); Ex. 4, (Expert Report of J. Rees at 4-5). In fact, the last inmate-on-inmate

fatality at MSP occurred on January 21, 2020. *See* Ex. 1, (Mallett Decl. at ¶ 5). Without causation and evidence of deliberate difference, the fact of death alone is not adjudicative of claims in the lawsuit. Plaintiffs' evidence is insufficient to show a substantially serious, *current* risk of harm caused by further inmate violence or Defendants' subjective deliberate indifference to that risk. Based on the current evidence, Plaintiffs cannot show that they would be substantially likely to succeed on their underlying claim for protection from violence.

### ii. Plaintiffs have not been deprived adequate medical care or adequate mental health care.

MSP's healthcare staff provides medical and mental health care that comports with constitutional standards.[34] Plaintiffs claim that they are denied adequate medical care and that mental health care is "nonexistent" at MSP. *See* [Doc. 99] at 12-17. As discussed, to prevail on these claims, Plaintiffs must demonstrate that healthcare at MSP is so deficient that it evinces a "deliberate indifference" by prison officials to Plaintiffs' serious medical needs. *Gobert*, 463 F.3d at 345-46. "The Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and "deliberate indifference exists wholly independent of an optimal standard of care," *Gobert*, 463 F.3d at 349. The adequacy of prison medical care is not judged against a community malpractice standard: "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference[.]" *Id.* at 346. Instead, "the plaintiff must show a denial of 'basic human needs.'" *Valentine*, 956 F.3d at 801; *see also Inmates of Occoquan v. Barry*, 844 F.2d 828, 837 (D.C. Cir. 1988) ("In [the prison] setting, it is decency—elementary decency—not professionalism that the Eighth Amendment is all about.").

MSP's medical and mental health system, which is accredited by the National Commission on Correctional Health Care ("NCCHC"), is functioning effectively and providing

---

[34] Centurion, a correctional healthcare company, provides medical and mental health care to inmates at MSP pursuant to a contract with MDOC.

necessary care to MSP inmates. This is confirmed by the testimony of Dr. James Glisson, the

medical director for MSP, Dr. May Leflore, the mental health director for MSP, and the opinions

of Dr. Thomas Fowlkes, an independent expert in correctional healthcare who inspected MSP

and has provided a report on its medical system and the care being provided at the prison today.

### 1. MSP's medical and mental health systems are operating effectively and are certified by the NCCHC.

MSP's medical staff delivers care in much the same way as do hospitals or clinics

operating in the community, subject of course to the constraints of a prison setting. *See West v.*

*Atkins*, 487 U.S. 42, 57 (1988) ("Unlike the situation confronting free patients, the nonmedical

functions of prison life inevitably influence the nature, timing, and form of medical care

provided to inmates"). Since February 2020, the MSP medical team has been led by Dr. James

Glisson, a licensed physician with 15 years of professional experience. *See* Ex. 3, (Glisson Decl.

at 1). As the site medical director and chief physician, Dr. Glisson is supported by a team of over

60 medical providers:  two other medical doctors, including an emergency room physician; a

physician's assistant and two nurse practitioners; a director of nursing who supervises two nurse

supervisors, five nursing assistants, 16 registered nurses, and 24 licensed practical nurses; four

EMTs/paramedics. *Id.* at 2. These providers are supported by medical administrative staff, a

phlebotomist, a physical therapist, a dentist and two dental assistants, a pharmacy director and

two pharmacy technicians, two lab technicians, and an infection control program coordinator

(who is a registered nurse). *Id.* The staff is supervised by a Health Services Administrator—a

position akin to the administrator of a hospital. *Id.*

MSP's mental health team is led by the site mental health director, Dr. May Leflore, a

psychologist and licensed professional counselor with over 12 years of experience in correctional

mental health care. Ex. 9, (Leflore Decl. at 1). In addition to Dr. Leflore, MSP has three mental

health professionals (masters-level counselors) on site who provide regular mental health counseling to inmates. *Id.* at 2. Inmates also have access to a psychiatrist who is on site weekly and can access psychiatric care at other times through use of telepsychiatry services. *Id.* at 2. As of June 30, there are 235 inmates at MSP who are on the mental health case load, meaning that they have a diagnosed mental health condition. *Id.* at 2.

The hub of the healthcare system at MSP is the hospital (Unit 42), a 56-bed facility located on prison grounds. Prisoners are transported to MSP's hospital for emergency care and inpatient treatment, such as treatment for chronic conditions or other serious medical needs. In addition, patients may stay in the hospital for observation if their condition requires more constant attention, such as suicide watch or psychiatric observation. Ex. 9, (Leflore Decl. at 3).

MSP also has two satellite medical clinics, one in housing Unit 29 and another in housing Unit 30. Ex. 3, (Glisson Decl. at 3); *see also* Exhibit 11, (Report of Dr. Thomas Fowlkes at 5). Each medical clinic is staffed by a nurse practitioner during the week. *Id.* Those nurse practitioners provide primary care to their patients, including treatment for emergent medical conditions through the "sick call" process. *Id.*[35] In addition to routine treatment, prisoners may be held in the medical unit for observation or further care if their condition requires more constant attention. Ex. 3, (Glisson Decl. at 3). When off-site emergency care is required, Dr. Glisson arranges for the inmate to be transported to a community hospital, either by an ambulance that serves the local community or by one of MSP's medical transport vehicles if the ambulance's estimated response time is too long. *Id.*

---

[35] At MSP, prisoners request medical care by completing "sick call" request forms, which are collected by medical staff twice daily and triaged within 24 hours. Ex. 11, (Dr. Fowlkes Report at 6-7). The nurse practitioners address medical conditions that can be treated in the clinic (colds, sinus infections, headaches). *Id.* at 5. If the condition is more serious, the patient will be transported to the hospital.

MSP's medical systems are evaluated by the NCCHC, a national organization that develops and promulgates standards for effective correctional healthcare operations.[36] The NCCHC has accredited MSP's medical policies and operations, and that accreditation remains in effect today. Ex. 11, (Dr. Fowlkes Report at 5).

> ### 2. Plaintiffs' generalized allegations about medical and mental healthcare at MSP are neither supported by the evidence nor relevant to the preliminary injunctive relief sought.

The medical relief actually requested by the four named Plaintiffs in their Motion is very limited, and only three of the four even seek medical or mental health relief. As discussed in detail above, their requests have already been addressed in the normal course of patient care before Plaintiffs ever filed their Motion, or in some cases, are not substantiated by the inmate's medical records or current condition. *See* discussion in Section II, *supra*.

Rather than focus on the preliminary relief requested, however, Plaintiffs' medical experts—Dr. Marc Stern and Ms. Madeleine LaMarre—have jumped ahead to a class-certification stage, offering broad-stroke and highly generalized assertions about medical care at MSP. This approach does not assist the Court in resolving the narrow issues presented by the Motion. Worse, it appears to be an improper attempt to prematurely stigmatize the health systems and care provided to inmates at MSP based on a non-random, statistically insignificant subset of inmates (less than 1% of MSP's population) with known complaints about care.[37]

---

[36] Information about NCCHC including details on its accreditation process and standards, is available on its website: https://www.ncchc.org/facility-accreditation. Plaintiffs' expert, Dr. Marc Stern, purported to rely on NCCHC standards when offering his opinions. *See* [Doc. 101-1] (Stern Report at 3). Dr. Stern neglected to mention that MSP is currently, and has long been, accredited by NCCHC.

[37] Again, the Court made clear that this preliminary stage of litigation is limited to 33 named plaintiffs, only four of whom remain at MSP and have filed requests for preliminary relief, and was not intended to reach class-certification discovery or analysis. *See* Transcript of Feb. 3, 2020 hearing at 48:23-25, 49:1-12. Although MSP's population was over 3,200 inmates at the time of his review, Dr. Stern based his sweeping opinions on 17 inmates—less than 1% of the population. *See* [Doc. 101-1] (Stern Report at 2).

Another district court in Mississippi recently criticized Dr. Stern and Ms. LaMarre for their "purposive" sampling approach, which involves extrapolating across an entire prison system based on a few cases. *See Dockery*, 2019 WL 9046797, at *6.

Relying on Dr. Stern's and Ms. LaMarre's opinions, Plaintiffs make general allegations about medical and mental health care that, while detached from the relief actually requested, warrant a brief response. In particular, Plaintiffs claim that: (1) correctional officer understaffing impedes care; (2) the sick call process doesn't function properly; (3) follow-up care after emergencies "is virtually non-existent"; (4) the ambulances at MSP should be decommissioned; and (5) inmates cannot obtain mental health care. [Doc. 99] at 13-17. As noted, MDOC retained Dr. Thomas Fowlkes, an expert in correctional healthcare, to inspect MSP and offer his opinions on the medical systems and care being provided at the prison today. Dr. Fowlkes's report and opinions, as well as the information provided by MSP's medical team, demonstrate that Plaintiffs claims are unsupported and even misguided in some cases.

*First*, Plaintiffs' assertions—like their experts' opinions—are based on a snapshot of MSP during an aberrant period from late 2019 through February 2020. At that time, MSP housed over 3,200 prisoners, including hundreds of "close-custody" (dangerous) offenders, and MSP officers were combating a spate of gang violence that threatened the safety of everyone at the prison. As of July 10, the inmate population has been reduced to approximately 2,000.[38] As discussed above, this dramatic reduction in prisoners, including the transfer of dangerous offenders to other facilities, has greatly improved the ability of correctional officers to respond to inmate medical concerns and transport inmates to MSP's hospital or clinics as needed. Today, as

---

It is difficult to determine how many inmate case studies Ms. LaMarre based her opinions on, but it was no more than 32—again only 1% of the population. *See* [Doc. 101-4] (LaMarre Report, App'x B).

[38] MDOC reports its Daily Inmate Population on its public website: https://www.mdoc.ms.gov/Admin-Finance/Pages/Daily-Inmate-Population.aspx.

reported by MSP's medical team and confirmed by Dr. Fowlkes's inspection and report, inmate medical needs are being met and sick call and chronic care appointments are being kept. *See* Ex. 11, (Dr. Fowlkes Report at 6-7, 11-12).

*Second*, Plaintiffs are mistaken in their claim that the sick call process does not function effectively. "Sick call" is the process by which an inmate notifies medical staff via a written form that he has a health concern or condition that he would like to discuss with a medical provider. As confirmed by Dr. Fowlkes's inspection, sick call forms are available in all housing units, sick call requests are made by placing the form in a locked box without reliance on custody officers (so that the inmate's privacy is ensured), sick call forms are collected by nurses twice daily and triaged within 24 hours, and sick call appointments are being kept. *See* Ex. 11, (Dr. Fowlkes Report at 6-7). In addition, Dr. Glisson's decision to staff the satellite clinics with nurse practitioners ensures inmates can be quickly seen for emergent medical needs that have been identified through the sick call process. *Id*.

*Third*, Dr. Glisson and his medical team follow NCCHC standards for follow-up care after an inmate has received medical treatment or offsite specialty care. *See* Ex. 11, (Dr. Fowlkes Report at 9-10). MSP's medical team also ensures that specialty care is ordered when necessary, and they monitor and follow-up with the patient until the off-site care can be scheduled and provided. *Id*. Whatever might have been the case in January and February 2020, the time period on which Plaintiffs' experts focus, Dr. Fowlkes's inspection and medical-staff interviews confirmed that the follow-up process is working properly and effectively today. *Id*.

*Fourth*, Plaintiffs claim that the "ambulance service" at MSP is "abysmal" and the ambulances on site should be decommissioned. [Doc. 99] at 15. For starters, there is no Eighth Amendment requirement that prisons maintain licensed ambulances or that inmates be

transported for medical care in an "ambulance" as opposed to a transport van. *See*, *e.g.*, *Lane v. Klingler*, 25 F. App'x 781, 783 (10th Cir. 2001) (rejecting deliberate indifference claim based on inmate's assertion that he should have been transported to community hospital in an ambulance, rather than prison van); *Harvey v. Jones*, 2015 WL 9687841, *2 (W.D. La. Nov. 16, 2015) (same). Even so, MSP has three ambulances—which are more aptly described as medical transport vans—that are stocked with medical supplies and used to transport inmates within the confines of MSP to its internal hospital at Unit 42. Ex. 3, (Glisson Decl. at 3). In addition, medical staff sometimes uses these vehicles to transport inmates to community hospitals when the response time of an outside ambulance company seems too long and the patient's medical condition allows for transport without full ambulance-standard equipment. *Id.* Dr. Fowlkes inspected the ambulances and determined that they are adequate medical transport vans. Ex. 11, (Dr. Fowlkes Report at 12-13).

*Fifth*, Plaintiffs claim—citing only inmate testimony—that there are "no mental health services whatsoever." Doc. 99 at 16. This is plainly wrong. MSP has a team of mental health professionals, led by Dr. Leflore, who provide mental health treatment and care to inmates consistent with NCCHC standards. *See* Ex. 9, (Leflore Decl. at 2). Plaintiffs do not offer any expert testimony criticizing the work of MSP's mental health providers. The only one of Plaintiffs' experts who even mentions mental health care is Dr. Craig Haney, and he just parrots one inmate's complaints about the quality of his interactions with mental health providers. *See* [Doc. 101-2], Report of Dr. Craig Haney at 22.[39] The fact that "a prisoner does not agree that the

---

[39] Dr. Haney's opinions should be wholly rejected by the Court as the information he relies upon was collected in violation the Federal Rules of Civil Procedure and this Court's discovery order [Doc. 48]. Specifically, Dr. Haney's report relies on interviews conducted by Dr. Haney personally, before discovery was permissible and in the face of an objection from Defense counsel, with non-party inmates, and with party inmates who have no mental-health claims. The Rules and this Court's order prohibit such conduct.

medical care offered is appropriate" is not sufficient to show deliberate indifference to his serious medical needs. *Kennedy*, 344 F. App'x at 989.[40]

### iii. Plaintiffs have not been deprived adequate food.

The specific, limited relief requested by the four individual named Plaintiffs at issue in this Motion does *not* concern *any* food-related violations; therefore, Plaintiffs' likelihood of success on the merits of underlying, broader food-related claims is irrelevant to their Motion. Nonetheless, Defendants will address Plaintiffs' general food and nutritional allegations. Plaintiffs state that they "often are denied meals," that the food at MSP "is often inedible," that the food "fails its basic purpose of keeping inmates healthy," and that "deficiencies originate in the kitchens at Parchman." [Doc. 99] at 17-19. These generalized allegations are unfounded, and regardless, they do not rise to the level of a constitutional violation. *See Abreu v. Lipka*, 778 F. App'x 28, 33 (2d Cir. 2019) (for Eighth Amendment claim, plaintiffs must show food poses "an immediate danger to the health and well-being of the inmates who consume it").

### 1. Plaintiffs are not denied meals.

Plaintiffs first allege that "they often are denied meals" and cite various affirmations of inmates who no longer reside at MSP in support of their vague claim. *See* [Doc. 99] at 17-18. However, a simple review of Plaintiffs' own "Affirmation Compilation" reveals that *many* of the inmates do *not* claim they were denied meals.[41] One inmate even volunteered that there is "plenty [of food] for him to eat." *See* [Doc. 102-1], Ex. G, B. James Dec., ¶ 14, P000111.[42]

---

[40] In addition, MSP recently filled three positions for chaplains who will live on the grounds at MSP and provide religious-based counseling. *See* Ex. 1, (Mallett Decl. at ¶ 9). MSP also identified 30 inmate preachers who have never been utilized. This effort is aimed at bettering mental health and preventing suicides. *Id.* Clearly, Defendants are not deliberately indifferent to Plaintiffs' mental health needs.

[41] *See, e.g.*, [Doc. 102-1], Ex. G, Davis Dec., ¶ 2, P000036 (only complains that "[m]eals are late every 'now and then'"); Green Dec., ¶ 11, P000060 and ¶ 53, P000073 (stating he receives three meals per day except for during the noted gang riot); J. James Dec., ¶ 2, P000117 (only complains that dinner is served

46

The food service provider at MSP is Aramark Correctional Services, LLC ("Aramark"). In his declaration, Aramark's General Manager of MDOC's food service account, David Bokath, states that Aramark prepares three meals a day for the inmates and no inmates are denied a meal. *See* Ex 12, (Bokath Decl. at ¶ 9). Bokath's statements are confirmed by Roger Davis, MDOC's Director of Food Services. *See* Ex. 13, (Declaration of N. Roger Davis at ¶ 5). For each meal, MDOC requires that Aramark prepare enough food to feed MSP's prison population plus a five percent overage. *Id.* Invoices, count sheets, and Aramark's Delivery Sheets and Daily Production Packets confirm there is no systematic denial of meals to inmates at MSP. *Id.* at ¶ 5 & Ex. B. The evidence demonstrates that Plaintiffs cannot establish a substantial likelihood of success of proving a systematic denial of meals to Plaintiffs or any other inmates at MSP.

Even if Plaintiffs were able to establish that they have been denied meals on a few occasions, which they cannot, such a showing does not rise to the level of a constitutional violation. *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998). "The deprivation of food constitutes cruel and unusual punishment only if it denies the prisoner the 'minimal civilized measure of life's necessities.'" *Id.* (quotation omitted). "Whether the deprivation of food falls below this threshold depends on the amount and duration of the deprivation." *Id.* (doubting that plaintiff's allegation of missing 50 meals in five months rises to a constitutional violation); *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999) (inmate's claim he was denied eight meals did not

_____

late); Riley Dec., ¶ 2, P000204; Scott Dec., ¶ 10, P000239; Tillis Dec., ¶ 9-10, P000271-72 (only complains that "meals are delayed"); Timmons Dec., ¶ 10, P000279 (not aware of any "occasions where food has not been given to the prisoners at all"); Willard Dec., ¶ 13, P000312 (stating that meals are "always provided"); Wilson Dec., ¶ 11, P000320.

[42]Instead of demonstrating a systematic denial of meals, Plaintiffs' Affirmation Compilation merely suggests, at best, that there may be an occasional delay in providing meals. However, even a significant duration of time between meals does not rise to the level of a constitutional violation. *Benson v. Brown*, 2020 WL 2526005, at *4 (S.D. Ind. May 18, 2020) (duration of more than 14 hours between inmate's dinner and breakfast did not violate Constitution).

rise to level of a constitutional violation because "[e]ven on a regular, permanent basis, two meals a day may be adequate"); *Rieco v. Moran*, 633 F. App'x 76, 78 (3d Cir. 2015) ("only a substantial deprivation of food to prisoner states a viable Eighth Amendment claim"); *Zanders v. Ferko*, 439 F. App'x 158, 160 (3d Cir. 2011) (inmate's claim he was "depriv[ed] of three meals over two days fail[ed] to rise to the level of a constitutional violation").

### 2. The food at MSP is adequate, nutritional, and edible.

The meals Plaintiffs receive at MSP meet caloric and nutritional requirements for inmates and are adequate to maintain good health. *See* Ex. 14, (Declaration of Julianne Croegaert at ¶ 4). The daily meals provide approximately 2900 calories, along with 92 grams of protein and healthy amounts of vitamin A, vitamin C, calcium, and iron. *Id* at ¶ 4; *see also* Ex. 12, (Bokath Decl. at ¶ 32); Ex. 13, (Davis Decl. at ¶ 5). Indeed, Plaintiffs' *own expert* admits that MSP's "regular diet menu, as planned, averaging 2,900 calories per day likely meets the minimum nutritional standards for most adults." *See* [Doc. 101-3], Graham Report at 19. Ms. Graham does not opine that meals at MSP are nutritionally inadequate; instead, she states that "further assessments of meal plans and actual meals served, diets provided, and meal schedules is required in order to determine whether meals are adequate in fact." *Id*. However, a speculative claim of a potential constitutional violation is an insufficient basis for an injunction. *Fountain v. Rupert*, 2018 WL 1127925, at *2-4 (E.D. Tex. Mar. 2, 2018) (denying inmate's request for injunctive relief based on claim of inadequate meals and nutrition in part because plaintiff's allegations that defendants were not following their own meal plans were speculative, conclusory, and did not show an immediate risk of harm).

And contrary to Graham's limited observations, the menu at MSP is strictly followed. "The recipes for the menus are almost always followed to the letter, except in the rare instance

where a substitute food item is used because of an issue with supply or unavailability[,]" in which case "a food item of equal or greater nutritional value is used." Ex. 12, (Bokath Decl. at ¶ 5); Ex. 13, (Davis Decl. at ¶ 5). Further, specific utensils are used to ensure that a full serving of each food item is easily and precisely measured on the individual trays for the inmates. *See* Ex. 12, (Bokath Decl. at ¶ 7); Ex. 13, (Davis Decl. at ¶ 5). Bokath and Davis also inspect the meals to ensure compliance with the menus, including verifying portion sizes. *See* Ex. 12, (Bokath Decl. at ¶¶ 17-19); Ex. 13, (Davis Decl. at ¶ 5).

Moreover, MDOC has confirmed the nutritional adequacy of the meals through its review of the inmates' health records. There is no evidence of any significant health concerns caused by inadequate nutrition. Although Plaintiffs cite some random claims of weight loss and one alleged incident of food poisoning, *see* [Doc. 99] at 18-19, those claims, made by inmates who are no longer housed at MSP, are based on declarations that are contradicted or explained by medical records. *See* Ex. 3, (Glisson Decl. at 6).[43] Plaintiffs have not proffered any expert testimony from medical personnel to show that Plaintiffs experienced any significant health issues caused by a nutritionally inadequate diet or that the alleged isolated instances present a danger to the health and well-being of all MSP inmates. *See, e.g., Gabriel v. Gusman*, 2010 WL 3169840, at *6 (E.D. La. July 16, 2010) ("without an allegation of resulting harm, complaints regarding food service practices simply are not of constitutional dimension").

Plaintiffs also claim "the food at Parchman is often inedible." [Doc. 99] at 18. Plaintiffs cite various unsupported affirmations given by inmates who no longer reside at MSP for their

---

[43] For instance, Curtis Wilson's medical records show that he weighed 171 lbs. in June 2018 and 170 lbs. in June 2020. *Id*. H.D. Scott's medical records show that he arrived at MSP in August 2019 weighing 297 lbs. and weighed 262 lbs. when he was last seen in February 2020, which is a healthier weight for his size. *Id*. Willie Friend's medical records show that he weighed 150 lbs. in February 2018 and weighed 149 lbs. in February 2020. *Id*. Finally, Charles Gayles' medical records show that he weighed 165 lbs. in September 2018, gained weight during his incarceration, but then reported having begun exercising and was back down to 165 lbs. *Id*.

claim that the food is sometimes "contaminated with animal or insect feces or it is raw." *Id.*[44] There is simply no evidence that the food, which is adequate and nutritional, is inedible. In fact, neither MDOC's Director of Food Services nor Aramark's General Manager is aware of a single claim of food borne illness at MSP from July 1, 2016 to the present. *See* Ex. 13, (Davis Decl. at ¶ 5); Ex. 12, (Bokath Decl. at ¶ 29). As to the claim of raw food, most of the meat items on the menu are precooked by the manufacturer and merely reheated at MSP. *Id.* at ¶ 30. Further, Bokath and Davis inspect and taste the meals to ensure palatability before they are delivered or served to inmates. *See* Ex. 13, (Davis Decl. at ¶ 5); Ex. 12, (Bokath Decl. at ¶¶ 16-19).

Even if there was some factual basis for this allegation, which there is not, it does not amount to a constitutional violation. The Constitution "does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349, and prisoners "cannot expect the amenities, conveniences and services of a good hotel," *Wilson*, 878 F.2d at 849 & n.5. To that end, prisoners are not entitled to food that is tasty or even appetizing. *See McGee v. Aramark Correctional Servs.*, 2018 WL 7247135, at *2 (S.D. Miss. Dec. 20, 2018) (Constitution "requires that food served prisoners provide adequate nutrition, not that particular food be supplied, or that the food be served at a certain temperature or level of tastiness"); *Robbins v. Robertson*, 782 F App'x 794, 805 (11th Cir. 2019) (Eighth Amendment does not require prison officials "to indulge inmates' dietary preferences"). And the Constitution does not guarantee food that is prepared and served in a culinary pleasing manner. *E.g., Hmeid v. Nelson Coleman Correctional Ctr.*, 2018 WL 4922381, at *13 (E.D. La. Aug. 15, 2018); *Brown-El v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992) (prisoner's claim that his constitutional rights were violated when he was served cold food was frivolous). "The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant,

---

[44] It should be noted that the allegations about feces in food are part of a typed, form declaration that Plaintiffs' counsel submitted to inmates.

does not amount to a constitutional deprivation." *Hamm v. DeKalb County*, 774 F. 2d 1567, 1575 (11th Cir. 1985).[45]

### 3. The kitchens at MSP do not present a danger to the health and well-being of inmates.

Plaintiffs claim that food "deficiencies originate in the kitchens at Parchman," quoting Graham's statement that she observed "'security and/or food safety and Food Code violations.'" *See* [Doc. 99] at 19 (quoting [Doc. 101-3], Ex. D, Graham, p. 24). However, the kitchens in Units 26 and 30, which prepare the food for the rest of the housing units at MSP, regularly receive grades of "A" or "B" during annual inspections by the Mississippi Department of Health. *See* Ex. 13, (Davis Decl. at ¶ 5 & Ex. A). In *Dockery*, the court found this type of evidence to demonstrate "Plaintiffs ha[d] not shown they [were] being denied well-balanced, nutritionally sufficient meals based on the manner or environment in which those meals [were] prepared." 2019 WL 9046797, at *17. The meals are prepared and served under conditions which do not present a danger to the health and well-being of inmates at MSP. *See* Ex. 14, (Croegaert Decl. at ¶ 4); Ex. 12, (Bokath Decl. at ¶ 32); Ex. 13, (Davis Decl. at ¶ 5).

### 4. MDOC is not deliberately indifferent to Plaintiffs' food needs.

Even if there were a basis to find a sufficiently serious harm that objectively amounts to a constitutional violation, which there is not, Plaintiffs cannot show Defendants have acted with

---

[45] To the extent Plaintiffs have ever received servings of food that were unsatisfactory, they still do not have a claim. *Bosarge v. Brown*, 2015 WL 5156767, at *5 (S.D. Miss. Sept. 2, 2015) ("Courts have repeatedly held that occasional incidents of foreign objects contained in food do not present a question of constitutional proportions"). The few occasions, if any, in which Plaintiffs may have allegedly been served unsatisfactory meals present, at most, mere acts of negligence and not a Constitutional violation. *See George v. King*, 837 F.2d 705, 707 (5th Cir. 1998) ("A single incident of unintended food poisoning, whether suffered by one or many inmates at an institution, does not constitute a violation of the constitutional rights of the affected prisoners."); *Sinclair v. Henderson*, 331 F. Supp. 1123, 1126 (E.D. La. 1971) ("[a]n occasional incident of a foreign object finding its way into [prison] food, while regrettable, does not raise a question of constitutional proportion"); *Walker v. Dart*, 2010 WL 669448, at *5 (N.D. Ill. Feb. 19, 2010) (plaintiff must show persistent problem and significant physical harm); *Smith-Bey v. CCA/CTF*, 703 F. Supp. 2d 1, 8 (D.D.C. 2010) (two instances of cockroaches in prisoner's food does not rise to level of constitutional violation).

deliberate indifference. *See* Ex. 13, (Davis Decl. at ¶ 5); Ex. 12, (Bokath Decl. at ¶¶ 4-32). "Mere negligence on the part of the jail officials in the way they manage the food services does not amount to a constitutional violation." *Bosarge v. Brown*, 2015 WL 5156767, at *5 (S.D. Miss. Sept. 2, 2015). Where, as here, Plaintiffs are inmates alleging deprivation of an adequate diet, "deliberate indifference" means "a state of mind equivalent to a reckless disregard of a known risk of harm." *Parris v. Aramark Foods*, 2012 WL 1118672, at *6 (D.N.J. Apr. 2, 2012).

MDOC, through Aramark, tries to accommodate Plaintiffs and respond to any grievances about food. *See* Ex. 12, (Bokath Decl. at ¶ 20). On the rare occasion when an inmate complains about a foreign substance in the food, Aramark immediately replaces the inmate's meal and removes any alleged contaminated food from the service line. *Id*. Further, in between meals, Aramark takes several precautions to clean and sanitize the kitchens where food is prepared. *Id.* ¶¶ 25-27. Moreover, Aramark provides religious meal plans and special medical diets to inmates at MSP who are deemed eligible by MDOC. *See* Ex. 14, (Croegaert Decl. at ¶ 5). And in the event MDOC alerts Aramark that it is short on the requisite number of meals, Aramark prepares replacement meals so long as the kitchens are still open at the time MDOC makes the request. *See* Ex. 12, (Bokath Decl. at ¶ 14). Accordingly, Plaintiffs have not shown and cannot show that MDOC is deliberately indifferent to their food needs, and thus they cannot show a likelihood of success on the merits of their food-related claims.

### iv. Plaintiffs have not been denied adequate water.

Plaintiffs also claim Defendants have failed to make safe, drinkable water available to them in violation of the Eighth Amendment, citing vague allegations of contamination, aroma, appearance and taste and a lack of running water for various periods following the gang riot in January 2020. [Doc. 99] at 19-20. However, as discussed in detail above, there is absolutely no

52

evidence to support Plaintiffs' claim that the water at MSP is not safe and drinkable. The most recent potable water test results for MSP show its water is well within acceptable standards for drinking. *See* Ex. 2, (Sprayberry Decl. at ¶ 9 & Ex. E). And Plaintiffs' allegations to the contrary are refuted by the findings of *their own expert* based on samples he took at MSP in February 2020. [Doc. 101-5], Edwards, at 16 and 29. Edwards further acknowledged that whether drinking water is safe cannot be determined by aroma, appearance, or taste. *Id.*

Not only is Plaintiffs' evidence is insufficient to show a substantially serious risk of harm, but it is also insufficient to show Defendants' subjective deliberate indifference. Water tests from years ago are irrelevant so long as Defendants' "current attitudes and conduct" evince that they are not "knowingly and unreasonably disregarding an objectively intolerable risk of harm." *See Dockery*, 2019 WL 9046797, at *5. Again, Defendants have improved the water-supply system at MSP in recent years, installing a new, state-of-the-art water treatment system in 2019 to ensure safe and clean drinking water for MSP inmates. *See* Ex. 2, (Sprayberry Decl. at ¶¶ 7, 9). The water at MSP is routinely tested and is within acceptable standards for drinking. When Defendants become aware of lack of access to running water, they make repairs within a reasonable time. *Id.* Moreover, when MSP was on lockdown in January 2020, each inmate in Unit 29 was provided with six bottles of water per day. *See* Ex. 13, (Davis Decl. at ¶5).

Plaintiffs have not shown, and cannot show, that the water at MSP is inadequate or that MDOC is deliberately indifferent to their water needs. Accordingly, Plaintiffs cannot demonstrate a substantial likelihood of success on the merits of these claims.

### v. Defendants provide adequate sanitation and hygiene.

With regard to sanitation and hygiene, Plaintiffs again rely on outdated evidence and ignore, or simply are unaware of, the documented measures undertaken by Defendants to remedy

alleged unsanitary conditions. To be clear, Plaintiffs request no injunctive relief with regard to the vast majority of the alleged sanitation and hygiene violations. The only request for relief that even arguably falls within this category is the request to repair broken toilets and urinals, which as discussed in detail above, has already been addressed. *See* Ex. 1, (Mallett Decl.), Ex. 2, (Sprayberry Decl.).

None of the four named Plaintiffs here complain of "sewage" issues that allegedly existed in the past. *See* [Doc. 99] at 21-23. And Plaintiffs do not submit any evidence of the alleged sewage problems other than anecdotal and vague allegations from inmates who no longer reside at MSP. *See, e.g.*, [Doc. 99] at 22 ("sewage on the floor on '*many*' occasions since 2018"). Moreover, Plaintiffs rely principally on expert opinions regarding sewage problems in Unit 32, a unit which has been closed for more than a decade and does not regularly house any prisoners. *See* Ex. 1 (Mallett Decl. at ¶ 10). Inmates were temporarily housed in Unit 32 for two weeks in January 2020 after the gang riot in an effort to protect them from harming one another and to prevent further loss of life until a more permanent solution could be formulated. *Id.*; *see also* Ex. 4, (Expert Report of J. Rees at 6-7). To cite conditions in Unit 32 as evidence of MSP's sanitation issues is misleading and shows the weakness of Plaintiffs' arguments.

By contrast, the most recent evidence demonstrates that MSP's facilities are drastically improved. The photographs attached as exhibits to Defendants' Response show the reality of present conditions at MSP. *See* Ex. 6, (Photographs).

Moreover, Plaintiffs cite no evidence whatsoever that MSP's "laundry service is deficient." [Doc. 99] at 23. As ordered by the Court, Plaintiffs were allowed to inspect only areas of MSP where they resided or to which they had access since February 3, 2019. *See* [Docs. 48 & 49]. MSP's central laundry is operated by a group of inmates with special privileges and

access—a group to which none of the named Plaintiffs have ever belonged. Therefore, none of the named Plaintiffs have ever had access to the central laundry. Plaintiffs' experts on one hand admit they were not allowed to inspect the central laundry, but on the other hand they still criticize the central laundry service provided at MSP. In fact, there is nothing deficient about the central laundry service at MSP, and MDOC recently purchased three new washers and three new dryers for the laundry. *See* Ex. 1, (Mallett Decl. at ¶ 10). Inmates are prohibited from washing their clothes in the sinks, but many refuse to send their clothes to the central laundry. *Id.*

Inmates are also being provided adequate amounts of cleaning supplies, contrary to Plaintiffs' contentions. *See* Ex. 1, (Mallett Decl. at ¶ 10); Ex. 4, (Expert Report of J. Rees at 7); Ex. 5, (Expert Report of S. Tussey at 4).[46] And the current evidence of the conditions at MSP confirm that, while it is not perfect and needs continual cleaning, it is not "filthy" or neglected. *See* Ex. 6 (Photographs).

Inmates are not deprived of showers, nor were they ever deprived of showers, except for during a limited time of lockdown following the gang riots, which was necessary for security reasons. *See* Ex. 1, (Mallett Decl. at ¶ 10).[47] Of course, no part of MSP is on lockdown now, and inmates in general population are allowed to shower any time they like, as much as they like. *Id.* Dangerous inmates who are on long-term segregation status because of their classification are allowed to shower three times per week. *Id.* Showers are being provided as required. *Id.*

The current conditions at MSP are far from posing a "substantial risk of harm to inmates." *Taylor v. Stevens*, 946 F.3d 211, 220 (5th Cir. 2019). Plaintiffs are being provided "minimal civilized measures of life's necessities," which is all the Eighth Amendment requires.

---

[46] Courts determining the constitutionality of cell conditions often weigh whether inmates are "given the chance to clean [their] cell[s]." *Taylor v. Stevens*, 946 F.3d 211, 221 & n.13 (5th Cir. 2019).

[47] A "filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978).

*Davis*, 157 F.3d at 1006. And, again, even if Plaintiffs could show sufficiently serious risks of harm, which they cannot, Plaintiffs cannot show Defendants have acted with deliberate indifference. As mentioned exhaustively, Defendants are engaged in a comprehensive and far-reaching effort to repair and improve MSP's facilities. *See* Ex. 1, (Mallett Decl. at ¶¶ 6, 7, 9, 10, 13 & Exs. D-F); Ex. 2, (Sprayberry Decl. at ¶¶ 7-9 & Exs. B, C, F, App'x I, II). These efforts preclude a finding of any Eighth Amendment violations with respect to sanitation and hygiene.

>    **vi.  Defendants have remedied, and work diligently and continually to remedy, alleged structural deficiencies.**

Plaintiffs generally allege the following structural deficiencies at MSP:  mold, leaky roofs, exposed electrical wires, and rodent and insect infestation. [Doc. 99] at 25-28. Defendants have disposed of each of these allegations in the preceding sections relating to the specific relief that Plaintiffs requested. *See* Section II, *supra*.

First, as outlined above, and as a factual matter, Defendants have already remediated the alleged structural conditions. *See* Ex. 1, (Mallett Decl. at ¶¶ 6, 7, 9, 10, 13 & Exs. D-F); Ex. 2, (Sprayberry Decl. at ¶¶ 7-9 & Exs. B, C, F, App'x I, II) (there is no evidence of mold at MSP, no test has ever confirmed any presence of mold at MSP, and mold was not observed by Defendants' experts when they inspected MSP; the roofs at MSP have been repaired; the exposed electrical wires have been remediated and will continue to be remediated as inmates expose additional wiring; and MSP routinely conducts pest control services).

Second, Plaintiffs cannot show that the alleged structural deficiencies amount to sufficiently serious risks of harm such that they could be deemed constitutional violations. *See* Section II, *supra*. And finally, the current evidence, which shows that Defendants are making every effort to provide inmates with a structurally sound facility, precludes a finding that Defendants have acted with deliberate indifference toward ongoing structural needs at MSP. *Id.*

Accordingly, Plaintiffs cannot obtain a preliminary injunction or TRO for these alleged constitutional violations because they cannot show that these matters constitute sufficiently serious risks of harm and that Defendants are deliberately indifferent to such risks.

### c. Threatened injury to Plaintiffs does not outweigh the harm to Defendants and the coinciding public interest.

Because Mississippi's interest is indistinguishable from the "public's interest" in this case, the final two prerequisites of the *Canal Authority* test are considered together. *See Amos*, 2020 WL 1978382, at *12 (because state officials are the parties against whom relief is sought, consideration of the harm to them should the injunction issue merges with consideration of the public interest). Plaintiffs must make a "clear showing" that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant and that granting the preliminary injunction will not disserve the public interest. *White*, 862 F.2d at 1211.

In arguing Defendants will suffer "[n]o countervailing prejudice" should an injunction be granted, *see* [Doc. 99] at 31, Plaintiffs ignore the state's significant interest in operating MSP free from judicial interference, an interest that this Court recognized in its prior orders. In its Order related to Plaintiffs' previous COVID-19 Motion, this Court stated that "any time a state is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Amos*, 2020 WL 1978382, at *12 (quoting *Valentine*, 956 F.3d at 803). "[T]he Supreme Court has repeatedly warned that 'it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Valentine*, 956 F.3d at 803 (quoting *Woodford*, 548 U.S. at 94). "Accordingly, when a legislature assigns prison policy to an administration, an injunction modifying such policy 'imposes irreparable injury.'" *Amos*, 2020 WL 1978382, at *12. As the Court recently stated, "the Mississippi legislature has [assigned]

responsibility for prison policy to MDOC." *Id.* (citing Miss. Code Ann. § 47-5-23). As such, MDOC would suffer "irreparable injury" if the Court entered a preliminary injunction or TRO. This is especially true given that MDOC has just recently confirmed its new Commissioner, who is already working hard to address needed improvements at MSP. The Court should give the new Commissioner a chance to improve MSP. For the same reasons, the public interest would be harmed by granting the requested injunction.

Plaintiffs have failed to make the requisite "clear showing" that the threatened injury to Plaintiffs outweighs the threatened harm the injunction may do to Defendants and the public interest. *White*, 862 F.2d at 1211. Defendants of course do not dispute that Plaintiffs are entitled to constitutional protections or that Plaintiffs would be prejudiced by a denial of constitutional rights. But the public's interests in allowing MDOC to maintain autonomy and control over the State's penitentiary, free from judicial decree, far outweigh Defendants' requests for preliminary relief. As shown above, there is no emergency of any kind here, and Defendants have already addressed Plaintiffs' specific and limited items of relief. As such, Plaintiffs fail to make the requisite "clear showing" that the equities weigh in favor of granting preliminary relief.

## CONCLUSION

For the reasons discussed above, Defendants respectfully request that the Court deny Plaintiffs' Supplemental Emergency Motion for Temporary Restraining Order and Preliminary Injunction. Defendants request such other and further relief as the Court deems appropriate under the circumstances.

Date:  July 13, 2020.

Respectfully submitted,

**TOMMY TAYLOR, in his official capacity as the Interim Commissioner of the Mississippi Department of Corrections, and MARSHAL TURNER, in his official capacity as the Superintendent of the Mississippi State Penitentiary**

By:    */s/ Cody C. Bailey*
       Cody C. Bailey, MSB #103718
       One of Defendants' Attorneys

OF COUNSEL:

R. David Kaufman (MSB #3526)
dkaufman@brunini.com
William Trey Jones, III (MSB #99185)
tjones@brunini.com
Karen E. Howell (MSB #102243)
khowell@brunini.com
Cody C. Bailey (MSB #103718)
cbailey@brunini.com
Jacob A. Bradley (MSB #105541)
jbradley@brunini.com
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
The Pinnacle Building, Suite 100
190 East Capitol Street (39201)
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone: (601) 948-3101
Facsimile: (601) 960-6902

Michael J. Bentley (MSB# 102631)
mbentley@bradley.com
Molly M. Walker (MSB# 100689)
mmwalker@bradley.com
Bradley Arant Boult Cummings, LLC
One Jackson Place
188 East Capitol Street, Suite 1000
Post Office Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

## **CERTIFICATE OF SERVICE**

I, Cody C. Bailey, hereby certify that on July 13, 2020, I caused the foregoing pleading to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record and registered participants.

*/s/ Cody C. Bailey*
One of the Defendants' Attorneys