## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

**MICHAEL AMOS, et al.**                                                    **PLAINTIFFS**

**V.**                                                    **NO. 4:20-CV-7-DMB-JMV**

**TOMMY TAYLOR, et al.**                                                    **DEFENDANTS**

### ORDER

Before the Court is "Plaintiffs' Opposed Motion to Compel Defendants' Responses to Expedited Discovery Requests Related to COVID-19 and for Sanctions."   Doc. #172.

### I
### Procedural History

On January 28, 2020, thirty-three inmates at the Mississippi State Penitentiary at Parchman filed a "First Amended Class-Action Complaint and Demand for Jury Trial" against Tommy Taylor, in his official capacity as the Interim Commissioner of the Mississippi Department of Corrections, and Marshal Turner, in his official capacity as the Superintendent of Parchman.   Doc. #22.   In their complaint, the plaintiffs allege that the defendants' policies and practices caused years of neglect at Parchman, which placed them in imminent danger of serious physical injury, in violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment, as incorporated by the Fourteenth Amendment.   The pleading, which includes a proposed class action, seeks monetary and injunctive relief.

On March 16, 2020, the plaintiffs filed an emergency motion for a temporary restraining order and mandatory preliminary injunction seeking an "order directing mandatory and affirmative action to safeguard Plaintiffs at Parchman from SARS-CoV-2, also known as, COVID-19."   Doc. #59 at 1.   Three days after the completion of expedited briefing, the Centers for Disease Control and Prevention issued a document titled, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities."   Based upon this guidance,

the Court directed the parties to supplement their briefing. Doc. #70. The parties completed their supplemental briefing on April 15, 2020. *See* Docs. #74, #75.

On April 24, 2020, this Court denied the plaintiffs' request for preliminary injunctive relief, finding:

> [T]he defendants have undoubtedly taken steps to address the risk of COVID-19 in Parchman. Such undisputed steps include the creation and updating of the [facility's pandemic] Plan, posting of signs, promulgation of quarantine and screening policies for both inmates and visitors, suspension of in-person visitation except for attorneys, implementing cleaning procedures in the housing units, the waiving of co-pays for inmates, limitations on transfers, and the provision of extra soap to inmates.

Doc. #79 at 18. In reaching these factual conclusions, the Court credited the affidavits of officials from MDOC and Centurion (MDOC's third-party healthcare provider). *Id*. at 2–13.

On August 11, 2020, the plaintiffs filed a motion for "expedited discovery focused on Defendants' compliance [with] the representations made to this Court [regarding COVID-19 precautions at the Mississippi State Penitentiary] and with public health guidelines and implementation of measures at Parchman to reduce spread and protect against COVID-19." Doc. #128 at 1. Specifically, the motion asked that "the Court enter an Order: (1) that service of Plaintiffs' Interrogatories and RFPs on Defendants' be deemed effective the date this Motion is granted; and (2) directing Defendants to respond to interrogatories and produce documents responsive to Plaintiffs' RFPs on an expedited basis – within five (5) to seven (7) days." *Id*. at 3.

On August 26, 2020, the Court granted the motion to the extent it sought leave to conduct expedited discovery and deem the requested discovery (eight interrogatories and eight requests for production) served as of the date of the order. Doc. #141 at 17. The Court required the defendants to respond to the discovery requests within fourteen days and authorized the plaintiffs to file "an appropriate motion to compel" if the defendants objected to discovery and the good faith requirements of Rule 37 were satisfied. *Id*.

Two months after the Court authorized discovery, the plaintiffs filed a motion to compel. Doc. #172. The motion to compel is fully briefed. Docs. #173, #177, #178.

## II
## The Discovery Requests and Responses

As mentioned above, on August 26, 2020, the Court deemed the plaintiffs' requests for discovery (eight requests for production and eight interrogatories) served as of that date and directed the defendants to respond within fourteen days. The plaintiffs' proposed discovery seeks responses to the following interrogatories:

**INTERROGATORY NO. 1**: Consistent with information provided by Departments of Correction throughout the country, including the Louisiana Department of Public Safety and Corrections, please separately provide the following COVID-19 statistics for both the inmate and employee populations of each of the twenty-three (23) facilities for which MDOC typically reports COVID-19 information: (1) total number tested; (2) total number of positive tests; (3) total number of negative tests; (4) total number of pending tests; (5) total number of retests processed; (6) total number of recovered cases; and, (7) total number of COVID-19 deaths.

**INTERROGATORY NO. 2:** Consistent with information and statistics provided by Departments of Correction throughout the country, including the Louisiana Department of Public Safety and Corrections, please separately provide the following COVID-19 statistics and information for both the employee and inmate populations by Unit, Building, and Zone at Parchman: (1) total number tested; (2) total number of positive tests; (3) current number of symptomatic positive cases; (4) current number of asymptomatic positive cases; (5) total number of negative tests; (6) total number of pending tests; (7) total number of retests processed; (8) total number of recovered cases; and, (9) total number of COVID-19 deaths.

**INTERROGATORY NO. 3:** For all inmate and employee statistics requested in Interrogatory No. 2, please identify the individual Persons counted in the statistics along with the reason/basis for their testing, the date(s) on which their test(s) were conducted and on which results were received. For the employee population, please identify the Persons counted in the statistics who have self-reported this information along with the reason/basis for their testing, the date(s) on which their tests were conducted and on which results were received. If the employee did not self-report, you may identify said employee by a unique identifier consistent throughout these responses.

**INTERROGATORY NO. 4:** Identify and provide information regarding the individuals who were determined to be Close Contacts of any and all Parchman Residents and employees who have tested positive for COVID-19. Please include

in the information provided: (i) the identity of the Covid-19 positive case with whom they were a Close Contact; (ii) the steps taken to identify Close Contacts of the positive case; (iii) the location, time, and manner under which the contact took place; (iv) the Person(s) who undertook the contact tracing and/or Close Contact investigation and the date(s) on which it occurred; and, (v) whether the local or state health department was notified and/or involved in investigating/contact tracing.

**INTERROGATORY NO. 5:** Please identify each instance, since March 11, 2020, in which an individual, cohort, or any other group of Persons has been subject to Quarantine at Parchman. With respect to each instance, please include the following information: (i) whether it is an individual, cohort, or other group subject to the Quarantine; (ii) the number and identity of the Parchman Residents and employees involved or with access, including any floorwalkers or work crews; (iii) the location (Unit/Building/Zone/Cell/Bed) where it took place; (iv) the beginning and ending date, if any, of the Quarantine; (v) the identity of the Person(s) who made the decision to Quarantine; (vi) the circumstances and reasons the Quarantine was instituted; and, (vii) the MDOC employee(s) and/or healthcare professional(s) responsible for monitoring the health and symptoms of those subject to the Quarantine.

**INTERROGATORY NO. 6:** Please identify each instance, since March 11, 2020, in which a Person was placed under Medical Isolation at Parchman. With respect to each instance, please include the following information: (i) the identity of the Parchman Resident(s) and employee(s) involved or with access, including any floor walkers or work crews; (ii) the location (Unit/Building/Zone/Cell/Bed) where the Medical Isolation took place; (iii) the beginning and ending date, if any, of the Medical Isolation; (iv) the identity of the Person(s) who made the decision to begin Medical Isolation; (v) the circumstances and reasons the Medical Isolation was instituted; and, (vi) the MDOC employee(s) and/or healthcare professional(s) responsible for monitoring the health and symptoms of the person in Medical Isolation.

**INTERROGATORY NO. 7:** Please state the criteria used to determine when a COVID-19 test should be administered to a Parchman Resident and any guidance, instruction, or suggestions provided by MDOC (or any other government agency, official, or representative) to Parchman on the circumstances under which a COVID-19 test should be administered. Please include in your response (a) the role of MSP custody staff in assessing the need for testing, (b) the supply of available tests in MSP, and (c) the use of outside medical facilities and the Mississippi Department of Health for testing.

**INTERROGATORY NO. 8:** Pursuant to MDOC's announcement on April 27, 2020, MDOC suspended "inter-facility transfers, except in emergency cases," while intra-facility transfers were never suspended. Please identify: (a) the number of inter-facility transfers (by date, departure, and arrival facility) that have occurred since April 27, 2020; (b) for those inter-facility transfers that occurred between April 27, 2020 and May 29, 2020, please identify the "emergent reason" for said

transfer; (c) the number of intra-facility transfers that have occurred at Parchman (by date, departure Unit/Building/Zone, and arrival Unit/Building/Zone) since the diagnosis of the first COVID-19 case at the facility.

Doc. #128-1 at 4–7.   The requests for production provide:

> **REQUEST NO. 1:** Produce any and all Documents, ESI, data, or other materials on which you relied in answering the foregoing Interrogatories including, but not limited to: test results, Close Contact tracing investigation records, MDOC Mortality/Morbidity and Death of Offender report forms, employee work schedules, logs, minutes, reports, inmate records, updates from daily/weekly/monthly calls relating to COVID-19, reports to state and federal agencies, screening forms, and transfer documentation.

> **REQUEST NO. 2:** Produce all Sick Call requests submitted on or after March 11, 2020 by Parchman Residents reporting one or more COVID-19 Symptoms or a belief of having contracted COVID-19. Please include the documents reflecting the corresponding response/result, if any, of those Sick Call requests.

> **REQUEST NO. 3:** Produce the policies, procedures, and protocols instituted to address the evaluation, care, custody, medical monitoring, treatment, and supervision of Parchman Residents who: (a) have tested positive for COVID-19; (b) are awaiting test results for COVID-19; (c) have underlying medical conditions that increase the risk of severe illness from COVID-19; and/or, (d) report COVID-19 Symptoms.

> **REQUEST NO. 4:** All Documents and ESI in your possession, custody, or control relating to Centurion of Mississippi, LLC's ("Centurion") Pandemic Preparedness and Emergency Response Plan (the "Centurion Plan"), including, but not limited to, those required, maintained, created, and/or updated per the terms of the Centurion Plan and all records required to be maintained in this regard ….

> **REQUEST NO. 5:** Produce all iterations of the rules, regulations, methods, policies, protocols, and procedures for (a) when staff may report to work at Parchman after they report symptoms of COVID-19 or test positive for COVID-19, and (b) notifying staff or visitors who were in contact with employees and Parchman Residents who exhibit symptoms, are determined be a Suspected COVID-19 case, become subject to Quarantine, and/or test positive.

> **REQUEST NO. 6:** Upon information and belief, on or about April 8, 2020, Parchman Resident Earl Dycus was transported to Unit 42, the Parchman Hospital, due to COVID-19 Symptoms. Within two days of arriving at Unit 42, Dycus was transported to a local hospital where he died on April 11, 2020, having ultimately been diagnosed with COVID-19. Please produce all documentation reflecting the members of Dycus' work crew; the date(s) and locations (Unit/Building/Zone) where he worked in the fourteen (14) days prior to exhibiting COVID-19 Symptoms; the work performed; and, the Close Contact tracing investigation related to his diagnosis and death.

**REQUEST NO. 7:** Upon information and belief, a COVID-19 outbreak is currently on-going in Unit 31, the medically vulnerable unit of Parchman, where Defendants have allegedly housed Unit 31 inmates with confirmed negative COVID-19 tests in Zones A and B, and those with confirmed positive tests in Zones C and D. On or about July 27, 2020, Parchman Resident Jermaine Moore was housed in Zone C of Unit 31, waiting on the results of a pending COVID-19 test. That same day, Moore (along with other similarly situated inmates) was inexplicably moved from Unit 31 Zone C to Unit 31 Zone A, where medically vulnerable inmates who tested negative for COVID-19 were being housed. On or about the following day, July 28, 2020, Moore's and other inmates' tests returned positive and they were moved back to Zone C after having already exposed other Parchman Residents housed in Unit 31, Zone A (the "Moore Incident"). Please produce all documentation reflecting: (i) the transfer of Moore and any other Parchman Resident to/from/within Unit 31 since July 1, 2020; (ii) the investigation and Close Contact tracing that was performed as a result of this Moore Incident; (iii) the Person(s) who made the decision to transfer Moore; and, (iv) the actions taken by Defendant as a result of the Moore Incident.

**REQUEST NO. 8:** Upon information and belief, at least three Parchman Residents housed in Unit 29/A, the "quarantine unit", tested positive for COVID-19. Please produce all documentation relating to this matter including, but not limited, those Documents regarding: (i) the investigation and Close Contact tracing performed; (ii) the timing and transfer, if any, of the positive inmates from Unit 29/A; (iii) the treatment, monitoring, care, supervision, and custody of Parchman Residents housed in Unit 29/A; and, (iv) any other actions taken by Defendants as a result of this incident.

*Id*. at 7.

The defendants responded to these discovery requests on September 9, 2020. Doc. #172-1. Their September 9 responses include approximately five pages of general objections which, as discussed below, formed the bases of the specific objections to the discovery responses. *See id*. at 2–6. The defendants objected to most of the plaintiffs' discovery requests. As for those few discovery requests to which there was no objection, the defendants stated they would produce the relevant document or documents within seven days. *Id*. at 7. According to the plaintiffs, the only documents produced with the September 9 responses were certain housing records for the named plaintiffs.[1] One week later, the defendants provided supplemental discovery responses.

---

[1] The parties disagree whether this information was requested by the plaintiffs. This dispute is immaterial to

Doc. #171-2. Their supplemental responses, like their initial responses, objected to most of the plaintiffs' discovery requests. *See id.*

Dissatisfied with the defendants' supplemental responses, the plaintiffs sent the defendants a good faith letter on September 22, 2020. Doc. #172-4. The good faith letter identified numerous alleged deficiencies in the defendants' supplemental responses. The defendants responded to the good faith letter on September 28, 2020, Doc. #172-5, and served a second set of supplemental responses the next day, Doc. #172-6. The instant motion to compel followed one month later.

### III
### Applicable Framework

Federal Rule of Civil Procedure 26 authorizes a court to order discovery before the standard discovery period is set. *See* Fed. R. Civ. P 26(d)(1) ("A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except … when authorized by … court order."). When, as here, a party seeks expedited discovery for the purpose of preparing for a preliminary injunction hearing, the requested discovery must be "narrowly tailored to obtain information relevant to a preliminary injunction determination." *Dimension Data N. Am., Inc. v. NetStar-1, Inc.*, 226 F.R.D. 528, 532 (E.D.N.C. 2005). Additionally, the requested discovery must, of course, also be "discoverable" under the Federal Rules of Civil Procedure. *See Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 277 (N.D. Cal. 2002) (expedited discovery warranted when it was "relevant and discoverable under the current complaint"); *Doe v. Marine-Lombard*, No. 16-cv-14876, 2016 WL 6658965, at \*3 (E.D. La. Nov. 10, 2016) ("While the Defendant has demonstrated good cause for expedited discovery, the discovery request is still bound by the scope of discovery laid out in Rule 26(b)(1).").

---

resolving the plaintiffs' motion to compel.

Once expedited discovery has been authorized and served, a party may seek to compel responses to the served discovery but only after the "movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1), (3)(B). Ordinarily, "[t]he moving party bears the burden of showing that the materials and information sought are relevant to the action or will lead to the discovery of admissible evidence." *Abraham v. Alpha Chi Omega*, 271 F.R.D. 556, 559 (N.D. Tex. 2010). Once this is done, "the burden shifts to the party resisting discovery to show why the discovery is irrelevant, overly broad, or unduly burdensome or oppressive, and thus should not be permitted." *Id.*

However, this standard burden shifting framework is derived from Rule 26(b)(1)'s broad authorization for the scope of discovery. 8 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2008 (3d ed. 2020). And compliance with Rule 26(b)(1) is just one of two requirements for an expedited discovery request to be proper. When a party seeks to compel *expedited discovery*, the moving party's initial burden necessarily differs. The movant must show *both* that the materials are relevant to the action or will lead to the discovery of admissible evidence *and* that the requested discovery falls within the scope of permitted expedited discovery—in other words, that it is narrowly tailored to obtain information relevant to a preliminary injunction determination. *See generally Old Republic Nat'l Title Ins. Co. v. Kensington Vanguard Nat'l Land Servs. of Tex. LLC*, *No.* 3:17-CV-1014, 2017 WL 8677357, at *1 (N.D. Tex. May 10, 2017) (quashing discovery that "exceed[ed] the scope of permitted expedited discovery"). All this, however, presupposes that the moving party has satisfied its initial obligation to confer in good faith with the non-movant.

## IV
## Good Faith Conference

Pursuant to Federal Rule 37(a)(1), a motion to compel "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to

8

make disclosure or discovery in an effort to obtain it without court action." In the absence of controlling Fifth Circuit law on what good faith entails, courts in this circuit have looked to *Shuffle Master, Inc. v. Progressive Games, Inc.*,[2] "[a] hallmark case on the matter." *Compass Bank v. Shamgochian*, 287 F.R.D. 397, 398 (S.D. Tex. 2012). In *Shuffle Master*, the district court recognized two "performance" components to Rule 37—conferment and "good faith in conferring." 170 F.R.D. at 171 (quotation marks omitted). "The 'conferment' [component] requires a party to have had or attempted to have had *an actual meeting or conference.*" *Id.* (emphasis added). The good faith component "is tested by the court according to the nature of the dispute, the reasonableness of the positions held by the respective parties, and the means by which both sides conferred." *Id.* Where the conferment requirement has not been met, the good faith requirement is necessarily absent.

Here, there is no indication from the record that the plaintiffs held an "actual meeting or conference" with the defendants or attempted to hold such a conference. Rather, the only communications between the parties related to the plaintiffs' discovery are e-mails between counsel, Doc. #172-3; a "Good Faith Letter" sent by the plaintiffs to the defendants, Doc. #172-4; and the defendants' response to the plaintiffs' letter, Doc. #172-5. "[A] single letter and a series of emails outlining the deficiencies in a party's discovery responses have been deemed insufficient to constitute a good faith conferral or attempt to confer." *Kleppinger v. Tex. Dep't of Transp.*, No. 5:10-cv-124, 2012 WL 12894140, at *3 (S.D. Tex. Nov. 8, 2012) (collecting cases); *Hepstall v. Humana Health Plan, Inc.*, No. 18-163, 2018 WL 6588552, at *1 (S.D. Ala. Dec. 6, 2018) ("[S]imply corresponding with opposing counsel is not considered a good-faith attempt to confer or have a conference to resolve discovery disputes.") (collecting cases); *Reed v. Beverly Hills Porsche*, No. 6:17-cv-59, 2017 WL 11495243, at *1 (W.D. Va. Nov. 22, 2017) ("The meet and

---

[2] 170 F.R.D. 166 (D. Nev. 1996).

confer obligation requires a personal or telephonic consultation during which the parties engage in meaningful negotiations or otherwise provide legal support for their position.").

Although defense counsel offered on at least two occasions to speak with the plaintiffs' counsel,[3] the plaintiffs' counsel made no effort to arrange such a meeting. Furthermore, the record is clear that the plaintiffs had no intention of engaging in a good-faith conference. Indeed, the very first e-mail from the plaintiffs' counsel stated, "we intend to file a motion to compel and for sanctions." Doc. #172-3 at PageID 9898. Under these circumstances, the Court concludes that the conferral requirement has not been met and, as a result, the plaintiffs' motion must be denied. Nevertheless, to facilitate any future conferences on the discovery responses at issue here, the Court will provide the parties guidance on some overarching issues.

## V
## Guidance

The plaintiffs' memorandum brief makes no effort to individually analyze the disputed discovery requests. Rather, the plaintiffs argue that the defendants "objections are improper, inapplicable, deficient, or without merit; and, therefore, are either waived or subject to denial." Doc. #173 at 11. They further submit that most of the defendants' objections rely on an erroneous understanding of relevance in this case.

### A. Objections and Waiver

In attacking the sufficiency of the defendants' objections, the plaintiffs argue that the defendants (1) utilized improper identical "boilerplate" objections; (2) utilized improper "General Objections;" (3) "improperly hedged all responses through the use of 'subject to' or 'without waiving' language;" and (4) improperly made "Blanket Privilege Assertions" and failed to support such assertions with privilege logs. Doc. #173 at 11–17 (cleaned up).

---

[3] *See* Doc. #172-3 at PageID 9893 ("I remain open to having a telephone discussion or a meeting in person with you to discuss this matter."), Page ID 9894 ("I would be happy to have a meeting or phone conversation with you to discuss this further if you would like.").

### 1. Boilerplate objections

The Federal Rules of Civil Procedure require that a party objecting to interrogatories or requests for production state with specificity the reasons for the objection.  *See* Fed. R. Civ. P. 33(b)(4) ("The grounds for objecting to an interrogatory must be stated with specificity."); Fed. R. Civ. P. 34(b)(2)(B) ("For each [request for production], the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request.").   To satisfy the specificity requirements of these rules, a party may not make "[g]eneral or boilerplate objections."  *Zenith Ins. Co. v. Tex. Inst. for Surgery, L.L.P.*, 328 F.R.D. 153, 161 (N.D. Tex. 2018).   "General, boilerplate, and unsupported objections to discovery requests that fail to state their grounds with specificity are improper and result in waiver of those objections."  *Cinco Bayous, LLC v. Samson Expl., LLC*, No. 1:19-cv-452, 2020 WL 4926430, at *3 (E.D. Tex. Aug. 21, 2020) (collecting authorities).

The plaintiffs argue that the defendants used boilerplate objections because fifteen of the sixteen discovery responses begin with the following language:

> Defendants object to this [Interrogatory/Request] on the basis that it seeks information that is irrelevant, not proportional to the needs of the case, overly broad, unduly burdensome, and protected from disclosure by the physician-patient privilege and privacy interests of inmates whom have not placed their medical care at issue in this action.

Doc. #173 at 13.   The plaintiffs also contend:

> Defendants further objected to seven of eight Interrogatories and all eight Requests for Production because they sought "information for individuals other than the 33 named Plaintiffs in this action" - a limitation Defendants knew was not placed on this particular set of discovery. Defendants also claimed for five of eight Interrogatories and all eight Requests for Production that Plaintiffs' requests were "not relevant" and "not proportional" to the needs of the case. Yet, in each instance, Defendants failed to provide any explanation or specificity whatsoever as to how or why each individual request should be characterized as such.

*Id*. at 11–12 (cleaned up).

The defendants respond that the objections are not boilerplate because they "are

11

specifically tailored to be responsive to Plaintiffs' COVID discovery requests." Doc. #177 at 9. Specifically, the defendants argue that in addition to responding to the individual discovery requests, they "provided the detailed explanation of their generally applicable exceptions at the forefront of their discovery responses as a practical matter to avoid an excessively long response and because Defendants' objections applied to each of Plaintiffs' discovery requests." *Id*. at 10.

"Boilerplate objections are those that utilize 'standardized text' or 'ready-made or all-purpose language.'" *Tim Long Plumbing, Inc. v. Kinsale Ins. Co.*, No. 4:20-CV-42, 2020 WL 6559869, at *3 (E.D. Tex. Nov. 9, 2020). However, "copying and pasting an objection, by itself" does not render that objection a boilerplate objection. *Id*. at *4. "Objections are typically deemed 'boilerplate' when they are identical *and* not tailored to the specific discovery request." *Amazing Ins., Inc. v. DiManno*, No. 2:19-cv-1349, 2020 WL 5440050, at *5 (E.D. Cal. Sept. 10, 2020) (emphasis added). Examples of boilerplate objections include "Defendant objects to this Request, as it is overly broad and vague" and "Defendant objects to this Request to the extent it seeks discovery of information that is irrelevant and not proportional to the needs of the case." *Kinsale Ins.*, 2020 WL 6559869, at *3.

To be sure, the portions of the objections quoted by the plaintiffs would be boilerplate objections if they were standing alone. However, the language must be read in the context of the defendants' general objections, which provide detailed explanations for the defendants' arguments regarding relevancy and privilege. *See* Doc. #172-1 at 1–6. Additionally, while the defendants utilized near-identical language at the *beginning of their discovery responses*, the language cited by the plaintiffs does not represent the entirety of the specific objections to the discovery requests. For most (but not all) of the discovery responses, the defendants went on to detail why their general objections applied to the specific request at issue. *See* Doc. #172-1 at 13–14. When they did so, the objection is not boilerplate. When they failed to do so, the objection is boilerplate.

### 2. General objections

General objections, "as that term is commonly understood … refers to objections that a party responding to discovery asserts as applicable to multiple individual requests set forth in … a given set of interrogatories or document production requests." *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 134 n.16 (3d Cir. 2009). The plaintiffs object to the defendants' use of general objections in this case, arguing that "[i]n this District, the prohibition against general objections has long been established." Doc. #173 at 16 (citing *Wurlitzer Co. v. E.E.O.C.*, 50 F.R.D. 421, 424 (N.D. Miss. 1970) and *Carr v. Conoco Plastics*, No. 6861, 1969 WL 104, at *2 (N.D. Miss. June 16, 1969)). The defendants respond that while general objections are disfavored, they are allowed in certain circumstances. Doc. #177 at 11.

As to the plaintiffs' first point, the defendants are correct that there is no per se prohibition (in this district or anywhere) on the use of general objections. In *Wurlitzer*, the first case cited by the plaintiffs, a district judge stated the general proposition of law that discovery objections must be specific and that "general objections that the information sought [is] irrelevant, immaterial, oppressive, conclusory or already in possession of the requesting party [are] insufficient." 50 F.R.D. at 424. *Carr*, the other case cited by the plaintiffs, includes similar language. 1969 WL 104, at *2 n.3 ("A general objection that interrogatories are onerous and burdensome and require the party to make research and compile data raises no issue. The objection must make a specific showing of reasons why the interrogatory should not be answered.").

Both *Carr* and *Wurlitzer* stand for the unremarkable proposition that a general objection which is untethered to specific requests (and is thus also a boilerplate objection) is improper. *See DL v. District of Columbia*, 251 F.R.D. 38, 43 (D.D.C. 2008) ("When faced with general objections, the applicability of which to specific document requests is not explained further, this Court will not raise objections for the responding party, but instead will overrule the responding

party's objections on those grounds.") (cleaned up). Neither case precludes the use of general objections in all cases.

To the contrary, "[g]eneral objections may occasionally serve as an efficient response [when t]he court may consider and rule upon general objections raised against sets of interrogatories or requests for production." *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 304 (D. Kan. 1996). However, to serve this purpose, and to comply with the Federal Rules of Civil Procedure, the general objections must raise "specific objections" and "correspond[] to … specific discovery requests." *Dickey v. Apache Indus. Serv., Inc.*, No. 18-572, 2019 WL 4261117, at *3 (M.D. La. Sept. 9, 2019) (collecting cases); *see Hall v. Louisiana*, No. 12-657, 2014 WL 2560579, at *1 (M.D. La. June 6, 2014) ("Defendants initially gave general objections applicable to all of Plaintiff's discovery requests. But critically, after providing their general objections, Defendants addressed each and every discovery request individually, making specific objections before providing detailed and informative responses, notwithstanding those objections."). Accordingly, where the general objections are connected both to the facts of this case and specific discovery requests, they are proper. When they are disconnected from either the facts or the discovery requests, they are improper.

### 3. Use of "subject to" or "without waiving" language

Next, the plaintiffs argue that because the defendants produced some discovery "subject to" or "without waiving" their objections, the defendants have "waived each objection under these circumstances." Doc. #173 at 18. With the exception of objections involving privilege or work product, "the practice of responding to interrogatories and documents requests 'subject to' and/or 'without waiving' objections is manifestly confusing (at best) and misleading (at worse), and has no basis at all in the Federal Rules of Civil Procedure." *Heller v. City of Dallas*, 303 F.R.D. 466, 486–87 (N.D. Tex. 2014) (cleaned up). Such an objection paired with a response "preserves

nothing and serves only to waste the time and resources of both the Parties and the Court." *Id*. at 487. To the extent the defendants produced discovery responses "subject to" or "without waiving" objections other than privilege or work product, such objections are waived. *Id*.

### 4. Privilege objections

The plaintiffs object to the defendants' (1) failure to produce privilege logs; (2) use of "blanket" privilege objections; and (3) "assertions that certain information is protected under either the physician-patient privilege, the psychotherapist-patient privilege, or is subject to statutory protection under the Privacy Act of 1974 and HIPAA." Doc. #173 at 19–23.

#### a. Privilege Logs

Federal Rule 26(b)(5) states:

When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

> (i) expressly make the claim; and

> (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

To effectuate this requirement, Local Rule 26(e) requires:

A party withholding information claimed privileged or otherwise protected must submit a privilege log that contains at least the following information: name of the document, electronically stored information, or tangible thing; description of the document, electronically stored information, or tangible thing, which description must include each requisite element of the privilege or protection asserted; date; author(s); recipient(s); and nature of the privilege. To withhold materials without such notices subjects the withholding party to sanctions under FED.R.CIV.P. 37 and may be viewed as a waiver of the privilege or protection.

The plaintiffs argue that to the extent the defendants have asserted privilege but failed to produce privilege logs, "any and all objections proffered on the basis of privilege, including general objections, should be deemed waived." Doc. #173 at 21. The defendants respond that

no privilege log is required because Rule 26 applies only to "otherwise discoverable" information and that since they have objected to the allegedly privileged documents on other grounds, the documents are not "otherwise discoverable." Doc. #177 at 13. They further argue that even if a privilege log was technically required, the Court should excuse the requirement because the plaintiffs "know the type of information being withheld and can adequately state their grievances." Doc. #177 at 15.

The defendants are correct that under Federal Rule 26(b)(5) a responding party need not produce a privilege log if materials are withheld based on an additional non-privileged objection. *See Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) ("The federal rules do not require parties to provide logs of all documents that were not produced because they were deemed immaterial or irrelevant."). In such circumstances, "courts will need to make a judgment whether the nonprivilege grounds for objection are sufficiently substantial to excuse immediate presentation of detailed justification for privilege claims." 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2016.1 (3d ed.).

In contrast to the Federal Rules' conditional privilege log requirement, Local Rule 26(e) imposes an absolute requirement that a party asserting a privilege must produce a privilege log. But "district courts [may] adopt only local rules that are consistent with the policies of the Federal Rules." *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1268 n.11 (5th Cir. 1979) (Godbold, J., concurring in part). Thus, "local rules of procedure must be read together with the federal rules to ensure the consistency required both by statute and rule." *CX Reinsurance Co. Ltd. v. Johnson*, 977 F.3d 306, 311 (4th Cir. 2020) (internal quotation marks omitted).

Federal Rule 26(b)(5) evinces a clear policy to require a privilege log only when privilege is asserted as to otherwise discoverable materials. To avoid a conflict with the Federal Rules, the Court reads Local Rule 26(e) to clarify what must be disclosed pursuant to Federal Rule 26(b)(5),

16

rather than creating an independent disclosure obligation.   It follows, therefore, that the defendants are not required to produce a privilege log for those materials to which non-privileged objections remain outstanding.

### b.  Blanket Privilege Objections

"A party may not make a blanket assertion of privilege in response to a discovery request." *Green v. Baca*, 219 F.R.D. 485, 491 (C.D. Cal. 2003) (collecting cases).   A blanket privilege objection, which is an objection that does "not provide any particular or clear indication of how the requests … would be protected by … privilege," "will not suffice to prevent production." *Cunningham v. Smithkline Beecham*, 255 F.R.D. 474, 480–81 (N.D. Ind. 2009).

The plaintiffs argue the defendants utilized improper blanket privilege objections by referring broadly to privilege protections in their general objections.   Doc. #173 at 21–22.   The defendants respond that the objections are not blanket privilege objections because, notwithstanding references to other privileges, their general objections refer specifically to privacy interests and physician-patient privilege and "[t]he only information and documents withheld for privilege here are the medical information and records of the inmates and employees at [Parchman] and other MDOC facilities who are not named Plaintiffs in this action."   Doc. #177 at 13.   Given this clarification, and the specific arguments made in the defendants' general objections, the Court concludes that the defendants' objections provide a clear indication of how the requests would be protected by privilege.   The assertions of privilege, therefore, are not improper blanket privilege objections.

### c.  Specific Privilege Objections

In their general objections, the defendants invoke two grounds for withholding medical information for persons other than the plaintiffs—"the physician-patient or psychotherapist-patient privilege" and "laws aimed at protecting healthcare information," specifically the Health Insurance

17

Portability and Accountability Act ("HIPAA") and the Privacy Act of 1974. Doc. #172-1 at 5. The plaintiffs argue each of these objections is without merit. Doc. #173 at 23.

First, where, as here, a court's jurisdiction is based on federal question, federal law governs the existence of evidentiary privilege. *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 624 (5th Cir. 2017). Under federal law, "[t]he psychotherapist-patient privilege is a recognized privilege" that protects "confidential communications made to licensed psychiatrists and psychologists, and confidential communications made to licensed social workers in the course of psychotherapy." *United States v. Auster*, 517 F.3d 312, 315 (5th Cir. 2008) (cleaned up). However, "there is no physician-patient privilege under federal law." *Gilbreath v. Guadalupe Hosp. Found. Inc.*, 5 F.3d 785, 791 (5th Cir. 1993). Accordingly, to the extent the defendants invoke a physician-patient privilege, such invocation is improper.

Second, the plaintiffs argue that the Privacy Act, 5 U.S.C. § 552a does not apply to state agencies. Doc. #173 at 26. The plaintiffs are correct. *Mamarella v. Cnty. of Westchester*, 898 F. Supp. 236, 237–38 (S.D.N.Y. 1995). Even if the statute did apply, it does not preclude discovery of otherwise discoverable materials. *See Laxalt v. McClatchy*, 809 F.2d 885, 889 (D.C. Cir. 1987) ("[A] party can invoke discovery of materials protected by the Privacy Act through the normal discovery process and according to the usual discovery standards, and the test of discoverability is the relevance standard of Rule 26(b)(1) of the FRCP.").

Third, HIPAA does not create a privilege against disclosure. *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 926 (7th Cir. 2004). Rather, it creates a procedure for obtaining and using protected medical information in litigation. *Id.* Pursuant to HIPAA, disclosure of otherwise protected material is authorized if it is in response to a discovery request so long as the "individual who is the subject of the protected health information … has been given notice of the request" or the party seeking the information has made "reasonable efforts … to secure a qualified protective

order." 45 C.F.R. § 164.512(e). The Court believes that any potential HIPAA concerns can be alleviated through an appropriate protective order.

### B. Relevance

In their general objections, the defendants—citing the transcript of a February 3, 2020, hearing in this case and two court orders requiring the defendants to report certain remedial measures undertaken at Parchman—argue "that at this preliminary stage of litigation, all discovery is limited to the *areas of [Parchman]* where the *named Plaintiffs* in this action have *lived or otherwise had access* since February 3, 2019." Doc. #172-1 at 2. The defendants thus contend that "discovery related to (1) any persons other than the 33 named Plaintiffs (e.g., MDOC employees), or to (2) any area of an MDOC facility other than the specific areas of [Parchman] where the named Plaintiffs have lived or had access since February 3, 2019, is not relevant and is beyond the scope of permissible discovery." *Id.* This is simply incorrect.

The defendants' argument seems to rest on the premise that once a court approves expedited discovery for the purpose of *one* preliminary injunction motion, the scope of the approved expedited discovery controls all subsequent motions for expedited discovery, even those for *separate* preliminary injunction motions. Neither caselaw, treatises, nor logic support such an approach. As this Court previously observed, "[t]he purpose of expedited discovery in the context of a temporary restraining order or preliminary injunction is for further development of the record before the [relevant] injunction hearing …." *Amos v. Taylor*, No. 4:20-CV-7, 2020 WL 5809972, at *4 (N.D. Miss. Aug. 26, 2020) (quoting *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1057 (D. Minn. 2019)). It follows that discovery is "relevant" for this purpose when it would impact the relevant "preliminary injunction determination." *NetStar-1*, 226 F.R.D. at 532; *Franco-Gonzalez v. Napolitano*, No. 10-2211, 2010 WL 11479349, at *3 (C.D. Cal. Nov. 24, 2010) (limiting requests "**solely** [to] those issues relevant to the Court's consideration

19

of the Motion for a Preliminary Injunction."). The fact that expedited discovery has been approved (and limited) for a separate preliminary injunction request has no conceivable bearing on this inquiry. Thus, the Court rejects the defendants' argument that the relevance for the expedited discovery at issue here is somehow circumscribed by previous orders related to separate expedited discovery requests.

The plaintiffs requested expedited discovery for the purpose of filing a renewed preliminary injunction motion seeking to require the defendants to implement certain measures to prevent or mitigate the spread of COVID-19. Such a motion, which would be grounded in the plaintiffs' Eighth Amendment claims regarding the defendants' failure to mitigate the risk of infectious and communicable diseases,[4] would require the plaintiffs to show that an official policy or custom caused a violation of the plaintiffs' Eighth Amendment rights. *Doe v. United States*, 831 F.3d 309, 317–18 (5th Cir. 2016). To show a constitutional violation, the plaintiffs would have to show that they were exposed to an "objectively intolerable risk of harm" and that a prison official was deliberately indifferent to such a risk. *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020). Facts relevant to these inquiries include (1) COVID-19 infection rates at the facility where inmates are incarcerated, *Blackburn v. Noble*, __ F. Supp. 3d __, 2020 WL 4758358, at *6 (E.D. Ky. Aug. 17, 2020); (2) "protective measures" implemented at the facility, *Valentine*, 956 F.3d at 801–02; and (3) the implementation of the relevant protective measures, *Banks v. Booth*, 468 F. Supp. 3d 101, 115 (D.D.C. June 2020). Consistent with these factors, this Court held that expedited "discovery related to the policies of screening, testing, and quarantining of Parchman inmates and staff, as well as information related to the actual implementation of such policies, would undoubtedly be reasonable." Doc. #141 at 13. To the extent the defendants have adopted a definition of relevancy inconsistent with these conclusions, their position is flawed.

---

[4] Doc. #141 at 7.

**IV**

**Conclusion**

Due to the absence of a good faith conference, the plaintiffs' motion to compel [172] is

**DENIED**.   If discovery disputes remain outstanding once the good faith conference requirement

is satisfied, the plaintiffs may renew their motion to compel as to such disputes.

**SO ORDERED**, this 1st day of December, 2020.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**