## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

MICHAEL AMOS, et al.                                                    PLAINTIFFS

V.                                                    NO. 4:20-CV-7-DMB-JMV

NATHAN "BURL" CAIN, et al.                                                    DEFENDANTS

## ORDER

This is a tale of two prisons—if both the story of the inmates and the story of the prison administrators are credited. One prison, as told by the inmates and their retained experts, is unfit for human habitation, is dangerously understaffed, contains an array of inhumane conditions, and stands in clear violation of the Eighth Amendment's prohibition against cruel and unusual punishment. The other prison, according to the administrators and their retained experts, implemented recent repairs and increased staffing numbers and, as a result, complies with the Eighth Amendment, at least in most respects. These conflicting stories describe the same place— the Mississippi State Penitentiary at Parchman—just at different times. The inmates in this case, who have moved for injunctive relief for four of the plaintiffs, describe Parchman as it existed in February of 2020. The administrators describe Parchman as it existed in June of 2020, after the implementation of numerous improvements. Because the injunctive relief sought relies largely on the state of Parchman as it existed before the repairs and the plaintiffs otherwise have not shown a constitutional violation justifying injunctive measures, injunctive relief will be denied.

### I
### Procedural History

On January 28, 2020, thirty-three inmates at the Mississippi State Penitentiary at Parchman filed a "First Amended Class-Action Complaint and Demand for Jury Trial" against Tommy Taylor, in his official capacity as the Interim Commissioner of the Mississippi Department of

Corrections,[1] and Marshal Turner, in his official capacity as the Superintendent of Parchman. Doc. #22. In their amended complaint, the plaintiffs allege that the defendants' policies and practices caused years of neglect at Parchman, which place them in imminent danger of serious physical injury, in violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment, as incorporated by the Fourteenth Amendment. *Id.* at 18–26. The pleading, which includes a proposed class action, seeks monetary and injunctive relief. *Id.* at 27–29.

On June 9, 2020, the plaintiffs filed a supplemental motion[2] for a temporary restraining order and preliminary injunction.[3] Doc. #98. Pursuant to a scheduling order issued by the Court,[4] the defendants responded to the motion on July 13, 2020, Doc. #119, and the plaintiffs replied on July 27, 2020, Doc. #123.

## II
## Standard of Review

> A preliminary injunction is warranted only if the movant establishes: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 463–64 (5th Cir. 2021) (internal quotation marks omitted). For a preliminary injunction to issue, the party seeking the injunction must "clearly

---

[1] Nathan "Burl" Cain, the current Commissioner of MDOC, was substituted for Taylor on October 21, 2020. Doc. #168. The same order also substituted Timothy Morris, the current Superintendent of Parchman, for Marshal Turner. *Id.*

[2] The Court set a June 8, 2020, deadline for filing the supplemental motion. Doc. #91. It appears the plaintiffs missed this deadline by approximately one minute. In the interest of efficiency, and in the absence of any timeliness objection from the defendants, the Court considers the motion on the merits.

[3] Earlier, on January 24, 2020, the plaintiffs filed an emergency motion for a temporary restraining order and preliminary injunction, along with a supporting memorandum. Docs. #13, #14. On February 24, 2020, this Court, on the parties' joint motion, issued a scheduling order to allow the parties to supplement the record and provide additional briefing. Doc. #55. The scheduling order provided, "[i]n the interest of efficiency, the supplementary briefing and evidence shall be deemed to supersede all earlier-filed briefs and evidence. Accordingly, the parties should include all relevant arguments and evidence in their supplemental filings. Any filings that fail to comply with the Court's local rules may be disregarded." *Id.* at 1 n.1. Because the supplemental filing did not address the relief requested in the initial injunction motion, this Court denied the first motion as moot. Doc. #155.

[4] Doc. #91.

carr[y] the burden of persuasion on all four requirements." *Id*. at 464.

"The standard for issuing a [temporary restraining order] is the same as the standard for issuing a preliminary injunction." *Texas v. United States*, __ F. Supp. 3d __, No. 6:21-cv-3, 2021 WL 247877, at *1 (S.D. Tex. Jan. 26, 2021) (citing *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987)). While the elements are the same, a plaintiff seeking a temporary restraining order must ordinarily make a stronger showing than a plaintiff seeking a preliminary injunction. *Esparza v. Bd. of Trs.*, 182 F.3d 915 (5th Cir. 1999) (table decision). "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

In addition to the standards applicable to injunction motions generally, the Prison Litigation Reform Act provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). Necessarily, "when a district court fashions prospective relief in prison litigation, the relief must meet the standards set forth in the Act." *Williams v. Edwards*, 87 F.3d 126, 133 (5th Cir. 1996).

To determine whether the standards for an injunction have been satisfied, "the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993). However, "the record must nevertheless support [a] court's decision." *Id*.

3

## III
## Scope of Motion

Before addressing the merits of the plaintiffs' supplemental motion, it is necessary to clarify the scope of the requested relief and how this scope impacts the issues before the Court.

While the amended complaint includes a proposed class action, no class action has been certified. Accordingly, "each plaintiff's case … must be examined separately." *Crawford v. W. Elec. Co., Inc.*, 614 F.2d 1300, 1317 (5th Cir. 1980). In this sense, each plaintiff's entitlement to an injunction depends on their individual entitlement to such relief. *See Chainey v. Street*, 523 F.3d 200, 218 (3d Cir. 2008) ("This is not a class action suit; each plaintiff must prove he or she is entitled to damages."). That is not to say that a plaintiff (or even a non-party) who is not individually entitled to injunctive relief may not benefit from one who is so entitled. Others may benefit from an injunction "if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996).

The supplemental motion seeks injunctive relief as to four plaintiffs—Aric Johnson, Phillip Webster, Kuriaki Riley, and Justin James ("Injunction Plaintiffs"). Doc. #98 at 1–3. The requested relief concerns the medical treatment of these plaintiffs as well as the environmental conditions to which they are exposed. *Id.* The relevant factual background, therefore, is limited to those aspects of the Injunction Plaintiffs' medical treatment and housing directly related to the requests for injunctive relief.

## IV
## General Factual Background[5]

"Parchman is a prison consisting of an area of over 28 square miles, 58 separate buildings; a facility maintaining miles of roads, a water system, and sewage treatment plant." Doc. #118-4

---

[5] The Court sets forth the specific facts relevant to each of the Injunction Plaintiffs when considering their individual requests for injunctive relief. These facts are derived from six general categories of evidence: (1) inmates'

4

at 7. Parchman is divided into "Units." Doc. #101-1 at 1. Units are divided into buildings, *id*., and buildings are divided into zones, Doc. #101-5 at PageID 2402.

Of relevance to this case, inmates are housed in Unit 25, Unit 26, Unit 29, and Unit 30. Doc. #101-1 at 9–10. Johnson and Webster are housed in Unit 29, Building F, Zone A.[6] James is housed in Unit 30, Building A, Zone B.[7] And Riley is housed in Unit 30, Building B, Zone A.[8] Parchman's central medical operation is in Unit 42. Doc. #101-1 at 1–2.

As a part of permitted expedited discovery, a team of experts retained by the plaintiffs was authorized to inspect Parchman's premises. The results of this inspection, which occurred over three days in February 2020 (February 11, 12, and 28), paint a stunning picture of the conditions at that time.

Eldon Vail, a former correctional administrator with 35 years of experience in the field,[9] identified major problems with plumbing and electrical systems, including malfunctioning sinks and toilets and exposed wiring. *See* Doc. #100-1 at 9–12. Vail also observed "filthy" conditions and significant security risks posed by staffing shortages and use of force practices. *Id*. at 5–6. According to Vail, "the conditions at Parchman fall[] far below anything I have ever seen in any other jurisdiction in this country." *Id*. at 36.

Marc Stern, a board-certified internist specializing in correctional health care,[10] called "[t]he health-related conditions … at Parchman … the worst conditions I have observed in any

---

"affirmations" dated on or about January 2020; (2) reports prepared by the plaintiffs' experts following a February 2020 inspection of Parchman; (3) inmates' declarations dated on or about June 2020; (4) reports prepared by the defendants' experts following a June 2020 inspection of Parchman; (5) MDOC officials' declarations dated on or about July 5, 2020; and (6) inmates' declarations dated on or about July 24, 2020, which were executed in response to the defendants' evidence.

[6] Doc. #104-1 at ¶ 1; Doc. #104-2 at ¶ 1.

[7] Doc. #104-3 at ¶ 1.

[8] Doc. #104-4 at ¶ 1.

[9] Doc. #100-1 at 2.

[10] Doc. #101-1 at 1.

U.S. jail, prison, or immigration detention facility in my 20 years working in this field." Doc. #101-1 at 3. Stern based this conclusion on deficiencies in Parchman's healthcare practices, as well as the presence of mold, prisoner complaints about rodent infestations, prisoner complaints about temperatures, and the physical condition of Parchman. *Id*. 5–15.

Craig Haney, a professor in psychology,[11] found that the inmates at Parchman were being "subjected to truly horrendous living conditions" which posed a grave risk to their mental well-being. Doc. #101-2 at 19–20. Debra Graham, an environmental health and safety expert,[12] found that "the cleanliness and sanitation at [Parchman] is inadequate, and in many of the areas the conditions are deplorable." Doc. #101-3 at 12. Graham also found deficiencies in Parchman's lighting, plumbing, and fire safety. *Id*. at 18–19.

Madeline LaMarre, a nurse practitioner,[13] found a "systemic" lack of access to healthcare at Parchman. Doc. #101-4 at 6. LaMarre reached this conclusion based on inmate reports concerning access to healthcare request forms and the general provision of treatment. *Id*. at 8–12. Ultimately, LaMarre found that "[t]he totality of the conditions in Units 29 and 30 … are so horrific that all inmates should be transferred … and these Units should be permanently closed." *Id.* at 26.

Following the February inspection, Marshall Turner, the former superintendent at Parchman, resigned from his position. Doc. #118-1 at 3. Warden Timothy Morris was appointed as Acting Superintendent at Parchman. *Id*. Additionally, Mississippi Governor Tate Reeves appointed Burl Cain as the new MDOC Commissioner. *Id*. Beyond these changes in leadership, state officials have undertaken efforts to improve the conditions at Parchman. These changes include closure of certain buildings, transfers of inmates, the implementation of new staffing

---

[11] Doc. #101-2 at 2.

[12] Doc. #101-3 at 1.

[13] Doc. #101-4 at 3.

policies, and repairs to the infrastructure at Parchman.   *Id*. at 3–6.

Stephen Tussey, a corrections officer retained by the defendants,[14] conducted an inspection of Parchman on June 23, 2020, and June 24, 2020.   Doc. #118-5 at 2.   Tussey noted "significant steps to improve conditions at Parchman" and found "the living conditions" to be acceptable.   *Id*. at 4–5.

## V
## The Role of Corrective Measures

As discussed in more detail below, the defendants argue that many of the Injunction Plaintiffs' complaints have been addressed by the new Parchman administration and the subsequent repairs.   *See generally* Doc. #119.   The plaintiffs respond that the voluntary cessation of the allegedly illegal practices "does not deprive a federal court of its power to determine the legality of the practice."   Doc. #123 at 8.   The plaintiffs' argument is true, to an extent. Subsequent remedial measures are still relevant to the plaintiffs' claims for injunctive relief. Specifically, the impact of the remedial steps on an inmate's request for injunctive relief may relate to four separate issues—sovereign immunity, mootness, the injunction requirements under the PLRA, and the general requirements for injunctive relief.

### A.  Mootness

"Article III's 'case or controversy' requirement permits federal courts to adjudicate only live disputes—a party must retain a legally cognizable interest in the outcome of an issue, or its resolution is moot."   *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 548 (5th Cir. 2020) (internal quotation marks omitted).   "[R]esolution of a particular issue may be moot even if other issues … remain ripe."   *Id*.   To determine mootness, the "central question is whether decision of a once-living dispute continues to be justified by a sufficient prospect that the decision will have an impact

---

[14] Doc. #118-5 at 1.

on the parties." *Id*. (cleaned up). In the context of motions for injunctive relief, "[a] request for injunctive relief generally becomes moot when the event sought to be enjoined takes place." *Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 704 (5th Cir. 2017).

Where a controversy has been facially mooted by a defendant's voluntary cessation of a practice, the issue will not be moot unless "it is *absolutely* clear that the allegedly wrongful behavior could not be reasonably expected to recur." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) (internal quotation marks omitted). While this is a "heavy burden," "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties. Without evidence to the contrary, [courts] assume that formally announced changes to official governmental policy are not mere litigation posturing." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) (finding that injunctive relief claim was moot where the prison had changed the suspect policy).

### B. Sovereign Immunity

"[S]tate sovereign immunity precludes suits against state officials in their official capacities." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020). Suits against MDOC officials are suits against state officials which ordinarily fall under the sovereign immunity bar. *See Wilkins v. Miss. Dep't of Corrs.*, No. 4:17-CV-137, 2020 WL 3490063, at *3 (N.D. Miss. June 26, 2020). However, "[t]he Supreme Court's decision in *Ex Parte Young*, 209 U.S. 123 (1908), established a narrow exception to that immunity for suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Spec's Fam. Partners, Ltd. v. Nettles*, 972 F.3d 671, 680 (5th Cir. 2020) (cleaned up).

The *Ex Parte Young* exception applies when a suit "seeks prospective, injunctive relief from a state actor, in her official capacity, based on an alleged ongoing violation of the federal

constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). Ordinarily, this is a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019) (alteration omitted). But as with any other jurisdictional issue, a defendant may attack on factual grounds the absence of an ongoing violation. *See Green v. Mansour*, 474 U.S. 64, 71 (1985) (where defendant officials ceased illegal conduct after filing of the complaint, holding that "[b]ecause there is no continuing violation of federal law to enjoin in this case, an injunction is not available"); *Lighthouse Fellowship Church v. Northam*, __ F. Supp. 3d __, No. 2:20-cv-204, 2021 WL 302446, at *4 (E.D. Va. Jan. 27, 2021) ("There is no ongoing violation of federal law in this case. The Orders on which Plaintiff bases its Complaint are no longer in effect.").

"The interplay between the mootness inquiry and the ongoing-violation requirement under *Ex Parte Young* is somewhat unsettled." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1263 n.92 (M.D. Ala. 2017). However, the Fifth Circuit has suggested that the requirement is satisfied when the voluntary cessation exception to mootness applies. *See LeBlanc*, 729 F.3d at 439 ("The gist of their argument appears to be that with the panel's medical review now complete, any violation of federal law is no longer ongoing. …. Their theory, if accepted, would work an end-run around the voluntary-cessation exception to mootness where a state actor is involved.").

### C. PLRA

Courts are split on whether the PLRA's "narrowly drawn and necessary" language allows a court to grant injunctive relief in the absence of an ongoing constitutional violation. The Ninth Circuit has reasoned that because § 3626(a)(1)(A) requires that injunctive relief "extend[] no further than necessary to correct the violation of their Eighth Amendment rights," the statute necessarily presupposes "the existence of a constitutional 'violation' in need of correction."

*Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002) (internal quotation marks omitted).   The Fourth and Eleventh Circuits have reached the opposite conclusion based on two primary considerations:   (1) a court should not construe a statute to displace traditional equitable remedies; and (2) the inclusion of the phrase "current and ongoing violation" appears in a different section of the statute, suggesting that Congress knew how to include an ongoing violation requirement if it wanted to do so.   *Thomas v. Bryant*, 614 F.3d 1288, 1319–20 (11th Cir. 2010); *Porter v. Clarke*, 923 F.3d 348, 367 (4th Cir. 2019).

The Fifth Circuit has not yet squarely weighed in on this debate.   It has, however, held that findings "that relief be narrowly drawn, extend no further than necessary to correct the violation of a federal right, and be the least intrusive means to correct the violation of that right" are distinct from the finding that an ongoing violation exists.   *Guajardo v. Tex. Dep't of Crim. Just.*, 363 F.3d 392, 395 (5th Cir. 2004).   To the extent this reasoning resonates with the approach of the Eleventh and Fourth Circuits, it appears likely the Fifth Circuit would *not* require an express finding of an ongoing violation under the PLRA.   This Court, therefore, will follow that approach.

### D.  Injunctions Generally

"The purpose of an injunction is to prevent *future violations*."   *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added).   This purpose, which drives a court's power to grant injunctive relief, is independent from a court's "power to hear the case," i.e., mootness.   *Id.* ("Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct.").

Accordingly, when a defendant discontinues its illegal conduct, a court must consider whether "there exists some cognizable danger of recurrent violation."   *Id.*   This determination is based on "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."   *Id.*   Put differently, although mootness

10

and the propriety of an injunction following remedial conduct may be similar, "they are analytically distinct, and a court could find that a case is not moot yet deny injunctive relief." *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 366 (7th Cir. 1990) (collecting cases).

## E. Summary

When an inmate seeks injunctive relief against state officials and the officials argue that their subsequent conduct has remedied the alleged violations, a court must undertake a multi-part inquiry.

First, the Court must consider whether the cessation of the conduct amounted to the request for injunctive relief, thereby mooting the request. If the voluntary cessation moots the request, the Court must consider whether the voluntary cessation exception to mootness applies.

Second, if the case has not been mooted, the Court must consider whether the corrective conduct was so complete as to allow the Court to conclude there is no dispute that there is no ongoing violation to support the *Ex Parte Young* exception to sovereign immunity. If the cessation has produced this sort of correction, the Court must determine whether the voluntary cessation doctrine applies.

Third, if the case has not been mooted and if the *Ex Parte Young* exception remains applicable, the Court must decide whether the defendants corrected the underlying violation so as to preclude invocation of the Court's equitable powers.

Fourth and finally, if all these elements have been satisfied, the Court must determine whether injunctive relief is appropriate under the traditional standards for granting such relief and under the PLRA.

## VI
## Exhaustion

As another preliminary matter, the defendants argue the Court may not consider any of the claims for injunctive relief because the Injunction Plaintiffs have not exhausted their

administrative remedies.   Doc. #119 at 32.

"The PLRA's exhaustion requirement is no-nonsense. Inmates seeking to challenge prison conditions must exhaust such administrative remedies as are available before challenging prison conditions in court. The provision is mandatory, and courts have zero discretion to hear unexhausted claims." *Valentine v. Collier*, 978 F.3d 154, 160 (5th Cir. 2020) (cleaned up).   To exhaust administrative remedies under the PLRA, "[t]he petitioner must have pursued the grievance remedy to conclusion—substantial compliance with administrative procedures is not enough." *Bargher v. White*, 928 F.3d 439, 447 (5th Cir. 2019) (cleaned up).   Whether a plaintiff has satisfied the exhaustion requirement depends on the facts as they existed at the time the plaintiff filed his complaint in federal court.   *See Valentine*, 978 F.3d at 160 (plaintiff must exhaust "before challenging prison conditions in court").

Because failure to exhaust is an affirmative defense, it is a defendant's "burden to establish that there were available procedures that [the plaintiff] did not exhaust.   *Cantwell v. Sterling*, 788 F.3d 507, 508, 509 (5th Cir. 2015).   This standard is satisfied when a defendant shows that the plaintiff did not exhaust a remedy which was "generally available."   *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (collecting cases).   A remedy is generally available when a "grievance procedure exists."   *Wright v. Ga. Dep't of Corrs.*, 820 F. App'x 841, 845 (11th Cir. 2020); *see Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) ("Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute.") (cleaned up).

"Inmates who fail to exhaust can proceed in court by showing that administrative remedies were not available." *Valentine*, 978 F.3d at 160 (internal quotation marks omitted).   The United States Supreme Court has identified three circumstances when remedies will be considered

unavailable: "(1) when an administrative process 'operates as a simple dead end,' (2) when the process is 'so opaque that it becomes, practically speaking, incapable of use,' and (3) when 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Muhammad v. Wiles*, __ F. App'x __, No. 19-50514, 2021 WL 112523, at *3 (5th Cir. Jan. 12, 2021) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1859–60 (2016)). The burden of showing unavailability rests with the plaintiff. *Valentine*, 978 F.3d at 161.

"Exhaustion is defined by the prison's grievance procedures …." *Cantwell*, 788 F.3d at 509. At Parchman, these procedures comprise the Administrative Remedy Program ("ARP"). Doc. #118-10 at ¶ 2. The ARP at Parchman is a multi-step process. *Id.* at ¶ 4. An inmate first must file a grievance within thirty days of the incident complained of. *Id.* If the grievance is accepted into the ARP, the grievance is forwarded to an "appropriate official" who then issues a First Step Response. *Id.* The inmate may appeal the First Step Response by sending a form to the ARP's Statewide Director. *Id.* A final decision will then issue. *Id.*

According to Richard Pennington, the ARP's Statewide Director,[15] none of the Injunction Plaintiffs submitted a grievance related to any claim at issue here, much less pursued such a claim to conclusion. *Id.* at ¶¶ 6–9. Under these circumstances, the Court concludes that the defendants have shown the Injunction Plaintiffs failed to exhaust a generally available remedy. Accordingly, the burden shifts to the plaintiffs to show that the generally available remedy was, in fact, unavailable.

In arguing that administrative remedies were unavailable, the plaintiffs rely on the expert reports of Vail and LaMarre. Doc. #123 at 9. According to Vail, "[t]he current ARP program is perceived to be useless by the prisoners. Grievance forms are often not available and complaints

---

[15] Doc. #118-10 at ¶ 3.

that do get filed rarely receive a response." Doc. #100-1 at 35. LaMarre opines that inmates at Parchman "have no meaningful way to administratively grieve their health care or conditions of confinement" and that "[t]his system is a dead end providing these plaintiffs with no possibility of relief." Doc. #101-4 at 26. As support for her opinions, LaMarre points to reports from inmates that grievance forms were sometimes unavailable, that "nothing happens" to forms which are submitted, and that correctional officers confiscated the prisoner handbooks "which presumably instruct[] how to file grievances." *Id*. In response to these opinions, the defendants rely primarily on the fact that from January 2020 to June 2020 "578 grievances submitted at MSP have been resolved, with 91 resolved in favor of inmates. Of that 91, 13 concerned quality of life issues and 10 concerned medical issues." Doc. #118-10 at ¶ 5.

The problem with the defendants' evidence is one of timing. To be sure, it seems the ARP process at Parchman improved during the six-month period after this litigation was commenced. But the functioning of the ARP system *now* is irrelevant to whether the ARP was available (or unavailable) at the time the plaintiffs filed their initial complaint on January 14, 2020 (or the operative amended complaint on January 28, 2020). The only relevant evidence in this respect is the unchallenged assertions of the plaintiffs' experts that officials at Parchman confiscated the prison handbooks which provided instructions for submitting grievances and failed to provide inmates ARP grievance forms. The evidence also suggests that ARP grievances at Parchman "rarely" received responses, such that the process was functionally a dead end. Given this evidence, the Court concludes that the plaintiffs have shown a likelihood of success on their argument that administrative remedies were unavailable because the ARP at Parchman was a dead end and because Parchman officials took steps to thwart inmate access to the ARP. *See generally Banks v. Booth*, 468 F. Supp. 3d 101, 121 (D.D.C. 2020) (in preliminary injunction analysis, finding plaintiffs "evidence of exhaustion sufficient to show a likelihood of success on the merits

of exhaustion").

# VII
## Requests for Injunctive Relief

"[T]here must be a relationship between the injury claimed in [a] motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation Oncology, LLC v. Queens' Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (collecting cases). "The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.'" *Id.* (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). Accordingly, the substantial likelihood of success inquiry focuses on the "merits of [the] underlying claim." *Walgreen Co. v. Hood*, 275 F.3d 475, 478 (5th Cir. 2001).

In their motion, the Injunction Plaintiffs ground their requests for injunctive relief on their underlying Eighth Amendment claims for failure to "provide basic security and protection from violence;" deprivations of adequate medical care (including mental health care); failure to provide adequate food and water; failure to provide adequate food and hygiene; and the existence of "pervasive structural deficiencies in the facility." Doc. #99 at 7–29. Because, as explained below, each request for injunctive relief is mooted, barred by sovereign immunity, or otherwise unlikely to succeed, the Court need not address any of the other preliminary injunction factors. *See Walgreen Co.*, 275 F.3d at 478 ("Because Walgreen does not have a substantial likelihood of success on the merits of its underlying claim we affirm the district court's denial of Walgreen's motion for preliminary injunction.").

### A.  Deliberate Indifference and the Eighth Amendment

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones …." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (cleaned up). Rather, the Eighth Amendment requires that prison officials "ensure that inmates receive adequate food,

clothing, shelter, and medical care, and … take reasonable measures to guarantee the safety of the inmates." *Id.* (internal quotation marks omitted).

When a plaintiff alleges an Eighth Amendment claim based on conditions of confinement, the plaintiff must make two showings. First, the plaintiff must show an objectively "sufficiently serious" deprivation by establishing a "denial of the minimal civilized measure of life's necessities." *Id.* at 834 (internal quotation marks omitted). When a plaintiff claims a failure to prevent harm, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."[16] *Id.*

Second, the plaintiff must show that the prison official had a "sufficiently culpable state of mind" by establishing that the official was deliberately indifferent to inmate health or safety. *Id.* The deliberate indifference inquiry is subjective and requires the plaintiff "show that the defendant: (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (cleaned up). An official disregards a risk when he fails "to take reasonable measures to abate it." *Torres v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020).

## B. Johnson

The plaintiffs argue that "Johnson's constitutional rights currently are being violated, as he is being deprived of constitutionally-adequate medical care and his conditions of confinement fall below constitutional standards, both of which subject him to an immediate risk of irreparable harm." Doc. #99 at 35. Based on these alleged constitutional violations, Johnson seeks

---

[16] Some Fifth Circuit opinions treat the "life's necessities" standard as distinct from the "substantial risk of serious harm" inquiry. *See, e.g.*, *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) ("[H]e must demonstrate that the alleged deprivation was objectively serious, exposing him 'to a substantial risk of serious harm' and resulting 'in the denial of the minimal civilized measure of life's necessities.'"). This appears to be inconsistent with *Farmer*'s analysis.

injunctive relief ordering that within (1) five days he be seen by a medical doctor to assess his blood pressure; (2) twenty-four hours he receive a refill of his blood pressure medication; (3) five days the defendants repair the roof and other avenues of water intrusion in his immediate living area; (4) five days the defendants repair exposed electrical wiring in his shower; (5) five days the defendants repair the toilets and urinals in his zone; and (6) five days the defendants repair the air conditioning in his zone.  Doc. #98 at 1–2.  The first two of these requests relate to Johnson's claims for denial of adequate medical care.  The latter four relate to Johnson's claims regarding the physical conditions in his living area.

### 1.  Medical Care

"Prison officials violate the Eighth Amendment's ban on cruel and unusual punishment when they show deliberate indifference to an inmate's serious medical needs."  *Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017).  To show an Eighth Amendment violation based on medical care, a plaintiff must show a "substantial risk of serious harm" from the condition and "that prison officials acted or failed to act with deliberate indifference to that risk."  *Valentine*, 978 F.3d at 162.  An official is deliberately indifferent to a medical risk when he is aware of the risk and disregards it by refusing to treat the plaintiff, ignoring his complaints, intentionally treating the plaintiff incorrectly, or "engag[ing] in any similar conduct that would clearly evince a wanton disregard for … serious medical needs."  *Id.* at 163.

In support of his claims, Johnson submitted a declaration dated June 5, 2020, stating that (1) he suffers from high blood pressure and hypertension; (2) he is "supposed to have [his] blood pressure checked regularly;" (3) his blood pressure "has gone unchecked for two months;" (4) he "frequently" is without his blood pressure medicine because he does not receive refills on time; and (5) after he was denied a sick call form, he was not permitted to deliver a hand written request to a nurse.  Doc. #104-2 at ¶ 2.  He also submitted the appendix of LaMarre's report which states

that Johnson "has not received timely and appropriate follow-up for his hypertension." Doc. #104-15 at PageID 4848.

In response, the defendants provided a declaration of James Glisson, M.D., the Medical Director for Centurion[17] and the Chief Physician at Parchman. Doc. #118-3 at ¶ 2. Glisson states that (1) it is "standard practice for providers to follow-up every six months with patients whose blood pressure is well-controlled;" (2) that Johnson's blood pressure tested normally in March 2019; (3) Johnson refused a six-month follow-up in September 2019 and then registered an elevated blood pressure on January 13, 2020; (4) based on the elevated blood pressure, Johnson was started on blood pressure medication and scheduled for monthly checks in February and March; (5) Johnson received regular checkups from February 5 through March 9, and was seen again on June 3, just two days before he executed his affidavit; (6) at each checkup, Johnson's blood pressure was evaluated as "controlled;" and (7) Johnson received regular refills of his medication, except for the month of May, when he refused a medical appointment. *Id.* at ¶¶ 14–15.

Assuming without deciding that Johnson's blood pressure and hypertension qualify as serious medical conditions,[18] Johnson has failed to establish that any prison official disregarded the risks associated with such conditions. The record is clear that following a single elevated blood pressure test, Johnson received a prescription for blood pressure medication (which he was provided monthly, except for the month he refused an appointment) and was provided regular blood pressure checks and follow-up appointments. These facts fall well short of the conduct needed to show deliberate indifference. *See LaBorde v. Lowe*, 471 F. App'x 390, 391 (5th Cir.

---

[17] Centurion, "[t]hrough a contract with [MDOC], … provides medical and mental health care to inmates housed at MSP." Doc. #118-3 at ¶ 6. The Court notes that in a separate case involving conditions at Parchman, Centurion has moved to dismiss on the ground that it "is no longer the contract healthcare provider for" MDOC. *See Lang v. Taylor*, No. 4:20-cv-30, at Doc. #65 (N.D. Miss. Feb. 12, 2021).

[18] *See Miller v. Larson*, 756 F. App'x 606, 610 (7th Cir. 2018) ("[H]e suffered from high blood pressure, which is an objectively serious condition.").

2012) ("Laborde [sic] received extensive medical care and numerous prescription medications; he has not shown any intentional delay or refusal to provide him with medical treatment for his high blood pressure or any other medical condition for which he requested treatment.");[19] *see generally Fails v. DeShields*, 349 F. App'x 973, 976 (5th Cir. 2009) ("Deliberate indifference is especially hard to show when the inmate was provided with ongoing medical treatment."). Accordingly, Johnson is unlikely to prevail on an Eighth Amendment claim premised on failure to provide medical care for his blood pressure and hypertension.

### 2. Water Intrusion

When a plaintiff asserts an Eighth Amendment claim based on the physical conditions of his incarceration, he "must show not only that the conditions were objectively so serious as to deprive prisoners of the minimal civilized measure of life's necessities but also that the responsible prison officials acted with deliberate indifference to his conditions of confinement." *Alexander v. Tex. Dep't of Crim. Just.*, 951 F.3d 236, 241 (5th Cir. 2020) (cleaned up). Life's necessities include "minimally safe housing." *Shannon v. Vannoy*, 682 F. App'x 283, 285 (5th Cir. 2017).

In his June 5 declaration, Johnson states that there is a roof leak in his zone and that there is "standing water" in the building. Doc. #104-2 at ¶ 4, 6. The defendants respond that a leaking roof does not rise to the level of an Eighth Amendment violation and, even if it did, Johnson acknowledged on July 6, 2020, that the roof over his zone was repaired in March. Doc. #119 at 16.

The record is undisputed that the roof above Unit F has been repaired and that Johnson himself has stated the leaking has ceased. *See* Doc. #118-1 at 11. Furthermore, the voluntary cessation doctrine ordinarily will not apply when the conduct underlying the voluntary cessation

---

[19] Because the plaintiff in *LaBorde* was a pretrial detainee, the claims were brought under the Fourteenth Amendment, rather than the Eighth Amendment. However, "Fourteenth Amendment case law concerning pretrial detainees is based on the Supreme Court's Eighth Amendment precedent concerning prisoners." *Baughman v. Hickman*, 935 F.3d 302, 306 (5th Cir. 2019) (alteration omitted).

involves physical improvements to property. *See Medina Rodriguez v. Canóvanas Plaza Rial Econo Rial, LLC*, No. 17-1943, 2020 WL 3971656, at *4 (D.P.R. July 13, 2020) (collecting cases). To the extent this repair amounts to a physical improvement of the building, the voluntary cessation exception to the mootness inquiry is inapplicable and accordingly, Johnson's claim for injunctive relief related to the water intrusion is moot and will be denied. Furthermore, to the extent the repairs unambiguously have addressed the ongoing violation, it would also appear the *Ex Parte Young* exception to sovereign immunity would no longer apply, thus depriving the Court of jurisdiction over the claim. Finally, even if the Court had jurisdiction over the claim, the Court finds the defendants' efforts at repair to be bona fide and effective, thereby precluding injunctive relief. *See W.T. Grant Co*., 345 U.S. at 633.

### 3. Exposed Wiring in Shower

As mentioned above, Johnson's declaration states that he has been electrocuted due to exposed wiring in his unit's showers. Doc. #104-2 at ¶ 4. The defendants (rightfully) do not dispute that exposed wiring in a shower may pose a serious risk to inmate health or safety. *See Cotton v. Taylor*, 176 F.3d 479 (5th Cir. Mar. 9, 1999) (table decision) (risk of electrocution from wiring was serious risk). They argue, however, that there is no exposed wiring in Johnson's shower. Doc. #119 at 17.

The evidence is that while a light fixture in the unit's showers was, at one point, destroyed, the fixture has been repaired to eliminate any exposed wires. Doc. #118-1 at 12. As this physical repair directly addresses Johnson's request that the wiring be repaired, such request is denied for the reasons identified above.

### 4. Toilets and Urinals

Johnson also avers that in his unit, "there is only one toilet and one urinal that work, and all of the inmates … are required to share them." Doc. #104-2 at ¶ 7. Assuming without deciding

that one toilet and one urinal for a unit would be constitutionally inadequate, Johnson's claim still must fail because the evidence shows that as of July 6, 2020, all toilets and urinals were operable. Doc. #118-1 at 12. These repairs justify denial of the request for injunctive relief related to toilets and urinals for all the same reasons discussed above regarding the water intrusion.

### 5. Air Conditioning

Finally, Johnson avers that "[t]here is no air conditioning or working heat in [his] zone." Doc. #104-2 at ¶ 5. The defendants respond that air conditioning is not constitutionally required and that to alleviate any heating issues they have purchased industrial-sized fans for each building at Parchman. Doc. #119 at 17–18.

"[E]xposing an inmate to extreme cell temperatures can constitute cruel and unusual punishment." *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015). However, "merely uncomfortable [temperature] in a prisoner's cell does not reflect a basic human need that the prison has failed to meet and is not constitutionally suspect." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (internal quotation marks omitted). Rather, the condition must post an unreasonable risk of serious damage to a prisoner's health. *Id.* An air-conditioning unit is required only when the temperature in the cell is unconstitutional *and* "other acceptable and less-intrusive remedies" are not available. *Yates v. Collier*, 868 F.3d 354, 370 (5th Cir. 2017).

Johnson has not shown that the temperatures in the cells in his unit reach an extreme or dangerous level. While the plaintiffs' experts reported complaints of various inmates, Johnson does not appear to be one of these inmates.[20] During the plaintiffs' expert's inspection, which was conducted on days when the outside temperatures were in comfortable ranges, the ambient air measurements were within normal ranges. Doc. #101-3 at 16. During Tussey's inspection,

---

[20] Stern's report states that "many" of the plaintiffs complained of thermal extremes. Doc. #101-1 at 16. According to Stern, two plaintiffs "reported specific situations in which the temperature was so high that two or three residents … could not breathe." *Id.*

which included "all units, buildings, zones, and other areas at issue," and was conducted "on a very hot and humid Mississippi day," "the ambient temperature inside the units was acceptable." Doc. #118-5 at 2, 6. Tussey further observed that "[t]he environmental conditions noticed throughout [his] tour were acceptable, and although most housing units have never been air conditioned, the comfort was maintained by numerous large fans. There was good air flow and virtually no odor in spite of the fact that some units held several hundred inmates." *Id*. at 6.

Even if Johnson could establish that the heat in his zone posed a serious risk of harm, he cannot establish the requisite deliberate indifference because it is undisputed the defendants are taking reasonable remedial steps (the installation of new industrial fans) to combat any heating issues. Even if Johnson could show deliberate indifference, he has made no effort to show that there are no acceptable and less-intrusive remedies to justify an injunction directing the installation of air conditioning. For all these reasons, Johnson cannot establish a likelihood of success with respect to his request for air conditioning.

### 6. *Summary*

Johnson has not shown entitlement to any of his requests for injunctive relief.

## C. **Webster**

Webster seeks injunctive relief ordering that within five days the defendants (1) treat a rat and cockroach infestation in his "immediate living area;" (2) repair the roof and other avenues of water intrusion in his living area; (3) repair the air conditioning in his zone; and (4) provide him an ophthalmologist to treat burning eyes. Doc. #98 at 2.

### 1. *Pest Infestation*

Webster avers that his zone is "inundated with rats and cockroaches" and that he has to "trap them when they get too close to keep them from crawling on [him]." Doc. #104-1 at ¶ 2. The defendants argue that none of the plaintiffs' experts documented a rodent problem and that

Parchman regularly treats Webster's building "for rodents, roaches, ants, and spiders, and has done so for the past several months as a matter of routine pest control procedures." Doc. #119 at 20.

Pest infestations may rise to the level of a constitutional violation. *See Gates v. Cook*, 376 F.3d 323, 340 (5th Cir. 2004) (affirming injunction related to "pest infestation problems"); *see Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) ("Pest infestations may … form the basis of a[n] … Eighth Amendment conditions of confinement claim."). However, "[t]he presence of insects and pests in a rural Mississippi prison unit does not, alone, establish a constitutional violation." *Bennett v. Morris*, No. 4:12-CV-108, 2020 WL 60240, at *5 (N.D. Miss. Jan. 6, 2020) (collecting cases). Rather, the presence of the pests must rise to the level of an objective risk of harm and the prison officials must have responded to such a risk with deliberate indifference. In determining whether a pest infestation poses an objective risk of harm, a court should consider whether (1) the pests are present in the plaintiff's cell; (2) the pests have come in contact with the plaintiff's person or property; (3) whether the plaintiff has been bitten or stung or otherwise suffered physical or psychological harm; and (4) whether the plaintiff's property has been damaged. *Dart*, 803 F.3d at 312; *see Gates*, 376 F.3d at 340 ("In addition to the risk of heat-related illness, the pest infestation problems were linked to chronic sleep deprivation, which exacerbates the symptoms of mental illness.").

Webster's allegations of a rodent and cockroach infestation so severe that he must trap them to prevent contact would seem to rise to the level of a deprivation of life's necessities. However, these allegations are simply not credible considering the rest of the record.

The defendants are correct that none of the plaintiffs' experts observed any rats. The plaintiffs' experts observed only "several roaches" during the two-day inspection. Doc. #101-3 at 23. No evidence of an infestation was cited by any expert.[21] The defendants' expert Tussey

---

[21] The closest an expert came was noting that "[t]here was ample amounts of food and water available to support both a rodent and roach infestation in the areas visited" and that "a more complete inspection is necessary to determine the

specifically noted that he "observed numerous areas [of Parchman] and … did not see any unusual infestation of any pests or insects." Doc. #118-5 at 5. Even considering that "rodents and roaches are nocturnal and may not be observed in daylight hours or where there is activity" and that "many inmates self-reported that they see rodents and roaches in and about their living areas," Doc. #101-3 at 23, the lack of any objective evidence supporting Webster's allegations precludes a finding of likelihood of success on this issue.

Even if Webster could show a substantial risk of harm, the claim premised on the pest control would fail because he cannot establish a likelihood of success as to deliberate indifference. In the absence of indications that pest treatments are futile,[22] ongoing pest control measures ordinarily will preclude a finding of deliberate indifference to a pest problem. *See Bennett*, 2020 WL 60240, at *5 ("[T]he very fact that that [sic] MDOC's pest control efforts are consistent undermines the argument that they are poor enough to constitute deliberate indifference."). It is undisputed MDOC employs a licensed pest control applicator who is on site three days a week, and that Webster's building is "routinely" treated for pests. Doc. #118-1 at 12. Given the lack of any evidence that the pest control service is futile, these services defeat a claim of deliberate indifference.

### 2. *Water Intrusion and Air Conditioning*

Webster is housed in the same building as Johnson. His claims premised on the presence of water intrusion and lack of air conditioning fail for the same reason as do Johnson's claims.

---

level of rodent and insect infestation that may be present at MSP." Doc. #101-3 at 23. The *possibility* of an infestation is not the same as an infestation.

[22] *Bentz v. Hardy*, 638 F. App'x 535, 537–38 (7th Cir. 2016) ("[E]vidence of a pest control contract alone does not necessarily exculpate the defendants since persisting in an ineffective method of pest control may be evidence of deliberate indifference.") (collecting cases).

### 3. Ophthalmologist

Webster avers that "[f]or months" he has suffered from "burning in [his] eyes," which he attributes to Parchman's "dirty water." Doc. #104-1 at ¶ 5. He claims that an eye exam was scheduled in 2019 but he was not taken to it. *Id.* During his February 2020 medical examination of Webster, LaMarre observed "bilateral conjunctival injection and watery eyes, no purulent drainage." Doc. #104-15 at PageID 4878. The defendants respond that Webster's medical records show he was seen regularly for his eye irritation and that, therefore, he cannot show deliberate indifference. Doc. #119 at 19–20. The defendants are correct.

According to Lamarre, Webster's medical records show that (1) on March 28, 2019, Webster submitted a Health Request form complaining that his eyes were "still burning from the water;" (2) on March 30, 2019, a nurse saw Webster, flushed his eyes, and noted that the irritation may be caused by chlorine in the water; (3) on June 23, 2019, Webster submitted a Health Request form complaining of burning eyes; (4) on June 25, 2019, a nurse flushed Webster's eyes; (5) Webster was scheduled for an appointment on August 23, 2019, but for unknown reasons was not transported to the appointment; and (6) on August 29, 2019, Webster saw an optometrist who observed eye irritation, provided eye wash solution, and recommended a return appointment in one month. Doc. #104-15 at PageID 4878. It does not appear Webster saw an optometrist after the August 29, 2019 appointment. However, there is no record Webster submitted a request for such an appointment. Doc. #118-3 at ¶ 20.

In the absence of evidence of degeneration or severe pain, mere eye irritation is not a serious medical need under the Eighth Amendment. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 459 (7th Cir. 2020); *Davidson v. Scully*, 155 F. Supp. 2d 77, 88 (S.D.N.Y. 2001); *Carter v. Baker*, No. 17-cv-52, 2020 WL 4605228, at *3 (D.N.H. Aug. 10, 2020). Because Webster's medical record shows no evidence of degeneration or pain connected to his eye

irritation, it is unlikely such a condition could be considered a serious medical need. Even if the condition could be considered sufficiently serious, there is no evidence any prison official engaged in the type of conduct which would show a disregard for such a need. To the contrary, the record shows consistent treatment for Webster's complaints.

### 4. Summary

Webster has not shown entitlement to any of his requests for injunctive relief.

### D. James

James seeks an order directing that within five days the defendants (1) treat effectively the infestation of rats and cockroaches in his immediate living area; (2) repair the roof and other avenues of water intrusion in his immediate living area; (3) remediate the mold in the shower in his zone; (4) repair the air conditioning in his zone; and (5) arrange for him to have one hour of recreation daily. Doc. #98 at 3.

### 1. Pest Infestation

James avers that he has "rats and roaches in [his] cell frequently." Doc. #104-3 at ¶ 2. He states that "[e]very night, rats crawl on me in my bunk and eat my food. There are infestations of roaches in certain areas of my zone, and I see them in my cell all the time." *Id*. As with Webster, the defendants argue that "[t]here is simply no basis for claiming there is an 'infestation' at MSP or in James's zone." Doc. #119 at 27. In reply, James declares that while a "pest control applicator employee delivers insecticide/chemicals approximately every two months to [his] zone," the employee does not apply the treatment in the zone. Doc. #123-3 at ¶ 2. Instead, the "task is performed by an inmate located on the zone" and that "[a]fter the application … rodents and insects are still present." *Id*.

As explained above, the presence of pests is not, standing alone, a sufficiently serious deprivation to support an Eighth Amendment claim. *Bennett*, 2020 WL 60240, at *5. The pests

must be present in such numbers as to create a risk of direct contact with an inmate.   Because no expert observed anything which would support such an infestation, James is unlikely to prevail on such a claim.

### 2.   Water Intrusion

James states that "[w]hen it rains, water leaks through the ceiling and into [his] cell. When the rain is heavy, it also leaks through the walls. There are similar leaks all over [his] zone. After a heavy rain, there are puddles of standing water throughout the zone."   Doc. #104-3 at ¶ 6.   The defendants respond that "MDOC recently repaired the roof over Unit 30, Building A, in which James is housed" and "[t]here are currently no known leaks or avenues of water intrusion in James' immediate living area."   Doc. #119 at 27.   James replies that "[t]here are currently six to seven water leaks on [his] zone which have not been repaired. One of the six to seven roof leaks is directly above [his] head on [his] sleeping rack."   Doc. #123-3 at ¶ 3.

To the extent James' relief is premised on the conditions as they existed before the roof repair, the Court finds, for the reasons above, that the relief must be denied.   To the extent the relief is premised on the remaining "six or seven" leaks, the claim must fail because James has not shown a serious deprivation.

A leak, without more, does not deprive an inmate of life's necessities.   *Shannon*, 682 F. App'x at 285.   However, the Eighth Amendment may be implicated when the leak conspires with other conditions (such as exposed electrical wires or raw sewage) to place the safety of inmates at risk.   *Id*. (collecting cases).   James' reply affidavit offers no details as to the frequency or severity of the leaks.   And while he states that there is exposed electrical wiring in his zone, he does not allege that any of the leaks are sufficiently close to such wiring as to pose a risk of electrocution. Under these circumstances, James is unlikely to be able to show a deprivation of life's necessities to support a claim for injunctive relief.

27

### 3. Mold

The presence of mold standing alone does not amount to a constitutional violation. *Zeno v. Terrebonne Par. Crim. Just. Complex*, No. 20-2521, 2020 WL 6909292, at *3 (E.D. La. Nov. 2, 2020) (collecting cases). The presence of the mold must "present[] an unreasonable risk of harm." *Stokelin v. A.C.J.F. Warden*, No. 17-3484, 2018 WL 4357482, at *2 (D.N.J. Sept. 13, 2018) (collecting cases).

James declares that there is mold in the shower in his zone. Doc. #104-3 at ¶ 4. However, according to Jeworski Mallett, MDOC's Deputy Commissioner of Institutions, as of July 6, 2020, there was no mold in James' shower area.[23] Doc. #118-1 at 13. James' reply declaration does not dispute this fact. *See* Doc. #123-3.

To the extent it appears the mold issue has been resolved, James' claim based on the presence of such mold is likely moot. Even if the mold remained (or was likely to recur), James has introduced no evidence that the mold in the shower is of the type which would present a risk of harm.[24] His claim is unlikely to succeed for this reason.

### 4. Air Conditioning

James's declaration alleges that "[t]here is no air conditioning" in the zone. Doc. #104-3 at ¶ 5. He states that on hot days, "it is like an oven in the zone, even with fans." *Id*. According to Mallett, there is no air conditioning system in the zone. Doc. #118-1 at 13. Instead, Parchman utilizes "industrial-sized fans, which are routinely monitored … and repaired or replaced as

---

[23] The affidavit goes further, stating "I am aware of no test, investigation, or study that has ever confirmed the existence of mold anywhere at MSP." Doc. #118-1 at 13. This statement is contrary to the statement in Stern's report that "[m]old is ubiquitous in the living areas of Parchman." Doc. #101-1 at 15. Graham's report also repeatedly mentions the presence of mold. *See* Doc. #101-3 at 7–10.

[24] The plaintiffs' experts opined on general health risks associated with mold. *See Doc*. #101-1 at 15 ("For patients sensitive to mold, its presence can cause or exacerbate breathing difficulties, such as asthma."); Doc. #101-3 at 16 ("Mold can adversely affect the health of those exposed causing respiratory issues, asthma symptoms, cough, and/or sinus problems."). But no expert opined on the specific health risks associated with the alleged mold in James' shower.

necessary." *Id*. Mallett also states that "new industrial-sized fans are being installed [in] James's zone." *Id*. Thus, although the request for injunctive relief asks that the defendants *repair* the air conditioning in James' zone, it seems the request is that air conditioning be *installed* in the zone. This request fails for the same reasons described above—that because the experts observed no issues with heat (even on a hot day), James is unlikely to be able to show extreme temperatures which would constitute a serious deprivation; because the defendants are installing industrial fans to improve the temperature situation, James cannot show the defendants are acting with deliberate indifference; and because James cannot show that air conditioning is the least invasive means for addressing any constitutional deprivation.

### 5. *Recreation Time*

"To succeed on an Eighth Amendment claim that he was denied adequate recreation, [a plaintiff] must establish (1) that prison officials failed to provide him with adequate exercise opportunities; and (2) that prison officials acted with deliberate indifference to a substantial risk of harm to his health and safety." *Lewis v. Smith*, 277 F.3d 1373 (5th Cir. Nov. 13, 2001) (table decision) (cleaned up) (collecting cases). "Thus, what is constitutionally required is that the prisoner not be confined for long periods without the opportunity for regular physical exercise, *whether it be indoor or outdoor*." *Woods v. St. Tammany Par. Jail*, No. 19-12469, 2020 WL 4926964, at *4 (E.D. La. July 14, 2020) (cleaned up and emphasis added).

James submitted a declaration that he has "not been out of [his] zone for recreation in three weeks" due to a staff shortage. Doc. #104-3 at ¶ 7. Mallett responds that around June of 2020 he "instructed all wardens to ensure that they permit inmates in general population, such as James, to have at least one hour of recreation or yard time every day." Doc. #118-1 at 14. However, in his July 24, 2020, declaration, James states that he has not been allowed recreation time in two

weeks and that "[f]rom January 2020 to [July]" he has been allowed recreation time "on less than ten occasions." Doc. #123-3 at ¶ 6.

Even if the denial of recreation time could be deemed a severe deprivation of the right to exercise, James has made no effort to show that such a deprival was done with deliberate indifference to his health or safety. *See Hernandez v. Velasquez*, 522 F.3d 556, 560–61 (5th Cir. 2008) (plaintiff deprived of out-of-cell exercise for thirteen months failed to show deliberate indifference when his records "revealed no complaint of muscle disorder"). His claim is unlikely to succeed for these reasons.

### 6. *Summary*

James has not shown entitlement to any of his requests for injunctive relief.

### **E. Riley**

Riley seeks an order that within (1) five days he see a psychiatrist regarding his mental health; (2) five days, he see a doctor to "assess" his high blood pressure; (3) twenty-four hours he receive a refill of his blood pressure medication; and (4) five days the defendants return the water in his zone to "acceptable standards." Doc. #98 at 2.

### 1. *Psychiatrist*

Riley argues that "[d]espite a suicide attempt, [he] has never been seen by a mental health professional at Parchman" and "[w]ith no mental health treatment, [he] remains at serious risk of imminent harm." Doc. #99 at 42.

Claims for mental health treatment (or the lack thereof) fall under the same rubric as general claims for deliberate indifference to health. *See Grogan*, 873 F.3d at 278. That is, the plaintiff must show a serious psychiatric need and that prison officials knew of the need and "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."

*Id*.

Riley states that he fears for his safety and feels hopeless at Parchman. Doc. #104-4 at ¶ 3. He claims he was admitted to the hospital after cutting his wrists but has not seen a mental health provider after that event. *Id*. In a July 27, 2020, declaration, he states that within the last two weeks he has experienced suicidal ideations and has spent several days in Unit 42 on a psychiatric hold but has "yet to be prescribed any mental health medication or received any therapeutic treatment." Doc. #123-4 at ¶¶ 2, 4. He claims that his suicidal ideations stem from the "security issues" in his zone. *Id*. at ¶ 3.

Riley's medical records do not reflect a hospitalization for cutting his wrists. *See* Doc. #118-9 at ¶ 13; Doc. #138 at PageID 9182–9191. The records do, however, show that he was seen at the infirmary on May 11, 2020, for suicidal ideations. Doc. #138 at PageID 9182. At the infirmary, Riley stated that he was having thoughts about hanging himself and complained about his relationships with other inmates. *Id*. at PageID 9182–83. Notes from this visit reflect a treatment plan of admitting Riley "for short stay for suicidal ideations" and drawing labs. *Id*. at PageID 9183. The notes also state that Riley "is on suicide precautions although his complaints sound more like security issues." *Id*.

The next day, May Leflore, the primary mental health professional, completed a "Mental Health Crisis Treatment Plan – Suicide Watch" for Riley. *Id*. at PageID 9184. The plan provides certain "Patient Strategies to Reduce Risks" as well as recommending two "Staff Interventions." *Id*. The recommended staff interventions were to "[e]valuate inmate for the need for medication and prescribe medication as appropriate" and "[a]ssist in identification of reasons for continuing to choose to live or reasons to choose not to kill self." *Id*.

Riley was discharged from the infirmary on May 14, 2020. *Id*. at PageID 9186. The notes from Riley's discharge reflect that he denied symptoms of depression and that he wanted "to

kill himself because people were going to hurt him in his zone." *Id*. However, he did not identify "what the issue was on the zone and why he was fearful for his safety." *Id*. The notes state, "At this time he is safe and stable for discharge. He is not a threat to himself and has not made any suicidal gestures." *Id*. at PageID 9187.

At a May 16, 2020, follow-up interview, Riley joked about his recent admission and stated that he was trying to leave Parchman. *Id*. at PageID 9188. The provider, Evelyn Dunn PMHNP-BC, noted that Riley displayed no mood or thought disturbances and that the mood disturbances which resulted in his earlier admission were "highly likely related to his substance abuse." *Id*. Dunn found that there were "no indications for a mental health transfer." *Id*.

At a second follow-up two days later, Riley informed Emma Brownlow MHP that he was doing "alright" but was still having suicidal thoughts connected to security concerns. *Id*. at PageID 9190. Brownlow noted that Riley denied any delusions or hallucinations and exhibited no signs of distress. *Id*. at PageID 9191. Brownlow concluded that Riley was "exhibiting security issues" and referred him to security. *Id*. She also educated Riley "on access to medical care and … advised [him] to complete a sick call when need arrives." *Id*. There is no indication that Riley ever requested a follow-up. But in mid-July, Riley experienced suicidal ideations and was placed on a psychiatric hold. Doc. #123-4 at ¶ 2.

Riley's arguments basically amount to a belief that the array of professionals who saw him were incorrect in their assessment that he was not suffering from a mental health condition which would require therapy or medication. However, absent extraordinary circumstances, a "prisoner's disagreement with his medical treatment" does not establish deliberate indifference. *Grogan*, 873 F.3d at 278.

The record reflects that Riley was provided hospitalizations when he expressed suicidal ideations. Following these hospitalizations, Riley was provided regular follow-ups. That these

follow-ups did not produce the results that Riley desired is not a fact which would support a finding of deliberate indifference. *See id.* at 278–79. Accordingly, even if Riley can show a serious psychiatric need, he is unlikely to succeed on his claim premised on inadequate medical care.

### 2. Hypertension Treatment and Medication

It is undisputed that Riley suffers from hypertension and is prescribed medication for this condition. *See* Doc. #138 at PageID 9193. However, Riley states that despite submitting his "refill requests in advance, … the delivery from nurses is always late and [his] symptoms return." Doc. #104-4 at ¶ 7. He has been without his medication "for up to two weeks." *Id.* Riley also states that he has been to the chronic care clinic only one time for his blood pressure. *Id.* at ¶ 8. The defendants argue that Riley has received regular checkups and medication refills. Doc. #119 at 23.

The defendants are correct that Riley's medical records undermine his claims. The records show that Riley was seen at least three times at the chronic care clinic. Riley first was seen on October 21, 2019. Doc. #138 at PageID 9193. Notes from this visit state that Riley's hypertension was "fair[ly] controlled." *Id.* at PageID 9195–96. The notes also recommend weekly blood pressure monitoring and a chronic care visit every three months. *Id.* at PageID 9196. Consistent with this recommendation, Riley was seen at the clinic on January 9, 2020. *Id.* at PageID 9201. At this visit, Riley was prescribed updated medications, education on various issues associated with hypertension, and scheduled for a follow-up in three months. *Id.* at PageID 9202. Riley was seen again at the chronic care clinic on April 7, 2020. *Id.* at PageID 9204. A follow-up appointment was scheduled for August 2020. Doc. #118-3 at ¶ 17. The records also show that he received (1) thirty-day supplies of his blood pressure medications on January 14, February 6, February 25, March 21, April 28, (2) a seven-day supply on May 14; and (3) thirty-day supplies on May 19 and July 7. *Id.* at ¶ 18; *see* Doc. #138 at PageID 9208–16.

To the extent Riley's request to see a doctor to "assess" his hypertension appears grounded in an argument that he has not been seen by doctors, such claim is unlikely to succeed for the simple fact that Riley is receiving medical treatment for his hypertension. This regular treatment precludes a finding of deliberate indifference.

With respect to delays in receiving medication, the serious harm and deliberate indifference inquiries focus on the effects of the delay in medication, rather than the underlying condition. *See Lee v. Richland Par. Det. Ctr.*, 483 F. App'x 904, 905 (5th Cir. 2012). Put differently, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

A delay in receiving hypertension medication is not a severe deprivation unless there is evidence that the delay "gave rise to a significant risk of harm." *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007). Riley has submitted no evidence that would show the alleged delays in medications gave rise to a significant risk of harm. Beyond a reference to being without medication for two weeks (a time period which he does not attribute solely to any delay), Riley does not state how long the alleged delays have been. He merely claims that the delays cause his symptoms to return but does not clarify what these symptoms are or why the symptoms suggest he would be at a serious risk of harm. Even if the delays could be deemed sufficiently serious, there is nothing in Riley's allegations that suggests any officials knew of the delay to warrant a finding of deliberate indifference. Thus, he cannot establish an Eighth Amendment violation as to the delays in receiving his medication.

### 3. *Drinking Water*

"[A]ccess to a sufficient supply of *uncontaminated* drinking water is a basic human need." *Womble v. Harvanek*, 739 F. App'x 470, 473 (10th Cir. 2017); *see James v. Edwards*, No. 20-452,

2020 WL 2500202, at *5 (E.D. La. Apr. 7, 2020) ("Obviously, potable water is a basic human need and must be provided to inmates.") (collecting cases).   Of course, to succeed on such a claim a plaintiff must show that the water is, in fact, sufficiently contaminated and that the prison officials were deliberately indifferent to this fact.   *Wright v. N.Y. State Dep't of Corr. Servs.*, 372 F. App'x 175, 176 (2d Cir. 2010).   Water is sufficiently contaminated when it is "demonstrably unsafe." *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("[A] prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery."). Riley's drinking water claim is unlikely to succeed because he has not established that the water at Parchman is unsafe.

To be sure, Riley alleges that the water in his zone "is brown and contaminated to the point that [he] become[s] ill when [he] drink[s] it."   Doc. #104-4 at ¶ 4.   But this claim seems unsupported by objective evidence.   It does not appear any of the experts in this case *actually observed* such discolored water (although the plaintiffs' experts credited the complaints of inmates as to the color).   *See* Doc. #101-1 at 15; Doc. #101-2 at 21.   Furthermore, even if the water in Riley's cell is brown, Frank Edwards (the plaintiff's water testing expert)[25] noted that "[y]ou cannot tell by the look, taste, or smell of the water if disease-causing organisms are in it."   Doc. #101-5 at 4.   With respect to testing, the plaintiffs' water testing expert found that the water at Parchman was "below the [maximum contaminant levels] for the parameters analyzed."   Doc. *Id.* at 13.   The expert also noted that "the limited data provided by the MDOC to date indicates the absence of fecal coliform and Escherichia coli."   *Id.*   While the expert tempered this analysis by noting that he was unable to test for all contaminants and that a single test does not paint a complete picture of contamination, *id.*,[26] Mallett averred "that the most recent potable water test results for

---

[25]  Doc. #101-5 at 1–2.

[26]  This does not represent a conclusion that Parchman *always* provided the inmates clean water.   The opposite seems to be true.   Doc. #101-5 at 4–5.   Graham noted that Parchman records showed that in 2013 and 2015 testing showed elevated levels of Coliform in Parchman's water.   *Id.* at 4.   Graham also noted that from 2015 to 2017, the drinking

MSP show its water is within acceptable standards."   Doc. #118-1 at 13.   Accordingly, the lack of any *demonstrable* danger in the water dooms Riley's claim.

### 4.   *Summary*

Riley has not shown entitlement to any of his requests for injunctive relief.

### VIII
### <u>Conclusion</u>

While this is a tale of two prisons, the present motion concerns only the story of four inmates.   These inmates indisputably experienced inhumane and intolerable conditions at Parchman in the early months of 2020 (and likely before).   The conclusions in this order regarding Parchman's current state are not intended to diminish these inmates' experiences or suggest there is no form of redress available for what they were forced to endure.   Nor does this order hold that Parchman as it stands today is in complete compliance with all constitutional standards or that the prison administrators' work to improve Parchman is done.   This Court merely concludes that, based on the administrators' recent efforts, the limited injunctive relief requested for these four inmates is inappropriate.   The prison administrators are encouraged, if not cautioned, to continue to improve the conditions at Parchman to ensure that the Parchman of early 2020 never returns.[27] For now, because the plaintiffs seek injunctive relief for four inmates based on conditions at Parchman that no longer exist or for which they have not shown a constitutional violation to justify the relief sought, their supplemental motion for injunctive relief [98] is **DENIED**.

**SO ORDERED**, this 19th day of March, 2021.

<u>/s/Debra M. Brown</u>
**UNITED STATES DISTRICT JUDGE**

___

water tested at Parchman contained lead at levels approximately three parts per billion above the "reporting limit" of 15 PPB.   *Id*.   Given the unchallenged results from 2020, these older tests, which predate the litigation by approximately three years, fall short of establishing a risk of demonstrable harm.

[27] Should such conditions return, voluntary remedial efforts likely would be insufficient to defeat a request for immediate and far-ranging injunctive relief.   *See Gates*, 376 F.3d at 337 ("The fact that many of these conditions have persisted for years *despite MDOC's purported efforts* leads us to likewise conclude that MDOC has not met the heavy burden of showing that its voluntary conduct has mooted any of the issues presented here.") (emphasis added).